**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

MARY B. HEATON, et al.,

    Plaintiffs,

  v.

THE ISLAMIC REPUBLIC OF IRAN,

    Defendant.

Civil Action No. 1:19-cv-03003-JMC

## PLAINTIFFS' BELLWETHER MOTION FOR
## DEFAULT JUDGMENT AGAINST IRAN

   Pursuant to Federal Rule of Civil Procedure 55(b) and 28 U.S.C. § 1608(e), Plaintiffs, by and through undersigned counsel, hereby move for default judgment for the Bellwether Plaintiffs against Defendant the Islamic Republic of Iran ("Iran").  Pursuant to LCvR 7, the grounds for this motion are set forth in the accompanying Statement of Points and Authorities.

Dated: June 2, 2023

/s/  *Matthew D. McGill*

Matthew D. McGill (D.C. Bar No. 481430)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9522
mmcgill@gibsondunn.com

/s/  *Craig W. Carlson*

Craig W. Carlson (D.C. Bar No. TX0182)
Philip J. Koelsch (D.C. Bar No. TX0039)
THE CARLSON LAW FIRM, P.C.
100 East Central Expressway
Killeen, TX 76541
Telephone: (254) 526-5688
Facsimile: (254) 526-8204
ccarlson@carlsonattorneys.com
pkoelsch@carlsonattorneys.com

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARY B. HEATON, et al.,

               Plaintiffs,

      v.                             Civil Action No. 1:19-cv-03003-JMC

THE ISLAMIC REPUBLIC OF IRAN,

               Defendant.

## STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' BELLWETHER MOTION FOR <u>DEFAULT JUDGMENT AGAINST IRAN</u>

# TABLE OF CONTENTS

Page(s)

Table of Authorities ........................................................................................................ ii

I.    Procedural Background ...................................................................................... 1

II.   Legal Standard for Default Judgment Under the FSIA .................................... 3

III.  Service of Process and Personal Jurisdiction .................................................. 4

IV.   Subject-Matter Jurisdiction ............................................................................. 7

     A.   Elements One, Two, and Three are met because this case seeks money damages against Iran for personal injury or death. ......................................... 8

     B.   Elements Four and Five are met because Iran provided material support for the purpose of bringing about extrajudicial killings, which caused Plaintiffs' injuries and deaths. ............................................................................... 8

          1.   Legal Standard ....................................................................................... 9

          2.   Evidentiary Approach .......................................................................... 12

          3.   Iran's Material Support and Causation ............................................. 14

     C.   Elements Six and Seven are met because Iran is a designated state sponsor of terrorism and the Plaintiffs are all U.S. Citizens. ....................................... 24

V.    Liability and Damages .................................................................................... 25

VI.   Conclusion ...................................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Belkin v. Islamic Republic of Iran*,
667 F. Supp. 2d 8 (D.D.C. 2009) ....................................................................13, 26

*Ben-Yishai v. Syrian Arab Republic*,
2022 WL 17250344 (D.D.C. Nov. 28, 2022) ..................................................26, 27

*Borochov v. Islamic Republic of Iran*,
589 F. Supp. 3d 15 (D.D.C. 2022) .........................................................................10

*Bundy v. Jackson*,
641 F.2d 934 (D.C. Cir. 1981) .................................................................................4

*Burks v. Islamic Republic of Iran*,
No. 1:16-CV-1102, slip op. (D.D.C. Sept. 30, 2022) .............................................11

\* *Cabrera v. Islamic Republic of Iran*,
2023 WL 1975091 (D.D.C. Jan. 27, 2023)..................................................9, 11, 12

*DiBenedetto v. Islamic Republic of Iran*,
2020 WL 820877 (D.D.C. Feb. 19, 2020) ...............................................................2

*Fissler v. Islamic Republic of Iran*,
2022 WL 4464873 (D.D.C. Sept. 26, 2022) ...............................................13, 14, 19

*Flanagan v. Islamic Republic of Iran*,
87 F. Supp. 3d 93 (D.D.C. 2015)........................................................................27, 28

*Flatow v. Islamic Republic of Iran*,
999 F. Supp. 1 (D.D.C. 1998)...................................................................................26

*Force v. Islamic Republic of Iran*,
610 F. Supp. 3d 216 (D.D.C. 2022) .........................................................................11

*Fritz v. Islamic Republic of Iran*,
320 F. Supp. 3d 48 (D.D.C. 2018)........................................................................4, 5

*Gill v. Islamic Republic of Iran*,
249 F. Supp. 3d 88 (D.D.C. 2017)...........................................................................10

*Hake v. Bank Markazi Jomhouri Islami Iran*,
2022 WL 4130837 (D.D.C. Sept. 12, 2022) ...........................................................11

*Han Kim v. Democratic People's Republic of Korea*,
774 F.3d 1044 (D.C. Cir. 2014)................................................................................3

*Harrison v. Sudan*,
    882 F. Supp. 2d 23 (D.D.C. 2012) ...................................................................8

*Jakubowicz v. Islamic Republic of Iran*,
    2022 WL 3354719 (D.D.C. Aug. 9, 2022) .....................................................11

*Karcher v. Islamic Republic of Iran*,
    2021 WL 133507 (D.D.C. Jan. 14, 2021).......................................................14

\* *Karcher v. Islamic Republic of Iran*,
    396 F. Supp. 3d 12 (D.D.C. 2019) ........................................7, 9, 10, 19, 20, 22

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
    376 F.3d 1123 (D.C. Cir. 2004) ....................................................................9

*Lee v. Islamic Republic of Iran*,
    518 F. Supp. 3d 475 (D.D.C. 2021) .........................................................11, 20

*Maalouf v. Islamic Republic of Iran*,
    923 F.3d 1095 (D.C. Cir. 2019) ....................................................................8

*Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) .............................................4

*Opati v. Republic of Sudan*,
    60 F. Supp. 3d 68 (D.D.C. 2014) .................................................................27

*Oveissi v. Islamic Republic of Iran*,
    768 F. Supp. 2d 16 (D.D.C. 2011) ...............................................................26

*Owens v. Republic of Sudan*,
    864 F.3d 751 (D.C. Cir. 2017) ..................................................................4, 12

*Owens v. Republic of Sudan*,
    882 F. Supp 2d 128 (D.D.C. 2012) ...............................................................5

*Peterson v. Islamic Republic of Iran*,
    515 F. Supp. 2d 25 (D.D.C. 2007) ...............................................................27

*Reed v. Islamic Republic of Iran*,
    845 F. Supp. 2d 204 (D.D.C. 2012) ..............................................................4

*Rimkus v. Islamic Republic of Iran*,
    750 F. Supp. 2d 163 (D.D.C. 2010) ..........................................................4, 13

\* *Roberts v. Islamic Republic of Iran*,
    581 F. Supp. 3d 152 (D.D.C. 2022) ....................................10, 14, 19, 20

*Roth v. Syrian Arab Republic*,
    2018 WL 4680270 (D.D.C. Sept. 28, 2018) ...............................................9, 27

*Saberi v. Islamic Republic of Iran*,
541 F. Supp. 3d 67 (D.D.C. 2021) .......................................................................4

*Spencer v. Islamic Republic of Iran*,
71 F. Supp. 3d 23 (D.D.C. 2014) .......................................................................26

\* *Taitt v. Islamic Republic of Iran*,
2023 WL 2536518 (D.D.C. Mar. 16, 2023).................................................8, 24, 26, 27

*Valore v. Islamic Republic of Iran*,
700 F. Supp. 2d 52 (D.D.C. 2010) ...................................................................9, 27

*Van Beneden v. Al-Sanusi*,
709 F.3d 1165 (D.C. Cir. 2013) ........................................................................12

**Statutes**

8 U.S.C. § 1101 .............................................................................................24

18 U.S.C. § 2339A ...........................................................................................9

28 U.S.C. § 1330 ....................................................................................4, 6, 7, 25

\* 28 U.S.C. § 1605A ...........................................1, 2, 7, 8, 9, 10, 11, 24, 25, 27

28 U.S.C. § 1608 ...............................................................................1, 3, 4, 5, 6

28 U.S.C. § 1961 ...........................................................................................2, 28

**Rules**

Fed. R. Evid. 201 ...........................................................................................14

Fed. R. Evid. 702 ...........................................................................................13

Fed. R. Civ. P. 55 ..........................................................................................1, 3

**Other Authorities**

U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of
1979—Iran, 49 Fed. Reg. 2836 (Jan. 3, 1984)...............................................................24

U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-
terrorism/ (last visited June 1, 2023)..........................................................................24

Pursuant to Federal Rule of Civil Procedure 55(b) and 28 U.S.C. § 1608(e), Plaintiffs Mary B. Heaton, et al., by and through undersigned counsel, hereby submit this Statement of Points and Authorities in Support of their Bellwether Motion for Default Judgment Against Iran, and state as follows:

## I.      Procedural Background

Plaintiffs are United States nationals who seek judgment against Defendant the Islamic Republic of Iran ("Iran") for its role in approximately 420 separate acts of extrajudicial killing or attempted acts of extrajudicial killing that occurred from approximately 2003 to 2011.  Those attacks were committed by enemy forces who—with material support from Iran—intended to kill U.S. Armed Forces members and U.S. Government contractors stationed in Iraq during Operation Iraqi Freedom.

As alleged in detail in the Amended Complaint, ECF No. 26, Plaintiffs comprise 122 immediate family members of United States Armed Forces members and U.S. Government contractors who were tragically killed in action during Operation Iraqi Freedom, *id.* at 42–82; and 750 individuals who include former U.S. Armed Forces members and U.S. Government contractors who were stationed in Iraq from approximately 2003 through 2011 and who suffered personal injuries following attempted extrajudicial killings, along with certain members of their immediate families, *see id*. at 82–367.  Forty-six Plaintiffs—the Armed Forces members and government contractors who were either killed or injured in 20 of the terrorist attacks at issue in this case, along with their family members—have been selected as the Bellwether Plaintiffs and now bring this Motion for Default Judgment.  *See* ECF No. 48 (Bellwether Status Report).

This case arises under the Foreign Sovereign Immunities Act of 1976, Pub. L. 94-583, 90 Stat. 2891 (codified as amended at 28 U.S.C. §§ 1330, 1332(a), 1391(f), 1601-1611) ("FSIA").  Plaintiffs have sued Iran under Section 1605A(c) of the FSIA, 28 U.S.C. § 1605A(c), for its

material support of the terrorist attacks that caused them harm.  As authorized by Section 1605A, they have brought claims for pain and suffering, solatium, intentional infliction of emotional distress, and punitive damages.  *See* 28 U.S.C. § 1605A(c)(4) (authorizing right to solatium, pain and suffering, and punitive damages); *see also DiBenedetto v. Islamic Republic of Iran*, 2020 WL 820877, at *1 (D.D.C. Feb. 19, 2020) ("Survivors may recover damages for their pain and suffering, estates of the deceased may recover economic losses stemming from wrongful death to the victims of terrorism, family members may recover solatium for their emotional injury, and all plaintiffs may recover punitive damages.").  Plaintiffs also seek post-judgment interest pursuant to 28 U.S.C. § 1961(a).

Plaintiffs initiated this suit in October 2019.  ECF No. 1.  Plaintiffs served their Complaint on Iran, first by trying to send it via DHL to the head of Iran's ministry of foreign affairs in June 2020, ECF Nos. 10-12, and then, when that failed, by dispatching it through diplomatic channels with the help of the U.S. Department of State, ECF Nos. 15-17.  Service was effected on November 4, 2020.  ECF No. 19.  Because Iran did not timely respond to the Complaint or otherwise appear in the case, the Clerk of Court entered default against Iran on January 15, 2021.  ECF No. 25.

Shortly after that, however, Plaintiffs filed the Amended Complaint, which remains the operative complaint in this action.  ECF No. 26.  The Amended Complaint largely maintained the same legal theories but added additional plaintiffs who, like the original group, experienced harm as a result of Iran's material support for terrorist attacks on U.S. Armed Forces and U.S. government contractors stationed in Iraq.  *See* ECF No. 24 at 2.

Plaintiffs then proceeded to serve Iran with the Amended Complaint.  Plaintiffs sent, through the Clerk's Office, the Amended Complaint, summons, and notice of suit by DHL to the head of Iran's foreign affairs ministry in April 2021.  ECF Nos. 28-30.  Iran rejected two attempts

to serve the documents, ECF No. 31-1, and so Plaintiffs in June 2021 proceeded to service through diplomatic channels with the help of the State Department, ECF Nos. 32-34.  Iran was successfully served on April 6, 2022.  ECF No. 42; *see also* Min. Entry (Aug. 19, 2022).

Although required by 28 U.S.C. § 1608(d) to respond to the Amended Complaint within 60 days of service, Iran has not to date filed any responsive pleading or otherwise appeared in this case.  The time for Iran to answer or otherwise plead, respond to, or defend this action has not been extended.  Thus, on August 26, 2022, on Plaintiffs' request, ECF No 43, the Clerk of Court entered default under Federal Rule of Civil Procedure 55(a) against Iran, ECF No. 44.

At a status conference on November 8, 2022, this Court accepted Plaintiffs' proposal to bifurcate this case into a bellwether phase, in which a selected set of Plaintiffs would move for entry of default judgment against Iran, and a second phase, in which, "if the Court is satisfied with the evidence presented for the bellwether plaintiffs," the remaining Plaintiffs would move for default judgment.  Min. Entry (Nov. 8, 2022).  The Court ordered the Plaintiffs to file a status report "identifying the proposed bellwether plaintiffs and outlining the evidence that will be provided for each plaintiff," *id.*, which Plaintiffs did on February 9, 2023, ECF No. 48.  The Bellwether Plaintiffs identified in that status report now bring this Motion for Default Judgment.

## II.     Legal Standard for Default Judgment Under the FSIA

To secure a default judgment against Iran, the Bellwether Plaintiffs must "establish [their] claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  "[W]hen [a] defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'"  *Han Kim v. Democratic People's Republic of Korea,* 774 F.3d 1044, 1047 (D.C. Cir. 2014).  District courts therefore "have the authority— indeed . . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'"  *Id.*

3

at 1047-48 (quoting *Bundy v. Jackson,* 641 F.2d 934, 951 (D.C. Cir. 1981)).  They must therefore assess default judgment motions "in light of both Congress's purpose" to compensate victims of terrorism "and the difficulty in obtaining 'firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign.'"  *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)).

In practice, "courts in FSIA cases may look to numerous evidentiary sources to satisfy their statutory obligation" under § 1608(e), including a "plaintiff's uncontroverted factual allegations . . . supported by . . . documentary and affidavit evidence"; "traditional documentary and testimonial evidence"; and "evidence in the form of affidavits."  *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal quotation marks and citations omitted) (collecting cases); *accord, e.g.*, *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005); *Saberi v. Islamic Republic of Iran*, 541 F. Supp. 3d 67, 77 (D.D.C. 2021); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012).  Courts also may "take judicial notice of related proceedings and records in cases before the same court."  *Rimkus*, 750 F. Supp. 2d at 171 (citation omitted).  And "cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA . . . based solely upon expert testimony."  *Owens*, 864 F.3d at 788.

## III.   Service of Process and Personal Jurisdiction

Plaintiffs properly served Iran with the operative complaint, ECF No. 26, by attempting service through registered mail and then, when that failed, serving Iran through diplomatic channels, *see* ECF No. 42.  Because Plaintiffs served Iran in compliance with the FSIA's service requirements, this Court has personal jurisdiction over Iran.  28 U.S.C. § 1330(b) ("Personal jurisdiction over a foreign state shall exist as to every claim for relief [for which the foreign state

is not entitled to immunity] where service has been made under section 1608 of this title."); *see also Owens v. Republic of Sudan*, 882 F. Supp 2d 128, 143 (D.D.C. 2012) ("A court can obtain personal jurisdiction over a [foreign state] defendant if the plaintiff properly serves the defendant in accordance with 28 U.S.C. § 1608.").

A foreign sovereign can be served through one of four methods listed in 28 U.S.C. § 1608(a).  Each method is permissible only if service cannot be made under the method listed before it.  *See id.*  Here, service could not be made under the first method—service "in accordance with any special arrangement for service" between the plaintiff and the foreign state, 28 U.S.C. § 1608(a)(1)—because Plaintiffs have no special arrangement with Iran.  Nor could service be made under the second method—service "in accordance with an applicable international convention on service of judicial documents," *id.* § 1608(a)(2)—because "Iran is not party to an international convention on service of judicial documents."  *Fritz*, 320 F. Supp. 3d at 88 (citation omitted).

As a result, Plaintiffs attempted to serve Iran through the third method:  mailing "a copy of the summons and complaint and a notice of suit," along with a translation of each, to the head of the foreign state's ministry of foreign affairs.  28 U.S.C. § 1608(a)(3).  The mailing must be addressed and sent out by the Clerk of Court and must be "by any form of mail requiring a signed receipt."  *Id.*  Plaintiffs requested that the Clerk of Court send out English and Farsi copies of the summons, complaint, and notice of suit on April 8, 2021, and arranged for service to Iranian Minister of Foreign Affairs Mohammad Javad Zarif by DHL, through a shipping intermediary, Condor Speditions, in Austria.  ECF Nos. 28-29.  The Clerk's Office sent out the materials the next day.  ECF No. 30.  On May 25, 2021, however, Plaintiffs learned from Condor Speditions that Iran rejected each of the two attempts made to serve it (on April 21 and 25).  ECF No. 31-1.

5

Because "service [could] not be made within 30 days under [§ 1608(a)](3)," Plaintiffs proceeded to serve Iran through the fourth method—diplomatic channels. 28 U.S.C. § 1608(a)(4). That process requires that the Clerk of Court address and dispatch "two copies of the summons and complaint and a notice of suit," along with translations, to the Secretary of State, who then transmits one copy of the papers to the foreign state "through diplomatic channels" and send to the Clerk of Court "a certified copy of the diplomatic note indicating when the papers were transmitted." *Id.* Plaintiffs successfully effected service through that process, requesting that the Clerk of Court mail the requisite documents on June 29, 2021. ECF Nos. 32-33; *see also* ECF No. 31. The Clerk's Office sent the materials to the Department of State, to the attention of the Director of Overseas Citizens Services, on July 14, 2021. ECF No. 34. The State Department delivered the papers to the Iranian Ministry of Foreign Affairs through diplomatic channels, with the assistance of the Swiss Embassy in Tehran, on April 6, 2022. ECF No. 42. On May 10, 2022, the State Department sent the Clerk of Court a certified copy of Diplomatic Note No. 1025-IE confirming the delivery, which the Clerk's Office filed on the docket on May 18, 2022. *Id.*

As a result, Plaintiffs were deemed to have successfully served Iran on April 6, 2022, "the date of transmittal indicated in the certified copy of the diplomatic note." 28 U.S.C. § 1608(c)(1); *see also* Min. Entry (Aug. 19, 2022) (noting that "[t]he docket reflects that Defendant was served"). That service, in combination with Iran's lack of immunity from this suit, *see* Part IV, *infra*, means that this Court has personal jurisdiction over Iran. 28 U.S.C. § 1330(b).[1]

---

[1] This Court had personal jurisdiction over Iran already because Plaintiffs also properly served the original complaint on Iran, following the exact same process as the one followed for the Amended Complaint. Plaintiffs requested, and the Clerk's Office sent out, a foreign mailing through DHL under § 1608(a)(3) in June 2020. ECF Nos. 10-12. After that failed, Plaintiffs requested, and the Clerk's Office sent out, a foreign mailing through diplomatic channels under § 1608(a)(4) in August 2020. ECF Nos. 15-17. The State Department delivered the complaint,
*(Cont'd on next page)*

IV.     **Subject-Matter Jurisdiction**

This Court has subject-matter jurisdiction over the Bellwether Plaintiffs' claims under Section 1605A of the FSIA because Iran, as a foreign state sponsor of terrorism that provided material support to the completed and attempted extrajudicial killings that harmed the Bellwether Plaintiffs, is not entitled to sovereign immunity from this action.  The FSIA vests in the district courts jurisdiction "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity . . . under sections 1605–1607 of this title."  28 U.S.C. § 1330(a).

Relevant here, the FSIA's terrorism exception, Section 1605A, strips foreign states of immunity "in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing" or by "the provision of material support or resources for such an act" by the foreign state's officials, employees, or agents. 28 U.S.C. § 1605A(a)(1).  A court may hear such a case if, as relevant here, (i) "the foreign state was designated as a state sponsor of terrorism at the time the [relevant] act . . . occurred . . . and . . . remains so designated when the claim is filed under this section"; and (ii) the plaintiff was, at the time the relevant act occurred, a national of the United States, a member of the armed forces, or an employee of the U.S. government or a government contractor acting within the scope of his employment.  *Id.* § 1605A(a)(2)(A).[2]  As it pertain to this case, the jurisdictional inquiry breaks

---

summons, and notice of suit to the Iranian Ministry of Foreign Affairs on November 4, 2020, and returned the diplomatic note to the Clerk's Office the following month.  ECF No. 19; *see also* Min. Entry (Jan. 7, 2021) ("Defendant Islamic Republic of Iran was served on November 4, 2020.").

[2] Section 1605A(a) also requires that a plaintiff provide the foreign state a "reasonable opportunity to arbitrate the claim," but that only applies in a case "in which the act occurred in the foreign state" being sued.  28 U.S.C. § 1605A(a)(2)(A)(iii).  The Bellwether Plaintiffs seek to hold Iran responsible for its support of terrorist attacks that occurred in Iraq, so that requirement does not apply here.  *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 54 (D.D.C. 2019) ("[T]he killings at issue did not take place in Iran and accordingly Plaintiffs had no obligation to afford Iran an opportunity to arbitrate.").

*(Cont'd on next page)*

down into seven elements:  There must be (1) "money damages . . . sought" (2) "against a foreign state" (3) for personal injury or death (4) that was "caused by" (5) "the provision of material support or resources for" "an act of . . . extrajudicial killing" by the foreign state's employees, officials, or agents, *id.* § 1605A(a)(1), (6) the foreign state was designated as a state sponsor of terrorism at the time of the attack through to the present, and (7) the plaintiff was a U.S. national, member of the armed forces, or U.S. government employee or contractor acting within the scope of his employment.[3]  *See Harrison v. Sudan*, 882 F. Supp. 2d 23, 29 (D.D.C. 2012).

### A.    Elements One, Two, and Three are met because this case seeks money damages against Iran for personal injury or death.

The Bellwether Plaintiffs' compliance with the first three elements is straightforward.  The Bellwether Plaintiffs are (1) seeking money damages (2) against Iran (3) based on personal injuries they or their family members experienced or based on the death of their family members.  **Exs. 1-2**; *see* ECF No. 26 at 371-72.  The first three elements are therefore met.

### B.    Elements Four and Five are met because Iran provided material support for the purpose of bringing about extrajudicial killings, which caused the injuries and deaths of the Bellwether Plaintiffs and their family members.

The fourth element, causation, and the fifth element, "the provision of material support or resources for" "an act of . . . extrajudicial killing" by the foreign state's employees, officials, or agents, are more fact-intensive inquiries.  28 U.S.C. § 1605A(a)(1).  A material-support claim under the FSIA triggers a "two-step inquiry": "(1) did the defendant nation provide material support or resources 'for' the purpose of bringing about acts of extrajudicial killing, and (2) if so,

---

[3] Although Section 1605A contains a limitations period, 28 U.S.C. § 1605A(b), it "is 'not jurisdictional' and the Court lack[s] authority or discretion to *sua sponte* raise the terrorism exception's statute of limitations' on behalf of an entirely absent defendant." *Taitt v. Islamic Republic of Iran*, 2023 WL 2536518, at *5 (D.D.C. Mar. 16, 2023) (quoting *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108, 1114–15 (D.C. Cir. 2019)).

was that provision of material support the proximate cause of the plaintiff's personal injury or death?" *Cabrera v. Islamic Republic of Iran*, 2023 WL 1975091, at *7-8 (D.D.C. Jan. 27, 2023). Each of the attacks at issue in this motion (the "Bellwether Attacks") meets that standard.

### 1.    Legal Standard

The FSIA defines "material support or resources" by reference to 18 U.S.C. § 2339A, *see* 28 U.S.C. § 1605A(h)(3), which defines the term broadly to mean "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials," 18 U.S.C. § 2339A(b)(1).

In addition, Iran's provision of material support or resources for the successful or attempted acts of extrajudicial killing[4] that impacted the Bellwether Plaintiffs must be "the 'proximate cause' of [their] personal injuries or death." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 57-59 (D.D.C. 2019) (citation omitted). The causation requirement "is established by showing 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Roth v. Syrian Arab Republic*, 2018 WL 4680270, at *8 (D.D.C. Sept. 28, 2018) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010). Notably, the FSIA's causation requirement is a "relatively low" one that does not require showing "but for" cause. *Id.* (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128

---

[4] The Bellwether Attacks are clearly "extrajudicial" killings; there is no evidence that these attacks, carried out by rogue militia groups and terrorist organizations, "were authorized by a judgment pronounced by a court of law." *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 170 (D.D.C. 2022).

(D.C. Cir. 2004)).  It is enough that the defendant's actions were a substantial factor in the events that caused plaintiff's injury, and that the injury was a reasonably foreseeable consequence of the defendant's actions.  *Karcher*, 396 F. Supp. 3d at 55.

Importantly, Iran loses its sovereign immunity, and can be held liable, whether or not the terrorist attack to which it provided material support in fact killed someone; Iran's provision of material support for an attempted extrajudicial killing suffices under the FSIA.  Section 1605A permits the exercise of jurisdiction when a plaintiff's claim "was caused by an act of . . . extrajudicial killing . . . or the provision of material support or resources for such an act."  28 U.S.C. § 1605A(a)(1).  "Nothing on the face of [this provision] requires that the material support or resources for an intended extrajudicial killing actually result in someone's death, as long as the victim represented in the case was injured."  *Karcher*, 396 F. Supp. 3d at 57.

Accordingly, courts in this District routinely exercise jurisdiction over claims arising from a foreign state's material support for "deliberated" attempted extrajudicial killings, which they have deemed to constitute material support "for" "act[s] of . . . extrajudicial killing."  *See Karcher*, 396 F. Supp. 3d at 57-59 (Kollar-Kotelly, J.) (looking to statutory text and purpose, precedent, and legislative history showing Congress's desire to allow suits "where Americans and/or their loved ones suffer *injury or death* at the hands of the terrorist states" (emphasis added) (citation omitted)); *Gill v. Islamic Republic of Iran*, 249 F. Supp. 3d 88, 99 (D.D.C. 2017) (Walton, J.) ("Hamas's attempted extrajudicial killing of the plaintiff constitutes an extrajudicial killing under the [FSIA's] terrorism exception.").[5]

---

[5] *See also, e.g.*, *Roberts*, 581 F. Supp. 3d at 169-70 (Lamberth, J.) (looking to dictionary definitions to conclude that support for "an act of" extrajudicial killing can mean support for "[t]he process of doing" the killing, which covers attempted killings since "the process of committing an extrajudicial killing does not imply that death results"); *Borochov v. Islamic Republic of Iran*, 589

*(Cont'd on next page)*

Although a few cases recently departed from these precedents by limiting the terrorism exception to claims arising from attacks that actually resulted in a death,[6] multiple subsequent opinions have rejected that approach and reaffirmed the clear consensus in favor of jurisdiction over attempted killings.  *See Cabrera*, 2023 WL 1975091, at *1 (Bates, J.); *Fissler v. Islamic Republic of Iran*, 2022 WL 4464873, at *5 (D.D.C. Sept. 26, 2022) (Kollar-Kotelly, J.); *Hake v. Bank Markazi Jomhouri Islami Iran*, 2022 WL 4130837, at *8 (D.D.C. Sept. 12, 2022) (Kelly, J.).

In *Cabrera*, Judge Bates expressly disagreed with the decisions disclaiming jurisdiction over nonlethal attempted killings after requesting supplemental briefing on this issue.  2023 WL 1975091, at *1.  He explained that the word "for" in the FSIA's phrase "material support for [an extrajudicial killing]," 28 U.S.C. § 1605A(a)(1), refers to the "intended purpose of a defendant's material support," not the *result* of such support.  *Id.* at *7.  He also noted that under the FSIA's material-support prong, "it is the defendant's act of *providing support* that triggers liability" rather than "the character of the attack that directly caused the injury."  *Id.*  And because that prong requires a plaintiff to show proximate rather than direct causation, a plaintiff need not show that the "*specific injury-causing act* [was] an extrajudicial killing"—only that "the defendant's provision of material support was a 'substantial factor in the sequence of events that led to the plaintiff's injury' and that the plaintiff's injury was 'reasonably foreseeable or anticipated as a

_____

F. Supp. 3d 15, 32-33 (D.D.C. 2022) (McFadden, J.) (reaching the same conclusion by relying on the FSIA's denial of immunity for "'material support *for*' an extrajudicial killing," which means "support with the object or purpose of" "such an act," and on its allowance for claims based on "personal injury");  *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 491 (D.D.C. 2021) (Mehta, J.) (applying caselaw to hold that "causing *or attempting to cause death* by detonating an EFP" counts (emphasis added)).

[6] *See Force v. Islamic Republic of Iran*, 610 F. Supp. 3d 216, 222 (D.D.C. 2022) (Moss, J.); *Jakubowicz v. Islamic Republic of Iran*, 2022 WL 3354719, at *1 (D.D.C. Aug. 9, 2022) (Moss, J.); *Burks v. Islamic Republic of Iran*, No. 1:16-CV-1102, slip op. at 19 (D.D.C. Sept. 30, 2022) (Cooper, J.).  These decisions largely rely on the fact that the term "killing" ordinarily encompasses a death and on the absence of express statutory authorization for suits based on attempted killings.

natural consequence' of the defendant's material support." *Id.* at *7-8 (quoting *Owens*, 864 F.3d at 794). Judge Bates thus concluded that the FSIA "does encompass injuries occurring in nonfatal attacks, so long as those injuries are the foreseeable result of a defendant nation's material support for acts of extrajudicial killing." *Id.* at *4-6 & n.5, *12.

Judge Bates's well-reasoned decision is right; the FSIA's plain text confirms that a defendant's material support for an act of terrorism that is intended to cause an extrajudicial killing is sufficient to give rise to jurisdiction and trigger liability under Section 1605A, regardless of whether the act in fact results in a death. But to the extent the Court finds "the meaning of the material-support prong ambiguous," "the D.C. Circuit's instruction that courts should 'interpret [the FSIA's] ambiguities flexibly and capaciously' would still counsel in favor of" jurisdiction over claims arising from deliberated, nonlethal attempted killings. *Cabrera*, 2023 WL 1975091, at *9 n.9 (quoting *Van Beneden v. Al-Sanusi*, 709 F.3d 1165, 1167 & n.4 (D.C. Cir. 2013)). The D.C. Circuit has insisted that courts read any ambiguities in the FSIA "[g]uided by the statute's . . . purpose" of "lighten[ing] the jurisdictional burdens borne by victims of terrorism seeking judicial redress." *Van Beneden*, 709 F.3d at 1167 & n.4. That purpose favors allowing injured victims of terrorism (along with their family members) to obtain relief for the harms they experienced when terrorists deliberately attempted to kill them or others and a foreign state provided material support for those acts, whether or not the terrorists actually succeeded. This Court should thus join the significant majority of courts in this District that deny immunity to, and hold liable, foreign state sponsors of terrorism in these circumstances.

### 2.    Evidentiary Approach

The Bellwether Plaintiffs have provided ample evidence to satisfy their evidentiary obligations under the FSIA. Much of that comes in the form of the "uncontroverted factual allegations" in the Amended Complaint, ECF No. 26, as "supported by" the extensive

"documentary and affidavit evidence," *Rimkus*, 750 F. Supp. 2d at 171, that the Bellwether Plaintiffs have grouped together by family, *see* **Exs. 7-29**.

In addition, the Bellwether Plaintiffs respectfully request that the Court qualify as experts Dr. Michael Knights (as an expert on Iran's role in the use of explosively formed penetrators, also called Explosively-Formed Projectiles ("EFPs") in Iraq and on its support for terrorist and militia groups in Iraq), Dr. Patrick Clawson (as an expert on Iran and its sponsorship of terrorist organizations), and Retired Colonel Ryan Thompson (as an expert on improvised explosive devices ("IEDs") and EFPs).[7]   These experts' qualifications in their area of expertise, their methodologies for their analyses, and their analyses of the facts as laid out in the evidentiary record provided by the Bellwether Plaintiffs are laid out in their corresponding affidavits, **Exhibits 3-6**. *See* Fed. R. Evid. 702 (permitting expert testimony by an individual "qualified as an expert by knowledge, skill, experience, training, or education" if the expert's "specialized knowledge will help the tier of act to understand the evidence or to determine a fact in issue," their testimony is based on sufficient facts or data and is the product of reliable principles and methods, and the expert has reliably applied those principles and methods to the facts of the case).   Moreover, in similar cases, courts in this District have already recognized Mr. Thompson and Dr. Clawson as experts on Iran's connection to strikes using EFPs and its involvement in other terrorist acts perpetrated by militia groups. *See, e.g.*, *Fissler*, 2022 WL 4464873, at *2 ("The Court . . . qualifies Mr. Thompson as an expert on IEDs, including EFPs, used against U.S. and allied forces in the most recent wars in Iraq and Afghanistan."); *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d

---

[7] The Bellwether Plaintiffs previously indicated their intent to rely on an additional expert witness, ECF No. 48 at 10, but have since determined that the expert affidavits of Dr. Knights, Dr. Clawson, and Mr. Thompson, as well as the affidavits and records included in the Bellwether Plaintiffs' individual exhibits, are sufficient to establish jurisdiction, liability, and damages.

8, 13 n.3 (D.D.C. 2009) ("In over 20 cases, Dr. Clawson has provided this Court with reliable and credible testimony regarding the involvement of Iran [and its proxy groups] in sponsoring and organizing acts of terrorism carried out against citizens of the United States.").

The Bellwether Plaintiffs also respectfully request that the Court take judicial notice of expert evidence and other materials submitted in substantially similar litigation.  Fed. R. Evid. 201; *see, e.g., Fissler*, 2022 WL 4464873, at *2 ("incorporating *Karcher*'s factual findings here"); *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 157 (D.D.C. 2022) ("The Court also takes judicial notice of *Lee v. Islamic Republic of Iran* and *Karcher v. Islamic Republic of Iran*, both of which involved similar EFP attacks.").

### 3.    Iran's Material Support and Causation

For every one of the twenty attacks at issue in this motion ("Bellwether Attacks"), Iran provided material support and resources—namely, by financing, manufacturing, and providing the EFPs used in the attack, or by financing the terrorist groups and militias that carried out the attacks. That provision of material support or resources enabled the execution of the attack, resulting in Iran's intended result behind its support:  completed or attempted extrajudicial killings that caused serious injuries and/or death to the Bellwether Plaintiffs or their family members.

a.    For fourteen of the Bellwether Attacks, Iran's responsibility is evinced by the fact that the attacks were perpetrated with an EFP.

For each of the following attacks, Mr. Thompson has found to a reasonable degree of certainty that the attack was caused by the use of an EFP, based on:  (1) his expertise; (2) previous judicial findings and evidence regarding the same attack (specifically, in *Karcher v. Islamic Republic of Iran*, 2021 WL 133507 (D.D.C. Jan. 14, 2021)); 3) reports from U.S. Central

14

Command ("CENTCOM") submitted in support of this motion, *see* ECF No. 50-1[8]; (4) the affidavits and records submitted by the Bellwether Plaintiffs as evidence of the attack; and (5) individual Bellwether Plaintiffs' evidence packets, on which Mr. Thompson relied, cited below with each corresponding attack.  S*ee* **Ex. 6 at 3-4.**

1. The May 14, 2006 Extrajudicial Killing of Army Master Sergeant Robert West – *see* **Ex. 7**

   1) Bellwether Plaintiff: Mary B. Heaton (The Late Robert West's Mother)

   2) Bellwether Plaintiff: Lisa R. Brooks (The Late Robert West's Sister)

2. The January 5, 2010 Extrajudicial Killing of Army Specialist David Andrew Croft, Jr. – *see* **Ex. 8**

   3) Bellwether Plaintiff: Victoria Croft (The Late David Croft's Mother)

   4) Bellwether Plaintiff: Robin Messer (The Late David Croft's Sister)

   5) Bellwether Plaintiff: Tyler Croft (The Late David Croft's Brother)

   6) Bellwether Plaintiff: Melodie Hanson (The Late David Croft's Sister)

   7) Bellwether Plaintiff: Andrea Whatley (The Late David Croft's Sister)

3. The March 11, 2008 Extrajudicial Killing of Army Staff Sergeant Laurent J. West and Attempted Extrajudicial Killing of Army Specialist Albert Dyk. – *see* **Exs. 9-10**

   8) Bellwether Plaintiff: Laurie West (The Late Laurent West's Mother[9])

   9) Bellwether Plaintiff: Albert Dyk (Surviving Soldier)

---

[8] Plaintiffs have moved for leave to file the CENTCOM Reports under seal contemporaneously with this motion, *see* ECF No. 50, consistent with the Agreed Protective Order, ECF No. 40.

[9] Laurie West (formerly Larry West) is the decedent's biological father. Mrs. West now identifies as female.  Because "mother" is a gender-specific description, Plaintiffs have described Laurie West as Laurent's mother.  However, at the time of Laurent's death, Laurie (then Larry) identified as male and as Laurent's father.

*(Cont'd on next page)*

4. The December 26, 2007 Attempted Extrajudicial Killing of Army Sergeant Joseph Morcerf.[10] – *see* **Ex. 11**

   10) Bellwether Plaintiff: Joseph Morcerf (Surviving Soldier)

5. The May 17, 2011 Attempted Extrajudicial Killing of Army Sergeant James W. Hull. – *see* **Ex. 12**

   11) Bellwether Plaintiff: James W. Hull (Surviving Soldier)

   12) Teresa Hull (James W. Hull's Mother)

   13) James Hull (James W. Hull's Father)

6. The January 4, 2011 Attempted Extrajudicial Killing of Army Specialist Maximillian Miller. – *see* **Ex. 13**

   14) Bellwether Plaintiff: Maximillian Miller (Surviving Soldier), Individually and as Next Friend of his Minor Son, K.M.

   15) Bellwether Plaintiff Caitlin Miller (Maximillian Miller's Wife)

7. The September 8, 2009 Attempted Extrajudicial Killing of Senior Airman Jon Kone.[11] – *see* **Ex. 14**

   16) Bellwether Plaintiff: Jon Kone (Surviving Airman)

8. The April 21, 2005 Extrajudicial Killing of Blackwater Contractor Curtis Lee Hundley and Attempted Extrajudicial Killing of Blackwater Contractor Robert Scott Sabado. – *see* **Exs. 15-17**

   17) Bellwether Plaintiff: Lisa Hundley (The Late Curtis Hundley's Wife), Individually and as Personal Representative of the Estate of Curtis Lee Hundley

   18) Bellwether Plaintiff: Robert Sabado (Surviving Military Contractor)

   19) Bellwether Plaintiff: Michelle Sabado (Robert Sabado's Wife)

---

[10] Although the Bellwether Plaintiffs obtained CENTCOM records regarding Joseph Morcerf, it has come to light that those records seem to "describe a different attack than the attack at issue in this lawsuit." **Ex. 11 at 6.** The records are included in the evidentiary record for the sake of completeness, but they are relied on neither by Mr. Morcerf nor by Mr. Thompson in his assessment of the attack. *See* **Ex. 3.**

[11] At the time of the attack, Mr. Kone's last name was "Gally."

20) Bellwether Plaintiff: Skyler Sabado (Robert Sabado's Son)

21) Bellwether Plaintiff: Crystal Sabado (Robert Sabado's Daughter)

22) Bellwether Plaintiff: Tiffany Sabado (Robert Sabado's Daughter)

9. <u>The October 29, 2008 Attempted Extrajudicial Killing of Army Sergeant Christopher G. Gomes.</u> – *see* **Ex. 18**

23) Bellwether Plaintiff: Christopher Gomes (Surviving Soldier)

10. <u>The May 16, 2006 Attempted Extrajudicial Killing of Army Sergeant Joshua Mattson.</u> – *see* **Ex. 19**

24) Bellwether Plaintiff: Joshua Mattson (Surviving Soldier), Individually and as Next Friend of his Minor Son, J.M.[12]

11. <u>The March 29, 2007 Attempted Extrajudicial Killing of Army Specialist Manuel Roman.</u>[13] – *see* **Ex. 20**

25) Bellwether Plaintiff: Manuel Roman (Surviving Soldier)

12. <u>The January 18, 2007 Attempted Extrajudicial Killing of Army Sergeant Bradley Salisbury.</u>[14] – *see* **Ex. 21**

26) Bellwether Plaintiff: Bradley Salisbury (Surviving Soldier), Individually and as Next Friend of his Minor Daughter, M.S.

27) Bellwether Plaintiff: Deidre Salisbury (Bradley Salisbury's Wife)

28) Bellwether Plaintiff: Robin Bogacz (Bradley Salisbury's Mother)

---

[12] Joshua Mattson's son, Joshua G. Mattson, is now an adult; he will shortly be moving to amend the caption of this case and substitute himself in as the real party in interest in place of his father as next friend.

[13] Due to a typographical error, the attack date listed in the First Amended Complaint, March 27, 2009, is incorrect.  As reflected on Mr. Roman's Purple Heart, <u>March 29, 2007</u> is the correct attack date.

[14] Although the Bellwether Plaintiffs obtained CENTCOM records regarding Bradley Salisbury, it has come to light that those records seem to "describe[] a different attack than the attack at issue in this lawsuit.  **Ex. 11 at 7.**  The records are included in the evidentiary record for the sake of completeness, but they are relied on neither by Mr. Salisbury nor by Mr. Thompson in his assessment of the attack.  *See* **Ex. 3.**

*(Cont'd on next page)*

29) Bellwether Plaintiff: Amy Crandel (Bradley Salisbury's Sister)

13. The August 24, 2007 Attempted Extrajudicial Killing of Army Sergeant Robert Crossno. – *see* **Ex. 22**

30) Bellwether Plaintiff: Robert Crossno (Surviving Soldier)

31) Bellwether Plaintiff: Angela Crossno (Robert Crossno's Mother)

14. The April 20, 2007 Attempted Extrajudicial Killing of Army Staff Sergeant Jeffrey Kadis.[15] – *see* **Ex. 23**

32) Bellwether Plaintiff: Jeffrey Kadis (Surviving Soldier)

33) Bellwether Plaintiff: Theresa Kadis (Jeffrey Kadis' Wife)

In addition, Dr. Knights has concluded to a reasonable degree of certainty—based on his experience, knowledge, and expertise, the evidentiary record in this case, and the military reports and other documents he cites in his expert affidavit—that because "the[se] attacks [all] involved [an] EFP, the[y] were perpetrated with material support from Iran."  **Ex. 3 at 20-21**.  As Dr. Knights describes, an EFP is an incredibly powerful weapon that has been "almost exclusively operated by militant groups with close operational ties to the [Islamic Revolutionary Guard Corps ("IRGC"), a branch of the Iranian military] and Lebanese Hezbollah," "an organization formed by the IRGC."  *Id.* at 10.  Other than those two groups, "the EFP has been encountered only in the use of other armed groups supported by the IRGC"—meaning all EFP use can be traced back to the IRGC and thus to Iran.  *Id.* at 10-11.  Dr. Knights further explains that EFPs were used frequently in Iraq as early as 2004 and that U.S. military officials found that "militant" Shia groups "received the weapons from Iran in order to aid their uprising against the U.S.-led coalition" and that Iran "was conducting a full-scale unconventional warfare campaign in Iraq to dominate the

---

[15] Plaintiffs inadvertently included two April 2007 attack dates in the First Amended Complaint. April 20, 2007 (not April 25, 2007) is the correct attack date.

emerging Iraqi Government while keeping the U.S.-led coalition off balance by supplying" EFPs to these militia groups. *Id.* at 11-14. Dr. Knights's report cites U.S. and U.K. military records and findings, statements from Iranian dissidents, and other evidence to determine that "Iran-backed political and militia groups . . . helped smuggle the EFPs into Iraq from Iran" and that EFPs used in Iraq were "manufactured in three factories run by the IRGC Qods Force."[16] *Id.* at 14-19.

In sum, Dr. Knights concludes that "the Iranian government, including the IRGC and its Qods Force, was the principal supplier of almost all, if not all, EFP warheads used in Iraq prior to U.S. military withdrawal in late 2011," and that as a result, "EFP attacks on U.S. persons in Iraq from 2004-2011 are examples of Iranian government material support to attempted extrajudicial killings and extrajudicial killings against U.S. persons." **Ex. 3 at 20-21.** In Dr. Knights's expert opinion, then, the fact that an EFP was used in each of the fourteen above Bellwether Attacks shows both that Iran provided material support (in the form of financing, manufacturing, and providing the EFPs) and that "there is a reasonable connection between Iran's material support and the personal injuries and deaths suffered as a result," since the EFPs that Iran helped provide directly caused the harms to the Bellwether Plaintiffs. *Id.*

Dr. Knights's conclusions match the findings of courts in this District that "Iran, through IRGC-QF and/or Hezbollah, furnished EFPs or the components thereof, facilitated training of Shi'a militia, and supported the militia's effective deployment of this weapon," and that "[b]ecause [EFPs] deliver deadly force," it is appropriate to "presume[] that Iran's intent was to kill" the people in the vehicles hit by EFPs and that Iran "wanted EFPs to be used against the U.S. military, which Iran saw as a threat to its objectives." *Karcher*, 396 F. Supp. 3d at 56; *accord*, *e.g.*, *Fissler*, 2022 WL 4464873, at *2 ("the use of an EFP in an attack on U.S. servicemembers during the

---

[16] The Qods Force ("IRGC-QF") is an arm of the IRGC. **Ex. 5 at 12.**

occupation 'all but necessitates the inference that Iran was responsible' for the attack"); *Roberts*, 581 F. Supp. 3d at 169-71 (finding that Iran's funding and provision of weapons—through the IRGC and its Qods Force—enabled EFP attacks and that its help was "crucial" to allowing militia groups to harm U.S. soldiers (quoting *Lee*, 518 F. Supp. 3d at 493)).

In sum, Iran (acting through agents like the IRGC and IRGC-QF) provided material support and resources to acts of extrajudicial killing by giving militia groups the money and EFPs they need to perpetrate these Bellwether Attacks.  Moreover, this Court has recognized that deploying an EFP "represents a 'deliberated' attempt to kill," and so Iran's "material support or resources to facilitate EFP attacks qualif[ies] as material support for" extrajudicial killings, whether completed or attempted.  *Karcher*, 396 F. Supp. 3d at 58; *accord Roberts*, 581 F. Supp. 3d at 170 (collecting cases recognizing that "thought and consideration required to conduct an EFP attack are hallmarks of deliberation").  And because Iran's support helped get these groups the resources they needed to attack U.S. forces, its material support was a proximate cause of the deaths and injuries that occurred in the attacks.

**b.**      For the remaining six Bellwether Attacks, Iran's responsibility is evinced by other means of proof showing that it was financing and providing assistance to the militia groups that carried out the attack.

For five of those attacks, Dr. Knights has identified to a reasonable degree of certainty which militia group(s) were responsible for the attack (listed below for each attack), using his expertise and knowledge of Iranian-backed militia groups, as well as the affidavits, military records, and other information submitted by the Bellwether Plaintiffs in support of this motion. *See* **Ex. 4 at 5-6** and accompanying analyses and conclusions; *see also* individual Bellwether Plaintiffs' evidence packets, on which Dr. Knights relied, cited with each corresponding attack.

20

1. <u>The May 21, 2004 Extrajudicial Killing of Army Staff Sergeant Jeremy Horton.</u> (attributed to Al-Qaeda in Iraq, Ansar al-Sunnah, the Islamic Army of Iraq, or Jaish al-Mahdi (JAM)) – *see* **Ex. 25**

   34) Bellwether Plaintiff: Gretchen Miller (The Late Jeremy Horton's Mother)

2. <u>The September 19, 2007 Extrajudicial Killing of Army Corporal Christian M. Neff.</u> (attributed to Al-Qaeda in Iraq, Ansar al-Sunnah, or the Islamic Army of Iraq) – *see* **Ex. 26**

   35) Bellwether Plaintiff: William Neff (The Late Christian Neff's Father)

   36) Bellwether Plaintiff: Nancy Neff (The Late Christian Neff's Mother)

   37) Bellwether Plaintiff: Shannon Neff (The Later Christian Neff's Sister)

3. <u>The June 20, 2007 Extrajudicial Killing of Army Staff Sergeant Darren Hubbell.</u> (attributed to Al-Qaeda in Iraq, Ansar al-Sunnah, or the Islamic Army of Iraq) – *see* **Ex. 27**

   38) Bellwether Plaintiff: Gary Hubbell (The Late Darren Hubbell's Father)

4. <u>The March 22, 2008 Extrajudicial Killing of Army Specialist David Stelmat, Jr.</u> (attributed to Al-Qaeda in Iraq) – *see* **Ex. 28**

   39) Bellwether Plaintiff: David Stelmat, Sr. (The Late David Stelmat, Jr.'s Father)

   40) Bellwether Plaintiff: Carisa Girdwood (The Late David Stelmat, Jr.'s Sister)

   41) Bellwether Plaintiff: Rebecca McGraw (The Late David Stelmat, Jr.'s Sister)

5. <u>The April 20, 2008 Attempted Extrajudicial Killing of Army Specialist Michael Sandeep Wells.</u> (attributed to the Jaish al-Mahdi (JAM)) – *see* **Ex. 29**

   42) Bellwether Plaintiff: Michael Wells (Surviving Soldier)

Dr. Clawson, meanwhile, has concluded to a reasonable degree of certainty—based on his experience, knowledge, and expertise, the evidentiary record in this case, and the government reports and other documents he cites in his expert affidavit—that each of the identified terrorist groups was a recipient of material support from Iran in the form of financing, training, equipment, assistance, directions, and advice.  **Ex. 5 at 11-23**.  He lays out in detail the support that Iran—

acting through the IRGC and its Qods Force—provided to each of those groups: Jaish Al-Mahdi (JAM), along with other "Shi'a extremist components in Iraq," *id.* at 11-16; and Sunni extremist groups, *id.* at 16-17, including Al-Qaeda in Iraq, *id.* at 17-21; al-Ansar al-Sunnah, *id.* at 21-22; and the Islamic Army of Iraq, *id.* at 22-23.

That support is of a piece with Iran's broader strategy of trying "to reduce U.S. influence in the world and, in particular, to force the United States to leave the Middle East" by, among other things, "the use of terrorism" to make the U.S. retreat "in face of constant attacks." **Ex. 5 at 9**. The goal is to indirectly support terrorism so Iran can "claim credit in the eyes of those who support its revolutionary goals while retaining plausible deniability which can dissuade extensive retribution from the international community." *Id.* at 9-10. To that end, Iran "work[s] through proxy groups rather than carrying out attacks directly itself . . . to reduce the risk of retaliation." *Id.* at 10. Iran has thus "provided material support to a wide array of groups willing to attack U.S. interests"—both groups "largely controlled by Iran, especially Lebanon's Hezbollah and many (but not all) of the Iraqi Shia militias," and other groups, such as Palestinian Hamas, "to which it has provided many tens of millions (if not hundreds of millions) of dollars of support and many types of arms," and al-Qaeda, with which it "share[s] a common anti-American agenda." *Id.*

In sum, Iran (acting through agents like the IRGC and IRGC-QF) provided material support and resources to acts of extrajudicial killing by giving Al-Qaeda in Iraq, Ansar al-Sunnah, the Islamic Army of Iraq, and/or Jaish al-Mahdi (JAM) the money, training, weapons, direction, and advise they need to perpetrate these Bellwether Attacks. As the evidence shows, Iran provided support to these terrorist groups with the intent that they carry out attacks like these ones, and the attacks were planned and executed in a deliberated fashion. These five attacks thus qualify regardless of whether they resulted in attempted or completed extrajudicial killings. *Karcher*, 396

F. Supp. 3d at 57.  And because Iran's support helped get the militia groups the resources they needed to attack U.S. forces, its material support was a proximate cause of the deaths and injuries that occurred in the attacks.

Finally, Iran is responsible for the last Bellwether Attack because it provided material support to the group—the Islamic State in Iraq—that carried out the attack.

6. The February 7, 2007 Extrajudicial Killing of Navy Hospital Corpsman 3rd Class Manuel Antonio Ruiz. – *see* **Ex. 24**

43) Bellwether Plaintiff: Lisa Ruiz (The Late Manuel Ruiz's Mother), Individually and as Personal Representative of the Estate of Manuel Antonio Ruiz

44) Bellwether Plaintiff: Manuel Ruiz (The Late Manuel Ruiz's Father)

45) Bellwether Plaintiff: Joshua Ruiz (The Late Manuel Ruiz's Brother)

46) Bellwether Plaintiff: Jacobo Ruiz (The Late Manuel Ruiz's Brother)

As seen in the newspaper articles included on pages **20-22 of Exhibit 24**, and as confirmed by Dr. Clawson in **Exhibit 5 at 24**, the Islamic State of Iraq publicly took responsibility for this attack.  As those articles state, and as Dr. Clawson confirms, the Islamic State of Iraq is "an umbrella group of Iraqi insurgent groups that includes al-Qaeda in Iraq."  **Ex. 5 at 24**.  And as explained above, Iran provided material support and resources to Al-Qaeda in Iraq, as well as to the Islamic State of Iraq in particular.  *Id.* at 18-19.  Dr. Clawson thus concludes to a reasonable degree of certainty—based on his experience, knowledge, and expertise, the evidentiary record in this case, and the government reports and other documents he cites in his expert affidavit—that "there is a reasonable connection between Iran's material support and the personal injuries and deaths suffered in the February 7, 2007 attack on Manuel Ruiz."  *Id.* at 24.

Thus, as with all other Bellwether Attacks, Iran (acting through agents like the IRGC and IRGC-QF) provided material support and resources to acts of extrajudicial killing by giving the

Islamic State of Iraq the money, training, weapons, direction, and advise needed to perpetrate this Bellwether Attack.  And because Iran's support helped get the Islamic State of Iraq the resources they needed, its material support was a proximate cause of the deaths and injuries that occurred.

### C.      Elements Six and Seven are met because Iran is a designated state sponsor of terrorism and the Plaintiffs are all U.S. Citizens.

As with the first three elements, the Plaintiffs' compliance with elements six and seven is straightforward.  The sixth element is met because "[t]he United States designated Iran a state sponsor of terrorism in 1984, and the designation remains in place today." *Taitt v. Islamic Republic of Iran*, 2023 WL 2536518, at *3 (D.D.C. Mar. 16, 2023); *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited June 1, 2023); U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979— Iran, 49 Fed. Reg. 2836 (Jan. 3, 1984).

The seventh element, of proper plaintiffs, is satisfied because all Bellwether Plaintiffs were nationals of the United States, members of the armed forces, and/or government contractors at the time of the relevant attack.  As alleged in the Amended Complaint, ECF No. 26 at 42-44, 48, 51-52, 66-67, 71-72, 75, 77-78, 80-81, 83, 85-86, 96-97, 115, 122-23, 132-33, 142, 153-54, 156, 168-69, 173-74, 334-35, 352-53, and as attested in the affidavits of the Bellwether Plaintiffs, **Exs. 7-16, 18-29**, all Bellwether Plaintiffs were and are U.S. citizens.  *See* 28 U.S.C. § 1605A(h)(5) (defining "national of the United States" by reference to 8 U.S.C. § 1101(a)(22), which includes "a citizen of the United States").  In addition, Bellwether Plaintiffs Albert Dyk, Joseph Morcerf, James W. Hull, Maximillian Miller, Jon Kone, Christopher Gomes, Joshua Mattson, Manuel Roman, Bradley Salisbury, Robert Crossno, Jeffrey Kadis, and Michael Wells were members of the U.S. military at the time of the relevant attack, **Exs. 10-14, 18-23, 29**, and Bellwether Plaintiff

Robert Scott Sabado was a U.S. government contractor for Blackwater Security working in that capacity when he was attacked, **Ex. 16**.

In sum, the Bellwether Plaintiffs have established that Iran is not entitled to sovereign immunity from their claims and that this Court therefore has jurisdiction over the clams under 28 U.S.C. §§ 1330(a) and 1605A(a).

## V. Liability and Damages

Finally, the Bellwether Plaintiffs are entitled to judgment and to compensatory and punitive damages (along with post-judgment interest) on their claims under Section 1605A. In addition to creating an exception to immunity giving rise to subject-matter jurisdiction, Section 1605A also creates a private right of action against foreign state sponsors of terrorism like Iran. Such a defendant "shall be liable to" a national of the United States, a member of the armed forces, a government contractor, or their legal representative "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c). The foreign state is subject to the vicarious liability for the acts of its officials, employees, or agents. *Id.* Plaintiffs who prevail may recover "economic damages, solatium, pain and suffering, and punitive damages." *Id.*

As explained above and as specified for each Bellwether Plaintiff in **Exhibit 1**, the Bellwether Plaintiffs—U.S. nationals and, in some cases, service members or government contractors—seek relief for personal injuries or deaths that were caused by Iran's provision of material support for the terrorist attacks at issue (acting through its agents like the IRGC and its Qods Force), as per Section 1605A(a)(1). That satisfies the requirements of Section 1605A(c).

Moreover, the Bellwether Plaintiffs have adequately made out their theories of liability against Iran. The service member and contractor Bellwether Plaintiffs' pain and suffering as a

result of the terrorist attacks they experienced and survived is laid out in detail in **Exhibit 1**; for

each one, the Exhibit identifies the nature and extent of each injury they experienced and the

evidentiary proof for that injury.[17]

For the family member Bellwether Plaintiffs, their solatium claims "are functionally

identical to claims for intentional infliction of emotional distress." *Spencer v. Islamic Republic of

Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014).  Solatium claims compensate plaintiffs for "mental

anguish, bereavement and grief" caused by the death or injury of a loved one; courts presume that

spouses and children of victims of terrorism suffer compensable mental anguish, and siblings with

"close emotional relationships" are typically entitled to relief as well. *Id.* (citing *Oveissi v. Islamic

Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011), and *Flatow v. Islamic Republic of Iran*,

999 F. Supp. 1, 30 (D.D.C. 1998)).  These Bellwether Plaintiffs' mental anguish, grief, and

bereavement as a result of the deaths or injuries of their close family members is laid out in **Exhibit

1**, which cross-references affidavits and other evidence corroborating their entitlement to relief on

a solatium theory.[18]  This Court should therefore enter judgment in the Bellwether Plaintiffs' favor.

This Court should also award damages in the amount set out in the chart appended as

**Exhibit 2** and the Proposed Order.  Courts in this District have coalesced around a set of standard

---

[17] Bellwether Plaintiff Lisa Hundley also asserts a claim for pain and suffering in her capacity
as personal representative of the estate of Curtis Lee Hundley.  *See* **Ex. 1 at 9, Ex. 2 at 5, Ex. 15**.

[18] Proceeding on an IIED theory yields the same result.  On an FSIA claim, "a defendant is
liable for IIED if its 'extreme and outrageous conduct intentionally or recklessly causes severe
emotional distress' to a plaintiff," whether or not the plaintiff was present at the time of the
incident.  *Taitt*, 2023 WL 2536518, at *8 (citations omitted).  Here, Iran intentionally provided
material support to proxy groups intending that they engage in terroristic acts, which are
"sufficiently extreme and outrageous."  *Ben-Yishai v. Syrian Arab Republic*, 2022 WL 17250344,
at *11 (D.D.C. Nov. 28, 2022).  "The intent requirement is . . . met because 'acts of terrorism are
by their very definition extreme and outrageous and intended to cause the highest degree of
emotional distress.'"  *Taitt*, 2023 WL 2536518, at *8 (quoting *Belkin*, 667 F. Supp. 2d at 22).  And
the Bellwether Plaintiffs' severe emotional distress is laid out in **Exhibit 1** and the underlying
evidentiary exhibits it cross-references.

amounts of damages for certain types of physical and solatium injuries in terrorism cases.  *See, e.g., Taitt,* 2023 WL 2536518, at *9; *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 79 (D.D.C. 2014); *Peterson v. Islamic Republic of Iran,* 515 F. Supp. 2d 25, 55-56 (D.D.C. 2007); *Valore*, 700 F. Supp. 2d at 84-85.  To that end, **Exhibit 1** sets out each Bellwether Plaintiff, the means by which he or she demonstrates their injuries (if a direct victim) or the means by which he or she demonstrates their familial relationship to a direct victim, and citations to the corresponding documentation's location in the record.  **Exhibit 1** also sets forth the nature and extent of each Bellwether Plaintiff's injuries, the documents demonstrating that the Bellwether Plaintiff suffered those injuries, and the amount typically awarded by courts in this District for similar injuries. **Exhibit 2** then sets forth Plaintiffs' proposed damages awards in accordance with precedent.

Moreover, "because all Plaintiffs here properly bring their claims under the federal private right of action established by section 1605A(c) . . . they are eligible to seek punitive damages." *Taitt*, 2023 WL 2536518, at *23.  One of the "primary methods of calculating punitive damages in FSIA cases" in "[t]is District" "involves multiplying the total compensatory damages award by a factor of between one and five."  *Ben-Yishai v. Syrian Arab Republic*, 2022 WL 17250344, at *15 (D.D.C. Nov. 28, 2022).  This method is "especially appropriate when the defendants "did not directly carry out the attack, but funded [a proxy actor]."  *Id.* (citation omitted) (alteration in original).  Because Iran "intentionally supported . . . proxy actor[s] who specifically sought to wreak violence," *id.*, this Court should follow "the usual practice" in such cases and adopt "a multiplier of three," *Roth*, 2018 WL 4680270, at *17; *accord, e.g.*, *Taitt*, 2023 WL 2536518, at *23; *Ben-Yishai*, 2022 WL 17250344, at *15; *Flanagan v. Islamic Republic of Iran,* 87 F. Supp. 3d 93, 126-127 (D.D.C. 2015).  The proposed damages in **Exhibit 2** therefore include punitive damages equal to three times the proposed compensatory damages amount.

27

Finally, this Court should award post-judgment interest in line with the federal post-judgment interest statute, which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a); *see Flanagan*, 87 F. Supp. 3d at 127 n.39.

## VI.   Conclusion

The Bellwether Plaintiffs respectfully request that the Court enter judgment in their favor against Iran and that it award them damages in the amounts set out in the **Proposed Order**.

Respectfully submitted,

Dated: June 2, 2023

/s/      *Matthew D. McGill*
Matthew D. McGill (D.C. Bar No. 481430)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9522
mmcgill@gibsondunn.com

/s/      *Craig W. Carlson*
Craig W. Carlson (D.C. Bar No. TX0182)
Philip J. Koelsch (D.C. Bar No. TX0039)
THE CARLSON LAW FIRM, P.C.
100 East Central Expressway
Killeen, TX 76541
Telephone: (254) 526-5688
Facsimile: (254) 526-8204
ccarlson@carlsonattorneys.com
pkoelsch@carlsonattorneys.com

*Attorneys for Plaintiffs*