# **EXHIBIT 16**

# <u>The Robert Scott Sabado Family</u>



SABADO 001

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARY B. HEATON, et al.,

                Plaintiffs,

    v.

THE ISLAMIC REPUBLIC OF IRAN,

                Defendant.

Civil Action No. 1:19-cv-03003-JMC

### TESTIMONIAL AFFIDAVIT OF PLAINTIFF ROBERT SCOTT SABADO IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST IRAN

Pursuant to 28 U.S.C. § 1746, I, **ROBERT SCOTT SABADO,** hereby declare as follows:

1.      "I am one of the Plaintiffs in this case. I am over the age of 18, of sound mind, and make this Affidavit from personal knowledge.

2.      I was born in January 1959 and am now 64 years old. I am a resident of the State of South Carolina. In accordance with 28 U.S.C. §§ 1605A(a)(2)(A)(ii)(I),(III) and 1605A(c)(1), (3), at the time of the April 21, 2005 terrorist attack in which I was injured (hereinafter '**the Attack'**) I was a United States citizen and an individual performing a contract awarded by the United States Government. Specifically, I was employed as a Security Contractor for Blackwater Security Consulting, LLC (hereinafter '**Blackwater**') and was acting within the scope of my employment at the time of the Attack. The photograph on the preceding page was taken around March 18, 2005 in Baghdad, Iraq and accurately depicts me in my Blackwater uniform.

3.      I am presenting this Affidavit in support of my request for the Court to enter a Default Judgment against Defendant Islamic Republic of Iran ('**Iran**'). More specifically, I am submitting this Affidavit to provide the Court with facts and evidence concerning the April 21, 2005 terrorist attack, the injuries I suffered in the Attack, the medical care and treatment I have

SABADO 002

received for my Attack–related injuries, my current condition, and how the Attack and my injuries have impacted my life. *See* Pls.' First Amend. Compl. at 173–174.

    4.      Prior to signing this Affidavit, my attorneys asked me a series of questions about the Attack, my resulting injuries, the medical care and treatment I have received since the Attack, and my life today. Below are the questions and my answers:

**Q.** When did you first join Blackwater and why did you join the organization?

**A.** I was hired by Blackwater in April 2004 as a Security Contractor. Prior to joining Blackwater, I worked as an International Police Officer from approximately February 2003 to March 2004 in Kosovo for a company called DynCorp. In Kosovo, I was involved in peace keeping missions. For instance, my first assignment in Kosovo was training the local police at a police station near the Serbian border. I also worked in the Organized Crime Unit and the Close Protection Unit. In the Close Protection Unit, I offered protection for various government officials and diplomats in Kosovo.

Several ex-Army Rangers and ex-Marine-recon guys in the Close Protection Unit told me that private security companies like Blackwater and Triple Canopy were looking for guys with our expertise and work experience. After doing some research, I felt that Blackwater was the right path for me career–wise. Furthermore, after spending 15 years working for the Los Angeles Police Department, I knew I was not going back to LAPD.

**Q.** What was your mission and what happened to you on April 21, 2005?

**A.** On April 21, 2005, I was the team leader of our Mamba Unit. Our mission that day was to transport 19 guys from our Team House in Baghdad to Ramadi. We heard from our program manager at Blackwater that in approximately 4 weeks, Blackwater was going to be involved in the biggest operation they had ever had and they wanted to use our team. Basically, what happened is that Blackwater had taken over Triple Canopy's contract and site. So Blackwater had to get 150 personnel to all these new sites in 48 hours.

We traveled in a convoy of 3 Mamba armored vehicles followed by a small pickup truck we called a 'Bongo Truck.' I was the lead gunner in the first Mamba Vehicle. Everything was 'smooth sailing' from Baghdad into Fallujah.

We then pulled out of Fallujah and began traveling on Route Michigan towards Ramadi. I then remember seeing 2 cars come off a dirt road in front of us. The first car was a white sedan that had 4 suspicious persons traveling inside. I recall seeing two young men, approximately 18 to 25 years old, in the backseat of the white sedan who were looking at us the whole time and communicating with the 2 men in the front seat who were about the same age. The second vehicle, a maroon sedan, was behind the white 'lead' vehicle. The second vehicle had a family in it. A male was driving and a female and two kids were in the back.

3

Before the white sedan pulled in front of us, we had been traveling at a speed of approximately 70 miles per hour. When the white sedan got in front of us, we slowed down to 40 miles per hour. After we slowed down, our driver, '**Tool**', told me he didn't like this feeling he had as he thought something bad was about to happen to us. Both the white sedan and the maroon sedan were approximately 30 to 40 yards in front of our lead Mamba vehicle.

I also remember seeing a line of cars pulled over to the side of the highway, which I initially thought were local people waiting to get gas. In that part of Iraq, very few gas stations are open and you usually see a bunch of males or kids carrying jerry cans filled with gasoline.

I fired 2 three-round bursts of warning shots from my 240 Bravo machine gun to the left of the white sedan. The family in the second maroon sedan moved over to the right real fast, but the white 'lead' vehicle did not budge and kept on going.

**Q.** What do you recall about the explosion and what happened after the explosion?

**A.** I never heard an explosion. I just remember our Mamba vehicle had come to a complete stop shortly after I fired two 3-round bursts from my 240 Bravo full auto machine gun to the left side of the white vehicle (that had the 4 suspicious persons in the car). I saw the hood of the Mamba was up and there were several white spots on the hood. I was the lead gunner in the turret so I had a good view of this. My first thought was Tool didn't latch the hood on securely when we left. I then realized something was wrong because the white spots were not there when I climbed into my turret spot (accessed via walking on the hood) to take my position as the lead gunner.

Within an instant, I heard Tool's voice on the radio from my headset. Tool said '**Miyagi** (my call sign) has been hit!' '**Sparky**' (Curtis Hundley's call sign) is down too!' This broadcast went to everyone on our team.

At this time, I felt a sharp pain in my right arm. It felt like I had bumped my funny bone but the tingling sensation never went away. In addition, it felt like my groin area was burning. I was still standing in my position. My concern was the sector in front of me and everything to my immediate right and left, 9 to 3 O'clock. We were still in the kill zone so to speak.

I knew the next thing that was going to happened was our 'Emergency Evacuation,' which we had practiced many times in the event of something like this. I did a quick assessment of my injuries (since I heard Tool say I had been hit). I looked at my right sleeve (I had a long sleeve jump suit on) and I saw blood all over the bottom of my right sleeve. I didn't know the severity of my injuries. But I could tell something was not right because of the tingling sensation in my right arm and I could see blood dripping off the material of my right sleeve. I also just couldn't figure out why my groin area was burning. I took a quick look but I didn't notice anything. It wasn't until later at the Ramadi Army base when I finally saw a real doctor (over an hour after the explosion) that I learned my artery in my right arm had been severed.

Shortly thereafter, I saw the passengers in our armored vehicle trying to give medical aid to Sparky. I could hear them yelling, 'Come on Sparky, wake up.' Sparky didn't look good the brief moment that I took a glance in.

4

SABADO 004

One passenger, '**Caveman**', came to check on me. Tool was helping Sparky. Caveman asked me where I was hit and I told him 'I got hit in my right arm.' Caveman quickly looked at my sleeve and placed a tourniquet on my right shoulder. It turned out that this tourniquet saved my life. I recall Caveman telling me 'This tourniquet is only good for 4-hrs.' It is 9am right now. He asked me to repeat what he said, which I did.

I don't how long it took until I was relieved but Michael Higgins (call sign '**86**'), another member of our Blackwater team, told me he was there to help me move to the other Mamba as we were executing our Emergency Evacuation. I grabbed my rifle and go bag and 86 secured the 240 Bravo.

I recall looking back at our Mamba and I saw the damage from the explosion. The right side of our Mamba had been peppered. The side where Sparky was at, the right rear gunner position, had so many white spots. I recall thinking that Sparky didn't stand a chance. There was also a large white spot where Tool's window was at. Thank God it was reinforced Plexiglas and the shrapnel didn't go through the window or else Tool would've been decapitated. I then took the position of 'Security' in our perimeter as passengers from our Mamba were moved to another Mamba.

During this time (while on perimeter security), I saw a local guy to my right carrying a large white flag and running in the direction the white sedan was last seen traveling. This individual was approximately over 100 yards away. I knew this person carrying the white flag was signaling someone else for a secondary attack. I had alerted the rest of the team of this sighting via radio. After this, we were ready to move on down the road. We had to squeeze our original passengers into the other two remaining armored vehicles. Tool had torched our Mamba with an incendiary device so the insurgents couldn't steal our downed Mamba.

I was assisted onto the other Mamba by my teammates. At this time, I learned that I had sustained significant injuries to my legs as my pant legs were bloody (and the blood was not from my arm). I also started to feel a little faint. Somehow, I caught a 'second wind' and I didn't pass out. However, this was the time that the thought had first occurred in my mind that I could possibly die out here and I didn't want to go out like this. I also heard that Sparky was dead.

Upon learning that Sparky had died from his injuries, I began to feel guilty for letting him talk me into doing the mission with us and knowing he was supposed to fly home later that afternoon. I asked myself, 'Would Sparky forgive me?'

As we were leaving the location where we were hit, I heard on the radio that 2 Suburban's filled with Haji's (locals) were driving fast on the opposite side of the highway. The guys on the team were locked in on these 2 vehicles and I also heard they all had eyes on our convoy. We all felt that this was supposed to be the secondary attack. And they had to be warned by the guy I saw carrying the large white flag. No shots were fired by the Haji's or our guys though.

**Q.** What happened next?

**A.** After leaving the 'kill zone', we were probably 30-40 minutes from Ramadi. I remember hearing somebody on the radio hollering 'Hey, there's big Army up ahead on that bridge! We need to stop. Let's get them to get help. Let's get the injured dealt with.'

5

SABADO 005

Tool made contact with that Army unit that was guarding the bridge or highway. Tool got me out and walked me up to the sand dune into a Humvee. The Army guy then said to me 'Hey, we're going to transport you to a medic which is down the road.'

I was taken in the Army Humvee toward Ramadi. An Army medic started to work on me. She started with an IV and began to assess my injuries. Unfortunately, the initial Army Humvee we were in broke down due to engine problems. We briefly had to wait for second Humvee. As I was moved to the next Humvee, I last saw Sparky. His body was propped up against a fence in a seated position. I couldn't tell where he was hit. His eyes were closed. Later at the Ramadi medical facilities, the guys on the team told me that Sparky was hit in his femoral artery.

**Q.** What happened when you got to the Army Base in Ramadi?

**A.** I was carried on a stretcher into the medical facility. The doctors started to work on me. At this time, nobody told me how bad I was injured. They had placed a catheter in my penis. I don't know how long it took but a doctor told me that they had contacted the trauma center in Balad, Iraq. A helicopter was en route to transport me to the Balad trauma center. The doctor told me they didn't have the capabilities to treat my injuries in Ramadi. I never lost consciousness.

Before the helicopter arrived, I asked two of my teammates to call my wife, Michelle. I knew if Michelle didn't hear from me after the mission we were on, she would freak out. The teammates agreed to call Michelle. As I was airlifted out, I started to feel groggy from the medication I was given (morphine). I remember one of the crewmen asked me what number (from 1 to 10) describes my pain. I told him I felt like a 10.

When we landed, I was put on a stretcher and carried into a medical tent. I could see it had to be around lunch time because we passed a lot of Army personnel who looked like they were in line for food and holding food trays. I could see they were looking down at me with a somber look.

Once inside the medical facility, I was introduced to several doctors. They told me that they needed to put me in a MRI machine to see the extent of the shrapnel that was inside my body. There was one person they didn't introduce me to who was standing to my immediate right. I asked who he was and he told me he was the Army Chaplain. At this time, I felt like my situation was not good because a Chaplain was next to me.

As I was placed in the MRI machine, I was knocked out. I recall hearing female voices who I thought were nurses. I heard them ask each other, 'Isn't this a Blackwater guy?' Was he involved in the helicopter crash?' In my mind, I was answering for them. I was in a Mamba, an armored vehicle. Not a helicopter.

It took me 2 days until I found out a helicopter that was transporting our Blackwater personnel had been shot down. Specifically, 7 other Blackwater contractors were killed the same day as my attack, April 21, 2005, later that afternoon. With Sparky being killed, that brought the total Blackwater deaths to 8. I was fighting not to be number 9.

SABADO 006

I don't know how much time had elapsed but when I opened my eyes, I was in a room in Balad and I saw '**Tiger**', one of the Blackwater contractors we were planning to drop off in Ramadi on April 21, 2005. I asked Tiger where we were and he told me we were still in Balad, Iraq. Tiger informed me that he was going to be transported back to Baghdad. I thought I may be going to the same place. I couldn't keep my eyes open much longer though.

Next thing I recall when I woke up, I heard a loud rumbling sound. It looked like I was in cave. I was tightly strapped in my stretcher and had a large ace bandage wrapped around my right arm.  I saw 2 female Army personnel to my left, who were sitting on a jump seat. At this time, I realized we were in a C130 aircraft. I got their attention and asked where were we going. They told me we were en route to the Army Hospital in Landstuhl, Germany.

**Q.** What happened when you got to Landstuhl?

Once I arrived at the Landstuhl Army Hospital, I had **5 surgeries in 6 days.** It wasn't until the 3rd or 4th day I was able to speak to a doctor. I asked the doctor 'Why I am I having so many surgeries each day?' He told me that I was lucky to have been in great 'cardio condition' and they needed to treat my injuries as aggressive as they could.

At this time, I asked the doctor (I do not remember his name) what was wrong with me. The doctor told me I had several life–threatening injuries. He didn't know how I was still alive. He told me my right arm had a severed artery. The doctor said that whomever placed a tourniquet on my right shoulder saved my life because I was bleeding out. I could've died within minutes. In addition, I had a 'through and through' shrapnel wound on my upper right thigh. The shrapnel entered the back of my leg just below my buttocks and exited the front of my upper right leg. I also had a hole in the back of my upper right leg the size of a baseball. The doctor informed me the exit wound missed my femoral artery by just a centimeter.

Next, the Landstuhl doctor told me I had a deep laceration on my upper front leg area. Had that been a 'through and through wound' (like my right leg), I would've been instantly killed. The shrapnel would've hit my femoral artery. Also, the doctor told me that the head of my penis had been hit with shrapnel on both sides and the bottom of my scrotum sack (on the left side) had been hit also. The doctor had stitched that area.

The Landstuhl doctor told me I could only stay at the Army hospital for 6 days. I was going to be flown home and would need an additional 6 days at a hospital back home. I needed to have additional surgery for my groin area and I needed to have the hole in my leg heal and closed.

Before I was transported back home to the United States, a traveling nurse met me at Landstuhl. She was going to help escort me home along with Michelle, who had been flown to Germany. The nurse told me I had lost a lot of blood. I needed 3 bags full of blood back in my system the day before we left. She was also going to help change my catheter during the flight. Furthermore, she was very concerned I could get staph infection with the hole in my leg. The traveling nurse didn't think I would make the flight back home. At this time, we had lived in Santa Barbara, California.

7

SABADO 007

**Q**. After doctors and emergency medical personnel had you stabilized in Landstuhl, what was your condition and how were you feeling?

**A**. Looking back, I was a mess. I got a phone call (in Landstuhl, Germany) from my first team leader, Rod Richardson. He was in North Carolina attending Sparky's funeral. He was checking in on me. Rod was a retired Lieutenant Colonel for the U.S. Marines. We had an in depth conversation that what happened to Sparky wasn't my fault.

I started to really feel the survivor's guilt regarding why I was still alive and had all my limbs intact. While at the Landstuhl, Germany hospital, I saw a lot of young soldiers who had missing limbs, lost their eyesight, etc.

I also could barely use the computer at the Landstuhl hospital to check my e-mail. I struggled to muster the strength to get out of my hospital bed and use the computer in the hallway. When I did check it, I saw that I had over 100 emails. A lot of e-mails were from my teammates and guys I knew who I had worked overseas with. Some of the e-mails said all communication was cut off from Blackwater. There were rumors that I had died and had my penis blown off.

I had asked Michelle to answer those emails. There was one email that stood out the most. It was from Tom Jaichner (call sign '**Bama**'). He wrote about how impressed he was that our Mamba team had dealt with the roadside bomb. He thanked me for keeping him alive and the rest of the passengers. And he was praying for me to have a full recovery.

**Q.** Please describe your return home to the United States?

During the time I was in Landstuhl, Germany, I heard that Blackwater was trying to have someone escort me home after my initial 6 days in the hospital. Michelle volunteered to be that person because she felt that my mental situation was not good.

Blackwater did send her a plane ticket to Germany. However, she had never flown to Europe. The personnel at the hospital told me that someone would meet her at Frankfurt Airport. It turned out that nobody met her. I was a complete mess the day Michelle was to fly in.

When Michelle arrived in Frankfurt Airport, she had no idea where to catch the train and she obviously didn't speak German. When Michelle found the location to catch the train, she got on the wrong train. Once she got on the right train to Landstuhl, nobody knew where the Army hospital was located. She had a hard time communicating with the locals. She later told me she went in a phone booth and broke down and cried. A taxi driver saw her and fortunately, the taxi driver did speak English. He told her where the Army hospital was at and gave her a ride. Once she was at the main gate, a worker asked her if I was going to meet her.

Once Michelle finally got to my room, I was upset that whomever told me that someone from the hospital was going to meet her was not telling the truth. I couldn't imagine what Michelle had gone through after she landed in Germany.

To me, the 14 hour flight back to California seemed like a 2 hour flight. I was still on a lot of

SABADO 008

morphine. There was an ambulance waiting for me at the Los Angeles International Airport (LAX). I was then transported to Cottage Hospital in Santa Barbara.

I remained at Cottage Hospital for an additional 6 days. I had one more surgery for my groin area by a urologist. I was hooked to wound vac machine for 72 hours to get the hole in my leg to heal. I was told that the hospital staff was quite surprised I didn't get staph infection. In my right arm, I had staple stitches.

**Q**. What did your doctors tell you about your future course of treatment?

**A**. Once I spoke to the doctor at Landstuhl, Germany, he told me that I had a long road to recovery. He was the only doctor who was frank with me. He mentioned that I would probably have nerve damage in my right arm due to how the doctor had to close the wound from my severed artery. I was also told that I would probably have early onset arthritis in my legs from the injuries on my upper thighs in my right and left leg. The doctor also advised that he tried to get all the shrapnel out of my body (that was embedded in me) but he couldn't get one piece that was lodged too close to my femoral artery. He didn't feel that this would cause a problem, but if it did, I needed to bring it to the attention of my doctors back home in the United States.

I was also told by the doctor in Landstuhl that a lot of my recovery (whether it was successful or not) would depend on how I worked with my upcoming physical therapy. I thanked the Landstuhl doctor (I do not remember his name) who was upfront with me. I also asked him why nobody said anything to me (in the Ramadi and Balad Trauma Centers). He advised that they probably didn't know how bad I was hurt and the medical personnel probably needed me to stay focused and they likely did not want to give me any negative thoughts. The doctor also told me that when I arrived to Landstuhl I was listed as 'grave critical condition.'

The doctors at Cottage Hospital in Santa Barbara didn't say too much. I guess it's because they didn't deal with my kind? After all, who deals with a patient who had been blown up by a bomb? I recall that they talked about starting physical therapy as soon as possible. I also needed to see a hand specialist. They told me I needed to make an appointment to get all my stitches out approximately a week or so after I left the hospital.

**Q**. What were your doctors telling you about your recovery, including any future surgeries, and what your future would be like after the Attack?

**A**. Nothing was mentioned about future surgeries. I had only spoken to the Defense Base Act (DBA) insurance one time on the phone. Blackwater didn't say anything at all. Later, I felt that my situation was kicked to the side of the curb because Blackwater had to deal with 8 dead personnel at one time. Because I had survived the Attack, I felt nobody knew how deal with me.

The physical therapist at Cottage Hospital (I do not remember her name) was working with me to get the strength and mobility back to my right hand. Michelle recommended that I see her trainer to get my legs and body back into shape. Around this time is when I spoke to someone at the DBA insurance to help pay for my on–going recovery. Very little to nothing was mentioned about my recover after I got back to the States. This led to my DBA/Longshoreman lawsuit from 2014–2016.

SABADO 009

My DBA attorney, David Linker, told me that the DBA insurance company had closed my case shortly after the April 21, 2005 attack.

**Q.** Please describe what your life was like when you returned to the United States?

**A.** In 2004, when I started contracting with Blackwater, I was the only financial support to my family. Michelle had left her job to go back to school. When I was injured on April 21, 2005, we took a financial hit. I was working hard to get back to work due to our financial struggles.

I was able to go back to Iraq working for Blackwater within 2 months after my injuries. Was I 100%, no. But we needed the money. On my first mission back, I was promoted to a site manager in Basra, Iraq. I was in Iraq for 4 months. This was my 4th deployment for Blackwater.

When I returned to Iraq for my 5th deployment for Blackwater, I was only there for a month and returned home for a family emergency. Michelle and I were experiencing marital problems which stemmed from my injuries, redeployments, and my ongoing recovery. Plus, not working for 2 months didn't help matters.

I went back for my 6th deployment for Blackwater in Iraq in the early summer of 2006. I just knew this was my last deployment. The build up from everything from being injured in the Attack finally took its toll in every facet of my life.

**Q.** Do certain dates or events trigger feelings of sadness, frustration, or anger relating to the Attack?

**A**. Yes. Sparky was my right rear gunner and died when our convoy was hit. On the afternoon of the Attack, Sparky was supposed to go home. Prior to us taking off, Sparky and I spoke and I told him 'Hey, you know, you don't have to go on this mission. You're going home today.' And Sparky said to me 'Hey look, I told you I would volunteer to go. My bags are packed, and when you guys come back, you're taking me to the Airport somehow.'

Sparky's death has caused me to experience significant survivor's guilt for a long time. As the team leader, I could have made him go home. The best way I can describe it is I would ask myself the following questions: 'How was I alive?' 'I was bleeding out, how did I survive?' Why did I let Sparky talk me into letting him do the mission?' Adding our financial hardships to these emotions, I went into a dark place very quickly after the Attack.

I kept beating myself up mentally because I was the team leader. I could've told Sparky to stand down. If I did, I knew he would be alive today. I guess I find it hard to forgive myself. And I hope Sparky would forgive me. These thoughts and replaying the events leading to the Attack in my head has really bugged me for a long time and has taken me down a dark path.

**Q.** Please describe what you mean when you use the phrase 'dark path'?

**A**. Some of the dark stuff I dealt with after the Attack are anxiety, depression, severe mood swings, suicidal thoughts, abandonment issues, and anger issues. There were times I just wanted to be by

SABADO 010

myself and not want to be around anyone. Many times, I felt like I failed myself and my family. Often times, I'd wake up and be angry. Michelle used to say to me during these times 'I'm going to go out, hopefully when I get back, you'll be in a better mood.'

**Q**. Please describe all the injuries you sustained in the April 21, 2005 terrorist attack?

**A.** As seen in the medical records and medical reports from my DBA lawsuit (attached to this Affidavit), as a result of the Attack I sustained the following injuries: A severed right arm, multiple shrapnel wounds in my upper left and right thigh, shrapnel wounds to my penis and scrotum sack, and Post-Traumatic Stress Disorder (PTSD) resulting in depression, survivor's guilt, anxiety, depression, severe mood swings, suicidal thoughts, abandonment issues, and anger issues.

**Q.** What plans did you have for your future before the Attack?

**A**. Because I was making decent money at Blackwater (a six figure salary), we were able to move closer to Michelle's family in Santa Barbara in the summer of 2004. We were starting to live a comfortable life. This also gave Michelle a chance to walk away from her court reporting job in Los Angeles and go back to school at Santa Barbara City College. It also gave her a chance to be a stay home mom to our kids, which was very important to Michelle.

I was hoping to save enough money so that one day I could secure great full time employment back home with my overseas experience.

**Q**. Will you please describe your post–Attack financial and relationship struggles?

**A.** It was very frustrating to not find a decent full time job back home after I stopped contracting with Blackwater in the summer of 2006. For example, in September 2006, I had a significant job interview at Santa Barbara City College for Head of Security. I was not chosen for the position. After my second interview, I was later told that my Blackwater experience disqualified me.

Michelle went back to court reporting in 2006, but the ordeal of the time off from my post–Attack injuries set us back. Due to the financial hardships we were experiencing, our marriage had also suffered. It probably didn't help that I went back to Iraq 3 more times after I was injured. I mistakenly thought that going back was going to get us back on our feet financially.

By the summer of 2007, Michelle and I were separated. I had picked up a part time job near home in the security industry. I only worked 4 days a week. From time to time, I picked up other security work for a private investigator. By 2009, I got another part time job during the day. I was working security at a high school during the school year. I had both jobs for 4 years.

Our home was foreclosed in 2007 and I was living out of my car. I had to file bankruptcy that same year. By the winter of 2007, I had extreme suicidal thoughts. It was cold, I was living out of my car, and I was having a hard time. I called a good friend at 4:40 AM one day and he talked me into seeing the sunrise one more day.

I was never again able to get decent full-time employment back home after the Attack. I feel that,

11

ever since Blackwater got a negative connotation around 2007 in the media, I never stood a chance when I listed Blackwater in my resume and/or if I had to discuss the job experience.  It didn't seem to matter that I also had 15 years of law enforcement experience with LAPD.

By around December of 2008, Michelle and I reconciled.  How it happened, I have no idea.  But we basically had to start all over again.  By 2014, we both started to attend relationship seminars and classes.

**Q**. What activities did you enjoy doing before the Attack that you can no longer do?

**A**.  I used to enjoy working out a lot and going to the gym.  After my injuries, it is very hard to lift weights because I lost feeling in my right hand.  I also started to experience weird shooting pains in both legs near my scar tissues.  It comes and goes.  There's no reason how it comes on, it just does from time to time. This shooting pain can happen a lot or not at all.

**Q**. What activities do you wish you could do that are not possible now?

**A**.  I have to be very careful when lifting boxes or carrying stuff around due to loss of feeling in my right hand.  My fingers get stiff too.  I live with the shooting pain in both legs.  As I have got older, I feel the arthritic pain in my legs now.

I can no longer go out for a jog or run a mile due to my injuries.  I also can no longer lift weights at the gym.

**Q**. What activities can you still do, but you need help to do it?

**A**.  I don't climb ladders or carry anything heavy, especially when we moved from California to South Carolina in 2021. I have to be very careful if I carry anything due to the loss of feeling in my hands.  The shooting pains in my legs today does get frustrating because it comes and goes.

**Q**. How does it make you feel to need help and to be dependent on others to do things that you used to be able to do yourself?

**A**. It's very frustrating.  Sometimes, I feel worthless.  I can't even help much when putting up Christmas lights at home or when we go shopping.

**Q**. Where are you living now?

**A**.  We left California in January of 2021 and moved to South Carolina.  We left California due to the high cost of living.

**Q**. Would you please describe a typical day in your life now?

**A**.  I am kind of like 'Mr. Mom' today.  I make sure the household is in order while Michelle works.  I do the cooking and market shopping.  We have a teenage son who is a freshman in high school. I make sure that when he gets home, he is fed and he gets his homework and chores

12

done.  I also drive him to his Taekwondo classes.

**Q**. What does the future look like for you?

**A**.  I am just living one day at a time and feeling very grateful that I am alive. In 2017, during a relationship seminar to work on my marriage, I was offered a free session with Dr. Robert Dee McDonald. Dr. McDonald, a Vietnam combat veteran, is a therapist who practices in Orange County, California and helps a lot of people with combat experience who struggle with PTSD.

Dr. McDonald has helped me tremendously to get my mind off the negative mental loop I had been experiencing since the Attack. Dr. McDonald had me do this exercise where I would describe in detail a time in my life I felt very happy. He then helped me 'dive into' this emotional feeling. This was life–changing as I had been in a very dark place for a long time since the Attack and forgot how to feel happy.

Another thing that helped me was finally being able to talk to and meet Sparky's wife, Lisa Hundley, back in 2007.  Initially, I didn't want to talk to Lisa.  I was in a bad place in my life.  But when I did, it just felt good.  Over the years, Lisa and I's relationship has evolved to be somewhat like family.  Perhaps meeting her and talking to her was meant to be.

**Q.** What plans for the future do you have now?

**A.**  Just trying to enjoy life and not let the negativity from the past like the Attack, my injuries, and Sparky's death get me down.  I'm lucky to be alive and grateful that somehow, Michelle and I survived our unfortunate circumstances.  We are very blessed to still be married.

**Q.**  Has it been difficult for you to answer these questions?

**A.**  Very. A lot of emotions have been generated in the past 24 hours or so while answering these questions. It is very hard to put my traumatic experience 'in words' and to revisit all this.

5.      With the exception of Exhibit 7[1], Exhibit 15[2], and Exhibit 16[3], the Exhibits from

my DBA Settlement Agreement (attached to this Affidavit) contain true and correct copies of

my employment records from Blackwater, my medical records related to the April 21, 2005

---

[1]DBA Settlement Ex. 7 includes a Landstuhl medical record involving a person named Joel D. Bates. Mr. Bates is not related to this action, the DBA lawsuit, and the Attack. Thus, I do not know why this record was included in DBA Exhibit 7.

[2]As seen on Page 4 of the DBA Settlement Agreement, I dispute the opinions of Neuropsychologist Dr. George Henry, Ph.D (DBA Settlement Ex. 15) and Dr. Jerome Franklin, M.D. (DBA Settlement Ex. 16).

[3]*See id.*

SABADO 013

Attack, and accurately describe my medical history related to the April 21, 2005 Attack.[4]

6. Lastly, my attorneys informed me that they received a redacted, 4 page OPS Report from United States Central Command ('CENTCOM') in response to a *Touhy* Request for records related to the Attack. After reviewing the OPS Report (featuring an April 21, 2005 occurrence date and attached to this Affidavit), it is my opinion that the Report is a ***somewhat accurate*** description of the April 21, 2005 attack at issue in this lawsuit. For instance, the location of the attack seen in the OPS Report (Northern Ramadi) and the description of the IED blast (detonated on the right side of the highway) is consistent with my recollection of the Attack. However, the vehicle that was hit by the IED was the first Mamba in the convoy (not the third vehicle) and Sparky should have been listed or described as Killed in Action (KIA) not Wounded in Action (WIA). Furthermore, the Attack occurred in the morning around 09:00 hours and not in the late evening (23:04 hours)."

---

[4]For example, DBA Settlement Ex. 7 describes the post-attack emergency surgery I received in Landstuhl, Germany. DBA Ex. 8 contains a May 3, 2005 Discharge Summary from Santa Barbara Cottage Hospital. And DBA Settlement Ex. 13 contains records from my 2006 therapy sessions with Social Worker Karla Freeman where Ms. Freeman notes that I am experiencing symptoms of posttraumatic stress disorder.

**"I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT."**

Robert Scott Sabado

SIGNED under oath before me on ___MARCH___ 13, 2023

Notary Public – State of South Carolina

My Commission Expires
December 14, 2028

15

UN-REDACTED VERSION FILED UNDER SEAL

USCENTCOM MDR 22-0035          Approved for Release In DOD - FOUO 7 PA applies          03/23/22 001

SABADO 016

UN-REDACTED VERSION FILED UNDER SEAL

USCENTCOM MDR 22-0035   Approved for Release to OGC - FOUO / PA applies   03/23/22 002

SABADO 017

UN-REDACTED VERSION FILED UNDER SEAL

USCENTCOM MDR 22-0035   Approved for Release to DGC - FOUO / PA applies   03/23/22 003

SABADO 018

UN-REDACTED VERSION FILED UNDER SEAL

JSCENTCOM MDR 22-0035          Approved for Release to OGC - FOUO / PA applies          03/23/22 094

SABADO 019

https://www.trac2cs.tre··om.mil/tdbs/SilverStream/Pages/pgRepor...



# PATIENT MOVEMENT REQUEST
## DATA PROTECTED BY PRIVACY OF 1974

**PATIENT DEMOGRAPHICS** Cite # 0500940012
Patient Name: Bates, Joel D | Status: X85 | Cite #: 0500940012 | Precedence: Routine
ID; SSN | Grade: N00 | Gender: Male | Classification: 2A
Nationality: UNITED STATES | Age: 26 Year | CCATT: N | Special: N

**UNIT INFORMATION** Cite # 0500940012
Unit Name: | Duty Station:
City: | Com Phone: | Com Fax:
State/Province: | DSN Phone: | DSN Fax:
Country: | PCS Code:

**POR INFORMATION** Cite # 0500940012
Address: | City: Detroit | State:
Country: | Postal Code: | Phone:

**MOVEMENT INFORMATION** Cite # 0500940012
Injury Type: Non-Battle Injury | Exception to Policy: | Comm Transport?: N
Space Type: LITTER | Will Return?: U

**ADMINISTRATIVE DATA** Cite # 0500940012
Originating MTF: J508A-88th CSH (North-BAGHDAD) | Casualty Event:OlraqF-Disease/NonBl | Ready Date: 009 2005
Destination MTF: A5040-LANDSTUHL REGIONAL MED CTR GE | | Reason Regulated: CT
Appt: | | Source System: T-WEB
Attending Physician: DR SANTANGELO | DSN Phone: 239-7823 | Com Phone:
Ward Name: | DSN Phone: | Com Phone:
Accepting Physician: | DSN Phone: | Com Phone:
Max Stops: | Max RONs: | Altitude Restriction: | Comm Travel?:

**CLINICAL DATA** Cite # 0500940012
Primary Med Spec: SOOP-Pediatric Orthopedic Surgery | Primary Diagnosis: 892.1-OPEN WOUND FOOT-COMPL
Secondary Med Spec: - | Secondary Diagnosis: -
Other Med Spec: - | Other Diagnosis: -
PatientHistory: 26 YO MALE SUSTAINED GSW LEFT FOOT WITH OPEN NAVICULAR FRACTURE. NORMAL PULES AND SENSATION, NO COMPANTMENT SYNDROME. HEAD/NECK NONTENDER , LUNGS CLEAR, CV: rrrNegative murmur. 1cm dorsal left foot wound with 2cmm plantar wound. wound was irrigated/ debris removed. Prepare patient for evac to LRMC. PT NEURO.IS INTACT. NO SPECIAL EQUIPMENT NEEDED.

**MEDICATIONS (2 rows)** Cite # 0500940012

| Medication Name | Dose | Frequency | IVS (1 rows) | | |
| --- | --- | --- | --- | --- | --- |
| | | | IV Location | Solution | Rate cc/hr |
| morphine sulfate | | 1mg iv q thr pm | Heparin Lock | | |
| phenergan | | 25 mg iv q 4 pm | | | |
| Special Diet: none | | | Allergies: | | |

**VITAL SIGNS AND LABS** Cite # 0500940012
T: 97 F | P: 88 | R: 13 | BP:142 /82 | Wt: 165 lbs | Oxygen Rate:
HGB: 18 | HCT: 49 | WBC: | Date Taken: 009 2005 | | Oxygen Mode:

**DRAINAGE (0 rows)** Cite # 0500940012 | **ORTHOPEDICS (0 rows)**

| Drainage Location | Type | Suction Type | Suction Amount | Type | Location |
| --- | --- | --- | --- | --- | --- |

**PMI DATA** Cite # 0500940012
Cardiac Monitor: | Suction: | Pulse Ox: | Incubator:
Ventilator: | Pump: | Stryker: | Traction:

**TRANSPORTATION INFORMATION** Cite # 0500940012
Orig Transport Name: | POC: | Com Phone: | DSN Phone:
Dest Transport Name: | POC: | Com Phone: | DSN Phone:

**ADMIN REMARKS:** Cite # 0500940012
passport Information passport number 701508762 place of birth michigan, usa issue date 11feb 99 expires 10 feb 2009 type p authotirly us consulategeneral milan italy insurance Information poc al harris number 914 822-5537 blue cross/blue shield policy number 384 90 0152 notes'----''--- COMPANY IS BLACK WATER SECURITY POC MS SARA PAYNE 1800 274-0288

SABADO 020

Exhibit 7

4/25/2005 12:31 PM



https://www.trac2es.tra · · · om.mil/tdbs/SilverStream/Pages/pgRepor...

## ATTENDANTS (0 rows)   Cite # 0500940012

| Attendant Name | Status | Grade | Age | Gender | Type |
|---|---|---|---|---|---|

## ITINERARY (1 rows)   Cite # 0500940012

| Mission ID | Aircraft | Origin ICAO | Destination ICAO | Proposed Departure Time | Proposed Arrival Time | Actual Departure Time | Actual Arrival Time | RON |
|---|---|---|---|---|---|---|---|---|
| ALW2064A0009 | GLOBEMASTER III | ORBD | ETAR | 010 2005 0015 | 010 2005 0530 | 010 2005 0400 | 010 2005 0910 | N |

## BILLING INFORMATION   Cite # 0500940012

| Insurance Ranking / Billing Agency / Policy Number | Address / City, State/Province / Country, Postal Code | Policy Holder Last Name, First Name / Policy Holder SSN | Point of Contact / POC Phone / Relationship to Holder | Memo |
|---|---|---|---|---|

SABADO 021

https://www.u~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

# PATIENT MOVEMENT REQUEST
## DATA PROTECTED PRIVACY OF 1974

**Created on:**   Lo-Side

## PATIENT DEMOGRAPHICS   Cite # 0511140028

| | | | |
|---|---|---|---|
| Patient Name: Sabado, Robert | Status: X85 | Cite #: 0511140028 | Precedence: Priority |
| ID: ▓▓▓▓ | Grade: | Gender: Male | Classification: 2A |
| Nationality: UNITED STATES | Age: 36 Year | CCATT: N | Special: N |

## UNIT INFORMATION   Cite # 0511140028

| | | |
|---|---|---|
| Unit Name:  Blackwater Security | Duty Station: | Com Fax: |
| City: | Com Phone: | DSN Fax: |
| State/Province: | DSN Phone: | |
| Country: | PCS Code: | |

## POR INFORMATION   Cite # 0511140028

| | | |
|---|---|---|
| Address: | City: | State: |
| Country: | Postal Code: | Phone: |

## MOVEMENT INFORMATION   Cite # 0511140028

| | | |
|---|---|---|
| Injury Type:  Battle Injury | Exception To Policy: None | Comm Transport?: N |
| Space Type: LITTER | Will Return:  U | |

## ADMINISTRATIVE DATA   Cite # 0511140028

| | | |
|---|---|---|
| Originating MTF: J531N -332 EMDG, Balad | | Ready Date: 111 2005 |
| Destination MTF: A5040 -LANDSTUHL REGIONAL MED CTR GE | | Reason Regulated: CT |
| Appt: | Casualty Event: OIraqF-Battle Inj | Source System: T-WEB |
| Attending Physician: Tieng | DSN Phone: | Com Phone: |
| Ward Name: | DSN Phone: | Com Phone: |
| Last PMR State Changed By: R_MCGETTIGANJ | DSN Phone: 480-8040 | Com Phone: |
| Accepting Physician: | DSN Phone: | Com Phone: |
| Max Stops: | Max RONs: | Altitude Restriction: | Comm Travel?: |

## CLINICAL DATA   Cite # 0511140028

| | |
|---|---|
| Primary Med Spec: SSE-General Surgery | Primary Diagnosis: E991.9-INJ WAR OPS OTH UNSPEC FRAGMNT |
| Secondary Med Spec: - | Secondary Diagnosis: - |
| Other Med Spec: - | Other Diagnosis: - |

Patient History:  Dx: IED- compartment sydrome, RUE, partial right ulnar nerve. Bilateral LE IED wounds, distal penile injury w/urethrotomy Hx: 35 y/o US civilian contractor S/P IED injury brought to Balad AFTH. CT Scan (-) for Abd injuries. Noted on presentation to be stable, but have decreased mobility of last 2 digits of right hand and IED blast injury to RUE. In addition, he had bilateral LE shrapnel wounds to thighs and distal penile injury w/foley already in place. Underwent emergent surgery for washout of Bilat LE wounds, removal of LLE shrapnel, release of RUE compartment syndrome, repair of ulnar nerve injury, ligation of ulnar artery, primary repair of RUE muscle tendons, penile exploration and urethral repair. A/O x3 NAD. Lungs CTA. Splint intact RUE. Dressings CDI. N/V (+). H/H 13.7/42.7, PLT 137. Na 139, K 4.0. ph 7.36. pCO2 47.7. SAO2 97% RA.

## MEDICATIONS (5 rows)   Cite # 0511140028      IVs (0 rows)

| Medication Name | Dose | Frequency | IV Location | Solution | Rate cc/hr |
|---|---|---|---|---|---|
| Morphine Sulfate | 5mg | q 1 hr pmm | | | |
| Zofran | 4 mg | IVP q 6 hrprn | | | |
| percocet | 1-2 tabs | q 6 hrprn | | | |
| ancef | 2 Gm | q 8 hr | | | |
| LOVENOX | 30MG | SC BID | | | |

Special Diet: none

Allergies: none

4/28/2005 8:33 AM

SABADO 022

https://www.traczes.transcom.mil/bb/unvea/brealhx/iges/pgxreport...

## VITAL SIGNS AND LABS   Cite # 0511140028

| | | | | | |
|---|---|---|---|---|---|
| T: 100.7 F | P: 88 | R: 16 | BP:129 / | Wt: 150 lbs | Oxygen Rate: |
| HGB: | HCT: | WBC: | Date Te: 111 2005 | | Oxygen Mode: |

## DRAINAGE (0 rows)   Cite # 0511140028          Orthopedic (0 rows)

| Drainage Location | Type | Suction Type | Suct... mount | Type | Location |
|---|---|---|---|---|---|

## PMI DATA   Cite # 0511140028

| | | | |
|---|---|---|---|
| Cardiac Monitor: | Suction: | Pulse Ox: | Incubator: |
| Ventilator: | Pump: | Stryker: | Traction: |

## TRANSPORTATION INFORMATION   Cite # 0511140028

| | | | |
|---|---|---|---|
| Orig Transport Name: | POC: | Com Phone: | DSN Phone: |
| Dest Transport Name: | POC: | Com Phone: | DSN Phone: |

## ADMIN REMARKS:   Cite # 0511140028

CLEAR TO FLY BY DR. JOHN JAMES, MAJ, USAF, MC FS IV L/R @ 100CC/HR;
HEPLOCK W/ PO FLUIDS. Passport/Insurance Info: DOB: 30 Jan 1969 Place of Birth: Hawaii
Passport #: 201701280 Place of Issue: Sim Valley, CA Date of Issue: 01/10/2000 Date of
Expiration: 01/09/2010 Company Name: Blackwater Security POC: Dave Jackson POC #:
877-425-6987/252-599-1604 Insurance Co: CIGNA International Policy #: DBA223501471
Phone #: 888-262-0042 Personal POC: Michelle Sabado, Wife Phone:
805-684-0258/805-217-8062 Address: 1336 Vallecito Place, Carpinteria CA

## ATTENDANTS (0 rows)   Cite # 0511140028

| Attendant Name | Status | Grade | Age | Gender | Type |
|---|---|---|---|---|---|

## ITINERARY (1 rows)   Cite # 0511140028

| Mission ID | Aircraft | Origin ICAO | Destination ICAO | Proposed Departure Time | Proposed Arrival Time | Actual Departure Time | Actual Arrival Time | RON |
|---|---|---|---|---|---|---|---|---|
| XLWRE640D111 | STARLIFTER | ORBD | ETAR | 111 2005 2245 | 112 2005 0400 | 111 2005 2230 | 112 2005 0325 | N |

## BILLING INFORMATION   Cite # 0511140028

| Insurance Ranking / | Address / | Policy Holder Last Name, First Name / | Point of Contact / | Memo |
|---|---|---|---|---|
| Billing Agency / | City, State/Province / | | POC Phone / | |
| Policy Number | Country, Postal Code | Policy Holder SSN | Relationship to Holder | |



4/28/2005 8:33 AM

SABADO 023

Page 1 of 3

Santa Barbara Cottage Hospital MR#: 1165375
P.O. Box 689 AC#: 3505561
Santa Barbara, CA 93102 RM#: 5S14
PT:

NAME: SABADO, ROBERT                    DOB: 01/■■/1959 SEX: M
D.P.: MEIJER, ROSALIE PAC
A.P.: WAXMAN, M.D. KENNETH S.
PCP :

DISCHARGE SUMMARY

DATE OF ADMISSION: 04/27/2005

DATE OF DISCHARGE: 05/03/2005

PROVISIONAL DIAGNOSIS: Civilian casualty from Iraq with
multiple shrapnel wounds, status post
bomb explosion, in his right forearm,
right lateral thigh, groin, and penis.

REASON FOR ADMISSION: The patient is a 46-year-old male who was a
civilian construction worker in the country of Iraq. He was
wounded on April 14, 2005 in Iraq following an explosion with
shrapnel injury to his right arm, right lateral thigh, penis, and
left groin. He was evaluated initially at the trauma center in
"Bilod," Iraq, at which time he underwent emergency surgery to
stabilize the patient, after which time he was transported to
Germany for operative treatment.

Upon arrival in Germany, he underwent fasciotomy of the right
forearm with exploration of the shrapnel wound which required
ligation of the ulnar artery and ulnar nerve repair. He also
underwent exploration and irrigation and debridement of the right
buttock and lateral thigh wounds as well as irrigation and
debridement of bilateral groin wounds and urethral repair of an
injury to the glans penis with placement of a Foley catheter. The
patient remained in Germany until he was stabilized for transfer
to Santa Barbara Cottage Hospital for continued care as the
patient is a local resident. He was brought in by medical
transport. This was a tier 3 activation.

FINDINGS: On primary survey airway, breathing, circulation, and
neuro were intact with a GCS of 15. Vital signs were stable.
Resuscitation was with sterile dressings for bleeding control as
well as IV fluids. On secondary survey, bilateral groin areas have
stapled incisions which are clean, dry, and intact. There are
sutures in the glans penis which are clean, dry, and intact and a
Foley catheter is in place. The right forearm is status post
fasciotomy with an open wound. Sterile dressings are intact.
Right lateral thigh has a
4 cm deep wound with wet-to-dry packing. The patient is admitted
for serial examinations and definitive care.

HOSPITAL COURSE: The patient is admitted to 5 South. He had a
wound VAC placed to his right thigh open wound. He was given a
regular diet which he tolerated well with "nausea and vomiting."
His pain was well controlled. He was evaluated by Dr. David Laub
of urology who reviewed all operative reports and ordered a
voiding urethrogram and recommended discontinuation of the Foley
and arranged for continued follow-up with this patient following
discharge.

The patient was evaluated by occupational therapy and is followed

https://www.cottagemd.org/resView/transcriptionDetail.asp?mode=readonly&noheader=&... 7/21/2005

SABADO 024

Exhibit 8

09/21/2010 12:31 FAX  805 569 2542        Dr.Laub M.D.                    ☑0006/0007

throughout the course of his hospital stay for range of motion and
strengthening of his left upper extremity.  The patient is
evaluated by Dr. Robert Ruth of hand surgery who arranged for
continued follow-up following discharge.

The patient was returned to the operating room on May 2, 2005 with
Dr. Waxman of general surgery for complex closure of the right
forearm fasciotomy wounds as well as right lateral thigh/buttock
wound. Postoperatively the patient is returned to 5 South where he
remained stable. He was voiding spontaneously, able to ambulate
without assistance, pain was well controlled and he was deemed
stable for discharge on May 3, 2005.

OPERATIONS PERFORMED:  Complex closure of right lateral
thigh/buttock wound and right forearm fasciotomy by Dr. Kenneth
Waxman of general surgery.

CONSULTATIONS:
1. Dr. David Laub of urology.
2. Dr. Robert Ruth of hand surgery.
3. Occupational therapy.

COMPLICATIONS:  None.

FINAL DIAGNOSES: Civilian casualty with shrapnel wounds,
status post bomb explosion with shrapnel
wounds to the right forearm, right
thigh/buttock, bilateral groin wounds, and
penile laceration.

CONDITION AT DISCHARGE:  Stable.

DISPOSITION:  Home with family.

INSTRUCTIONS: The patient is given aftercare instructions for
wound care as well as post-traumatic stress syndrome. He may
resume normal activity level as tolerated. He is to have sutures
and staples removed from bilateral thighs in three days, from
right lateral thigh in seven to ten days, and sutures will be
removed from his right forearm once cleared by Dr. Waxman. He is
to follow up with occupational therapy as an outpatient. He is to
schedule an appointment with the primary medical doctor in five to
seven days.  He has an appointment at county surgical clinic in
three days following discharge.  He is to schedule an
appointment with Dr. Ruth of orthopedic hand surgery as well as
Dr. Laub of urology and he is repeat the voiding cystourethrogram
before the appointment.  The patient has a JP drain present in his
right thigh. He is to empty the drain as needed, keep the
suction.  He is to have a dressing change each day, right arm, by
Visiting Nurses Association, right arm Adaptic over sutures,
Kerlix over hand and arm.  He is to have his splint on at all
times as was performed by occupational therapy, right thigh with
the JP drain and drain sludges with sponges, and 4 x 4s over the
staples.  No Adaptic to the thigh staples.  Inner thigh, groin
staples are to be kept open to air as well as the right lateral
thigh once the JP drain is removed, the staples will be left open
to air. He may resume any medications he normally takes as well as
Vicodin and Celebrex for pain, Colace while taking Vicodin, and he
is encouraged to take multivitamins with selenium, Vitamin C, and
zinc to promote wound healing.

ELECTRONICALLY SIGNED ON 6/28/2005 AT 7:08:44 AM BY:

MEIJER,  ROSALIE PAC

ELECTRONICALLY SIGNED ON 6/25/2005 AT 6:31:52 PM BY:

https://www.cottagemd.org/resView/transcriptionDetail.asp?mode=readonly&noheader=&... 7/21/2005

SABADO 025

09/21/2010 12:31 FAX  805 569 2542        Dr.Laub M.D.                    0007/0007

Page 3 of 3

WAXMAN, M.D.  KENNETH S.

RM/ 08363330/hk
JOB: 74132
ID:  7103
DD:  06/22/2005   15:27
DT:  06/25/2005   15:11
CC:  COORDINATOR, TRAUMA.

PAGE 2
 MR#: 1165375
NAME: SABADO, ROBERT
D.P.: MEIJER, ROSALIE PAC

https://www.cottagemd.org/resView/transcriptionDetail.asp?mode=readonly&noheader=&...  7/21/2005

SABADO 026

☐ VOID    ☐ CORRECTED

| PAYER'S name, street address, city, state, ZIP code, and telephone no. | | 1  Rents | OMB No. 1545-0115 | |
|---|---|---|---|---|
| BLACKWATER SECURITY CONSULTING, LLC<br>850 PUDDIN RIDGE ROAD<br>MOYOCK, NC 27909<br>252-435-2488 | | $<br>2  Royalties<br><br>$ | **2006**<br><br>Form **1099-MISC** | **Miscellaneous Income** |
| | | 3  Other income<br><br>$ | 4  Federal income tax withheld<br><br>$ | **Copy C** |
| PAYER'S federal identification number<br><br>45-0473998 | RECIPIENT'S identification number | 5  Fishing boat proceeds<br><br>$ | 6  Medical and health care payments<br><br>$ | **For Payer or State Copy** |
| RECIPIENT'S name, address, and ZIP code<br><br>ROBERT SABADO | | 7  Nonemployee compensation<br><br>$    88700.00 | 8  Substitute payments in lieu of dividends or interest<br><br>$ | **For Privacy Act and Paperwork Reduction Act** |
| | | 9  Payer made direct sales of $5,000 or more of consumer products to a buyer (recipient) for resale ▶ ☐ | 10  Crop insurance proceeds<br><br>$ | **Notice, see the 2006 General** |
| CARPINTERIA, CA 93013 | | 11 | 12 | **Instructions for Forms 1099, 1098, 5498,** |
| Account number (see instructions)<br><br>C-0966016 | 2nd TIN not. ☐ | 13  Excess golden parachute payments<br><br>$ | 14  Gross proceeds paid to an attorney<br><br>$ | **and W-2G.** |
| 15a  Section 409A deferrals<br><br>$ | 15b  Section 409A income<br><br>$ | 16  State tax withheld<br>$ .................<br>$ | 17  State/Payer's state no.<br>.......................... | 18  State income<br>$ ................<br>$ |

Form **1099-MISC**                                                    Department of the Treasury - Internal Revenue Service

SABADO 02...  Exhibit 9

# Robert M. Ruth, M.D.
## ASSOCIATED HAND SURGEONS
### SURGERY OF THE UPPER EXTREMITIES

## PRIMARY TREATING PHYSICIAN'S PERMANENT AND STATIONARY REPORT (PR-4)

November 02, 2015

Beverly Davis
CNA
P.O. Box 8317
Chicago, IL 60680-8317

RE:            :     SABADO, ROBERT
CLAIM NO. :    ▓▓▓▓▓▓▓
EMPLOYER :     BLACKWATER SECURITY
D.O.I.         :     04/21/2005
E/M PROVIDED:  99214

Dear Ms. Davis:

I performed a Permanent and Stationary Evaluation on Robert Sabado in my Santa Barbara office today, November 02, 2015. At that time, I performed an interval history and physical examination regarding Mr. Sabado's upper extremities.

**INTERVAL HISTORY:** I last saw Mr. Sabado in 2005. He did not return for further care. He returns today for permanent and stationary rating. He complains of numbness, pain, weakness, and limited motion right upper extremity. He notes constant numbness right ring and small finger. He has some pain emanating from the hand into the medial elbow. He gets some cramping in the fingers into a flexed posture. Right hand feels weak. He feels the symptoms may have worsened over the past two years. He has not had any additional surgery.

**CURRENT COMPLAINTS:** Mr. Sabado complains of numbness, pain, weakness, and limited motion in right upper extremity.

**OCCUPATIONAL HISTORY:** Mr. Sabado was employed by the Blackwater at the time of injury as a security contractor. He worked as a team leader, supervisor, and a gunner. He has been with this employer from March 2004 to the August 2006. He was out of work from August 2006 to October 2006. He is working as a case detective as a security worker from September 2015 to the present time. In June or July 2015, he worked at the Costco doing maintenance for one month.

## UPPER EXTREMITY PHYSICAL EXAMINATION

Dominant Extremity: Right
Injured Extremity:   Right

SABADO 028

Exhibit 10

SB SUPERIOR COURT          Fax:                    Nov 10 2015 10:00am P002/007

**RE:**            :       **SABADO, ROBERT**
**CLAIM NO.**    :       **HW550291**
**DATE:** November 02, 2015

Physical Parameters (patient self-reported)
Height:       5'7
Weight:       180 lbs.

| **SHOULDER** | **RIGHT** | **LEFT** |
|---|---|---|
| **Range of Motion** | | |
| Flexion | 180 | 180 |
| Extension | 50 | 50 |
| External Rotation | 90 | 90 |
| Internal Rotation | 90 | 90 |
| Abduction | 180 | 180 |
| Adduction | 50 | 50 |
| **Tests** | | |
| AC Tenderness | Negative | Negative |
| Supraspinatus Tenderness | Negative | Negative |
| Impingement Sign | Negative | Negative |
| Adduction Test | Negative | Negative |
| Apprehension Test | Negative | Negative |
| Instability | Negative | Negative |
| Abduction Strength | 5/5 | 5/5 |

| **ELBOW** | **RIGHT** | **LEFT** |
|---|---|---|
| **Range of Motion** | | |
| Flexion | 130 | 140 |
| Extension | 20 | 0 |
| **Tenderness** | | |
| Medial Epicondyle | Negative | Negative |
| Lateral Epicondyle | Negative | Negative |
| Radial Tunnel | Negative | Negative |
| Ulnar Nerve | Negative | Negative |
| **Tests** | | |
| Elbow Flexion Test | Negative | Negative |
| Middle Finger Test | Negative | Negative |
| Medial Instability | Negative | Negative |
| Tinel Sign Ulnar Nerve | Negative | Negative |
| Lateral Elbow Pain with Resisted Wrist Extension | Negative | Negative |
| Medial Elbow Pain with Resisted Wrist Flexion | Negative | Negative |

SB SUPERIOR COURT      Fax:            Nov 10 2015 10:00am P004/007

RE:       :   SABADO, ROBERT
CLAIM NO. :   HW550291
DATE: November 02, 2015

| FOREARM | RIGHT | LEFT |
|---|---|---|
| **Range of Motion** | | |
| Pronation | 80 | 80 |
| Supination | 80 | 80 |
| **Tenderness** | | |
| Volar | Positive | Negative |
| Dorsal | Negative | Negative |

Widened right ulnar forearm scar from the proximal forearm to the ulnar aspect of the
wrist and then extending to the proximal central portion of the palm. Scar measures 27
cm in length. It is mildly tender.

| WRIST | RIGHT | LEFT |
|---|---|---|
| **Range of Motion** | | |
| Extension | 60 | 60 |
| Flexion | 60 | 60 |
| Ulnar Deviation | 30 | 30 |
| Radial Deviation | 20 | 20 |
| **Tenderness** | | |
| First Dorsal Compartment | Negative | Negative |
| ECRL/ECRB Tendons | Negative | Negative |
| ECU Tendon | Negative | Negative |
| FCR Tendon | Negative | Negative |
| FCU Tendon | Negative | Negative |
| Snuffbox/Scaphoid | Negative | Negative |
| SL Interval | Negative | Negative |
| LT Interval | Negative | Negative |
| DRUJ | Negative | Negative |
| TFCC | Negative | Negative |
| Distal Radius | Negative | Negative |
| Distal Ulna | Negative | Negative |
| **Tests** | | |
| Tinel Sign Median Nerve | Negative | Negative |
| Tinel Sign Ulnar Nerve | Negative | Negative |
| Carpal Tunnel Comp. Test | Negative | Negative |
| SL Shuck Test | Negative | Negative |
| LT Shuck Test | Negative | Negative |
| Phalen's Test | Negative | Negative |
| Watson's Test | Negative | Negative |
| Finkelstein's Test | Negative | Negative |
| DRUJ Instability | Negative | Negative |

RE:        :   **SABADO, ROBERT**
**CLAIM NO.**  :   HW550291
DATE: November 02, 2015

| **HAND** | **RIGHT** | **LEFT** |
|---|---|---|
| Capillary Refill | Normal | Normal |
| Grip Strength (Jamar Dynamometer in Position 2) | 25/20/20 | 65/45/50 |
| **Atrophy** | | |
| Thenar | Negative | Negative |
| First Dorsal Interosseous | Positive | Negative |
| Hypothenar | Positive | Negative |
| **Strength** | | |
| Median Intrinsics | 5/5 | 5/5 |
| Ulnar Intrinsics | 3/5 | 5/5 |
| **Pulses** | | |
| Radial | 2+ | 2+ |
| Ulnar | 0 | 2+ |

| **THUMB** | **RIGHT** | **LEFT** |
|---|---|---|
| **Range of Motion CMC Joint** | | |
| Opposition | Normal | Normal |
| Radial Abduction | Normal | Normal |
| Adduction | Normal | Normal |
| **Tests** | | |
| CMC Grind Test | Negative | Negative |
| CMC Joint Tenderness | Negative | Negative |
| CMC Instability | Negative | Negative |
| MCP Joint Ulnar Collateral Instability | Negative | Negative |

**DIGITS - RIGHT**
Range of Motion

| RIGHT | THUMB | INDEX | MIDDLE | RING | SMALL |
|---|---|---|---|---|---|
| MP | NL | NL | NL | NL | NL |
| PIP | XX | NL | NL | NL | NL |
| DIP | NL | NL | NL | NL | NL |
| Distance from DPC (cm) | 0 | 0 | 0 | 0 | 0 |

RE:       :    **SABADO, ROBERT**
CLAIM NO. :    **HW550291**
DATE: November 02, 2015

**DIGITS - LEFT**
**Range of Motion**

| LEFT | THUMB | INDEX | MIDDLE | RING | SMALL |
|------|-------|-------|--------|------|-------|
| MP   | NL    | NL    | NL     | NL   | NL    |
| PIP  | XX    | NL    | NL     | NL   | NL    |
| DIP  | NL    | NL    | NL     | NL   | NL    |
| Distance from |  |  |  |  |  |
| DPC (cm) | 0 | 0 | 0 | 0 | 0 |

| SENSATION | THUMB | INDEX | MIDDLE | RING | SMALL |
|-----------|-------|-------|--------|------|-------|
| RIGHT     | NL    | NL    | NL     | Dec  | Dec   |
| LEFT      | NL    | NL    | NL     | NL   | NL    |

Decreased sensation to light touch right dorsal ulnar hand and the ulnar aspect of the ring finger and the volar radial and volar ulnar small finger. There is no pain perception with firm pinching of the right small finger.

| TRIGGERING | THUMB | INDEX | MIDDLE | RING | SMALL |
|------------|-------|-------|--------|------|-------|
| RIGHT      | Negative | Negative | Negative | Negative | Negative |
| LEFT       | Negative | Negative | Negative | Negative | Negative |

**DIAGNOSES:**
1.    STATUS POST RIGHT UPPER EXTREMITY IED INJURY WITH ULNAR
      NERVE LACERATION AND ULNAR ARTERY INJURY, STATUS POST
      RIGHT ULNAR NERVE REPAIR AND RIGHT ULNAR ARTERY
      LIGATION, STATUS POST VOLAR FOREARM FASCIOTOMY.

**DISCUSSION:** Mr. Sabado sustained a specific injury to his right upper extremity as previously discussed. He now returns for followup. He has ongoing ulnar nerve dysfunction of the right upper extremity as expected. He has reached a permanent and stationary status.

**DISABILITY STATUS:** For the purposes of this report, Mr. Sabado has reached a permanent and stationary level as of today, November 02, 2015, since he has reached a maximum medical improvement.

**SUBJECTIVE FACTORS OF DISABILITY:** It is my opinion that Mr. Sabado experiences constant numbness and weakness in his right upper extremity. He

SB SUPERIOR COURT          Fax:                    Nov 10 2015 10:00am P003/007

RE:          :    SABADO, ROBERT
CLAIM NO.    :    HW550291
DATE: November 02, 2015

experiences slight pain in his right upper extremity on a frequent basis which elevates to moderate pain with heavy or repetitive use.

## OBJECTIVE FACTORS OF DISABILITY:
1.  Decreased right elbow range of motion.
2.  Decreased sensation right upper extremity in the ulnar nerve distribution.
3.  Weakness in the right upper extremity related to ulnar nerve injury.

**WORK RESTRICTIONS/LOSS OF PRE-INJURY WORK CAPACITY:** As a result of this industrial injury, Mr. Sabado does not require work restrictions, nor has he lost any significant component of his pre-injury work capacity as a result of these industrial injuries.

**IMPAIRMENT RATING:** Utilizing the Fifth Edition of the AMA Guides to the Evaluation of Permanent Impairment, Chapter 16, Pages 433-520, Mr. Sabado does qualify for an impairment rating as a result of this industrial injury. With respect to his reduced right elbow range of motion, utilizing figure 16-34, this correlates with a 3% upper extremity impairment rating.

His right ulnar nerve laceration also qualifies him for a sensory and a motor impairment. Utilizing table 16-10, I would assign him a grade I involvement of right ulnar sensory nerve dysfunction of 90%. Review of table 16-15 shows maximum upper extremity impairment rating for ulnar nerve involvement at the proximal forearm of 7%. Multiplying 90% by 7% produces a 6% upper extremity impairment rating for ulnar nerve sensory dysfunction.

His right ulnar nerve motor function utilizing table 16-11, I would choose to assign a grade III involvement of 50%. Table 16-15 reveals maximum upper extremity impairment rating for ulnar nerve motor involvement at the proximal forearm of 46%. Multiplying 50% by 46% produces a 23% upper extremity impairment rating. The upper extremity impairment rating for sensory loss and motor loss of the ulnar nerve function produce combine for a 28% upper extremity impairment rating combining in the upper extremity impairment rating for elbow motion loss produces a 30% upper extremity impairment rating. This converts to an 18% whole person impairment. I believe that this calculation adequately captures Mr. Sabado's impairment.

**CAUSATION:** Mr. Sabado's injuries have arisen directly from his course of employment.

**APPORTIONMENT:** Mr. Sabado's injuries and their respective impairment related to these injuries, with respect to causation, are 100% attributable to industrial causes.

**VOCATIONAL REHABILITATION:** Mr. Sabado is not a Qualified Injured Worker and is not eligible for vocational rehabilitation since he can perform all the duties of his usual and customary occupation.

**RE:** : **SABADO, ROBERT**
**CLAIM NO.** :
**DATE:** November 02, 2015

**FUTURE MEDICAL CARE:** Provisions do need to be made for Mr. Sabado's future medical care. Should he experience worsening symptoms, he should be referred to an orthopedic hand surgery specialist for evaluation and treatment. Treatment options could include, but not be limited to medication, splinting, therapy, corticosteroid injection, additional diagnostic testing, or consideration of additional surgery such as exploration of the ulnar nerve, possible nerve grafting, or tendon transfers.

Thank you for allowing me to participate in Mr. Sabado's medical care. If there are any questions regarding this report or his clinical status, please feel free to contact my office.

I declare under penalty of perjury that this report is true and correct to the best of my knowledge, and that I have not violated labor code 139.3.

*Robert M. Ruth*

Calif. Lic. #: G81288
Executed at: Santa Barbara, California

Date: November 02, 2015

Name: Robert M. Ruth, M.D.
Specialty: Orthopedic Hand Surgery
Address:

Santa Barbara, CA 93105
Telephone: (805) 682-2267

RMR/snd/mnu#114726958

-7-
**SABADO 034**

**RE:**              :    **SABADO, ROBERT**
**CLAIM NO.**   :
**DATE:** November 02, 2015

### DECLARATION OF ROBERT M. RUTH, M.D.

This patient's history and physical examination were performed by me. The medical reports were reviewed by me and I prepared the report. The opinions and conclusions set forth in this report are those of Robert M. Ruth, M.D.

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information that I have indicated I received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, that I believe it to be true.

There has been no violation of California Labor Code Section 139.3.

Executed this 2nd day of November, 2015 at Santa Barbara, County of Santa Barbara, California, United States of America.

*/Blut m Ruth*

Robert M. Ruth, M.D.

# SCHEINBERG ORTHOPEDIC GROUP

Richard D. Scheinberg, M.D.
Medical Director

Mark Jamali-Ashtiani P.A.-C
Director of Physician Assistants

**Main Office**

| | | | |
|---|---|---|---|
| 401 Chapala Street, Suite 102 | 441 W. 5th Street | 530 E. Main Street | 1914 Truxtun Avenue |
| Santa Barbara, CA 93101 | Oxnard, CA 93030 | Santa Maria, CA 93454 | Bakersfield, CA 93301 |
| (805) 682-1394 | (805) 682-1394 | (805) 682-1394 | (661) 430-9050 |
| Fax (805) 682-6394 | Fax (805) 682-6394 | Fax (805) 682-6394 | Fax (661) 430-9053 |

February 9, 2016

Robyn A. Leonard, Attorney at Law
Law Offices of Laughlin Falbo Levy & Moresi LLP
255 California Street, Suite 700
San Francisco, CA 94111-4912

RE: SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
AND CONTINENTAL INSURANCE
DOL: 04/21/05
DOB: 01/30/59
CLAIM: ███████

## INDEPENDENT MEDICAL EXAMINATION

Dear Ms. Leonard:

Mr. Sabado was referred for an Independent Medical Evaluation. I saw him in my Santa Barbara office on February 9, 2016.

## IDENTIFYING INFORMATION:

Mr. Sabado was employed by Blackwater Security Consulting, LLC, working in Iraq in support of military operations. He worked in the capacity of a team leader. On the day of the injury his armored vehicle was destroyed by an explosion of an IED. Mr. Sabado suffered shrapnel wounds with a rupture of the right ulnar artery, ulnar nerve trauma in the right upper extremity, with deep wounds to both the anterior proximal thighs and lacerations of his penis. He was airlifted to Germany to the Army Medical Center in Landstuhl and then brought for further treatment, including surgery, to Santa Barbara Cottage Hospital.

In Germany he did undergo a fasciotomy of the right forearm with exploration of the shrapnel wounds, which required ligation of the ulnar artery and ulnar nerve repair. He underwent exploration, irrigation, and debridement of the right buttock and lateral thigh wounds, as well as irrigation and debridement of bilateral groin wounds, as well as urethral repair of an injury to the glans penis with placement of a Foley catheter.

SABADO 036

Exhibit 11

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
February 9, 2016
Page 2

On April 29, 2005, he underwent hand surgery consultation with Robert M. Ruth, M.D. Dr. Ruth's impression was: 1. Status post right ulnar nerve repair of ulnar nerve laceration. 2. Possible status post right ulnar artery ligation, status post volar forearm fasciotomy with open wound. He did not recommend reexploration of the ulnar nerve due to risk of iatrogenic injury and devascularization of the nerve.

He underwent additional treatment with Kenneth Waxman, M.D., and David J. Laub, M.D., for urological treatment.

On November 2, 2015, a permanent and stationary report was issued by Robert M. Ruth, M.D., who noted the patient had never returned for further care. He noted the patient was working as a case detective and security worker from September 2015 to the date of his evaluation. He indicated an 18% whole person impairment for range of motion of the right elbow, as well as ulnar nerve laceration with both sensory and motor impairment.

## PRESENT COMPLAINTS:

At the present time Mr. Sabado has specific complaints referable to his right upper extremity (it should be noted that pursuant to the cover letter of January 19, 2016, I have been asked to address the right upper extremity condition even though this patient does relate that he had lower extremity injuries as well). Mr. Sabado does indicate that he has persistent weakness and numbness in the ulnar distribution of his right hand that does cause him pain and weakness, particularly with grip, grasp, and lifting. He notes that particularly when he worked for Costco he had difficulties holding and gripping items, and eventually he stopped working because of that. He notes that when he fully extends his right elbow he has discomfort about the right elbow and a pulling sensation about the scar tissue over the right forearm.

## PERTINENT PREEXISTING HISTORY:

The patient denies significant pertinent preexisting history, either industrial or otherwise. It should be noted that there is a subsequent history of an August 18, 2015, motor vehicle accident in which this patient sustained a neck and back injury. He did undergo treatment for that accident, but that does not overlap with the right upper extremity symptoms. He also had a motor vehicle accident in childhood at the age of 6 with no medical treatment. At the age of 9 he was hospitalized due to kidney failure. Surgical interventions during childhood including a tonsillectomy at age 11.

## PHYSICAL EXAMINATION:

### General:

Well-developed, well-nourished gentleman in no acute distress.

### Upper extremity examination:

On right upper extremity exam he has full range of motion of the right shoulder, elbow, wrists, and small joints of the hands. When he extends his right elbow fully he does get some pain down

SABADO 017

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
February 9, 2016
Page 3

the ulnar aspect of the right hand. He has a positive Tinel sign over the ulnar nerve at the level of the right medial epicondyle. He has a healed scar that traverses the entire volar aspect of the right forearm from the elbow to the wrist. The patient has diminished sensation at the central aspect of that scar and distal over the ulnar aspect of the right hand. He has hypesthesia to anesthesia to light touch and pinprick in that area. There is no evidence of significant motor atrophy of the interosseous muscles or the thenar muscles.

### Jamar dynamometer grip strength measurements:

Jamar dynamometer grip strength measurements, right-hand (dominant) are 25, 20, 20, left hand 40, 40, 40.

### DIAGNOSES:

1.    Status post right ulnar nerve repair.
2.    Status post fasciotomy, right arm.
3.    Ulnar artery injury, right upper extremity.
4.    Lower extremity injuries secondary to shrapnel.
5.    Urological injuries secondary to IED explosion.

### DISCUSSION/RECOMMENDATIONS:

I have been asked to focus my evaluation on this patient's right upper extremity. I believe he did in fact sustain a significant right upper extremity injury as a result of his industrial exposure at Blackwater Security in April 2005. His treatment appears to have been both reasonable and appropriate. I believe the permanent and stationary date that Dr. Ruth had determined is a reasonable date due to the chronic injury to the ulnar nerve necessitating a protracted period of healing. The patient does have significant residua in regard to weakness and numbness in the right hand ulnar distribution.

### WORK RESTRICTIONS:

I believe this patient does require work restrictions avoiding forceful gripping and grasping with his right hand.

### IMPAIRMENT RATING PURSUANT TO THE *AMA GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT,* 5TH EDITION:

Pursuant to the upper extremity section of the AMA Guides, the patient would have a grade 0 abnormality of the ulnar nerve below the midforearm for sensory deficit. Pursuant to table 16-10 and a grade 4, I would assess 25% motor deficit pursuant to table 16-11. Utilizing table 16-15 for the ulnar nerve below the midforearm, he would have a 7% upper extremity impairment and 9% motor impairment, for 16% upper extremity impairment, which converts to 10% whole person impairment. The patient does have full range of motion of the right elbow, and the grip strength loss is incorporated in the motor deficit evaluation pursuant to the AMA Guides, and therefore this patient would have a 10% whole person impairment for the right upper extremity.

SABRO 0438

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
February 9, 2016
Page 4

## APPORTIONMENT:

Pursuant to Labor Code 4663 apportionment is not indicated. There is no basis for additional apportionment.

## VOCATIONAL REHABILITATION:

This patient is not a qualified injured worker.

## FUTURE MEDICAL CARE:

The patient should have access to orthopedic followup, to include but not limited to nonsteroidal anti-inflammatory medications, pain medications, and muscle relaxants. However, I would say it is unlikely that additional treatment is indicated to the right ulnar nerve based on the fact that he does not have significant loss of motor function to the interosseous muscles, which may ultimately necessitate tendon transfer-type procedures. That is not occurring in this patient and, as such, I believe no additional surgical treatment will be indicated.

If I can be of further assistance, please do not hesitate to let me know.

Yours very truly,

*Richard D. Scheinberg*, M.D.

Richard D. Scheinberg, M.D., F.A.A.O.S.
cc:     Beverly Ann Davis, CNA International (e-mail only)
RDS/ps1 Dict#1242

# SCHEINBERG ORTHOPEDIC GROUP

| Richard D. Scheinberg, M.D. | Mark Jamali-Ashtiani P.A.-C |
|---|---|
| Medical Director | Director of Physician Assistants |

**Main Office**

| | | | |
|---|---|---|---|
| 401 Chapala Street, Suite 102 | 441 W. 5th Street | 530 E. Main Street | 1914 Truxtun Avenue |
| Santa Barbara, CA 93101 | Oxnard, CA 93030 | Santa Maria, CA 93454 | Bakersfield, CA 93301 |
| (805) 682-1394 | (805) 682-1394 | (805) 682-1394 | (661) 430-9050 |
| Fax (805) 682-6394 | Fax (805) 682-6394 | Fax (805) 682-6394 | Fax (661) 430-9053 |

February 9, 2016

Robyn A. Leonard, Attorney at Law
Law Offices of Laughlin Falbo Levy & Moresi LLP
255 California Street, Suite 700
San Francisco, CA 94111-4912

RE:  SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
    AND CONTINENTAL INSURANCE
DOL: 04/21/05
DOB: 01/30/59
CLAIM: ■■■■■■

## INDEPENDENT MEDICAL EXAMINATION

Dear Ms. Leonard:

Mr. Sabado was referred for an Independent Medical Evaluation. I saw him in my Santa Barbara office on February 9, 2016.

## IDENTIFYING INFORMATION:

Mr. Sabado was employed by Blackwater Security Consulting, LLC, working in Iraq in support of military operations. He worked in the capacity of a team leader. On the day of the injury his armored vehicle was destroyed by an explosion of an IED. Mr. Sabado suffered shrapnel wounds with a rupture of the right ulnar artery, ulnar nerve trauma in the right upper extremity, with deep wounds to both the anterior proximal thighs and lacerations of his penis. He was airlifted to Germany to the Army Medical Center in Landstuhl and then brought for further treatment, including surgery, to Santa Barbara Cottage Hospital.

In Germany he did undergo a fasciotomy of the right forearm with exploration of the shrapnel wounds, which required ligation of the ulnar artery and ulnar nerve repair. He underwent exploration, irrigation, and debridement of the right buttock and lateral thigh wounds, as well as irrigation and debridement of bilateral groin wounds, as well as urethral repair of an injury to the glans penis with placement of a Foley cathe SABADO 040

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
February 9, 2016
Page 2

On April 29, 2005, he underwent hand surgery consultation with Robert M. Ruth, M.D. Dr. Ruth's impression was: 1. Status post right ulnar nerve repair of ulnar nerve laceration. 2. Possible status post right ulnar artery ligation, status post volar forearm fasciotomy with open wound. He did not recommend reexploration of the ulnar nerve due to risk of iatrogenic injury and devascularization of the nerve.

He underwent additional treatment with Kenneth Waxman, M.D., and David J. Laub, M.D., for urological treatment.

On November 2, 2015, a permanent and stationary report was issued by Robert M. Ruth, M.D., who noted the patient had never returned for further care. He noted the patient was working as a case detective and security worker from September 2015 to the date of his evaluation. He indicated an 18% whole person impairment for range of motion of the right elbow, as well as ulnar nerve laceration with both sensory and motor impairment.

## PRESENT COMPLAINTS:

At the present time Mr. Sabado has specific complaints referable to his right upper extremity (it should be noted that pursuant to the cover letter of January 19, 2016, I have been asked to address the right upper extremity condition even though this patient does relate that he had lower extremity injuries as well). Mr. Sabado does indicate that he has persistent weakness and numbness in the ulnar distribution of his right hand that does cause him pain and weakness, particularly with grip, grasp, and lifting. He notes that particularly when he worked for Costco he had difficulties holding and gripping items, and eventually he stopped working because of that. He notes that when he fully extends his right elbow he has discomfort about the right elbow and a pulling sensation about the scar tissue over the right forearm.

## PERTINENT PREEXISTING HISTORY:

The patient denies significant pertinent preexisting history, either industrial or otherwise. It should be noted that there is a subsequent history of an August 18, 2015, motor vehicle accident in which this patient sustained a neck and back injury. He did undergo treatment for that accident, but that does not overlap with the right upper extremity symptoms. He also had a motor vehicle accident in childhood at the age of 6 with no medical treatment. At the age of 9 he was hospitalized due to kidney failure. Surgical interventions during childhood including a tonsillectomy at age 11.

## PHYSICAL EXAMINATION:

### General:

Well-developed, well-nourished gentleman in no acute distress.

### Upper extremity examination:

On right upper extremity exam he has full range of motion of the right shoulder, elbow, wrists, and small joints of the hands. When he extends the right elbow fully he does get some pain down the

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
February 9, 2016
Page 3

ulnar aspect of the right hand. He has a positive Tinel sign over the ulnar nerve at the level of the right medial epicondyle. He has a healed scar that traverses the entire volar aspect of the right forearm from the elbow to the wrist. The patient has diminished sensation at the central aspect of that scar and distal over the ulnar aspect of the right hand. He has hypesthesia to anesthesia to light touch and pinprick in that area. There is no evidence of significant motor atrophy of the interosseous muscles or the thenar muscles.

### Jamar dynamometer grip strength measurements:

Jamar dynamometer grip strength measurements, right-hand (dominant) are 25, 20, 20, left hand 40, 40, 40.

### DIAGNOSES:

1.  Status post right ulnar nerve repair.
2.  Status post fasciotomy, right arm.
3.  Ulnar artery injury, right upper extremity.
4.  Lower extremity injuries secondary to shrapnel.
5.  Urological injuries secondary to IED explosion.

### DISCUSSION/RECOMMENDATIONS:

I have been asked to focus my evaluation on this patient's right upper extremity. I believe he did in fact sustain a significant right upper extremity injury as a result of his industrial exposure at Blackwater Security in April 2005. His treatment appears to have been both reasonable and appropriate. I believe the permanent and stationary date that Dr. Ruth had determined is a reasonable date due to the chronic injury to the ulnar nerve necessitating a protracted period of healing. The patient does have significant residua in regard to weakness and numbness in the right hand ulnar distribution.

### WORK RESTRICTIONS:

I believe this patient does require work restrictions avoiding forceful gripping and grasping with his right hand.

### IMPAIRMENT RATING PURSUANT TO THE *AMA GUIDES TO THE EVALUATION OF PERMANENT IMPAIRMENT*, 5TH EDITION:

Pursuant to the upper extremity section of the AMA Guides, the patient would have a grade 0 abnormality of the ulnar nerve below the midforearm for sensory deficit. Pursuant to table 16-10 and a grade 4, I would assess 25% motor deficit pursuant to table 16-11. Utilizing table 16-15 for the ulnar nerve below the midforearm, he would have a 7% upper extremity impairment and 9% motor impairment, for 16% upper extremity impairment, which converts to 10% whole person impairment. The patient does have full range of motion of the right elbow, and the grip strength loss is incorporated in the motor deficit evaluation pursuant to the AMA Guides, and therefore this patient would have a 10% whole person impairment for the right upper extremity.

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
February 9, 2016
Page 4

## APPORTIONMENT:

Pursuant to Labor Code 4663 apportionment is not indicated. There is no basis for additional apportionment.

## VOCATIONAL REHABILITATION:

This patient is not a qualified injured worker.

## FUTURE MEDICAL CARE:

The patient should have access to orthopedic followup, to include but not limited to nonsteroidal anti-inflammatory medications, pain medications, and muscle relaxants. However, I would say it is unlikely that additional treatment is indicated to the right ulnar nerve based on the fact that he does not have significant loss of motor function to the interosseous muscles, which may ultimately necessitate tendon transfer-type procedures. That is not occurring in this patient and, as such, I believe no additional surgical treatment will be indicated.

If I can be of further assistance, please do not hesitate to let me know.

Yours very truly,

*Richard D. Scheinberg, M.D.*

Richard D. Scheinberg, M.D., F.A.A.O.S.
cc:   Beverly Ann Davis, CNA International (e-mail only)
RDS/ps1 Dict#1242

# SCHEINBERG ORTHOPEDIC GROUP

Richard D. Scheinberg, M.D.
Medical Director

Mark Jamali-Ashtiani P.A.-C
Director of Physician Assistants

**Main Office**

| 401 Chapala Street, Suite 102 | 735 N. A Street | 530 E. Main Street | 1914 Truxtun Avenue |
| Santa Barbara, CA 93101 | Oxnard, CA 93030 | Santa Maria, CA 93454 | Bakersfield, CA 93301 |
| (805) 682-1394 | (805) 682-1394 | (805) 682-1394 | (661) 430-9050 |
| Fax (805) 682-6394 | Fax (805) 682-6394 | Fax (805) 682-6394 | Fax (661) 430-9053 |

January 11, 2016

Robyn A. Leonard, Attorney at Law
Law Offices of Laughlin Falbo Levy & Moresi LLP
255 California Street, Suite 700
San Francisco, CA 94111-4912

RE:          SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC
               AND CONTINENTAL INSURANCE
DOL:      04/21/05
DOB:      01/30/59
CLAIM:

## INDEPENDENT MEDICAL EXAMINER'S MEDICAL RECORDS REVIEW

Dear Ms. Leonard:

Thank you for the opportunity to perform an Independent Medical Examiner's medical records review on January 11, 2016  This is in regard to the injury the patient sustained on April 21, 2005. The following medical records have been reviewed.

Mark Weinpahl, M.D., Zugan Health Clinic:

06/22/15: Office report, Zugan Health. Office visit ICD-9 rank description: Lesion of ulnar nerve, posttraumatic stress, pain in joint, pelvic region, and thighs.   This 56-year-old male with posttraumatic impairments during service in Iraq. His armored vehicle was hit by an IED. He received lift threatening wounds. He recovered and returned to work but has ongoing permanent impairments to right dominant arm, both anterior thighs, and to mental status in the form of PTSD.

History: In April 2005, he was employed by Blackwater, working in Iraq in support of the military operations there. He was a team leader. On the day of injury, their armored vehicle was suddenly decimated by explosion of an IED. Several others were injured. One of their team was killed. The patient suffered shrapnel wounds, rupture of the right ulnar artery with ulnar nerve trauma, deep

SABADO 044

SCANNED

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC AND
CONTINENTAL INSURANCE COMPANY/CNA INTERNATIONAL
January 11, 2016
Page 2

wounds to both anterior proximal thighs, and lacerations of the penis; all required that he be
airlifted to Germany, the Army Medical Center in Lansthul, and then brought for further
hospitalization with surgery at Cottage Hospital in California. He states he had surgery on
numerous different dates. He was subsequently followed by a hand specialist and a urologist and
had a few sessions, estimated at no more than 5, with a psychotherapist.

In a general sense, he healed rapidly and well, and though handicapped mainly in his right arm but
feeling the usual pressure, he returned to work and was able to resume work in late May 2005. He
subsequently accomplished 3 further 3 to 6-month deployments for Blackwater, ending that
employment some time in 2006. He states he was never advised of further resource ability to deal
with his employment-related physical and psychological issues. Work was not easy to find, and he
recalled several promising job apps going well until he fell and was even advised, off the record,
that the employment history with Blackwater was a nonstarted for these companies.

He struggled with severe nightmares for several months following the incident and noted he was
intermittently irritable and angry. He had considerable guilt and other difficulty feelings for several
years postaccident. In 2007, he experienced marital difficulties and at 1 point was severed with
divorce papers. He had a trial separation from his wife and reconciled in December 2007.
Currently, they are together and strongly supportive in 2007. They lost their home they owned in
the Santa Barbara area, and subsequent he did, as I understand it, file for bankruptcy in 2007.

Regarding the right arm injury, he had suffered a severed ulnar artery and was likely save by the
tourniquet of a medic. The artery was irreparable per his history. He is describing ulnar nerve
damage. He describes current numbness and dysfunction of the ulnar side of the hand; basically
there is numbness from a bit above the wrist down to and including the fifth finger, thus he has to
be careful not to burn that area. He cannot spread his fingers apart. He has to be careful not to drop
things, like change. He has to concentrate to get a solid grip on anything heavy. Finally, he has
pain in the wrist and hand. He can tell falling barometric pressure as intermittent episodes of claw-
like cramping of the entire hand, whereupon he has to massage and work the hand open to relax the
spasm. He states he does not take any regular medications, such as analgesics for this or for any of
the pain sensation. He notes that although he used to be very athletic he no longer work out with
weights, in part as he feels he cannot firmly grip the weights. The injuries to both upper legs, the
anterior proximal thighs, though millimeters from severe neurovascular trauma were luckily were
basically soft tissue injuries, which healed apparently uneventfully per his description; however, he
has the residual currently of a tight cramp-like pain that grips him in both thighs in the flexural
crease areas, when he stands up form a seated position. This is intermittent and lasts 5 to 20
minutes, causing him to have to walk awkwardly at times. His penis was lacerated in several
places. He had a catheter for some days at the time of injury. Healing has been good, but he feels
he has a decreased urinary stream sense; he has decreased semen production; and he sometimes has
erectile difficulty.

Finally, there is a PTSD issue. He states it has been an uphill battle. He notes that it was his wife,
who finally confronted him several years after the event that she was sure he suffered from this and
that it was affecting the whole family. He speaks at length of all the parts of it that have plagued

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC AND
CONTINENTAL INSURANCE COMPANY/CNA INTERNATIONAL
January 11, 2016
Page 3

him, like facts that the teammate who died that day was leaving for home at the end of the day and that the patient himself would have been sitting in that seat but for another simple event, etc. He notes that 6 of the 14 men on his team are no longer alive, including 2 who have committed suicide. He notes he was very close to suicide in 2007. He does not have any self harm notions now. He has never been able to sleep well, some nights sleeping until 2 a.m. but not knowing why. He did try marijuana some years back, which helped sleep, and he even used it 3 times a day for a period, but he uses it rarely now. He has had no further psychotherapy. He has never taken any prescription medications.

Past Medical History: Bilateral cataract surgery in his 30s.

Past Surgical History: 2005 injuries in Iraq.

Social History: He does not drink. He takes tinctures for PTSD. Rare marijuana. Currently he is doing some driving for a local handicapped ride company. He has just started an hourly job at Costco. He almost finished college. He worked 20 years for the L.A.P.D. and several years of private security work all before the Blackwater employment.

Hospitalizations: In 04/26/2005, he spent 6 days hospitalized for multiple surgeries for shrapnel trauma in the Iraq war.

Medications: Over-the-counter.

Examination was performed.

Assessment:
1.  Right ulnar neuropathy secondary to remote trauma. The sensory and motor deficits are permanent and stationary. They compromise full functional use of his right dominant arm though at this time he has quite good use of the extremity. The cramping, spastic, painful spasms he gets in the last several years would be explained by this injury, and this problem may or may not worsen with age.
2.  PTSD. I do think he has this diagnosis, but I do not feel skilled in assessing its degree. At 10 years from the incident, he appears to have found significant coping skills, and with his very supportive wife and their faith he is functioning fairly well. Nonetheless, it is my opinion that he has had significant disability from this to date, and I feel he might well benefit from some further therapy and attention to this diagnosis.
3.  I believe his overall health is impaired to some degree due to his bilateral proximal leg pain. This is likely due to the above-noted trauma any may be permanent, but could conceivably be improved by some form of physical therapy. It does not appear to be significant impairment.

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC AND
CONTINENTAL INSURANCE COMPANY/CNA INTERNATIONAL
January 11, 2016
Page 4

Plan: I discussed with him that I would put down his history in my findings, and this would be made available to his attorney.

1. I encouraged him to resume exercising for his health.
2. I encouraged him to continue seeking some psychotherapy evaluation and treatment for his PTSD.
3. At this time, I do not find any indication for radiologic studies or lab work.
4. I do think hearing testing should be done, but we are able to conclude that here.
5. No medications or direct referrals were given today.

Santa Barbara Cottage Hospital:

04/09/13: Santa Barbara Cottage Hospital Emergency Room, Angelo Salvucci, M.D. This is noncontributory. He was diagnosed at that time with subconjunctival hemorrhage, nontraumatic.

04/27/05: Trauma note. Signed by Benedict Taylor, M.D. This is a 46-year-old male, who was transferred from Germany. He was wounded in Iraq on April 14, 2005, sustaining shrapnel wounds to his right forearm, his right lateral thigh, and his groin in an explosion to his convoy. The patient was initially treated in Iraq, stabilized, and then transferred to Germany for operative treatment. In Germany, he underwent fasciotomy of the right forearm with exploration of the forearm shrapnel wound, which required a ligation of the ulnar artery and apparently discovery of the ulnar nerve being severed; exploration with I&D of the right buttock and laterally thigh wound; urethral repair of the injury to the grans penis with placement of Foley catheter; I&D of bilateral groin wounds.

Diagnosis: A 46-year-old male casualty from Iraq. He sustained shrapnel injury to the right forearm, right thigh, and bilateral groins as well as sustaining a urethral injury, all of which were addressed initially in Germany. The patient was transferred to Santa Barbara Cottage Hospital for followup care.

Discussed with Kenneth Waxman, M.D. Admit to the floor. Regular diet. Pain control. Wound V.A.C dressing for the right thigh. Call hand surgery in the morning. David Laub, M.D., was already called for evaluation of the urethral injury and followup.

06/01/05: Occupational Therapy Progress Report. Diagnosis: Shrapnel injury, ulnar nerve injury, right upper extremity.

Referring Physician: Robert M. Ruth, M.D., Kenneth Waxman, M.D., Rosalie Myer, P.A.-C.

Extensive physical therapy notes.

04/29/05: Hand surgery consultation: The patient is a 46-year-old male, who was a civilian contractor in Iraq when he was involved with a car bomb and hit with shrapnel in multiple areas, including his right upper extremity. He had his initial surgery in Iraq at a military base and then 2 subsequent surgeries in Germany. At some point during these procedures, a right ulnar nerve repair

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC AND
CONTINENTAL INSURANCE COMPANY/CNA INTERNATIONAL
January 11, 2016
Page 5

was performed and reported ligation of the right ulnar artery. Operative notes are not available. He denies any previous history of problems with his right upper extremity. The trauma team is planning on returning to the operating room on Monday for wound closure of his right forearm fasciotomy, and there is a question as to whether the ulnar nerve should be re-explored at that point; therefore, hand surgery evaluation was requested.

Impression:
1.   Status post right ulnar nerve repair of ulnar nerve laceration.
2.   Possible status post right ulnar artery ligation; hand viable.
3.   Status post volar forearm fasciotomy with open wound.

At this point, I would not recommend re-exploration of his ulnar nerve due to risk of iatrogenic injury and devascularization of the nerve. I discussed with the patient the length of time needed to maximize nerve recovery as being typically 1 to 2 years. Thus reviewed that nerve recovery is not complete after nerve repair at this level of the extremity in an adult. If he has persistent motor deficits, consideration should be given toward tendon transfers. I would proceed with wound closure as per the trauma team.

Trauma team activation:

History: A 46-year-old civilian male wounded in Iraq on 04/14/05. History once again reviewed. Same recommendations.

05/02/05: Operative Report, Kenneth Waxman, M.D., Surgeon.

Preoperative Diagnosis: Explosion wound to right buttock and right arm.

Operation Performed: Complex closure of right arm and right buttock wounds.

Date of Discharge: May 3, 2005.

Records of David Laub, M.D.

Robert is here in followup. He was seen at Cottage Hospital last month with a history of urethral disruption from shrapnel-related injury in Iraq. He had a primary repair in Germany. The catheter has been out for several weeks now, and he has no voiding complaints. He reports good urine flow without hesitancy, straining, or spraying of the flow. Urinalysis is clear. He has no problems with erections, reporting good straight erections, although he did request samples of Cialis.

On exam, phallus is normal in appearance. Mr. Sabado is recovering nicely. Potential for delayed urethral stricture.

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC AND
CONTINENTAL INSURANCE COMPANY/CNA INTERNATIONAL
January 11, 2016
Page 6

Records of Robert M. Ruth, M.D.:

06/02/05:  I reevaluated Robert Sabado in my office today.

Impression:  Status post right ulnar nerve repair in the Middle East.

I have recommended that he continue supervised therapy.  I have renewed his prescription for range
of motion strengthening and fabrication of an Anti Cloth splint if needed.

Again I discussed with him the typical long-term sequelae of ulnar nerve lacerations.  As a whole,
however, he appears very motivated.  He is making good progress in his recovery.  He is anxious to
return to shooting and his work duties.

Work Status:  Mr. Sabado's work status is under the care of Dr. Waxman as his primary care
physician.  I remain a consultant at this point.  He may need modification of his job requirements.

06/16/05:  He has not yet reached permanent and stationary due to the length of time to reach MMI
with an ulnar nerve injury.  He is requesting release to full duty at this point since he plans on
returning to Baghdad.

11/02/15:  Permanent and Stationary Report, Robert M. Ruth, M.D.

He notes that after 2005, the patient did not return for further care.  He returned for a permanent and
stationary rating.  He is complaining of numbness, pain, weakness, and limited motion in the right
upper extremity.  He noted that he was working as a case detective and security worker from
September 2015 to the present.  He indicated an 18% whole person impairment for range of motion
to the right elbow as well as ulnar nerve laceration with both sensory and motor impairment.  Under
"Future Medical Care," he did indicate the patient would need potential consideration for additional
surgery, such as exploration of the nerve, nerve grafting, or tendon transfers.

Records of Brandy Chapman, D.C., in Greenville, South Carolina:

08/13/15:  It is not clear as to who this individual is.  Mr. Robert Sabado entered the office to,
August 13, 2015, having completed the patient intake questionnaire.  He was in a motor vehicle
accident on August 9, 2015.  He was the restrained driver of a vehicle.  The air bag did not deploy.
Robert reports that he was looking straight ahead at the time of impact.  He did not strike any body
part to any interior part.  The patient related he did not lose consciousness.
Vehicle impact location:  Rear.  His vehicle was stopped.  Moderate visual damage.  Police were at
the scene.  An accident report was completed.  EMS was at the scene.  Robert denies transport from
the scene.  He had pain in the left side neck, posterior cervical right-sided neck, left trapezius, upper
thoracic, and right posterior trapezius.

SABADO 049

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC AND
CONTINENTAL INSURANCE COMPANY/CNA INTERNATIONAL
January 11, 2016
Page 7

Complaint:
1.    Left side of neck pain.
2.    Posterior cervical and lumbar, left and right, with pain radiating down the legs.

Past History:  Exercise habits a few times a week.

The following activities are producing moderate pain with a limited ability to perform bend over,
lift, lay down, sit, stand, and walk.

Assessment:  Robert is of good health and is expected to make good progress and recovery with
few residuals.    Based on his history of no complicating factors and nothing noted as
contraindications to chiropractic care, it is reasonable to believe that his recovery may take about
the same length of time as an average patient with an uncomplicated case.

Diagnoses:  1) Cervical sprain; 2) Cervicocranial syndrome; 3) Lumbar sprain/strain; 4) Sacroiliac
joint and pelvic dysfunction; 5) Headaches; 6) Restriction of motion; 7) Spasm; 8) Weakness.

Treatment:  Chiropractic treatment.

Records of Ramon Alcerro D.C.:

Mr. Sabado was examined on 08/18/15 in connection with low back and neck pain suffered in a car
accident on 08/09/15.  During the course of his evaluation, it was revealed that he has weakness in
his right wrist with flexion and extension and right grip, which are not explained by the trauma of
the accident.  Mr. Sabado stated he has had weakness, which is gradually worsening since it was
injured in a roadside bomb explosion in Iraq 10 years ago.  He has recovered nearly completely
from his injuries of 08/09/15, but he continues to have weakness in the right upper extremity as
stated above.

Records of Audiologic Associates of Santa Barbara:

10/13/15:  Audiologic evaluation by Robert Segal, Ph.D.  Using the impairment formula, right ear
has 0% impairment; left ear 30%; binaural impairment 5%; ratable loss calculated.

Records of Clinical Neuropsychological Associates, Juan Manual Gutierrez, Ph.D., ABPS:

10/20/15:  Neuropsychological Consultation:

This is a 56-year-old right-handed Pacific Islander, who presents with difficulty, such as physical
pain due to a blast in April 2005, from an IED with resulting shrapnel injuries sustained during a
tour in Iraq for Blackwater Security.  He injured his neck, right arm, legs, and groins with cognitive
deficits, such as concentration defects and memory problems as well as survivor guilt, nightmares,
irritability, and other issues.

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC AND
CONTINENTAL INSURANCE COMPANY/CNA INTERNATIONAL
January 11, 2016
Page 8

The patient endured a motor vehicle accident during childhood at the age of 6 with no medical treatment. Also at the age of 9 years, he was hospitalized due to kidney failure with surgical interventions in childhood, a tonsillectomy at age 11 years. His adolescence was marked by 1 incident when he was struck in the frontal region of his head. He denied use of medications. He noted a chaotic first marriage, which ended in divorce. He denied any surgical interventions during this time period, but he did require the use of physical therapy for lower back pain due to work-related chronic injuries. He has undergone physicians' exams. He denies alcohol abuse; he rarely consumes alcohol. He has 14 years of formal education with several more years of college level. Second marriage for 19 years.

Additional observations discussed complaints, problem solving, speech, language, and math skills, verbal skills, concentration highly distractable, memory, motor, and behavior.

Results: Verbal learning 45th percentile; 30th percentile initial acquisition; initial learning from trial to trial 16th percentile, mild impairment but improved to superior range at later stages in the 94th percentile.

Summary and Discussion: Given test results coupled with history, etiology is posttraumatic disorder, chronic. In addition, he appears to have endured cognitive losses that are likely related to this condition. There is a need to rule out cognitive disorder, NOS. Regrettably, his profile would indicate that these losses will likely be permanent and also leave him open to probable decline in the near future.

Recommendations: The patient has significant neurological underpinnings to his behavior. He likely has significant injury to the central nervous system, and this should be assessed through comprehensive cognitive exams.

In the short term, it is likely the patient may have increasing difficulty with activities of daily living. It is possible that within the next 3 to 5 years he will have poor ability maintain his current status. He is seen for therapy on a weekly basis. EMDR would be preferable, but even supportive therapy would be beneficial.

Once he has undergone 9 to 12 months of therapy, it would be prudent to reassess him from a psychological perspective.

## DISCUSSION:

Mr. Sabado was involved in a work-related injury in Iraq while working for the Blackwater Security consulting firm. He sustained injuries from an IED on April 14, 2005, involving his right arm, right lateral thigh, penis, and left groin area. He initially underwent some treatment in the field then was transferred to Germany where he underwent a repair of the ulnar nerve in the right arm as well as a fasciotomy of the right upper extremity. The ulnar artery was sacrificed. The patient also had other lacerations that were repaired in Germany.

SABADO, ROBERT S. V. BLACKWATER SECURITY CONSULTING, LLC AND
CONTINENTAL INSURANCE COMPANY/CNA INTERNATIONAL
January 11, 2016
Page 9

He was transferred to the Santa Barbara Cottage Hospital where further closure of his wounds was
performed. He was seen by Robert M. Ruth, M.D., for his ulnar nerve injury, and no additional
treatment was recommended. In followup, it was noted that he did have a relatively dense ulnar
nerve palsy when he was finally released permanent and stationary in 2015 by Dr. Ruth.

The patient has also been evaluated and treated from a psychological perspective for posttraumatic
stress disorder. He also underwent urological consultation by Dr. Laub for repair of a penile injury,
which apparently did not have significant residua.

I look forward to evaluating Mr. Sabado for his Independent Medical Examination.
If I can be of further assistance, please do not hesitate to let me know.

Yours very truly,

*Richard D. Scheinberg, M.D.*

Richard D. Scheinberg, M.D., F.A.A.O.S.
cc:     Beverly Ann Davis, CNA International (e-mail only)
RDS/ps9 Dict#0851

## PROOF OF SERVICE BY MAIL

I, UNDERSIGNED, HEREBY DECLARE THAT I AM OVER THE AGE OF EIGHTEEN YEARS AND NOT A PARTY TO THE WITHIN ACTION. I AM EMPLOYED IN THE COUNTY OF VENTURA AND MY BUSINESS ADDRESS IS 1464 MADERA ROAD, SIMI VALLEY, CA 93065.

I SERVED THE ATTACHED ON, 01/19/2016.

**PATIENT NAME:** SABADO, ROBERT
**DATE OF SERVICE:** 01/11/2016
**PROCEDURE:** RECORD REVIEW

ON THE PARTIES IN SAID ACTION BY PLACING A TRUE COPY OF THEREOF IN A SEALED ENVELOPE WITH POSTAGE THEREON FULLY PREPAID, IN THE UNITED STATES MAIL AT SIMI VALLEY, CALIFORNIA, ADDRESSED AS FOLLOWS:

LAW OFFICES OF LAUGHLIN,FALBO LEVY
255 CALIFORNIA ST STE 700
SAN FRANCISCO, CA 94111

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT. EXECUTED AT SIMI VALLEY, CALIFORNIA ON 01/19/2016.

LAURETTE HARRIS

01/19/2016

# Audiologic Associates of Santa Barbara
## 215 West Pueblo Street   Santa Barbara, CA 93105

## AUDIOLOGIC EVALUATION

Name: ROBERT SABADO    Age: 56    Chart #: _____

Date: 10/13/15    Examiner: H W



Frequency in HZ

| KEY | | L | R |
|---|---|---|---|
| | | Blue | Red |
| AC | | X | O |
| AC MASKED | | ☐ | △ |
| BC | | ☐ | △ |
| BC MASKED | | ☐ | ☐ |
| NO RESPONSE | | | |
| SOUND FIELD | | | |

Test Reliability
GOOD ———
FAIR ———
POOR ———

MAICO MI 24

No. 747755

226 Hz Tympanogra



Right                    Lef

Ear Volume   0.87 ml        Ear Volume   1.07
Compliance   0.25 ml        Compliance   0.20
Pressure    -53 daPa        Pressure    -16
Gradient     91 daPa        Gradient     214

## SPEECH AUDIOMETRY

Tape ☐   Live Voice ☐   Materials: Type of Noise

| EAR | PTA (3 FREQ.) | SRT | SAT | SPEECH DISCRIM | | |
|---|---|---|---|---|---|---|
| | | | | % | SL | % |
| RIGHT | | 20 | | 100 | 40 | |
| Masking Level | | | | | | |
| LEFT | | 30 | | 100 | 40 | |
| Masking Level | | | | | | |
| SOUND FIELD | | | | | | |
| Masking Level | | | | | | |

Remarks:

SABADO 054

Exhibit 12

NO. 3404   P. 2

## AUDIOMETRIC EVALUATION RECORD

NAME: Robert Sabado   DOB: 1-30-59   SSN: 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

DID YOU EVER EXPERIENCE AS CHILD OR ADULT:

| | | | |
|---|---|---|---|
| 1. | ANY DIFFICULTY HEARING? | NO | (YES) |
| 2. | SURGERY ON YOUR EARS? | (NO) | YES |
| 3. | EAR INFECTIONS? | (NO) | YES |
| 4. | RINGING OR BUZZING IN YOUR EARS? | (NO) | YES |
| 5. | SEVERE DIZZINESS? | (NO) | YES |
| 6. | EXTENDED DAILY MEDICATIONS? | (NO) | YES |
| 7. | SEVERE BLOW TO YOUR HEAD? | (NO) | YES |
| 8. | MILITARY SERVICE? | (NO) | YES |
| 9. | RECREATIONAL HUNTING OR SHOOTING? | (NO) | YES |
| 10. | LOUD NOISE AT THIS EMPLOYMENT? | NO | (YES) |
| 11. | LOUD NOISE AT PRIOR EMPLOYMENT? | NO | (YES) |
| 12. | CHAINSAWS, CARPENTRY, OR FARMING? | (NO) | YES |
| 13. | OFF ROAD VEHICLES, RACING OR FIRECRACKERS? | (NO) | YES |
| 14. | WHEN WORKING IN NOISE – DO YOU WEAR HEARING PROTECTION?   YES   WHAT PERCENT OF THE TIME?   90.% | | | |

OTOSCOPIC EXAM:   CANALS CLEAR (R L)   TM VISIBLE (R L)   TM NORMAL R L
NOT CLEAR R L   NOT VISIBLE R L   TM ABNORMAL R L

DATE: 10/13/15

| | 500 Hz | 1000 Hz | 2000 Hz | 3000 Hz | 4000 Hz | 6000 Hz | 8000 Hz |
|---|---|---|---|---|---|---|---|
| RIGHT | 20 | 25 | 25 | 30 | 35 | 50 | 50 |
| LEFT | 20 | 40 | 60 | 65 | 70 | 70 | 70 |

AUDIOMETER USED   MAKE: STANLEY   MODEL: AA-30
CALIBRATED TO ANSI 1989 STANDARDS ON   2/9/15
CALCULATIONS:

RIGHT .500 _____
1000 _____
2000 _____
3000 _____
TOTAL _____  14 =
-25
X 1.5 = _____   % MONAURAL

LEFT 500 _____
1000 _____
2000 _____
3000 _____
TOTAL _____  14 =
-25
X 1.5 = _____   % MONAURAL

5( ___ )+( ___ )
——————————   _____   % BINAURAL
6

[X] TEST RESULTS APPEAR RELIABLE   [ ] TEST RESULTS ARE NOT RELIABLE

[ ] RATABLE LOSS CALCULATED   [ ] REFERRED OUT FOR RE-EVALUATION

[ ] NO RATABLE LOSS CALCULATED   [ ] SCHEDULE FOR RE-TEST

[X] I FIND TO A REASONABLE DEGREE OF MEDICAL CERTAINTY THAT THE LOSS OBSERVED IS CONSISTENT WITH NOISE EXPOSURE

[ ] I FIND TO A REASONABLE DEGREE OF MEDICAL CERTAINTY THAT THE LOSS OBSERVED IS NOT CONSISTENT WITH NOISE EXPOSURE

EXAMINER:   Era J. Hadill, Ph. D.
AUDIOLOGIST

SABADO 055

**From:** Robert Siegel [mailto:RSiegelAuDLLC@hotmail.com]
**Sent:** Thursday, October 29, 2015 12:03 PM
**To:** Barnes, Ann
**Cc:** Linker, David
**Subject:** Re: Robert Sabado

Dear Ann,

I have reviewed all of the materials that were sent to me in reference to Mr. Robert Sabado. The Audiological Evaluation completed on October 13, 2015 by Audiologic Associates of Santa Barbara appear consistent and reliable.

Using the impairment formula I obtained the following findings:

Right Ear - 0% impairment.
Left Ear - 30% impairment

    Binaural Impairment - 5%

A ratable loss has been calculated and I feel that This is consistent with noise exposure.

Please call me if you have any questions relating to this case.

Sincerely,

Bob

Robert B. Siegel, Au.D., CCC-A, BC-HIS, FAAA
Doctor of Audiology
Robert B Siegel AuD LLC
Ph. 386-872-3170
Mobil 856-264-0913

NOTICE: This email message is for the sole use of the intended recipient(s)??
and may contain confidential and privileged information. Any unauthorized??
review, use, disclosure or distribution is prohibited. If you are not the??
intended recipient, please contact the sender by reply email and destroy all??
copies of the original message.??



SABADO 05... Exhibit B

**From:** Barnes, Ann <ABarnes@freedmanlorry.com>
**Sent:** Tuesday, October 20, 2015 9:51 AM
**To:** 'Robert Siegel'
**Cc:** Linker, David
**Subject:** Robert Sabado

Dear Dr. Siegel,

David asked me to send the attached to you for your review and evaluation and calculations:

Attached please find the following:

1.     Audiometric evaluation record and hearing test from Ira Nadell, Ph.D. of Audiologic Associates of Santa Barbara dated October 13, 2015;

2.     Employee's Claim for Compensation filed with the US Department of Labor on April 30, 2015 regarding the DBA claim for Mr. Sabado;

3.     Narrative statement attached to our filing with the U.S. Department of Labor, describing in detail from Mr. Sabado what occurred while working in Iraq in 2005.

If you have any questions, please give David a call on his cell phone to discuss further.

Thank you very much!

Ann

**KARLA FREEMAN, LICENSED CLINICAL SOCIAL WORKER**
License #LX11215

1205C Rebecca Lane
Santa Barbara, CA 93105
805-687-4260

Robert Sabado          ID# C59MTH11

4/15 — Symptoms of post traumatic stress included
anxiety, depersonalization, depression, flat
affect, displacement.
Patient focused on troubles in marriage.
Was open to support. Established contract for
working weekly.

4/22   Continued to be unable to connect with his
feelings. Supportive work to provide safety.
Frozen affect was not loosened to do allow
the relationship with therapist to develop.
Patient still focused on problems of marriage.
More history of relationship emerged

4/29   Patient broached subject of wife's acting
out with other men. He began to express
his feelings of fear and separation

5/6    Discussion of bringing wife to session.
Patient was a little less frozen.
Supportive Therapy continued

5/13   Session with wife. She expressed
her need for client to be home and
ambivalence regarding financial issues.

5/20   Wife came in. Revealed financial
distubance. Discussed history of their

SABADO 058
06/30/2010 13:53 5001

Financial difficulties,

5/27   Therapist gave support and education regarding role of finances and stress. Explored the feelings about clients' work, fears of safety, and need for money,

6/10   Worked on how to keep super communication when client returned to work with Blackwater. Client's stress was lessened by providing more support

6/17   Continued to reinforce building communication & support for clients ambivalence about leaving his family

7/1   Reviewed understanding of stress and how to cope while overseas, as well as family support by therapist while client was overseas. Symptoms were lessened and client felt less overwhelmed and anxious

SABADO 059

## Clinical Neuropsychological Associates

*ADD Clinic      Forensic Program      Organizational Consulting*

## NEUROPSYCHOLOGICAL CONSULTATION

**Name:**     Bob Sabado

**DOB:**     01/■■/59     **Age:** 56

**Education:**     14

**Date of Exam:**  10/20/15

**Reason for Exam:** Assess cognitive decline

### BACKGROUND

The patient is a 56 year old, right handed, Pacific Islander, male. He presents with difficulties such as physical pain due to a blast in April of 2005 from an IED and resulting shrapnel injuries he sustained during his tour in Iraq for Blackwater Security. He injured his neck, right arm, legs, and groin. Additionally, he describes cognitive deficits such as concentration defects and memory problems as well as survivor's guilt, nightmares, irritability, and other issues.

Peri-natal history is unremarkable. Unusual difficulties during his birth were denied.

Early childhood history is also unremarkable, noting that all developmental milestones were adequately met (including walking). The patient endured a motor vehicle accident during childhood, at the age of 6 years (no medical treatment, no residuals). Also, at the age of 9 years old, he was hospitalized due to kidney failure. Surgical interventions in childhood were limited to a tonsillectomy at the age of 11 years. During the same period, nutrition was felt to be average to excellent. Lastly, he denied the use of medications during childhood.

Adolescence was marked by one incident. He indicated that he was struck in the frontal region of his head. He denied the use of medications. He described no surgical interventions during this period. During this time, nutrition was felt to be average to excellent.

1



SABADO 060

His adulthood was marked by no severe medical issues. He did note a chaotic first marriage, which ended in divorce. He denied any surgical interventions during this time period but he did require the use of Physical Therapy for lower back pain (due to work related chronic injuries). Current use of medications was denied.

He has undergone physician's exams and been prescribed medications for his physical and psychological issues.

He denies alcohol abuse. He notes that he now rarely consumes alcohol. He has never endured any legal or other difficulties due to past use of alcohol or other substances. He may seek a prescription for marijuana to aid in sleep.

The patient stated that he completed 14 years of formal education and also completed several more years of college level education. He has been employed primarily in law enforcement and security.

He has been in his second marriage for 19 years; his first marriage ended due to irreconcilable differences. He has two daughters from his first marriage and two sons from his second marriage. His current wife was considered be in excellent health.

Family of origin history includes no neurological history for his parents but his father had hypertension and his mother endured GI defects. His siblings do not seem to present with any serious issues. Extended family history denotes no significant issues.

He denied any formal military service. He was also never participated in any auxiliary service.

He notes enjoyment of few activities. He stated that he had enjoyed going to a local gym and working out. He also has enjoyed watching baseball. Further, he also stated that his wife has been a great support to him.

He has undergone various examinations, surgeries and treatments for his physical conditions. He has never undergone comprehensive neuropsychological examination but he did note that he saw a therapist.

## OBSERVATIONS

He was assessed over one session. He was unaccompanied. However, he seemed to be nervous when he began to talk about his life. He also became slightly tearful.

2

SABADO 061

Both gait and stance were adequate but due to his leg injuries, he needed to be careful about his movements. He presented with adequate speech but he was slightly hesitant occasionally during the day. Vision was adequate but auditory difficulties were reported. Orientation was adequate to self, time, place and situation. No formal thought disorder was reported or observed. Affect was expansive but mood was anxious to depressed.

## COMPLAINTS

**Problem Solving**: Difficulty figuring out how to do new things, difficulty planning, difficulty figuring out problems most others can do, slowed speed of mentation, sequencing defects, impaired ability to describe multiple steps, difficulty changing a plan or activity, takes longer than expected to complete activities, difficulty doing more than one thing at a time, difficulty switching from one activity to another activity, easily frustrated. **Speech, Language and Math Skills**: Difficulty finding the right word to say, difficulty understanding others, difficulty staying with one idea, difficulty writing letters or words, odd or unusual speech. **Non-Verbal Skills**: Problems finding his way around familiar locations, parts of his body do not seem to belong to him, not aware of time, slow reaction times. **Concentration**: Highly distractible, loses his train of thought, problems concentrating, becomes easily confused, mind goes blank, an aura, doesn't feel alert or aware of things on occasion and other times is hyper-alert. **Memory**: Forgetting where he leaves items, forgets what he should be doing, forgets where he is going, forgets recent events, needs hints to recall, relies more and more on notes, forgets faces, forgets street names. **Motor**: Fine motor control problems, weakness on one side of his body (right), difficulty holding onto things, walking more slowly, feeling stiff, difficulty starting to move, muscles tire quickly, diminished penmanship. **Sensory**: Loss of feeling, tingling skin, difficulty telling hot from cold, loss of hearing (more significantly on left), tinnitus, hypo-sensitive olfaction. **Physical**: Excessive fatigue, cannot run as well. **Behavior**: Sadness, anxiety, stress, sleep difficulties (falling and staying asleep), becomes angry more easily, feels as if he just doesn't care anymore, difficulty being spontaneous, increased eating, diminished libido.

Overall, his symptoms developed quickly after his initial physical recovery. His symptoms were also described as occurring often. He feels that in the last six months, his symptoms have stayed about the same and also that he definitely is noting that something is wrong with his mental state.

3

## PROCEDURES

California Verbal Learning Test, Second Edition (CVLT II), Minnesota Multiphasic Personality Inventory, Second Edition (MMPI-2).

## RESULTS

Verbal learning was seen as within the Average range overall (45th percentile). Initial acquisition was within the Low-Average range (30th percentile). Initial learning from trial to trial was within the Mildly impaired range (16th percentile) but improved to within the Superior range at the later stages (94th percentile). Performance was also marked by inability to repeat inappropriately (6th percentile ability to avoid such errors). Performance was also assessed in terms of intruding words that were never presented (again, only 6th percentile ability to avoid this type of error). Lastly, when required to use a second wordlist, clear indications of interference were evident (only 2nd percentile ability).

Verbal memory was assessed and found to be within the Mildly impaired range at the short term level (16th percentile). If cues were utilized to aid recall, performance actually diminished (6th percentile). Long term verbal memory was within the Mildly impaired range once again (16th percentile). However, when semantic cues were utilized at this stage, performance continued to fall within the Mildly impaired range (16th percentile). Lastly, a cursory examination of recognition format performance would reveal Average ability to recognize verbal stimuli (69th percentile). However, in-depth analysis would indicate a very poor ability to distinguish between real target words and semantically similar words (only 2nd percentile ability here).

Psychological injury was evident through interview and formal testing supports this assertion. His validity scores point to confusion and a significant amount of fearfulness, that can be seen as a cry for help. He appears to have little ability to handle stress and even more so, likely has anxiety that would be related to having survived a significant, typically, physical trauma. He also has a significant level of depression, and may have some sense of suicidal thinking.

Performance on these tasks was observed against the backdrop of adequate performance on a measure of effort. The task was embedded within the memory test and the patient scored perfectly.

## SUMMARY AND DISCUSSION

Given his test results coupled with his history, etiology is Post Traumatic Stress Disorder (Chronic). In addition, he appears to have endured cognitive losses that are likely related to this condition, thus, there is a need to rule out Cognitive Disorder, NOS. Regrettably, his profile would indicate that these losses will likely be permanent and also leave him open to probable decline in the near future.

## RECOMMENDATIONS

Given the above noted scores, it is likely that the patient has significant neurological underpinnings to his behavior. He likely has significant injury to the central nervous system, and this should be assessed through comprehensive cognitive examination to assess the impact of his injury.

In the short term, it is likely that the patient may have increasing difficulty with activities of daily living. It is possible that within the next 3-5 years he will have poor ability to maintain his current status. In the long run, it is possible that he will decline to a state in which he will need one-on-one care. He may be vulnerable to a progressive dementia within the next 5 to 10 years.

Fortunately, he can address many of his issues if he is seen for therapy on a weekly basis. EMDR would be preferable but even supportive therapy would be beneficial.

Once he has undergone 9 to 12 months of therapy, it would be prudent to re-assess him from a psychological perspective.

Thank you for the privilege of participating in this patient's care. Should you have any questions, please feel free to contact me.

Juan Manuel Gutierrez, Ph.D., ABPS

PSY 15192

**George K. Henry, PhD/ABPP-CN**
Board Certified Clinical Neuropsychologist
11601 Wilshire Blvd., 5th Floor
Los Angeles, California 90025
Tele & Fax:  310-457-0777

March 28, 2016

Robyn A. Leonard, Esq.
Law Offices of Laughlin, Falbo, Levy & Moresi, LLP
255 California Street, Suite 700
San Francisco, CA 94111-4912

## INDEPENDENT PSYCHOLOGICAL EXAMINATION

### RE:  Robert Sabado

OWCP No:  ▉
LFLM No:  ▉
Claim No:  ▉
DOB:  01-▉-59
DOI:  04-21-05
DOE:  03-24-16

### INTRODUCTION/REASON FOR REFERRAL

Robert Sabado is a 57-year-old, right-handed, married, male, and former security guard in Iraq who was employed by Blackwater Security Consulting from April, 2004 to August, 2006. On 4-21-05 Mr. Sabado was injured in Iraq when a roadside bomb exploded near a vehicle in which he was riding. Mr. Sabado was referred by Robyn A. Leonard, Esq. acting on behalf of CNA International Insurance Company, for an Independent Psychological Examination (IPE) to determine if there is substantive data to support a claim of psychological injury as a result of his employment with Blackwater and the 4-21-05 incident. Mr. Sabado was interviewed and tested by me for a total of 6 hours on 3-24-16. The examinee was informed that the evaluation did not constitute a doctor-patient relationship, that the clinician was not providing treatment, and the limits of confidentiality were explained. Mr. Sabado agreed to proceed with the examination. The conclusions of the current IPE are based upon a review of available records, deposition transcript, clinical interview, observations of the claimant, test data, and are considered accurate and reliable. Specific questions posed by the referral source will be addressed in the Summary and Conclusions section of this report. Should additional records or objective test data become available for my review which alter any opinions expressed in this IPE then a Supplemental IPE Report will be issued.

SABADO 065



RE: SABADO, Robert
Page: 2

### RECORDS REVIEWED

Balad Air Force Theatre Hospital
Santa Barbara Cottage Hospital
Santa Barbara County Health
Cottage Health Systems
Mark Wienpahl, M.D.
David J. Laub, M.D.
Juan Manuel Gutierrez, PhD
Karla Freeman, LCSW
Deposition: Robert Sabado

### HISTORY OF PRESENT ILLNESS & BRIEF RECORD REVIEW

Robert Sabado is a 57-year-old, right-handed, married, male, and former security guard in Iraq who was employed by Blackwater Security Consulting from April, 2004 to August, 2006. On 4-21-05 Mr. Sabado was injured in Iraq when a roadside bomb exploded near a vehicle in which he was riding. He sustained shrapnel wounds to his right upper extremity, bilateral thighs, penis and scrotum. He was taken to a combat support hospital in Ramadi, and flown to a trauma center at Balad Air Force Theatre Hospital where he underwent surgery. He was subsequently transferred to Landstuhl Regional Medical Center in Germany where he underwent additional surgery before he returned home to the United States.

He was hospitalized at Santa Barbara Cottage hospital from 4-27-05 to 5-3-05. On 5-2-05 he underwent additional surgery for complex closure of the right arm fasciotomy wounds as well as right lateral thigh/buttock wound. He received outpatient occupational therapy with improvements in grip strength from his initial visit on 5-4-05 (L=32.5kg, R=NA) to 5-24-05 (R=8.2kg) to 6-11-05 (R=8.9kg) to 6-15-05 (R=11.9kg). He was cleared to return to work on 6-17-05.

Mr. Sabado completed two additional deployments, before returning home for a "family emergency" in February, 2006. While home and before returning for his final deployment Mr. Sabado began seeing social worker Karla Freeman on 4-15-06 with a focus on "troubles in his marriage". Ms. Freeman also noted "symptoms of post-traumatic stress" which included "anxiety, depersonalization, depression, flat affect, and displacement". Mr. Sabado participated in a total of 10 sessions with the last session on 7-1-06. Two sessions included his wife. The main focus of the sessions was on marital problems, finances, and communication. Mr. Sabado left for Iraq and completed his final deployment before he returned home in August, 2006.

RE: SABADO, Robert
Page: 3

There is a nine year gap in medical records until 6-22-15 when he was seen at the Zugan Health Clinic in Santa Barbara by general practitioner, Mark Wienpahl, M.D., who noted that Mr. Sabado "had struggled with severe nightmares for several months following the incident, and was intermittently irritable and angry, and had considerable guilt and other difficult feelings for several years post-accident". Dr. Wienpahl diagnosed PTSD but added, "I do not feel skilled in assessing its degree. At 10 years from the incident, he appears to have found significant coping skills, and with his very supportive wife and their faith, he is functioning fairly well". Mr. Sabado was encouraged to seek an evaluation and treatment for PTSD. On 10-20-15 a neuropsychological evaluation was conducted by Juan Manuel Gutierrez, PhD who administered the California Verbal Learning Test-2nd Edition (CVLT-2) and Minnesota Multiphasic Personality Inventory-2 (MMPI-2). Diagnosis was PTSD (Chronic). Recommendation was 9-12 months of therapy.

### PSYCHOSOCIAL HISTORY

Mr. Sabado was born on 1-30-59 in Oahu, Hawaii, and at age 3 came to Los Angeles with his mother. He graduated from John Marshall High School in Los Angeles in 1977. He reportedly was an average student. He denied any history of learning disability or attention-deficit-disorder. In 1978 he attended Whittier College for one year, and transferred to Los Angeles City College for his 2nd year. In 1980 he enrolled at the University of California Santa Barbara where he played baseball for two quarters, but dropped out with a GPA = 1.99. In 1981 he began taking teaching classes at Cal State Los Angeles, but in 1983 applied to be a police officer with the LAPD. In 1984 he married and graduated from the police academy. His marriage ended in divorce in 1988 and produced two daughters, ages 32 and 31. He remarried in 1995, and his second wife entered the union with three children (two boys, who are currently ages 32 and 29, and a daughter, who is currently 27). Mr. Sabado stated that he and his current wife have two sons, ages 20 and 7, from their current marriage. Mr. Sabado worked as a police officer for the LAPD until 1999 when he quit and was employed by Fed-Ex from 1999-2001. He was briefly unemployed before he was hired as an international police officer in Kosovo by DynCorp from February, 2003 to March, 2004. In April, 2004 he was hired as a security contractor/consultant by Blackwater. Mr. Sabado stated that his job with Blackwater was his favorite employment experience of his life. He misses the comradery and would return to Iraq if offered a consultant position. He believes his right upper extremity injury from the 4-21-05 incident would prevent him from meeting the physical demands of his former position with Blackwater. After returning home from Iraq in August, 2006 Mr. Sabado was employed in many different jobs for varying degrees of duration. For example, in October and December, 2006 he trained marines at Camp Lejeune in North Carolina. From July, 2007 to 2014 he worked part-time as a security guard at a director's home in Montecito, California, and from 2009-2012 worked part-time as a security guard at Carpentaria High School, where he also coached the JV baseball team. From October, 2013 to August, 2014 he was employed as a salesperson by Santa Barbara Nissan, and worked at Costco during the summer months.

RE: SABADO, Robert
Page: 4

From November, 2014 to May, 2015 he worked part-time as a driver for Lyft. Since September, 2015 he has worked part-time providing security for Case Detective Agency in Isla Vista on the campus of UCSB, as well as the oil fields in Goleta. He works 20-40 hours per week and is paid between $10-13 per hour. Mr. Sabado is independent in all activities of daily living. Since returning home from Iraq nearly 10 years ago he has also experienced multiple psychosocial stressors. For example, in 2007 he was unemployed, lost his home to foreclosure, filed for bankruptcy, separated from his wife, and lived several months in his car. He stated that during this low point in his life he experienced suicidal ideation. He reconciled with his wife in December, 2007. Since 2008 he has been audited annually, and in 2010 he moved from Carpentaria to Santa Barbara. In 2014 his son was the victim of vandalism and left home for college. In 2015 his wife's stepfather passed away, his sister-in-law entered an alcohol rehabilitation facility, he filed a lawsuit, and he was rear-ended in a motor vehicle accident and received chiropractic treatment. In 2016 two uncles were hospitalized with one uncle declared brain dead following a fall.

## MEDICAL HISTORY

Premorbid medical history is remarkable for a month long hospitalization at age 9 or 10 secondary to the Hong Kong flu, and bilateral cataract surgery. Mr. Sabado denied any prior concussions or substance abuse. Psychiatric history is unremarkable. Mr. Sabado reported that he currently uses a tincture of marijuana "when PTSD kicks in". Mr. Sabado reported that symptoms of PTSD, e.g., nightmares, began in May, 2005 and he also experienced considerable guilt and self-blame related to the death of his friend, "Sparky" following the 4-21-05 incident. He estimated that these "symptoms" continued for 2-3 years, but stated that he was not diagnosed with PTSD until 2015 by Dr. Wienpahl and Dr. Gutierrez. He has never received any treatment for PTSD, but reported that when he gets in a "foul mood" he will read an e-mail which he keeps on his person from Sparky's father. Mr. Sabado stated that a hearing exam in 2015 revealed bilateral hearing loss, L>R.

## CURRENT COMPLAINTS

Mr. Sabado reported the following complaints: intermittent bilateral leg pain, right upper extremity pain secondary to heavy lifting, intermittent right hand contracture and weakness, reduction in urine flow and sperm count, forgetfulness, irritability, "foul moods" every couple of weeks, and nightmares once every two months.

RE: SABADO, Robert
Page: 5

**BEHAVIORAL OBSERVATIONS**

Mr. Sabado arrived on time and was unaccompanied for his Independent Psychological Examination on 3-24-16. He was casually dressed in jeans and a Blackwater parka. He had a salt and pepper colored goatee and wore glasses for reading. There was a long linear surgical scar visible on the medial aspect of his right upper extremity. Mr. Sabado appeared to be his stated age of 57. A two hour clinical interview was conducted during which the claimant displayed an adequate attention span and comprehension. Speech was somewhat pressured, but fluent with no word finding difficulty. During the six hour examination process he displayed no pain behaviors or fatigue. Thought processes were goal-directed. Affect was rather broad, while mood appeared slightly anxious. Mr. Sabado displayed noncredible performance on motor tasks, especially bilateral upper extremity strength during the current examination. Although Mr. Sabado passed stand alone and embedded measures of cognitive performance validity, his total score on a separate test of verbal learning and memory (CVLT-2) was worse relative to testing by Dr. Gutierrez last year. This suggests some episodic exaggeration of cognitive dysfunction on the current exam. Psychological assessment also contained elements of symptom magnification which raises questions about the credibility of Mr. Sabado's current self-report.

**TESTS ADMINISTERED**

Wechsler Abbreviated Scale of Intelligence-2nd Edition (WASI-II)
Wechsler Adult Intelligence Scale- 4th Edition (WAIS-IV, Digit Span)
Test of Premorbid Functioning (TOPF)
Wechsler Memory Scale-4th Edition (WMS-IV, VR Subtest)
California Verbal Learning Test-2nd Edition (CVLT-II)
Modified Somatic Perception Questionnaire (MSPQ)
Pain Disability Index (PSI)
Psychosocial Checklist (PSC)
Minnesota Multiphasic Personality Inventory-2-Restructured Form (MMPI-2-RF)
Trauma Symptom Inventory-2nd Edition (TSI-2)
Word Memory Test (WMT)

RE: SABADO, Robert
Page: 6

## TEST RESULTS

### PERFORMANCE VALIDITY & COGNITIVE & MOTOR FUNCTIONING

Although Mr. Sabado passed stand alone and embedded measures of cognitive performance validity, his score on a separate test of verbal learning and memory (CVLT-2=36) was worse relative to testing by Dr. Gutierrez last year (CVLT-2=43). He also scored in the low average range of general intelligence (WASI-II=82) which is 20 points below his predicted level of intelligence (TOPF: WASI-II=102). This suggests some episodic exaggeration of cognitive dysfunction on the current exam. In contrast, auditory attention (Digit Span=37th %ile) and immediate and delayed visual memory (WMS-IV: $VR_1$=75th %ile; $VR_2$=75th %ile) were average. Mr. Sabado displayed noncredible performance on motor tasks, especially bilateral upper extremity strength during the current examination (R=5.5kg, <1st %ile vs L=25kg, 1st %ile). His current bilateral upper extremity grip strength was actually significantly weaker compared to his strength in the days and weeks following his right arm surgery at Santa Barbara Cottage Hospital in 2005 (5-4-05: L=32.5kg, R=NA; 5-24-05: R=8.2kg; 6-11-05: R=8.9kg; 6-15-05: R=11.9kg). Current bilateral upper extremity motor dexterity was in the borderline range (R=92", 8th %ile vs L=102", 8th %ile).

### SYMPTOM VALIDITY & PSYCHOLOGICAL FUNCTIONING

The examinee's pattern of item endorsement on psychological measures of symptom validity was variable, but characterized by exaggerated self-reporting of somatic and emotional distress. The MMPI-2-RF was valid with a few minor elevations on scales indicating a lack of interest in being around others, low energy, and being stress reactive. On a separate trauma inventory (TSI-2) extreme elevations were displayed on one validity scale (ATR=90T), one factor scale (EXT≥100T) and three clinical scales (SUI≥100T, SUI-B≥100T, TRB≥100T). Scores on the factor and clinical scales are more than 3 standard deviations greater than those seen in combat veterans. Raw scores on IE, DA and AA (19 respectively) were at or exceeded raw scores characteristic of individuals feigning symptoms of PTSD. Since returning home from Iraq nearly 10 years ago Mr. Sabado has experienced multiple psychosocial stressors including being unemployed, lost his home to foreclosure, filed for bankruptcy, separated from his wife, lived several months in his car, suicidal ideation (2007); since 2008 he has been audited annually, and in 2010 he moved from Carpentaria to Santa Barbara. In 2014 his son was the victim of vandalism and left home for college. In 2015 his wife's stepfather passed away, his sister-in-law entered an alcohol rehabilitation facility, he filed a lawsuit, and he was rear-ended in a motor vehicle accident and received chiropractic treatment. In 2016 two uncles were hospitalized with one uncle declared brain dead following a fall.

RE: SABADO, Robert
Page: 7

## SUMMARY & CONCLUSIONS

Robert Sabado is a 57-year-old, right-handed, married, male, and former security guard in Iraq for Blackwater Security Consulting who was injured on 4-21-05 when a roadside bomb exploded near a vehicle in which he was riding. Mr. Sabado was referred by Robyn A. Leonard, Esq. acting on behalf of CNA International Insurance Company, for an Independent Psychological Examination (IPE) to determine if there is substantive data to support a claim of psychological injury as a result of his employment with Blackwater and the 4-21-05 incident. This examiner was asked to formally address the following questions:

1. **Please address the psychological testing administered in this case, and provide your interpretation of the results of said testing?**

Answer: Although Mr. Sabado passed measures of cognitive performance validity, his total score on a separate test of verbal learning and memory was worse relative to testing by Dr. Gutierrez last year. He also scored in the low average range of general intelligence which is significantly below his predicted level of intelligence according to the TOPF. This suggests some exaggeration of cognitive dysfunction on the current exam. In contrast, auditory attention and immediate and delayed visual memory were average. Mr. Sabado displayed noncredible performance on motor tasks, especially bilateral upper extremity strength, which was significantly weaker compared to his strength in the days and weeks following his right arm surgery at Santa Barbara Cottage Hospital in 2005. The examinee's pattern of item endorsement on psychological measures of symptom validity was variable, but characterized by exaggerated self-reporting of somatic and emotional distress. The MMPI-2-RF was valid with a few minor elevations on scales indicating a lack of interest in being around others, low energy, and being stress reactive. On a separate trauma inventory (TSI-2) extreme elevations were displayed on one validity scale (ATR=90T), one factor scale (EXT$\geq$100T) and three clinical scales (SUI$\geq$100T, SUI-R$\geq$100T, TRB$\geq$100T) at levels that were more than 3 standard deviations greater than those seen in combat veterans. Raw scores on IE, DA and AA (19 respectively) were at or exceeded raw scores characteristic of individuals feigning symptoms of PTSD.

2. **In your professional opinion what is Mr. Sabado's current diagnosis?**

Answer: Mr. Sabado does not currently meet criteria for any psychological or psychiatric diagnosis, although he still harbors some intermittent self-blame and guilt surrounding the death of his former comrade, "Sparky", and reports experiencing a nightmare every 2 months.

SABADO 071

RE: SABADO, Robert
Page: 8

**3. What is the etiology of the diagnosis as set forth in your answer to Question #2? Please support your answer with data regarding diagnostic criteria.**

<u>Answer</u>: Mr. Sabado does not currently meet criteria for any psychological or psychiatric diagnosis.

**4. Is there substantive data to support that Mr. Sabado suffered a psychological injury as a result of his employment with Blackwater and the April, 2005 incident? Please explain.**

<u>Answer</u>: If "substantive" means data which are unquestionable, undeniable, certain, factual, indisputable, and definite then the answer would be no. Although he reported to this examiner that he began having nightmares in May, 2005 after he came back from Iraq in April, 2005 there is no record to support this claim. There is also was no evidence of any avoidance after the April, 2005 incident as Mr. Sabado signed contracts for three additional deployments. In fact, the only reference to post-traumatic stress appears once during an initial meeting on 4-15-06 with social worker, Karla Freeman who also mentions anxiety, depression, depersonalization, flat affect, and displacement. Ms. Freeman noted that Mr. Sabado was focused on "troubles in marriage". Although Ms. Freeman mentions "symptoms of post-traumatic stress" the majority of the "symptoms" she notes (flat affect, displacement, and depression) are not specific to PTSD and do not form any of the core diagnostic criteria for the disorder. Mr. Sabado participated in a total of 10 sessions, two of which included his wife. The main focus of the sessions was on marital problems, finances, and communication. The last session was on 7-1-06. Mr. Sabado returned to Iraq and completed his final deployment before he came home in August, 2006. There is nearly a 10 year gap before any mention of a psychological issue emerges when Mr. Sabado is seen at the Zugan Health Clinic in Santa Barbara by general practitioner, Mark Wienpahl, M.D., who diagnosed PTSD, but added, "I do not feel skilled in assessing its degree, and at 10 years from the incident, he appears to have found significant coping skills, and with his very supportive wife and their faith, he is functioning fairly well". On 10-20-15 Dr. Gutierrez conducted a neuropsychological evaluation. He administered the California Verbal Learning Test-2nd Edition (CVLT-2) and Minnesota Multiphasic Personality Inventory-2 (MMPI-2). Although Dr. Gutierrez failed to administer a single test to objectively evaluate PTSD, he renders a diagnosis of PTSD (Chronic). Recommendation was 9-12 months of therapy. On interview with this examiner Mr. Sabado stated that his job with Blackwater was his favorite employment experience of his life. He misses the comradery and would return to Iraq if offered a consultant position.

RE: SABADO, Robert
Page: 9

5. **Is there substantive data to support that Mr. Sabado has been limited from engaging in any activities due to an industrially-related psychological injury?**

Answer: If "substantive" means data which are unquestionable, undeniable, indisputable, certain, factual and definite then the answer would be no.

6. **Is there substantive data to support that Mr. Sabado suffers from any of the Somatoform Disorders, Personality Disorders or Factitious Disorders? Is there any evidence of malingering? If so, how might this impact Mr. Sabado's current complaints and/or level of functioning? Please support your answer with data and diagnostic criteria.**

Answer: There is no evidence that Mr. Sabado suffers from a Somatoform Disorder, Personality Disorder or Factitious Disorder. There is evidence of malingering. This impacts Mr. Sabado in the form symptom exaggeration in the areas of cognitive, physical, and emotional functioning. His total score on a test of verbal learning and memory was worse relative to testing by Dr. Gutierrez last year, and he scored significantly below his predicted level of intelligence according to the TOPF. This suggests some exaggeration of cognitive dysfunction on the current exam. Mr. Sabado displayed noncredible performance on motor tasks, especially bilateral upper extremity strength, which was significantly weaker compared to his strength immediately following his right arm surgery at Santa Barbara Cottage Hospital in 2005. Psychologically, Mr. Sabado's scores on a separate trauma inventory (TSI-2) were extremely elevated on one validity scale, one factor scale, and three clinical scales at levels that were more than 3 standard deviations above those seen in combat veterans. Raw scores on IE, DA and AA were at or exceeded scores of individuals feigning PTSD. The current objective databases, as well as comparison with prior testing seriously compromise the credibility of Mr. Sabado's current clinical presentation.

7. **What further psychological evaluation or testing is needed in Mr. Sabado's case, if any? Please be specific.**

Answer: None.

8. **Maximum Medical Improvement ("MMI") is defined by the AMA Guides as the date from which further recovery or deterioration is not anticipated, although over time there may be some expected change. If you have concluded that Mr. Sabado has an industrially-related psychological condition, has he reached MMI for said condition? On what date do you believe that MMI status was reached for any industrially-related psychological condition?**

Answer: There is no industrially-related psychological condition.

RE: SABADO, Robert
Page: 10

9. **Is Mr. Sabado psychologically capable of returning to his usual and customary occupation as a Security Guard in an overseas war zone?**

Answer: Yes.

10. **If you determine that Mr. Sabado is not psychologically capable of returning to his usual and customary occupation as a Security Guard in an overseas war zone, is he capable of returning to alternative full-time employment?**

Answer: Mr. Sabado is psychologically capable of returning to his usual and customary occupation as a Security Guard in an overseas war zone.

11. **If work restrictions are indicated, please provide specific work restrictions that are the result of the industrial condition.**

Answer: There are no work restrictions on a psychological basis. Mr. Sabado is psychologically capable of returning to his usual and customary occupation as a Security Guard in an overseas war zone.

12. **Please evaluate the medical records provided to you. If there are discrepancies between the findings in those records and your conclusions, please explain and discuss the discrepancies.**

Answer: Mr. Sabado's current total score on a test of verbal learning and memory was worse relative to testing by Dr. Gutierrez last year, and he scored significantly below his predicted level of intelligence according to the TOPF. This suggests some exaggeration of cognitive dysfunction on the current exam. Mr. Sabado displayed noncredible performance on motor tasks, especially bilateral upper extremity strength, which was significantly weaker compared to his strength immediately following his right arm surgery at Santa Barbara Cottage Hospital in 2005. Psychologically, Mr. Sabado's scores on a separate trauma inventory (TSI-2) were extremely elevated on one validity scale, one factor scale, and three clinical scales at levels that were more than 3 standard deviations above those seen in combat veterans. Raw scores on IE, DA and AA were at or exceeded scores of individuals feigning PTSD. The current objective databases and comparison with prior testing seriously compromise the credibility of Mr. Sabado's current clinical presentation. Given the presence of external financial incentives these facts are consistent with a malingering presentation which manifests in the form of symptom exaggeration in the areas of cognitive, physical, and emotional functioning.

RE: SABADO, Robert
Page: 11

**13. Please provide any further information that you feel would be useful in our understanding of this case. We are interested in any observations that you have with respect to the opinions of other physicians in the file.**

Answer: Over the past 10 years Mr. Sabado has been seen by three health care providers who either mention "symptoms of post-traumatic stress" (social worker, Karla Freeman in 2006) or diagnose PTSD (Dr. Wienpahl, June, 2015) and Dr. Gutierrez (November, 2015). Although Ms. Freeman mentions "symptoms of post-traumatic stress" during the initial visit, the majority of the "symptoms" she notes (flat affect, displacement, and depression) are not specific to PTSD and do not form any of the core diagnostic criteria for the disorder. She never conducted any objective psychological testing to diagnose PTSD and most of her meetings with Mr. Sabado, including two meetings with his wife, were focused on the marital relationship, communication, and finances. In a similar manner Dr. Wienpahl, who is a family practitioner and not a psychiatrist or psychologist, never administered any objective psychological tests to validate any diagnosis of PTSD. In fact, he stated "I do not feel skilled in assessing its degree, but at 10 years from the incident, he appears to have found significant coping skills, and with his very supportive wife and their faith, he is functioning fairly well". The methodology employed by Dr. Gutierrez is significantly flawed as he failed to administer a single test to objectively evaluate PTSD, yet renders a diagnosis of PTSD (Chronic). On interview with this examiner Mr. Sabado stated that his job with Blackwater was his favorite employment experience of his life. He misses the comradery and would return if offered a consultant position. This is exactly opposite of what an individual with PTSD would do, as individuals with PTSD try to avoid external reminders that arouse distressing memories, thoughts, or feelings about or closely associated with the traumatic event. The main issue that has troubled Mr. Sabado since the 4-21-05 incident is guilt and self-blame associated with the death of "Sparky". He carries an e-mail letter on his person from Sparky's father dated 5-10-08 which he reads from time to time to lessen his guilt and self-blame. In fact, at the time of his current examination Mr. Sabado informed this examiner that he and his wife were going to North Carolina to not only visit their son at college, but also meet Sparky's wife, whom Mr. Sabado has never met, but calls every year on the anniversary of Sparky's death in Iraq.

Thank you for the opportunity to assist you in this evaluation.

Sincerely,

George K. Henry, PhD/ABPP-CN
Board Certified Clinical Neuropsychologist
Assistant Clinical Professor of Psychiatry
David Geffen School of Medicine at UCLA

# JEROME H. FRANKLIN, M.D.

*DIPLOMATE OF THE AMERICAN BOARD*
*OF PSYCHIATRY AND NEUROLOGY*

· · · ·

**450 North Bedford Drive**
**Suite 303**
**Beverly Hills, California 90210-4378**
**(310) 276-0809**
**Fax: (310) 278-1509**

March 23, 2016

Beverly Ann Davis
CNA International
P. O. Box 8317
Chicago, Illinois 60680

Robyn A. Leonard
Jamie B. Horowitz
Law Offices of
Laughlin Falbo Levy & Moresi LLP
255 California Street, Suite 700
San Francisco, CA 94111-4912

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:
      OWCP No:
      LFLM No:
      D/Injury:   4/21/05

Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016

## INDEPENDENT MEDICAL EVALUATION

## PSYCHIATRY

Mr. Robert Sabado is a 57-year-old, married, Hawaiian-Filipino male who is seen for a complex Independent Medical Evaluation in Psychiatry at the request of Attorney Robyn Leonard of the Law Offices of Laughlin, Falbo, Levy & Moresi.

**SABADO 076**



RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:   ███████
      OWCP No:    ███████
      LFLM No:    ███████
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
      Page 2
      March 23, 2016

## PSYCHIATRIC BILLING/ML104/RV5 FEE EXPLANATION

(1)   Robert Sabado was seen in my office on the above date, at which time I, myself, set aside a total of three hours with the patient, face-to-face, obtaining the history and making a diagnosis. No physical examination of any type was conducted and no psychometric tests were administered unless otherwise stated.

(2)   After obtaining Mr. Sabado's history, I addressed the issue of medical causation.

(3)   After obtaining Mr. Sabado's history, I addressed the issue of apportionment.

(4)   Medical records were made available to this Examiner and were fully reviewed in excess of 6-1/4 hours.

(5)   I was asked to answer a number of questions including whether Mr. Sabado's alleged emotional symptoms were related to work stress, and if there was any temporary or permanent disability. Furthermore, I was asked whether Mr. Sabado needed further treatment and if the condition was permanent and stationary.

(6)   Preparing this report required extensive time, thought and experience. Therefore, I spent seven hours and 35 minutes. Revisions took an additional 90 minutes. Thirty minutes was spent in research. I have spent in excess of 18-3/4 hours on this evaluation, review of records, research and report.

(7)   Because of the time spent correlating the clinical findings at the time of examination, addressing the issues of medical causation and the issue of apportionment, charges for this report have been billed under the Med-Legal Fee Schedule, **ML104/RV5**, since no other fee procedure description can possibly be contemplated or could, in any way, be applicable.

(8)   A final factor that makes this case extraordinary are issues inherent in Mr. Sabado's past history which are detailed in my report.

RE:  Employee:   Robert Sabado
     Employer:   Blackwater Security Consulting
     Claim No:   ███████
     OWCP No:    ███████
     LFLM No:    ███████
     D/Injury:   4/21/05
     Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
     Page 3
     March 23, 2016

## CAUTION

This psychiatric report is confidential and privileged. Some patients and family members may tend to misunderstand and distort the information enclosed in this report. This may result in significant psychological distress to the patient or may interfere with treatment and eventual recovery from illness.

For patients with self-destructive or assaultive tendencies, the consequences of ill-considered disclosure of this report may be serious.

This report is meant for the use of qualified professionals only, and those with a need to know by operation of law. Persons breaching the confidential nature of this report assume the risk and liabilities of so doing.

## REVIEW OF MEDICAL RECORDS

Prior to this examination, I was asked to review a voluminous set of medical records measuring approximately four inches in height. These records indicate that Mr. Sabado was employed by Blackwater Security Consulting as a security guard in Iraq. He was injured on April 21, 2005 when he was riding in a vehicle convoy that was hit by a vehicle-borne improvised explosive device (IED). He had injuries to the right arm and bilateral lower extremities.

(1)   ***Combat Support Hospital, C-MED, Camp Junction City, Iraq***

   The file indicates that he was first treated at a Combat Support Hospital, C-MED, Camp Junction City, Iraq. He was seen on the date of his injury, April 21, 2005. At that time, they state that he was stable and had multiple minor puncture wounds to his right and left leg, penis and scrotum. A surgical evaluation was requested. Nursing notes indicate that he had multiple minor puncture wounds as noted to his right and left leg, penis and scrotum. He had decreased mobility in the digits of his right hand. He was provided with medication for pain and

SABADO 078

RE:    Employee:   Robert Sabado
         Employer:   Blackwater Security Consulting
         Claim No:   HW550291
         OWCP No:   █████
         LFLM No:    █████
         D/Injury:    4/21/05
         Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
         Page 4
         March 23, 2016

Medivac was requested. At first, he was at Balad and then he went to Landstuhl Regional Medical Center in Germany. He underwent emergency surgery to his lower extremity wounds and right upper extremity when he was at the Combat Support Hospital. At Landstuhl Medical Center in Germany, he underwent additional surgery. He was then repatriated to the United States. At Balad, *"Underwent emergent surgery for washout of bilateral lower extremity wounds, removal of LLE shrapnel, release of RUE compartment syndrome, repair of ulnar nerve injury, ligation of ulnar artery, primary repair of right upper extremity muscle tendons, penile exploration and urethral repair."*

(2)    *<u>Santa Barbara Cottage Hospital</u>*

The next records reviewed are from Santa Barbara Cottage Hospital where he was admitted on April 27, 2005.

The history indicated, *"He sustained shrapnel wounds in an explosion to his convoy with shrapnel wounds to his right forearm, his right lateral thigh and his groin. The patient was initially treated in Iraq, stabilized and then transferred to Germany for operative treatment.*

*In Germany, he underwent: 1. Fasciotomy of the right forearm with exploration of the forearm shrapnel wound, which required a ligation of the ulnar artery and apparently discovery of the ulnar nerve being severed. 2. Exploration and I&D of the right buttock and lateral thigh wound. 3. Urethral repair of an injury to the glans penis with placement of Foley catheter. 4. I&D of bilateral groin wounds."*

He was seen by Dr. Benedict Taylor and Dr. Kenneth Waxman. They advised evaluation with a hand surgery for the ulnar nerve and fasciotomy injury. Dr. Laub called for evaluation of the urethral injury..

RE:    Employee:    Robert Sabado
        Employer:    Blackwater Security Consulting
        Claim No:    █████████
        OWCP No:    █████████
        LFLM No:    █████████
        D/Injury:    4/21/05
        Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
        Page 5
        March 23, 2016

Next reviewed is the hand surgery consultation by Dr. Robert Ruth on April 29, 2005. Mr. Sabado was described as an alert, adult male in no acute distress. Dr. Ruth diagnosed status post right ulnar nerve repair of ulnar nerve laceration; possibly status post right ulnar artery ligation, hand viable; status post volar forearm fasciotomy with open wound and multiple other wounds.

*"I would proceed with wound closure as per the trauma team and I will allow them to continue to manage the wound as they are currently doing per their protocols."*

Dr. Ruth was available for assistance. He recommended passive and active range of motion exercises and active assisted range of motion exercises to maintain supple joints for future outcome.

There is an operative report dated May 2, 2005 at which time there was a complex closure of the right arm and right buttock wounds by Dr. Waxman. He then had a retrograde urethrogram on May 2, 2005 which showed "*high-grade stricture at the penoscrotal junction.*"

He then had an outpatient occupational therapy hand evaluation on May 3, 2005. There is a lengthy report describing their evaluation and recommendations for treatment.

He was then discharged from Santa Barbara Cottage Hospital on May 3, 2005 with a provisional diagnosis of "*Civilian casualty from Iraq with multiple shrapnel wounds, status post bomb explosion, in his right forearm, right lateral thigh, groin and penis.*" They note his evaluation by occupational therapy and his evaluation by Dr. Robert Ruth who was a hand surgeon. They note that postoperatively, Mr. Sabado was able to ambulate without assistance.

*"The pain is well-controlled and he was deemed stable for discharge on May 3, 2005."*

RE:    Employee:    Robert Sabado
       Employer:    Blackwater Security Consulting
       Claim No:    ▉▉▉▉▉▉▉
       OWCP No:     ▉▉▉▉▉▉▉
       LFLM No:     ▉▉▉▉▉▉▉
       D/Injury:    4/21/05
       Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
       Page 6
       March 23, 2016

(3)    **_Santa Barbara County Public Health Department_**

       Subsequently, he was seen at Santa Barbara County Public Health Department and
       six handwritten notes between the dates of May 6, 2005 and July 26, 2005 are
       reviewed. They indicate that he was "*doing well.*" He was working with physical
       therapy and occupational therapy and felt well. He was urinating well. They note
       that the lateral thigh wound exhibited closure.

       In the report of June 17, 2005, they state there was a very small residual ulnar
       nerve weakness. They also state, "*Patient cleared for return to work.*" He was to
       have follow up as planned.

       There are two occupational therapy progress reports dated June 1, 2005 and
       January 3, 2006. They note in the last report, "*Therapy interrupted due to patient
       returned to work in Iraq.*"

       There is a report from Dr. David Laub dated June 2, 2005 which indicated that
       Mr. Sabado had no voiding complaints. They note that his "*Phallus is normal in
       appearance.*" The doctor concludes, "*Mr. Sabado is recovering nicely. I
       explained that there is still a potential for delayed urethral stricture and he
       should contact me immediately, if he has change in his urinary stream.*"

       Also reviewed is a report from Dr. Robert Ruth dated June 2, 2005 noting, "*Mr.
       Sabado is doing very well. He is pleased with this clinical progress. He notes
       numbness in the right small finger, no significant pain in his right upper
       extremity. He is undergoing therapy at Cottage Hospital one to two times a week.
       He has no difficulty with fine motor activities.*" Dr. Ruth recommended that he
       continue supervised therapy and he renewed a prescription for range of motion,
       strengthening and fabrication of an anti-claw splint if needed.

       "*From a right upper extremity standpoint, he may pursue his work activities as
       tolerated.*"

RE:  Employee:     Robert Sabado
     Employer:     Blackwater Security Consulting
     Claim No:     ▮▮▮▮▮
     OWCP No:
     LFLM No:
     D/Injury:     4/21/05
     Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
     Page 7
     March 23, 2016

> Dr. Ruth examined him again on June 16, 2005 stating, *"Status post right ulnar nerve repair in the Middle East."* He states once again that Mr. Sabado may return to full work activities on June 21, 2005.
>
> The medical file then jumps to April 9, 2013 at Santa Barbara Cottage Hospital when Mr. Sabado presented for evaluation of a foreign body sensation in the right eye. This appears to be a non-work-related injury. He was diagnosed as having subconjunctival hemorrhage which was nontraumatic. He was not provided with medication. He was told to return if his condition got worse.
>
> The next report is from Dr. Mark Wienpahl, a general practitioner, dated June 22, 2015. This is a highly detailed report which discusses Mr. Sabado's work-related injury in April of 2005 at which time he was employed by Blackwater. The doctor reviews his injury and treatment and finally after discussing all of his physical injuries and treatment states, *"Finally, there is the PTSD issue. He states, 'It has been an uphill battle.' He notes that it was his wife who finally confronted him several years after the event that she was sure he suffered from this and that it was affecting the whole family."* Mr. Sabado then spoke at length about all the things that have plagued him.
>
> *"...like facts that the teammate who died that day was leaving for home at the end of the day, and that the patient himself would have been sitting in that seat but for another simple event, etc. He notes that 6 of the 14 men in his team are no longer alive, including 2 who have committed suicide. He notes he was very close to suicide in 2007. He does not have any self harm notions now. His sleep has never been able to sleep well, some nights not sleeping till 2:00 a.m. not knowing why. He did try marijuana some years back, which helped sleep, and even used it three times a day for a period, but uses it rarely now. He has had no further psychotherapy and has never taken any prescription meds for this."*
>
> Under the heading of Cognitive/Functional, the doctor states, *"Cognition he rates as intact; no history of brain injury. He questions his functional status given*

RE:     Employee:       Robert Sabado
        Employer:       Blackwater Security Consulting
        Claim No:       ███████████
        OWCP No:        ███████████
        LFLM No:        ███████████
        D/Injury:       4/21/05
        Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
        Page 8
        March 23, 2016

*mainly the PTSD symptoms he feels he has, along with the dominant right
hand/arm impairment. As noted above, his physical fitness is rated as poor by
himself."*

Under Examination, it was noted that he was a talkative Hawaiian male. He did
not appear in any obvious distress. He was fully oriented and had a normal gait.

Finally, there is an assessment indicating multiple diagnoses including right ulnar
neuropathy secondary to remote trauma.

*"I do think he has this diagnosis, but I do not feel skilled in assessing its degree.
At ten years from the incident, he appears to have to have found significant
coping skills, and with his very supportive wife and their faith, he is functioning
fairly well."*

The doctor went on to say that he might well benefit from some further therapy
and attention to this diagnosis. The third diagnosis was bilateral proximal leg
pain which was likely due to the trauma and may be permanent. He felt that it
could conceivably be approved by some form of physical therapy but it does not
appear to be a significant impairment.

It appears that Dr. Wienpahl had a discussion with him and encouraged him to
resume exercising for his health. He also encouraged him to consider seeking
some psychotherapy evaluation and treatment for his PTSD.

Mr. Sabado was then interviewed by Brandy Chapman but there is no designation
as to Ms. Chapman's provider title. Her report is dated August 14, 2015. She
states, *"He signed consent for evaluation and possible treatment of injuries
sustained as a result of a motor vehicle collision that occurred on or about August
9, 2015."* It appears that this entire file has nothing to do with his work-related
injury. As a result of the motor vehicle accident, he had a number of diagnoses to

RE:    Employee:    Robert Sabado
       Employer:    Blackwater Security Consulting
       Claim No:
       OWCP No:
       LFLM No:
       D/Injury:    4/21/05
       Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
       Page 9
       March 23, 2016

various areas of his back including cervical, lumbar and sacroiliac joints. He also had headaches, restrictions of motion, spasm and weakness.

He was also seen by Dr. Ramon Alcerro, a chiropractor, who submitted a report dated August 18, 2015 in connection with his low back and neck pain which was suffered in a car accident on August 9, 2015.

*"During the course of his evaluation it was revealed that he has weakness in his right wrist, flexion and extension (4/5) and right grip (3/5) which are not explained by the trauma of the accident."* He went on to state, *"Mr. Sabado stated that he has had weakness which is gradually worsening since it was injured in a road side bomb explosion in Iraq ten years ago. He has recovered nearly completely from his injuries of August 9, 2015 but continues to have weakness in his right upper extremities as stated above."*

Mr. Sabado was then seen by Dr. Robert Siegel who is a doctor of audiology. He was found to have a binaural impairment of 5%.

*"A ratable loss has been calculated and I feel that this is consistent with noise exposure."*

Mr. Sabado was then seen once again by Dr. Robert Ruth on November 2, 2015 at which time he was considered permanent and stationary. Dr. Ruth notes that he saw Mr. Sabado in 2005.

*"He did not return for further care. He returns today for permanent and stationary rating. He complains of numbness, pain, weakness, and limited motion right upper extremity. He notes constant numbness right ring and small finger. He has some pain emanating from the hand into the medial elbow. He gets some cramping in the fingers and into a flexed posture. Right hand feels weak. He feels the symptoms may have worsened over the past two years. He has not had any additional surgery."*

SABADO 084

RE:    Employee:     Robert Sabado
       Employer:     Blackwater Security Consulting
       Claim No:
       OWCP No:      ████████
       LFLM No:
       D/Injury:     4/21/05
       Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
       Page 10
       March 23, 2016

Dr. Ruth notes that Mr. Sabado was working as a case detective as a security
worker from September 2015 to the present time. In June or July 2015, he worked
at Costco doing maintenance for one month.

Dr. Ruth diagnosed status post right upper extremity IED injury with ulnar nerve
laceration and ulnar artery injury, status post right ulnar nerve repair and right
ulnar artery ligation, status post volar forearm fasciotomy.

Dr. Ruth found him to be permanent and stationary. He listed his subjective and
objective factors of disability as well as work restrictions. He states, "*As a result
of this industrial injury, Mr. Sabado does not require work restrictions, nor has
he lost any significant component of his pre-injury work capacity as a result of
these industrial injuries.*" He then provides a number of ratings to the various
areas of his injuries. He notes that he has a 3% upper extremity impairment rating
and a 6% upper extremity impairment rating for ulnar nerve sensory dysfunction.
He then rated his right ulnar nerve motor function stating, "*This converts to an
18% whole person impairment. I believe that this calculation adequately
captures Mr. Sabado's impairment.*" Apportionment is 100% industrial. He was
not a qualified injured worker.

"*Provisions do need to be made for Mr. Sabado's future medical care.*"


(4)    **_Richard Scheinberg, M.D., Orthopedist_**

There is then an Independent Medical Examiner's Medical Records Review dated
January 11, 2016 by Dr. Richard Scheinberg. Dr. Scheinberg reviews all of the
above-mentioned records and offers a discussion. He notes all of the injuries and
the repair of these injuries. He notes, "*The patient has also been evaluated and
treated from a psychological perspective for posttraumatic stress disorder. He
also underwent urological consultation by Dr. Laub for repair of a penile injury,
which apparently did not have significant residua.*"

RE:    Employee:    Robert Sabado
       Employer:    Blackwater Security Consulting
       Claim No:    ▮▮▮▮▮▮▮
       OWCP No:
       LFLM No:
       D/Injury:    4/21/05
       Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
       Page 11
       March 23, 2016

Dr. Scheinberg then concludes, *"I look forward to evaluating Mr. Sabado for his Independent Medical Examination."*

Lastly, on February 3, 2016 he was seen by a physician's assistant, Mr. Brant Richardson. He had left groin pain at that time and he stated, *"Over the last three years, he has been getting sudden, severe, sharp pains which can come on either with movement or at rest."* He was prescribed Aleve, 440 mg twice per day.

*"I recommend he see a physical therapist twice weekly for the next month and develop a home exercise program."*

From a psychological point of view there are two reports.

(5)   *Karla Freeman, LCSW*

The first is from Karla Freeman, Licensed Clinical Social Worker, who apparently saw him in 2005 although she does not date the year of her report. Altogether there are 10 handwritten notes between April 15 and July 1, I believe, 2005.

In her first note, she states, *"Symptoms of posttraumatic stress included anxiety, depersonalization, depression, flat affect, displacement."* She notes, *"Patient focused on troubles in marriage, was open to support. Established contract for working weekly."*

At the time of the second meeting, it was stated, *"Continued to be unable to connect with his feelings. Supportive work to provide safety. Frozen affect was not loosened...Continue to focus on problems of marriage, more history of the relationship emerge."*

At the time of the third visit, Mr. Sabado discussed his wife's acting out with other men.

RE:  Employee:   Robert Sabado
     Employer:   Blackwater Security Consulting
     Claim No:   ███████
     OWCP No:    ███████
     LFLM No:    ███████
     D/Injury:   4/21/05
     Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
     Page 12
     March 23, 2016

"*He began to express his feelings of fear and separation.*"

At the time of the fourth meeting, he discussed bringing his wife to the sessions.

"*Patient was a little less frozen.*"

On May 13th, there was a session with his wife.

"*She expressed her need for client to be home and ambivalence regarding financial issues.*"

On May 20th, his wife came again and revealed financial disturbances.  There were financial difficulties in their situation.

At the next meeting, the therapist gave support and education regarding the role of finances and stress.  They explored wife's feeling about the client's work and his fears of safety and their need for money.

At the eighth meeting, it was noted that the client return to work with Blackwater and that the client's stress was lessened by providing more support.

At meeting number 9, she states, "*Continue to reinforce building communication and support for client's ambivalence about leaving his family.*"

The last session was on July 1, 2005 at which time "*reviewed understanding of stress and how to cope while overseas as well as family support by therapist while client was overseas.  Symptoms were lessened and client felt less overwhelmed and anxious.*"

That ended the therapy.  It does not appear as if Mr. Sabado sought the help of any other psychotherapist.

RE:    Employee:    Robert Sabado
        Employer:    Blackwater Security Consulting
        Claim No:
        OWCP No:
        LFLM No:
        D/Injury:      4/21/05
        Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
        Page 13
        March 23, 2016

(6)    ***Juan Manuel Gutierrez, Ph.D., ABPS***

Lastly, there is a neuropsychological consultation dated October 20, 2015 by Dr. Juan Manuel Gutierrez, Ph.D., ABPS. This is a highly detailed report. Dr. Gutierrez begins by reviewing the history of Mr. Sabado's injury while in Iraq.

*"He injured his neck, right arm, legs and groin. Additionally, he describes cognitive deficits such as concentration, defects in memory problems as well as survivor's guilt, nightmares, irritability and other issues."*

There is an indepth history of Mr. Sabado's entire life noting some stress as an adolescent. He notes that he may seek a prescription for marijuana to aid in sleep.

It was noted that he has been employed primarily in law enforcement and security. He has been in his second marriage for 19 years. His first marriage ended due to irreconcilable differences. Two daughters from his first marriage and two sons from his second marriage.

Under Observations, it was noted, *"He seemed to be nervous when he began to talk about his life. He also became slightly tearful."*

Orientation was adequate and there was no formal thought disorder.

*"Affect was expansive but mood was anxious to depressed."*

There is then a lengthy listing of complaints including excessive fatigue, sadness, anxiety, stress, sleep difficulties, anger, etc.

*"Overall, his symptoms developed quickly after his initial physical recovery. His symptoms were also described as occurring often. He feels that in the last six months, his symptoms have stayed about the same and also that he definitely is noting that something is wrong with his mental state."*

SABADO 088

RE:     Employee:     Robert Sabado
        Employer:     Blackwater Security Consulting
        Claim No:
        OWCP No:
        LFLM No:
        D/Injury:      4/21/05
        Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
        Page 14
        March 23, 2016

He then completed a number of psychological tests including an MMPI. These tests are discussed in detail.

"*Psychological injury was evident through interview and formal testing supports this assertion. His validity scores point to confusion and a significant amount of fearfulness, that can be seen as a cry for help. He appears to have little ability to handle stress and even more so, likely has anxiety that would be related to having survived a significant, typically, physical trauma. He also has a significant level of depression and may have some sense of suicidal thinking.*"

He goes on to state that test results coupled with history point to posttraumatic stress disorder, chronic.

"*In addition, he appears to have endured cognitive losses that are likely related to this condition, thus, there is a need to rule out Cognitive Disorder, NOS. Regrettably, his profile would indicate that these losses will likely be permanent and also leave him open to probable decline in the near future.*"

Dr. Gutierrez makes recommendations and appears to be pessimistic about Mr. Sabado's future.

"*In the short term, it is likely that the patient may have increasing difficulty with activities of daily living. It is possible that within the next 3-5 years he will have poor ability to maintain his current status. In the long run, it is possible that he will decline to a state in which he will need one-on-one care. He may be vulnerable to a progressive dementia within the next 5 to 10 years.*"

He recommends addressing these issues by having therapy on a weekly basis.

"*EMDR would be preferable but even supportive therapy would be beneficial.*"

RE:    Employee:    Robert Sabado
        Employer:    Blackwater Security Consulting
        Claim No:
        OWCP No:
        LFLM No:
        D/Injury:      4/21/05
        Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
        Page 15
        March 23, 2016

> He adds, "*Once he has undergone 9 to 12 months of therapy, it would be prudent to reassess him from a psychological perspective.*"

(7)   **_Deposition of Robert S. Sabado, September 25, 2015_**

Lastly, I reviewed a deposition of 89 pages taken on September 25, 2015. This deposition was somewhat shocking in Mr. Sabado's ability to clearly and in great detail describe and answer every question that he was asked. His response in his deposition would appear completely and totally opposite as to how he is described by Dr. Gutierrez in a neuropsychological consultation dated October 20, 2015.

Initially, he was asked a number of general questions which he answered in detail.

On page 10, he notes he was first hired by Blackwater in April 2004.

On page 20, he discusses a low back injury that occurred during the course of his employment with LAPD at which time he was out of work one week. He denied having any permanent disability. He did have physical therapy.

On page 24, he discusses a motor vehicle accident that involved back and neck whiplash type injuries. He stated, "*The back is a 100% better.*"

On page 29, he denied ever having been diagnosed with any type of mental illness prior to filing this claim.

On page 30, he was asked about recreational drugs and indicated that he had a medical marijuana card.

*"My wife recommended that — she notices more when the PTSD kicks in, she recommended that I try some tinctures, and -- "*

**SABADO 090**

RE:     Employee:      Robert Sabado
        Employer:      Blackwater Security Consulting
        Claim No:
        OWCP No:
        LFLM No:
        D/Injury:      4/21/05
        Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
        Page 16
        March 23, 2016


He stated that the marijuana helped. He then began discussing his employment by
Blackwater in April of 2004. He discusses his various deployments starting with
the Karbala team.

On page 38, he begins to discuss his injury on April 21, 2005. He goes into
incredibly great detail with what sounds like a complete and accurate memory of
exactly what happened and how it happened. He indicates that a roadside bomb
hit their vehicle and as noted is very descriptive and detailed. One description
goes on for multiple pages.

On page 45, he indicated that one person was killed.

*"I was severely injured. Another two guys had been injured that were in my
vehicle. We were off the kill zone within about 10 to 15 minutes, which was
honestly, that was fast."*

On page 47, Mr. Sabado describes meeting up with an army unit that was
guarding the highway or a bridge. He was told that big army was going to take
over from there.

*"Hey, we're going to transport you to a medic which is down the road."*

He was then taken to Ramadi and treated. He was put on a gurney and given
treatment. It was a temporary site. They then called a helicopter to medivac him
to Billad. After that, he went to Landstuhl. He recalls that a chaplain came to talk
to him while he was in the hospital.

On page 54, he describes talking to a doctor who told him, *"You're lucky to be
alive."* He also stated, *"Whoever slapped that tourniquet on you saved your life."*

The doctor went on to explain his various injuries and need for treatment. It

**SABADO 091**

RE:     Employee:     Robert Sabado
        Employer:     Blackwater Security Consulting
        Claim No:
        OWCP No:
        LFLM No:
        D/Injury:     4/21/05
        Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
        Page 17
        March 23, 2016

should be stated that Mr. Sabado remembered all this in considerable detail which
is amazing considering his injury was 10 years prior to the deposition.

On page 46, he indicates that he was in Landstuhl, Germany for six days. Then,
he was flown home and spent another six days in Cottage Hospital. After Cottage
Hospital, he had to go to the County Hospital for several follow up treatments.
They removed his stitches and he started physical therapy with a hand specialist.

He had therapy for approximately one month and then saw Dr. Robert Ruth. He
also saw Dr. David Laub. He recalls seeing Dr. Waxman but not since 2005.

It was then noted on page 60 that he was released to return to work for Blackwater
on June 21, 2005.

"*I made up my mind I was going to go back. And I don't expect anybody to ever
understand it or want to understand it, but I went back for several reasons.*"

He states that he did not want his career to end like that and "*I went back because
my teammate was killed. I went back for my team, because pretty much everybody
had been devastated by the events that had happened. At the time, I just felt that
that was about the best thing to do, just go back and work as fast as I could.*"

He explains how he went about getting back into the job, who he contacted and
what he had to do. He notes that it turned from a 90-day contract into a four
month contract. Initially, he was in Baghdad. Then, he went to Basra. He
admitted that he was responsible for supervising 20 to 30 people. After four
months, he went home. He discusses his various activities after returning home.
He was told that he would be guaranteed six months of work. He then signed
another contract. After a month and a half, he came home on an emergency leave.
Apparently, it had something to do with his marital relationship. He refers to it as
a change in dynamics relationship wise. Coming home had nothing to do with his
employment.

**SABADO 092**

RE: Employee: Robert Sabado
      Employer: Blackwater Security Consulting
      Claim No:
      OWCP No:
      LFLM No:
      D/Injury: 4/21/05
      Date of Independent Medical Evaluation/Psychiatry: March 23, 2016
      Page 18
      March 23, 2016

He had attempted to get employment at home and had a couple of interviews but did not get hired. He decided to go back overseas because they were in some kind of financial pinch. His last contract was for three months. He was assigned back to the team house and it was uneventful. He came home in approximately August of 2006 but is not quite sure of the date.

He indicates that he did notice problems with his arm in that his arm was weak and his hand was weak. He could not fully loaded his 9 mm pistol.

*"My hand -- I had no feeling on half my hand, so every time I was -- I had a rifle, you know, I would always have to double, triple check, you know, my safety, because it just -- you know, I knew things felt different, if my rifle had moved up against my --the ammo pouch in the vest, that I --sometimes I found that the safety would be off and so I knew that, hey, you know, there were steps that I had to take to make sure that I was safe."*

He denies seeking any medical treatment for his arm or hand between deployments.

He denies ever complaining of problems to anybody and at no time did he seek medical treatment.

On page 70, he indicates that he did seek counseling after the incident of April 21, 2005.

*"Briefly for a few weeks, there was a lady we saw in town that was a counselor."*

He recalls that it was Karla Freeman. Both he and his wife were in therapy together.

RE: Employee: Robert Sabado
   Employer: Blackwater Security Consulting
   Claim No:
   OWCP No:
   LFLM No:
   D/Injury: 4/21/05
   Date of Independent Medical Evaluation/Psychiatry: March 23, 2016
   Page 19
   March 23, 2016

*"I was having nightmares. I was going through a really bad survivor guilt. We were having our relationship problems, financial problems, and, you know, I just figured that was something that needed to be done."*

He then discusses the financial problems pointing out that he was the sole support of the family.

*"I didn't finish that third deployment, started falling behind in our mortgage payment, and I needed to get back to work."*

He denied receiving temporary total disability. He got one check from CNA and that was it.

His wife had not yet returned to work. Then he saw Karla Freeman for about one month. When asked why he stopped seeing her, he stated, *"I went back to work. I left. I want to say my fourth deployment return I think in June, by June I was gone."*

He also recalls seeking counseling with a pastor at his church in 2007 as a result of the marital relationship. In fact, he and his wife were separated for two to three months. They reconciled in December 2007. He denied any additional psychiatric treatment since returning from Iraq.

He denied ever taking medication.

There is then a discussion of further employment after he returned to this country. He recalls working for Kroll Security. He helped train U.S. Marines at Camp Lejeune. He also worked at Carpinteria High School from August 2009 to June of 2012. That was part-time working security on campus. One year, he was the assistant JV baseball coach. For two seasons, he was the head JV baseball coach.

**SABADO 094**

RE:     Employee:     Robert Sabado
           Employer:     Blackwater Security Consulting
           Claim No:
           OWCP No:
           LFLM No:
           D/Injury:     4/21/05
           Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
           Page 20
           March 23, 2016

He then began working for Berman & Ely doing estate security. That was from July 2007 to April 2014. That overlapped with his Carpinteria High School duties.

He admits that he did "*a whole bunch of stuff.*" It was "*just under the table.*"

He then started at Santa Barbara Nissan in October 2013 which overlapped with Berman & Ely. He had no further injuries. At Santa Barbara Nissan, he was in car sales. He was then at LYFT doing driving starting in November 2014. He also worked at Costco which overlapped with some of his other jobs.

More recently, he started at Case Detective Agency on a part-time basis. He was doing uniform security in an unarmed position.

On page 77, he was asked if he was still working and he stated, "*No. I got pain in my legs.*"

For that reason, he went to Dr. Weinpahl who told him that he had disability in his right arm and also PTSD.

When asked about Dr. Weinpahl, he stated that he went to urgent care and asked if he could see somebody for a medical exam.

"*They were the only ones available that would take me without a workers' comp case.*"

He was asked why he had not sought treatment in a while and what made him decide to go.

"*My arm was hurting more. Been hurting since for over a year.*"

As far as he knows, he does not have shrapnel that needs to be removed.

RE:  Employee:  Robert Sabado
     Employer:  Blackwater Security Consulting
     Claim No:
     OWCP No:
     LFLM No:
     D/Injury:  4/21/05
     Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
     Page 21
     March 23, 2016

When asked how he currently spends his day other than when he was working at the Case Detective Agency, he stated, *"Sleep, take my son to school, wife to work and pick them up, go to work."*

He then discusses the fact that his right arm is weak and he has pain in his legs.

*"...I have a shooting pain that will go right where my scars are."*

He also has difficulty walking.

On page 81, he indicates that he saw Dr. Weinpahl in June of 2015 on one occasion and never went back.

He was then asked, *"So, what would you like to see happen with this case?"* He answered, *"I'd like to be fairly compensated."*

He indicates that what got the ball rolling occurred in 2008 or 2009 when he spoke to a former contractor who informed him. He asked him if he was injured and he said yes.

*"And he said, 'I'm doing some work now to help guys get disability claims'."*

He admits that after the conversation, he never spoke with that man again.

*"And I was really pissed off, and it wasn't until -- I want to say it was December 2014 somebody started a Blackwater alumni page on Facebook, and reading the post or guys would get on, there was a comment that somebody made that he had been injured and he fired his attorney or was seeking another attorney for his claim."*

Another man got in touch with him and they had a long conversation on Facebook and was told, *"Hey, you have a Department of Labor file."*

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:   ███████████
      OWCP No:    ███████████
      LFLM No:    ███████████
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 22
      March 23, 2016

It was recommended that he get hold of a specialized attorney that handled those cases. He was given two names including Mr. Linker. He contacted Mr. Linker who recommended that they order his Department of Labor file to see what it says.

On page 84, he was asked about Dr. Weinpahl's statements relative to PTSD.

*"I'll get angry at stupid little things. It's a lot of stuff. I--I--I'll forget things. I'll go off in a daze. A lot of times I'll be reminded by my wife. She'll tell me, she goes, 'Hey, man. You need to -- you need to take a chill pill.' She'll tell me like, 'You're in a bad mood, and you've got -- she says, 'You need to check yourself and just chill'."*

When asked if he had any other symptoms, he stated, *"I'll start missing the guys, missing work. I start missing K2 and start really feeling bad about Sparky."* Sparky was the team leader that was killed a year after he was injured from a roadside bomb.

*"Sparky was my right rear gunner, and he died instantly when our convoy was hit. And the sad part was he was supposed to go home that afternoon. Prior to us taking off, we had spoke, and I says, 'Hey, you know, you don't have to go on this mission. You're going home today'."*

He also admitted that he *"was missing work."* He missed the guys. He missed the camaraderie. He was then asked that if he were physically able would he go back. He stated, *"Yeah, I probably would. I would think about it."*

The deposition then ended.

Once again, it should be noted that Mr. Sabado presented his answers in a very clear, highly detailed fashion with significant excellent memory. There is nothing in this deposition that would indicate his behavior is anything like that described by Dr. Gutierrez in their psychological

SABADO 097

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:
      OWCP No:   ███████
      LFLM No:   ███████
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 23
      March 23, 2016

consultation dated October 20, 2015.  As a matter of fact, after reviewing Dr. Gutierrez's report, I
was shocked when I read the deposition to see how well Mr. Sabado was able to answer the
questions and to the degree of detail and recall that he exhibited.

## IDENTIFYING INFORMATION

*At the beginning of this Examiner's interview with Mr. Sabado, it was explained that there
was no confidentiality between him and the Interviewer with regard to what was put into this
report, and Mr. Sabado understood this and agreed to proceed with the evaluation.*

At the time of this examination, Mr. Sabado arrived early.  He made a very nice appearance.  He
is 5'7" in height, weighed 190 pounds and was well-dressed in beige shorts and a blue sports
shirt.  He has thick hair which is nicely combed.  He is beginning to turn gray.  He was cleanly
shaven with the exception of a neatly trimmed goatee and mustache.  There is no deterioration of
personal grooming habits.

Mr. Sabado did not appear chronically ill or in any acute distress.  He exhibited no pain behavior.
He walked without a limp and sat comfortably throughout a very lengthy interview.  He made
good eye contact and presented his history in a straightforward, well-organized fashion showing
no difficulty with memory impairment or concentration.  He did not appear tired at any time
during the interview.  He was not restless.  He had no abnormal movements or tics.  He did no
hand or foot tapping.  He gave me a strong handshake upon entering and leaving the office and
on both occasions his palm was dry.  He was able to use both arms to gesture in a normal
fashion.

Mr. Sabado is an extremely good historian.  He is able to provide dates, time sequences, doctors'
names, location of the treatment areas, etc. with absolutely no problem.  If anything, he appears
to be highly intelligent and articulate.

Mr. Sabado did not appear sad or nervous.  He never cried or came close to tears.  At times
during the interview, he appeared in very high spirits and could be jocular.  At other times, he

RE:   Employee:    Robert Sabado
      Employer:    Blackwater Security Consulting
      Claim No:
      OWCP No:
      LFLM No:
      D/Injury:    4/21/05
      Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
      Page 24
      March 23, 2016

became much more serious and although he appeared on the verge of possibly crying, he never broke down nor was he ever emotionally labile. He appears to be well-defended against expressing acute emotions.

At the end of the interview, I was able to talk at length with Mr. Sabado about his current feelings and what he would like to have happen in the future. He seemed very realistic about his expectations and wishes.

### CURRENT WORK STATUS

Mr. Sabado is currently working at a part-time security job. He admitted that he is working 20 to 40 hours per week depending on the need. At one place, he sits in the lobby at a college apartment complex at UCSB. He was also doing Lyft to earn extra money from November of 2003 through September of 2014 off and on. He stopped because he began to get pain in his legs. His plan is to continue working as long as he can.

*"Yeah, because it helps."*

He explained once again that he goes to two different sites, one at UCSB and one at an oil rig. He currently earns $10 to $13 per hour.

### CURRENT MEDICAL TREATMENT

(1)    Mr. Sabado denies seeing any doctors whatsoever at the present time. He admits that he went to see a doctor approximately two months ago at Sansum Clinic because of the pain in his legs. They did x-rays and discovered that he had shrapnel in his right upper thigh. They recommended over-the-counter pain medication. He had no return visits.

(2)    He denied having a primary care physician at the present time.

RE:     Employee:       Robert Sabado
        Employer:       Blackwater Security Consulting
        Claim No:       ███████
        OWCP No:        
        LFLM No:        
        D/Injury:       4/21/05
        Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
        Page 25
        March 23, 2016


        *"No, I just go to Sansum Clinic."*

(3)     Prior to his visit two months ago, he was last seen there in 2009 for a
        colonoscopy.

(4).    Mr. Sabado denies taking any medication on a regular basis. He does not have
        high blood pressure or diabetes.


## CURRENT SYMPTOMATOLOGY

**Physical**. When asked to describe any current physical symptoms or complaints, he states, *"I can get pain in my right forearm. Pain in both legs where the scar tissue is. It'll stay in my upper thigh near the groin. Sometimes my right hand will lock up. It's claw-like. That's about it. I had an injury to my penis and over the years I've noticed it doesn't come out strong. But I'm in my late fifties and I've noticed a change."* He also has noticed a loss of hearing in the left ear. The person that examined his hearing said his left ear was bad. He denies any other symptoms.

**Emotional**. When asked about his current emotional symptoms or complaints, he states, *"At the present time, I feel pretty good. Two weekends ago, I was agitated the whole weekend. That comes and goes. My wife catches me and says I need to take time out. She knows me the best and tells me if emotionally I'm going through an episode. That's about it right now."*

He says that the episodes can come a dozen times a month.

*"It can be a day or the entire weekend. I get really agitated. I'm mad. I'm angry. And I don't know at what. I just want to stay at home. I don't want to leave the house. I want to be left alone."*

**SABADO 100**

RE: Employee: Robert Sabado
      Employer: Blackwater Security Consulting
      Claim No:
      OWCP No: ███████
      LFLM No:
      D/Injury: 4/21/05
      Date of Independent Medical Evaluation/Psychiatry: March 23, 2016
      Page 26
      March 23, 2016

## GENERAL SYMPTOMATOLOGY - GENERAL HEALTH

Mr. Sabado admits his general health is excellent. He denies any chronic medical problems whatsoever.

## APPETITE

When asked about appetite, he states, "*Lately, I've been eating a lot.*" It is rare that he will not eat. He eats at least two meals per day. He has gained about 15 pounds over the last year. He is surprised by the weight gain.

"*I try to eat good. You shouldn't starve yourself.*"

## SLEEP

Mr. Sabado does not complain about sleep. He explains that he works late usually from 10:00 p.m. until 7:00 a.m. He will go to bed at 8:00 o'clock in the morning and sleep four to four and a half hours on the days that he is working. When he is off, he gets at least six hours sleep. He explains that he has never needed eight hours of sleep.

"*If I get six, I'm pretty good.*"

He does not remember dreams all the time. He had nightmares in the past but not now.

"*I can't think of any right now.*"

## SOCIAL HISTORY

Mr. Sabado lives with his 51-year-old wife and 7-year-old son in a rented house in Santa

RE:    Employee:       Robert Sabado
       Employer:       Blackwater Security Consulting
       Claim No:
       OWCP No:
       LFLM No:
       D/Injury:       4/21/05
       Date of Independent Medical Evaluation/Psychiatry:    March 23, 2016
       Page 27
       March 23, 2016


Barbara. His wife works full-time as a court reporter at a courthouse. She earns approximately $100,000 per year. He explains that she used to work a higher-paying job but gave it up to come to Santa Barbara.

He has two daughters, ages 32 and 31, from his first marriage who live in Los Angeles. He is not close to the older daughter but he talks with the younger one frequently. He has a 20-year-old son from this marriage who is attending college in Columbia, South Carolina. He has a baseball and academic scholarship.

His wife also has three children from a previous marriage. They are grown and on their own. He is very close to them. He states that his 7-year-old son is doing great.

*"He's smart as a tack."*

Mr. Sabado states that the marriage is good. He and his wife get along well.

*"Now we do."*

He almost got a divorce in 2007 and were separated for three to four months. He indicates he was actually served with divorce papers but she dropped it and they got back together.

*"We talked and said our apologies and forgave each other. We both decided to stay together."*

They ended up losing their house and they had financial problems.

*"But, we weathered the storm."*

### SEX

When asked about sex, he states, *"I dealt with erectile dysfunction in my thirties and as I've gotten older, it's changed. I have taken Viagra in the past."* He admits to sexual feelings and he

RE:   Employee:    Robert Sabado
      Employer:    Blackwater Security Consulting
      Claim No:
      OWCP No:    █████████
      LFLM No:
      D/Injury:      4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 28
      March 23, 2016

and his wife are sexually active once or twice per week. He and his wife practice orgasmic meditation. They attended a class to learn about this and it has been helpful. He finds his wife very attractive.

*"She's good-looking, no doubt."*

## DAILY ACTIVITIES

Mr. Sabado is able to drive a car and drove by himself from Santa Barbara. He does most of the grocery store shopping. He does the majority of the cooking. He also does the laundry. His wife makes the beds and he uses the dishwasher. He does vacuuming.

*"We'll clean the house together."*

With his free time, he tries to relax. He used to work out a lot but is not too motivated anymore.

*"When I get agitated, I want to be alone."*

He watches television and does some reading. He watches movies and the sports channel. He likes baseball and is a big fan. He likes college basketball and he likes to watch football. He denies exercising at all. He does not have a dog and does not take walks. He and his wife go out to eat a lot but he does not go to movies. His wife does go to movies with her 7-year-old son. He used to attend church a lot but has not done so lately. He and his wife will read verses from the Bible together. He rarely goes to swapmeets. Their only vacation is to visit his son in South Carolina. They go about twice per year for about one week and they are leaving for South Carolina tomorrow night.

*"That's pretty much it."*

RE: Employee: Robert Sabado
Employer: Blackwater Security Consulting
Claim No:
OWCP No: ███████
LFLM No:
D/Injury: 4/21/05
Date of Independent Medical Evaluation/Psychiatry: March 23, 2016
Page 29
March 23, 2016

## INTERPERSONAL RELATIONS

Mr. Sabado gets along well with people. He does not describe himself as having many friends.

*"I've always had that personality. I've always been engaging."*

There are people he can call that he is close to but he does not do it very often. He is close to his children.

*"We'll talk but I don't initiate the phone calls. My wife is more family oriented."*

He spends time with his 7-year-old son.

*"I'm the one who drops him off at school and I do the pickup. I make sure he gets his homework done."*

## MOOD

When asked to describe his current mood, he states, *"It's up and down. I try to be happy. Just dealing with all the stuff. I try to stay positive and not get pissed off about the overall situation. There were quite a few years I didn't know what the heck was wrong. When I stopped working overseas, I would go through an emotional roller coaster. That went on quite a while. My wife would catch me. She would tell me she was going to leave for a while and you need to change your attitude. It comes and goes."* He denies being depressed at this time.

*"Right now, I'm okay. We're talking."*

He sometimes does fall into a depressed mood.

*"It's hard to estimate. Sometimes it can happen quite a bit."*

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:   
      OWCP No:   ███████
      LFLM No:   
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 30
      March 23, 2016

He denies having crying spells stating, "*Not a lot.*"

When asked about suicide, he admits that he felt suicidal in the past but not now.  Once in 2007, he felt suicidal.

"*I was close.  We were separated.  I was living out of my car.  Sleeping in the church parking lot. Angry about a number of things.*"

He admits that he had a gun at that time because of a job that he had but he called a friend who talked him out of it.  He admits that he felt that way a few times but nothing recently.  The last time he felt that way was about one and a half years ago.  That lasted several days.  He admits that he talked to a few people.

"*It just didn't seem that we were heading in a good direction.  I was working two jobs. Finances.*"

He denied feeling suicidal at this time.

"*But, sometimes I get emotional.*"

## HISTORY OF PRESENT ILLNESS

Mr. Sabado began working with Blackwater Security in late March 2004 as a private security contractor.  Prior to that time, he worked for Dyn-Corp.  The company is based in North Carolina and he heard about them during the time that he was working for Dyn-Corp in Yugoslavia.  He had gone through very intense training for 10 days prior to Blackwater.

He heard about the company and submitted a resume.  He was hired after he finished his commitment with Dyn-Corp.  Blackwater first sent him for training.  Then, he was sent to Karbala, Iraq.  He was in a special security team.  He admits that he enjoyed the work and he knew that it was very dangerous.

RE:    Employee:      Robert Sabado
       Employer:      Blackwater Security Consulting
       Claim No:      ███████████
       OWCP No:       
       LFLM No:       
       D/Injury:      4/21/05
       Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
       Page 31
       March 23, 2016


He did well until April 21, 2005 at which time he was riding in a convoy that was transporting 19 security contractors. His convoy was struck by an IED and he was seriously injured.

Initially, he was treated by an army unit that was five miles down the road. A teammate slapped a tourniquet on him which may have saved his life. He was taken to an army base at Ramada and was there for two to three hours. They then airlifted him to Balad which was a big trauma center. He had an MRI and met several doctors. The chaplain talked to him. Then, he was transferred to Landstuhl, Germany where he had five surgeries in six days. A doctor came to see him and explained what had happened.

*"He broke everything down."*

He was told that the shrapnel just missed several large arteries. He also had an injury to his penis.

After six days, he was flown to College Hospital in Santa Barbara where he stayed another six days. He had additional surgery. After he left the hospital, he had outpatient physical therapy for about one month.

Shortly thereafter, he decided to return to work.

*"I was the sole provider for the family."*

When he saw Dr. Ruth, a hand surgeon, he told him he wanted to return to work. Prior to that, he went to visit a friend in San Diego who had a private range and he was able to practice and find out if he could still shoot a gun. Then, he called Blackwater and they took him back.

He started working one month after he was released from the hospital in late May. He returned to Iraq for four months and was in charge of a site.

*"I thought I was fine. I was a site manager in Basra."*

SABADO 106

RE: Employee: Robert Sabado
    Employer: Blackwater Security Consulting
    Claim No:
    OWCP No:
    LFLM No:
    D/Injury: 4/21/05
    Date of Independent Medical Evaluation/Psychiatry: March 23, 2016
    Page 32
    March 23, 2016

Then, he came home for approximately two months and then returned to Iraq. He was deployed for one and a half months and came home on a family emergency.

*"I noticed a change in my wife. She was angry. Reality set in. She felt that being overseas was like my second family."*

She did not like that he was deployed to Iraq.

Then, he returned to Iraq once more.

*"Because we were struggling to make our mortgage. She was not working and when you're home, you don't make any money."*

He was there for three months.

*"The company changed. It wasn't the same."*

He came home in August of 2006 and never went back to Blackwater. He did go out once more for five weeks with a former supervisor to the Congo. It was not dangerous.

*"We weren't armed."*

He then returned to Santa Barbara for good in approximately May of 2007. After that, he had a variety of jobs. In late July, he secured an estate protection job working three to four days per week, 12-hour shifts. He primarily did security work. He held that job for seven years. Then, he sold cars for 10 months at Santa Barbara Nissan. He also worked security at a high school for four years. There were times that he was out of work for two to three months but he always was able to find a job.

In 2008, a contractor that he knew called and told him that he was doing disability work for guys that were injured. They told him that he had one year to file a claim but no one told him to do that.

**SABADO 107**

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:   ▮▮▮▮▮
      OWCP No:    ▮▮▮▮▮
      LFLM No:    ▮▮▮▮▮
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 33
      March 23, 2016

*"I was pissed.  You give your life to working and no one tells you anything."*

In December 2014, someone started a Blackwater alumni page on Facebook. He received a post that someone put up that he was looking for a new DBA attorney and he responded to the post.

*"At least you have something going."*

Within a few minutes, someone contacted him and asked him about a Department of Labor file which he knew he had. That person helped him find the file. Then, he got a list of attorneys who handled these cases and was told to pick one. After that, he got hold of his attorney and they talked. He was finally able to file his claim in approximately March of 2015. It took a while but eventually he began to see doctors.

Despite the above, he admits that he was working regularly off and on. He admits that he enjoys working.

*"It's better than sitting at home.  Obviously, I can't do what I did before."*

His plan is to continue working as long as he can.


**PAST HISTORY**

Mr. Sabado was born in Oahu, Hawaii and raised in LA since the age of three. He attended local schools graduating from Marshall High School in 1977. After high school, he attended college for three years and worked part-time. He did not graduate. Instead, he started at the Police Academy in November 1984. He worked for LAPD for 15 years. He states that the Department changed and he did not like it anymore and he resigned and took his money. Then, he worked at FedEx for two years. After that, he started with Dyn-Corp in February 2003. He was with them for a year and went to Blackwater.

SABADO 108

RE:  Employee:   Robert Sabado
     Employer:   Blackwater Security Consulting
     Claim No:
     OWCP No:   █████████
     LFLM No:
     D/Injury:    4/21/05
     Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
     Page 34
     March 23, 2016


## MARITAL HISTORY

Mr. Sabado was married twice. He first married in 1984 and divorced in 1988. Issue of that relationship are two daughters, ages 32 and 31.

He married his current wife in 1995. Issue of that relationship are two sons, ages 20 and 7. His wife also has three children from a previous relationship who are 32, 30 and 27. They are grown and on their own.


## PARENTS

He was raised by his birth mother and a stepfather. They remain intact. His mother and father are both in their late seventies and are in fairly good health. His mother has had a colostomy bag since 1975. His father's health is good and he has nothing major wrong with him.


## SIBLINGS

Mr. Sabado indicates that he is an only child. His father has children from a previous relationship but he is not close to them.


## CHILDHOOD

His birth father and mother were never married. He was raised by his mother and stepfather who were very good to him. He describes having a good childhood. He did average work in school. He denies any type of physical or sexual abuse. He enjoyed playing sports.

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:
      OWCP No:   ███████████
      LFLM No:
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 35
      March 23, 2016

## HABITS

Mr. Sabado does not smoke cigarettes.  He rarely drinks alcohol.  He denies experimenting with or abusing drugs.  He did have a marijuana card and used it for a while but he is not using it now.

## LEGAL HISTORY

Mr. Sabado has never been arrested.  He has never had any problems with the law.  He denies filing any lawsuits other than his current suit.  He did file bankruptcy once in 2006 or 2007.

## MEDICAL HISTORY

Mr. Sabado denies having any chronic medical problems.  He has never been diagnosed with high blood pressure or diabetes.

## SURGICAL HISTORY

When he was in his late thirties, he had bilateral cataract surgery.  He has also had three to four surgical procedures with his current injury.

## PSYCHIATRIC HISTORY

Mr. Sabado denies a family history of emotional problems. In 2005, he and his wife met with Karla Freeman on a weekly basis for about two months.

*"Part of it was the injury.  Part was family."*

He recalls seeing a psychiatrist once during the time he worked with LAPD after he was

RE:    Employee:    Robert Sabado
       Employer:    Blackwater Security Consulting
       Claim No:    ████████
       OWCP No:
       LFLM No:
       D/Injury:    4/21/05
       Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
       Page 36
       March 23, 2016

divorced. He also saw a psychiatrist once when he and his wife decided to get married.

He also recalled seeing someone at his church once per week for about three months for marital counseling. Otherwise, he has had no psychiatric treatment. He denies ever taking any psychotropic drugs.

## MENTAL STATUS EVALUATION

Mr. Robert Sabado is an alert, well-oriented, 57-year-old man who is verbal and completely cooperative to examination. He is very easy to relate to.

He presents as a very pleasant, congenial man who was verbal and responsive. As noted, he is an excellent historian. He has excellent recall and shows no difficulty with memory impairment or concentration. Affect was completely appropriate to his mood. He appears to be in good spirits but there were brief moments during the interview where he would become somewhat sad and look as if he might cry but held back from expressing his emotions. He had no abnormal movements or tics. He was not restless. He did no hand or foot tapping. He did not appear to be sweating.

He was able to give me a strong handshake upon entering and leaving the office and on both occasions his palms were dry. He is very well-organized and very articulate. There is no evidence of anorexia, weight loss, insomnia, anergia or anhedonia. He did not have circles around his eyes and did not appear fatigued or tired. He never sighed, yawned or grimaced. There is no psychomotor retardation or agitation. He has had suicidal ideation in the past and in fact at one point had a plan of using a gun. He denies having suicidal ideation at the present time.

Thinking is grossly intact and there is no evidence of an overt psychotic thought process. Insight seems very good. Judgment is not impaired. Intellect is bright-average.

SABADO 111

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:
      OWCP No:
      LFLM No:
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 37
      March 23, 2016

**IMPRESSION**

**AXIS I       F43.12        POSTTRAUMATIC STRESS DISORDER, CHRONIC.**

AXIS II                      NO PERSONALITY DISORDER.

AXIS III                     MULTIPLE WORK-RELATED PHYSICAL INJURIES,
                             MULTIPLE SURGICAL PROCEDURES.

AXIS IV                      SEVERITY OF PSYCHOSOCIAL STRESSOR SCALE -
                             MILD.

AXIS V                       GAF - 68.

                             HE EXHIBITS MILD SYMPTOMS WHICH WOULD
                             CAUSE INTERMITTENTLY SOME DIFFICULTY WITH
                             SOCIAL FUNCTIONING BUT HE GENERALLY
                             FUNCTIONS WELL AND HAS MEANINGFUL
                             INTERPERSONAL RELATIONSHIPS PARTICULARLY
                             WITH HIS WIFE AND CHILDREN.

**WHOLE PERSON IMPAIRMENT**

A GAF of 68 equates to a WPI of 3.

**PROGNOSIS**

Good.

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:
      OWCP No:   █████████
      LFLM No:
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 38
      March 23, 2016


## RECOMMENDATION

In summary, this is a 57-year-old man who presents with an extremely complex history. He indicates that he began working for Blackwater Security in March of 2004 as a private security contractor. Prior to that time, he worked at Dyn-Corp during which time he had intensive training. He then applied with Blackwater, submitted a resume and was accepted. He had extensive training with them as well.

He deployed to Iraq which he recognized was highly dangerous. Despite this, he enjoyed the job and did well until April 21, 2005 at which time he was the victim of an IED. He was riding in a convoy that was transporting 19 security contractors when the IED exploded and he was significantly injured. Fortunately, somebody nearby put a tourniquet on him or he might have bled to death.

Initially, he was treated by an army unit that was five miles down the road. Then, he was taken to an army base at Ramada where he was treated for two to three hours. Then, he was airlifted to Balad which was a big trauma center. They did MRIs and began treatment. He was then transferred to Landstuhl, Germany where he had five surgeries in six days. The doctor came to his room and explained everything that was happening to him which he found helpful. He was told that he had severe injuries some of which could have been fatal.

After six days, he was flown to College Hospital in Santa Barbara where he stayed another six days and had had additional surgery. After he left the hospital, he had physical therapy for about one month.

He began feeling better and quickly decided that he wanted to return to work. He explains his reasons for going back to Iraq. He stated that he felt very guilty about the teammate that was killed whose name was Sparky. He felt it was important to not leave Iraq as if they had the best of them. He also felt he owed it to his unit to return to help them.

Mr. Sabado started work one month after he was released from the hospital in late May of 2005.

SABADO 113

RE:   Employee:   Robert Sabado
      Employer:   Blackwater Security Consulting
      Claim No:
      OWCP No:   ███████
      LFLM No:
      D/Injury:   4/21/05
      Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
      Page 39
      March 23, 2016


He returned to Iraq for four months and as noted was in-charge of a site. He felt that he did fine work.

He then came home for approximately two months and then returned to Iraq for a third deployment. He was there for one and a half months and came home for a family emergency. He became aware that there was a change in his wife's attitude and he felt that he had to address it.

Subsequently, he returned to Iraq again, primarily because they were struggling to make mortgage payments. His wife was not working at that time and they had no income.

He was there for three months and decided to not re-deploy. He states that the company had changed and he did not feel it was the same.

He returned home in August of 2006 and never went back with Blackwater. He did deploy to the Congo when asked to do so by a former supervisor. That situation was not dangerous and he was not armed.

He returned to Santa Barbara for good in May of 2007 and has been working ever since at a variety of jobs including an estate protection job for seven years. He worked at a high school for another four years.

Currently, he is working 20 to 40 hours per week at two separate positions. One is at UCSB and the second is at an oil rig. He earns $10 to $13 per hour.

Mr. Sabado did not file a workers' comp claim subsequent to his injury. He knew nothing about the procedure and no one said anything to him. He explains that more recently he got more information and was supplied a list of attorneys with whom he talked. He then filed a claim last year and saw several doctors.

Mr. Sabado describes a number of symptoms of posttraumatic stress disorder. Primarily, he has episodes intermittently of being extremely angry, resentful and withdrawn. His wife is able to

RE:   Employee:   Robert Sabado
       Employer:   Blackwater Security Consulting
       Claim No:
       OWCP No:   ███████
       LFLM No:
       D/Injury:   4/21/05
       Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
       Page 40
       March 23, 2016

observe his behavior and tells him that emotionally he is going through an episode. He then withdraws until he feels better and comes out of it. He admits that he has had a great deal of anger and resentment and states, *"I'm mad. I'm angry. And I don't know what to do about it."* More recently, he has felt that he just wants to stay at home and not leave the house. At times, he wants to be left completely alone.

As noted, Mr. Sabado presented as an extremely pleasant, friendly man who was articulate and easy to relate to. He did show episodes during the lengthy interview of being somewhat sad but he did not cry or come close to tears. He was not emotionally labile. He does show periods of anger and resentment but those periods do not last for a long period of time.

## DISABILITY STATUS

In my opinion, Mr. Sabado is permanent and stationary from a psychiatric point of view. He is currently working 20 to 40 hours per week without difficulty. Therefore, it can be surmised that he is capable of competing in the open labor market and can perform certain jobs. I strongly doubt that Mr. Sabado would be able to perform his usual and customary job as a security guard in Iraq.

I have reviewed the Work Function Impairment Form, and in my opinion, his level of impairment in all eight categories is, as follows:

    1. Ability to comprehend and follow instructions: No more than minimal.

    2. Ability to perform simple and repetitive tasks: No more than minimal.

    3. Ability to maintain a workpace appropriate to a given workload:. No more than minimal.

    4. Ability to perform complex and varied tasks: No more than minimal.

RE:    Employee:    Robert Sabado
        Employer:    Blackwater Security Consulting
        Claim No:
        OWCP No:
        LFLM No:
        D/Injury:     4/21/05
        Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
        Page 41
        March 23, 2016

5. Ability to relate to other people beyond just giving and receiving instructions: No more than minimal.

6. Ability to influence people: No more than minimal.

7. Ability to make generalizations, evaluations or decisions without immediate supervision: No more than minimal.

8. Ability to accept and carry out responsibility for direction, control and planning: No more than minimal.

I have also reviewed the Mental and Behavioral Disorders Impairment Chart concluding that he is between Class I and Class II, between no impairment and mild impairment. Mild impairment is defined as discernible impairment levels compatible with most useful functioning. Obviously, he is able to perform all activities of daily living without too much difficulty. Socially, he appears somewhat withdrawn with little, if any, friends. He remains close to his wife but occasionally there is distance between the two of them.

During this lengthy examination, there was no evidence of difficulties with concentration, persistence and pace. It appears that he has adapted to his current circumstances and shows little, if any, deterioration.

## DISCUSSION OF CAUSALITY

From review of a voluminous medical file and taking an indepth history, it is my opinion that Mr. Sabado developed a psychiatric injury during the course of his employment. Unquestionably, he suffers from posttraumatic stress disorder, chronic. He has many symptoms of chronic posttraumatic stress disorder including recurrent thoughts, mildly disrupted sleep, feeling on edge and being easily startled, feeling depressed or sad and having diminished energy. Sometimes he feels irritable, easily agitated, angry and resentful. At times he is emotionally numb and withdrawn and disconnected from others. Sometimes there is spontaneous crying or a sense of

RE:    Employee:   Robert Sabado
       Employer:   Blackwater Security Consulting
       Claim No:
       OWCP No:   ███████████
       LFLM No:
       D/Injury:    4/21/05
       Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
       Page 42
       March 23, 2016

despair and hopelessness.

In my opinion, Mr. Sabado is in need of psychiatric treatment on an industrial basis.  The first
phase of treatment focuses on ensuring safety reducing symptoms and increasing emotional,
social and psychological competency.  The overall objective of PTSD therapy is to treat the four
core symptom clusters of intrusive re-experiencing, avoidance, negative alterations and
cognitions in mood and hyperarousal.  Psychotherapy is the backbone of PTSD therapy with
pharmacotherapy use as an adjunct if necessary.

In talking with Mr. Sabado, he is highly motivated for individual psychotherapy and psychotropic
medication if it would help him.

There are a multitude of therapeutic approaches, some of which are highly recommended and
others are less helpful.  Therapists should recognize that complex trauma treatment is generally
longer than with many other patient populations and is rarely meaningful if completed in less
than 10 to 20 sessions.  SSRIs are widely recommended as first-line agents in the treatment of
PTSD but they are not without shortcomings.  Research now suggests the usefulness of SNRIs as
opposed to SSRIs.  Propranolol is also highly recommended as a useful adjunct to reduce stress
and intrusive distressing memories in PTSD.  Benzodiazepines are not necessarily recommended
for long-term use but may be useful in short-term attempts of treatment.

In my opinion Mr. Sabado would greatly benefit from being seen by a psychiatrist for both
individual psychotherapy and the possibility of psychotropic medication, especially when he
experiences the episodes that he describes.

I would recommend that he be given a provision for future psychiatric care and to possibly
provide treatment on a monthly basis by a psychiatrist who is capable of prescribing medication
as well as providing psychotherapy.  As such, I would recommend treatment be available once
per month over a period of five years.  I strongly doubt that Mr. Sabado would take advantage of
treatment that frequently but that should be available to him as necessary.  There is no question
but that he had a severe injury that could have been fatal.

RE:    Employee:    Robert Sabado
       Employer:    Blackwater Security Consulting
       Claim No:    <span style="background:black">   </span>
       OWCP No:
       LFLM No:
       D/Injury:    4/21/05
       Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
       Page 43
       March 23, 2016

I believe that Mr. Sabado's PTSD resulted from exposure to threatened death and serious injury. He was also exposed to the death of one of his teammates and is aware that a number of other teammates have succumbed at other times. Two of his teammates have committed suicide.

Unquestionably, Mr. Sabado suffers from survivor guilt.

I believe that Mr. Sabado would greatly benefit from individual psychotherapy and possibly from psychotropic medication on an as needed basis.

**APPORTIONMENT**

Apportionment, in my opinion, is 100% industrial. He has also been affected by marital problems in the past as well as financial insecurity but that in a sense comes about as a result of his work-related injury.

After having reviewed this voluminous set of medical records and taking an indepth history, it is my opinion that Mr. Sabado has functioned in an extremely healthy manner despite his serious injuries. I am rather amazed that he has done as well as he has done. He has been a consistent worker for many years and plans on continuing to do so. If anything, I am somewhat shocked by how well he functions cognitively. From reviewing the psychologist's report, I might have imagined that he would be much worse off from a cognitive point of view only to be shocked and surprised by how well he did during his deposition and during this evaluation. He shows absolutely no difficulties with memory or any other cognitive difficulty. I see no reason why he should be prone to a poor prognosis from a cognitive point of view based on his performance at the present time. There is nothing about his current functioning that would indicate that he is having any cognitive difficulties. At this time, I would strongly disagree with Dr. Gutierrez' neuropsychological consultation results as they do not describe Mr. Sabado whatsoever at the present time.

I have reviewed all the questions that you have submitted in your cover letter and hopefully have answered everything in detail. There is no question that his diagnosis Is Chronic Posttraumatic

RE:    Employee:    Robert Sabado
       Employer:    Blackwater Security Consulting
       Claim No:    ███████
       OWCP No:     ███████
       LFLM No:     ███████
       D/Injury:    4/21/05
       Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
       Page 44
       March 23, 2016

Stress Disorder. I do not see any evidence of major depressive disorder at this time. The etiology is clearly secondary to his traumatic injury in April of 2005. I see no evidence that Mr. Sabado suffers from somatoform disorder, a personality disorder or factitious disorders. As noted, Mr. Sabado is working 20 to 40 hours per week and does not indicate any serious financial difficulties at the present time, especially in view of the fact that his wife is working on a full-time basis and is earning six figures from her current job.

Unquestionably, Mr. Sabado is interested in some secondary gain which, in my opinion, is completely understandable. He did have a near fatal injury and was never compensated for that. I do not believe that he is exaggerating his symptomatology strictly for the purpose of secondary gain. I see no evidence that he is exaggerating anything and in fact he continues working practically on a full-time basis.

In my opinion, he has reached maximum medical improvement or it can be said he is permanent and stationary. I would strongly doubt that there is going to be any significant improvement even after a long period of time. I strictly see psychiatric treatment as responding to his intermittent bouts of being withdrawn, angry and resentful. He describes himself as being frequently agitated which I believe psychotherapy and psychotropic medication can be helpful with.

I do not believe that Mr. Sabado has had efficacious psychological treatment to date. His last treatment was in 2005 and was secondary to psychological and financial difficulties as well as his PTSD.

Unquestionably, Mr. Sabado is not psychologically capable of returning to his usual and customary occupation as a security guard in an overseas war zone. It does not even appear that he could do that from a physical point of view from what he states about his current complaints.

Mr. Sabado is capable of returning to alternative full-time employment and in fact he is doing so. He is highly motivated to continue working.

I see no need for specific work restrictions and focus rather on his high motivation for continued employment.

RE:    Employee:    Robert Sabado
           Employer:    Blackwater Security Consulting
           Claim No:
           OWCP No:
           LFLM No:
           D/Injury:    4/21/05
           Date of Independent Medical Evaluation/Psychiatry:  March 23, 2016
           Page 45
           March 23, 2016

Hopefully, this answers all of your questions. Should you have any further questions, please feel free to contact me at anytime. Thank you very much.

## AFFIDAVIT OF COMPLIANCE/DISCLOSURE

This report is for medical-legal assessment of the injury noted and is not to be construed as a complete physical examination for general health purposes. Only those symptoms which are believed to have been involved in the injury or that might be related to the injury have been assessed by this Examiner.

I declare under penalty of perjury that the information contained in this report and its attachments, if any, is true and correct to the best of my knowledge and belief, except as to information I have indicated I have received from others. As to that information, I declare under penalty of perjury that the information accurately describes the information provided to me and, except as noted herein, that I believe it to be true.

Date of Evaluation:  March 23, 2016.

Date of Report:  March 23, 2016.

Location where performed:  450 North Bedford Drive, Suite 303, Beverly Hills, California 90210.

Physician Performing Evaluation:  Jerome H. Franklin, M.D.

History obtained by:  Jerome H. Franklin, M.D.

Review of Records by:  Jerome H. Franklin, M.D.

Dictation of the report performed by:  Jerome H. Franklin, M.D.

RE:  Employee:     Robert Sabado
     Employer:     Blackwater Security Consulting
     Claim No:
     OWCP No:
     LFLM No:
     D/Injury:     4/21/05
     Date of Independent Medical Evaluation/Psychiatry:   March 23, 2016
     Page 46
     March 23, 2016

Further, I declare under penalty of perjury that I have, to the best of my information and belief,
not violated California Labor Code §139.3, and I have not offered, delivered, received or
accepted any rebate, refund, commission, preference, patronage, dividend, discount or other
consideration, whether in the form of money or otherwise, as compensation or inducement for
any referred examination or evaluation.  Forty per cent of my practice consists of patient
treatment.  A curriculum vitae is available upon request.

Should you have any further questions, please feel free to contact me at any time.  Thank you
very much.

                              Sincerely,

                              JEROME H. FRANKLIN, M.D.
                              Board Certified Psychiatrist

County where executed:  Los Angeles
JHF:bvd

Attachments:
(1) "Eye Movement Desensitization and Reprocessing"
(2) "Who What How Where to Treat/Find PTSD Resources

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARY B. HEATON, et al.,

　　　　　　Plaintiffs,

v.

THE ISLAMIC REPUBLIC OF IRAN,

　　　　　　Defendant.

Civil Action No. 1:19-cv-03003-JMC

---

<u>**TESTIMONIAL AFFIDAVIT OF PLAINTIFF MICHELLE SABADO IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST IRAN**</u>

Pursuant to 28 U.S.C. § 1746, I, **MICHELLE SABADO,** hereby declare as follows:

　　　1.　　　"I am one of the Plaintiffs in the above–captioned Action. I am over the age of 18, of sound mind, and make this Affidavit from personal knowledge.

　　　2.　　　I was born in February 1965 and am now 58 years old. I am a resident of the State of South Carolina. In accordance with 28 U.S.C. §§ 1605A (a)(2)(A)(ii)(I) and 1605A(c)(1), at the time of the April 21, 2005 terrorist attack at issue (hereinafter '**the Attack'**) I was a United States citizen.

　　　3.　　　I am submitting this Affidavit in support of my request for the Court to enter a Default Judgment against Defendant Islamic Republic of Iran ('**Iran'**). More specifically, I am submitting this Affidavit to provide the Court with facts and evidence concerning the mental anguish, bereavement, grief, and loss of society and comfort (*i.e.*, solatium damages) I suffered following the Attack. *See* Pls.' First Amend. Compl. at 173—174.

　　　4.　　　I am Robert Sabado's wife. At the time of the Attack, I was 40 years old. For the reasons detailed in this Affidavit, Robert's experience during the Attack, and his resulting injuries, has caused a significant personal impact on my life.

1

5.        Prior to signing this Affidavit, my attorneys asked me a series of questions about the Attack and how the injuries Robert Sabado (hereinafter '**Bob**') sustained in the Attack has impacted my life. Below are the questions and my answers:

**Q**. When did you and Bob first meet? What did you think of Bob when you first met him?

**A**. Bob and I actually met twice before it 'took.'  He was working for the LAPD and I was a court reporter working for the Los Angeles Municipal Court. I was at an officer's club with my girlfriends one evening and Bob's sergeant, who was a mutual friend of ours, introduced us.  Bob asked me to dance. While on the dance floor, he blurted out 'You know I only asked you to dance because my sergeant told me to!' Fifteen seconds later, Bob was on the dance floor by himself and I was over it.

Several weeks later, Bob's sergeant organized a lunch and tricked us both into going.  This time Bob was charming and funny.  With his good looks and his great sense of humor, I was hooked.

**Q**. When did you and Bob get married? What do you remember about your wedding day?

**A**. We were married on January 21, 1995 at the Treasure Island Hotel in Las Vegas.  We had over 100 guests and everyone important to us was there.  Our kids on both sides were involved and my oldest son walked me down the aisle.  Bob was so nervous at the altar, he was rocking back and forth and at the very end when our pastor led us in a family prayer, Bob was even crying.  We were so happy and our families still talk about what fun that trip was all together.

The photographs on Page 3 and Page 4 below accurately depict me and Bob and were taken on our wedding day.

**Q**. Why did you decide to marry Bob?

**A**. When I met Bob, I had 3 kids and he had 2.  We had both been married and divorced before. We dated for 4 years before we ever thought about marrying again.  I married Bob because he was the most charming, outgoing, fun loving man I had ever met.  He was always up for adventure and he met every challenge head on.  He was warm and loving and we had a deep connection.  He was a really good man with a really good heart.

SABADO 123



3



**Q.** What was your relationship with Bob like on April 21, 2005?

**A.** Bob and I were deeply connected and each other's allies. Having him gone for long stretches, we kept in touch by daily e-mails and phone calls. He shared with me a lot of what was going on over in Iraq and I was a sounding board for him when things were difficult or stressful. I felt like Bob was really challenged by the work but feeling really good about being the breadwinner in the family. We missed each other but counted the days until he would come home between deployments.

**Q.** Where were you when you found out about the Attack and what feelings did you experience at this time?

**A.** I remember getting a call from Blackwater the morning of April 22, 2005. When Anna, my main point of contact at Blackwater, told me the convoy had been hit and Bob was injured, I just

said, 'What?' Not because I didn't hear her, but because my brain just couldn't process what was happening. I got our son in the car to go to school and held it together until he got out of the car. I then called my mother and had a huge meltdown. I was frantic over how injured Bob was, what had happened and what would happen next. After I cried, my mom just said, 'Now what are you going to do? You have a family to take care of. Get it together.' I could not have prepared for the journey we were now on.

Anna had told me Bob was being airlifted to Landstuhl, so my next step was to call the hospital and figure out everything I needed to know. I spent a very long time on the phone with the hospital, being transferred all over until I reached the proper doctor to discuss the situation and what they were expecting. He gave me a brief description of the injuries they were aware of, that Bob was alive, and where he would be in the hospital. When Bob finally arrived at the hospital and was able to contact me, he was heavily medicated and all over the map with emotions and mood swings.

**Q.** What did you and Bob discuss when you were able to speak with him?

**A.** Bob was extremely concerned about his teammates and colleagues at Blackwater. Because of the Blackwater helicopter crash and Bob's Blackwater convoy also being hit, there was a total blackout of information to others in Blackwater. For instance, Bob's teammates had no idea where he had gone or if he was even alive. Even under heavy sedation, Bob managed to give me as many e-mails as he could remember and I then began to send out a daily email of updates on his condition and what was happening with him. I then asked those people to pass on the information.

During this time, the hospital had also given Bob a phone card so he proceeded to call at all hours of the day and night. Sometimes he would be lucid, but more often, he would be very morose and saying things like 'it should have been me' or 'I don't deserve to live' or 'I'm to blame for this.'

**Q.** Please describe your journey to Landstuhl, Germany to see Bob?

**A.** Every day, Blackwater would call me and tell me that 'someone' would be escorting Bob home but it was very clear to me that there was no contingency for what happens if you almost die but don't. During this time, I felt helpless and I could tell that emotionally we were losing Bob. I was afraid without family near him, he would not recover. After 5 days of this, I was getting desperate. Bob told me in one of his lucid moments, 'I thought you would come and get me.' **That broke my heart**. I called Anna and told her that I needed Bob to be at a hospital at home in California that had a trauma center and that she needed to give me a plane ticket to go get him.

I left the next day for Germany. My plan was I had a ticket and I was going to get my husband and bring him home. Period. I was given the option to rent a car and drive on the Autobahn to a place I'd never been or to take the train from the airport to Landstuhl. What could go wrong? It was a 13 hour flight and then it took me over an hour to find the train in the airport. I had no one to contact in Germany and no one knew where in the country I was. I spoke no German, had only American money, and got off the train at the wrong stop. The train trip was over 3 hours with 2 changes. By the time I got to Landstuhl, no one seemed to know where the hospital was and I ended up wheeling my luggage into a phone booth and crying my eyes out. I was exhausted, scared, and hopeless.

SABADO 126

When I finally found the Army hospital, the guards at the gate indicated that I was not on the list and asked if my husband was coming out to get me. I informed them that I highly doubt it since my husband could not even walk.  By the time I got into the hospital, I met the traveling nurse and finally got to see Bob and saw what I was really facing.

**Q.** Please describe what Bob was like when you first saw him at the Army hospital in Landstuhl and what emotions you were experiencing at this time?

**A**. Bob's arm was bandaged and only partially closed up.  He still had a 'through and through' wound in his thigh as he had 5 surgeries in the prior 6 days.

I was very apprehensive when I first saw Bob. I was not exactly sure what I would see when I first saw him. It was scary. Bob was very heavily medicated and I was concerned about his mental state.

**Q.** Please describe your journey from Landstuhl back to the United States?

The very next morning, they gave Bob a transfusion and the 3 of us (me, Bob, and the traveling nurse) headed home. Bob was in a wheelchair, had a morphine drip, and had a catheter.

The Landstuhl hospital staff wasn't even sure if Bob would live through the flight.  An ambulance met us at LAX and drove us to the Santa Barbara Hospital to admit Bob.  He then spent 6 more days at the Santa Barbara Hospital and had more surgeries to close all of his wounds.

**Q.** Do certain dates or events trigger feelings of sadness, frustration, or anger relating to the Attack?

**A**. Sort of. Every year right around April, Bob gets melancholy and I know he is thinking about the Attack. However, it's not so much certain dates that trigger unhappy feelings. It's everyday events like when I see Bob dressing or undressing and see his scars (which are still highly visible), when Bob can't walk very long or help around the house carrying things, or when Bob can't use the ladder. These everyday moments are when I feel significant frustration and anger about the Attack. Bob was once so strong and capable and now he is forever disabled.

**Q.** How has the Attack changed Bob?

**A**. When Bob first came back home after April 21, 2005, he had screaming nightmares and horrible PTSD attacks that he does not remember.  Specifically, Bob would experience mood swings, suicidal episodes, and irrational outbursts.  For example, one time I left our house and was walking toward a nearby friend's house. Bob suddenly jumped in our Ford Explorer and attempted to run me over while I was walking on the street. Bob still does not remember this incident.

He was scary and unstable, even violent at times. Our family (including me) were all afraid of Bob and the 'crazy look in his eyes.' Things are better now but it has been a long road and has taken years of intense therapy.

6

Bob and I almost got divorced. When we were separated, Bob had a complete emotional breakdown and we had to rebuild our relationship from the ground up.  He has gone to therapy, both physically and emotionally, to regain as much mobility as he can and to heal his psyche from the trauma and scars that he will carry with him always from the Attack.

Before the Attack, Bob was always up for a challenge and loved adventures. For example, Bob loved to travel and was a very active person. Bob was also always so outgoing and happy.  Bob is much more cautious and careful now. Bob does not like crowds. He also can be moody and depressed. I never saw Bob experience these emotions before the Attack.

Before the Attack, Bob was also very athletic and had played baseball or softball all of his life.  He played on adult leagues and we all came out to watch him and enjoyed fun times at the park.  He can no longer do any of that and it makes me sad that he has lost that part of himself.

**Q**. What do you miss the most about your relationship with Bob prior to the Attack?

**A**. Before the Attack, Bob was my rock.  He was solid and steady, always with a smile and crazy for me.  He would never have lifted a hand to hurt me. Bob has worked really hard to get back to who he was but it will never be the same and how could it?  We have a clearly defined line in our lives.  Pre-Attack and our new normal post-Attack.

Furthermore, before the Attack, Bob was always helpful around the house and doing 'man things' like mowing the lawn, putting heavy boxes away, and putting up Christmas lights around the holidays. He can't do any of the 'heavy lifting' anymore regarding household chores. Our relationship is less equal and I am more of a caretaker now.

**Q**. Please describe how the Attack and how Bob's post–Attack injuries currently impacts your life?

**A**. I can feel the toll the Attack has taken on Bob. Especially when he is depressed. For instance, Bob is no longer the breadwinner in our family.  I am the only one working full time, taking care of our family financially. Bob has trouble walking at times from the pain in his legs and the numbness in his arm prevents him from doing anything too strenuous.  At Christmas time, he can't even get on the ladder to do the lights or hang anything.  If a ladder is involved, I have to do it because he might get dizzy or lose the feeling in his leg and fall.

After the Attack, Bob tried to go back to work but he was so broken.  The Attack turned our whole life upside down and we ended up losing our home and declaring bankruptcy because of the loss of income and loss of Bob's earning ability.  I had to go back to work full time and have been the primary earner for all these years since that time.  It was too expensive to live in California where our whole family is, so we had to move to South Carolina where the cost of living is cheaper because of the stress I was going through trying to keep it all together.

**Q**. Do you have a favorite photograph of you and Bob together?

**A**. Yes, the photograph on Page 8 below.

7

SABADO 128

**Q**. Why is this photograph so special to you?

**A**.  The photograph accurately depicts me and Bob together and was taken at a family birthday party around 2013. I love this photograph because we look so happy and it reminds me of the way Bob and I used to be before the Attack.



8

**"I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT."**

_Michelle Sabado_

MICHELLE SABADO

SIGNED under oath before me on ___3/14/2023___.

_____
Notary Public – State of South Carolina

*[Notary seal: JEFFREY BEAN, NOTARY PUBLIC, My Commission Expires 02/27/2030, SOUTH CAROLINA]*

9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARY B. HEATON, et al.,

      Plaintiffs,

  v.

THE ISLAMIC REPUBLIC OF IRAN,

      Defendant.

Civil Action No. 1:19-cv-03003-JMC

**SUPPLEMENTAL AFFIDAVIT OF PLAINTIFF TIFFANY SABADO IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST IRAN**

Pursuant to 28 U.S.C. § 1746, I, **TIFFANY SABADO**, hereby declare as follows:

1.      "I am one of the Plaintiffs in the above–captioned Action. I am over the age of 18, of sound mind, and make this Affidavit from personal knowledge.

2.      I was born in October 1984 and am now 38 years old. I am a resident of the State of California. In accordance with 28 U.S.C. §§ 1605A (a)(2)(A)(ii)(I) and 1605A(c)(1), at the time of the April 21, 2005 terrorist attack at issue ('**the Attack**') I was a United States citizen.

3.      I am submitting this Affidavit in support of my request for the Court to enter a Default Judgment against Defendant Islamic Republic of Iran ('**Iran**'). More specifically, I am submitting this Affidavit to provide the Court with facts and evidence concerning the mental anguish, bereavement, grief, and loss of society and comfort (*i.e.*, solatium damages) I suffered following the Attack. *See* Pls.' First Amend. Compl. at 173—174

4.      I am Robert Sabado's daughter. At the time of the Attack, I was 20 years old. For the reasons detailed in this Affidavit, Robert Sabado's traumatic experience during the Attack, and his resulting injuries, has caused a significant personal impact on my life.

5.      Prior to signing this Affidavit, my attorneys asked me series of questions about

1

the Attack and how the injuries Robert Sabado sustained in the Attack has impacted my life.

Below are the questions and my answers:

**Q**. What was your relationship like with Robert growing up?

**A.** My relationship with my father growing up was great, we were very close. We went to all of his softball games and we would frequent Dodgers games here in Los Angeles. My father and I went on many trips to Catalina Island and Palm Springs. We would go out to eat a lot at Gladstone's Restaurant in Malibu. We always spent quality time together. I always felt close to my father, and I could talk to him about anything. We would talk about life and the future, to include things like what I was going to do when I was older. Growing up, my father was fun to be around and was always easy to talk to.

The photograph below fairly and accurately depicts my Dad (in the middle of the photograph wearing a Dodgers hat) and me (in a blue t-shirt). The photograph was taken at my paternal grandmother's house when I was about 9 years old.



**Q.** What was your relationship with Robert like on April 21, 2005?

**A.** My relationship with my Dad on April 21, 2005 was still good. He was overseas, but he would write me letters frequently and we talk on the phone every week. My Dad was a very important figure in my life. I would look forward to his letters and our weekly calls.

SABADO 132

**Q.** Where were you when you found out about the Attack and what feelings did you experience at this time?

**A.** Answering this question, I feel like I'm straddling a timeline where my past is pulling me in one direction and the present in another. When I found out about the Attack, I was working at my part time job in the mall. I just remember feeling light headed and thought I would faint. I couldn't imagine knowing that I would never see my Dad or speak to him again. I thought about not having him in my life for my wedding to walk me down the aisle and all the life events that he would miss out on. I felt scared not knowing if my Dad would survive or if the last conversation we had would be the last time I would ever speak to him.

When I found out about the Attack, I saw flashes of images and noises burst through, and fear came out of nowhere. My heart started to race, my breathing got really loud, and I could no longer remember where I was. In the days following the Attack, I thought I was coping quite well with everything. However, a few weeks after the Attack, I began experiencing unpleasant physical symptoms similar to those of a heart attack. Like chest pains, tightness and dizzy spells which were so severe, I thought I would pass out. The lack of sleep was exhausting.

**Q.** Do certain dates or events trigger feelings of sadness, frustration, or anger relating to the Attack?

**A.** Yes. I feel triggered by the September 11, 2001 terrorist attacks and acts of terrorism in general like the Attack. I also feel triggered around the date of April 21st, as I re-live all the memories and feelings that happened around April 21, 2005. Even after all this time has passed, my thoughts and my memories of the day of the Attack are still in my mind.

**Q**. How has the Attack change Robert? What do you miss the most about your relationship with Robert prior to the Attack?

**A.** My Dad seems distant after the attack. His mind seems pre-occupied and he isn't the same happy person that was easy to talk to and fun to be around. I miss that person. My Dad has also suffered physically. Like I've noticed he isn't able to be as physically active as he used to be.

**Q.** Please describe how Robert's post–Attack injuries currently impacts your life?

**A.** My Dad's post-attack injuries definitely impacts my life. Since he suffers from Post-Traumatic Stress Disorder ('PTSD'), my Dad's behavior is erratic and is unpredictable. My Dad is not the same person and I am somewhat hesitant to be around him now. And I am definitely apprehensive when I do interact with him.

For example, being around my father on the Fourth of July is difficult for me. The fireworks and loud noises are triggering for him and he seems uneasy and unstable. I avoid being around him or going to visit him during this time of the year.

SABADO 133

Q. Do you have a favorite photograph of you and Robert together?

**A**. I have many favorite photos of us together. The photograph below is very special to me though. The photo fairly and accurately depicts my Dad (on the far left side of the photograph), my sister Crystal (with her hand pressed against our Dad's right arm), and me (on the far right side of the photograph). The photograph was taken at the circus when I was about 8 years old.



**Q**. Why is this photograph so special to you?

**A**. Because we are all happy and it feels good to see my Dad smile. The photo reminds me of a time when our lives were more carefree and there was no trauma."

4

Tiffany Sabado.

**"I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT."**

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of Los Angeles.

Subscribed and sworn to (or affirmed) before me on this 5 day of April, 20 23 by Tiffany Sabado

proved to me on the basis of satisfactory evidence to be the person(s) who appeared before me.

ALEJANDRA LOBOS
Notary Public - California
Los Angeles County
Commission # 2385146
My Comm. Expires Dec 2, 2025

(Seal)                         Signature_____

5

**SABADO 135**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARY B. HEATON, et al.,

        Plaintiffs,

    v.

THE ISLAMIC REPUBLIC OF IRAN,

        Defendant.

Civil Action No. 1:19-cv-03003-JMC

**TESTIMONIAL AFFIDAVIT OF PLAINTIFF CRYSTAL SABADO IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST IRAN**

Pursuant to 28 U.S.C. § 1746, I, **CRYSTAL SABADO,** hereby declare as follows:

1.      "I am one of the Plaintiffs in the above–captioned Action. I am over the age of 18, of sound mind, and make this Affidavit from personal knowledge.

2.      I was born on October 28, 1983 and am now 39 years old. I am a resident of the State of California. In accordance with 28 U.S.C. §§ 1605A (a)(2)(A)(ii)(I) and 1605A(c)(1), at the time of the April 21, 2005 terrorist attack at issue ("the Attack") I was a United States citizen.

3.      I am submitting this Affidavit in support of my request for the Court to enter a Default Judgment against Defendant Islamic Republic of Iran ("Iran"). More specifically, I am submitting this Affidavit to provide the Court with facts and evidence concerning the mental anguish, bereavement, grief, and loss of society and comfort (*i.e.*, solatium damages) I suffered following the Attack. *See* Pls.' First Amend. Compl. at 173—174.

4.      I am Robert Sabado's daughter. At the time of the Attack, I was 21 years old. For the reasons detailed in this Affidavit, Robert Sabado's traumatic experience during the Attack, and his resulting injuries, has caused a significant personal impact on my life.

5.      Prior to signing this Affidavit, my attorneys asked me series of questions about

1

the Attack and how the injuries Robert Sabado sustained in the Attack has impacted my life.

Below are the questions and my answers:

**Q**. What was your relationship like with Robert growing up?

**A.** Growing up, my relationship with my Dad was amazing. My parents divorced when my sister and I were about 2 and 3 years old. My Dad is who we were with all of the time. He did everything, like help me with my homework, teach me how to read, and even taught me how to play baseball! That was the best time! On my Dad's days off and on the weekends, we would go to the movies. He would always trick us to see something like Major League instead of My Little Pony. I remember going to Dodger games and the park. We were just always with my Dad.

The photograph below fairly and accurately depicts my Dad (in the middle of the photograph wearing sunglasses), me (on the left side of the photograph raising my hands up), and my sister Tiffany (on the right side of the photograph leaning against my Dad). The photograph was taken at Disneyland when I was about 7 years old.



SABADO 137

**Q.** What was your relationship with Robert like on April 21, 2005?

**A.** On April 21, 2005, my Dad and I hadn't talked in a while as he was in Iraq. But in that situation, I felt that no news was good news. I knew that my Dad was in touch with my stepmom, so I knew he was okay. They spoke whenever my Dad had the opportunity.

**Q.** Where were you when you found out about the Attack and what feelings did you experience at this time?

**A.** When I found out about the Attack, I was at my grandma's house. All I can remember is her saying that something happened to my Dad and he would be coming home. I cried because I knew that my sister and I weren't being told everything. I guess my family wanted to protect us. I just kept thinking, does my Dad know that I love him? Did I tell him that I did before he left?!

**Q.** Do certain dates or events trigger feelings of sadness, frustration, or anger relating to the Attack?

**A.** Well, April 21st is my Mom's birthday, so we celebrate her birthday on each anniversary of the Attack. However, I still always think about how I almost lost my Dad on that day and his partner did unfortunately pass away in the Attack. I will forever remember the drive to the hospital in Santa Barbara after the Attack because there was complete silence. I will never forget seeing my Dad in the hospital, hooked up to the wound vac machine. That was really hard for me to see. I cried the whole ride home. I think that was when it finally hit me that I almost lost my Dad. I knew I was lucky he was still here, but this was just the beginning. My Dad still had a long road to recovery at the time.

**Q.** How has the Attack changed Robert? What do you miss the most about your relationship with Robert prior to the Attack?

**A**. After the Attack, of course I was just happy my Dad was alive! But it was not the same at all. My Dad was very depressed and withdrawn. He spent a lot of time by himself at home and didn't want to go anywhere. If my Dad did leave the house, he would get so anxious, always looking around like something bad was about to happen. He was just very shut down.

My Dad carries a lot of guilt to this day. He says that he shouldn't be here, he should have died out there and not his partner. My Dad believes it should have been him and that's the saddest part. I think what I miss the most about my Dad is how he used to be carefree and happy go lucky. I miss the Dad that was always up for throwing around a baseball, catching a movie, going to Disneyland, or just chasing me around.

**Q.** Please describe how Robert's post–Attack injuries currently impacts your life?

**A.** My Dad still isn't the same and still has bad anxiety. It feels like he isn't comfortable like the way he was before. He is always on edge in public and misses out on family events sometimes. The Dad I knew before the Attack was outgoing and he just is not the same anymore. The Attack, April 21, 2005, took a part of the Dad I once knew away from us.

3

**Q**. Do you have a favorite photograph of you and Robert together? Why is this photograph so special to you?



**A.** Yes the photograph above. Although it is not the best copy, the picture above fairly and accurately depicts me (on the left side of the photograph in a yellow swimsuit), my Dad (in the middle of the photograph), and my sister Tiffany (on the right side of the photograph). The picture was taken in Palm Springs, California when I was around 7 years old.

This picture is special to me because it shows how our family spent our summers growing up. My Dad played on a baseball team with the Los Angeles Police Department and every summer they played in a tournament in Palm Springs. After the tournament, we would swim. My Dad would play with my sister and I, chase us in the water, and we would play Marco Polo. You name it, we played it. My Dad would make us laugh the whole time!

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California, County of LOS ANGELES
Subscribed and sworn to (or affirmed) before me on this 4 day
of April 2023 by Crystal Sabado
proved to me on the basis of satisfactory evidence to be the
person(s) who appeared before me.

Signature _____ (seal)                    4

H. ENRIQUEZ
Commission No. 2321313
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Mar. 8, 2024

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARY B. HEATON, et al.,

               Plaintiffs,

     v.

THE ISLAMIC REPUBLIC OF IRAN,

               Defendant.

Civil Action No. 1:19-cv-03003-JMC

---

### TESTIMONIAL AFFIDAVIT OF PLAINTIFF SKYLER SABADO IN SUPPORT OF PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT AGAINST IRAN

Pursuant to 28 U.S.C. § 1746, I, **SKYLER SABADO,** hereby declare as follows:

1.      "I am one of the Plaintiffs in the above–captioned Action. I am over the age of 18, of sound mind, and make this Affidavit from personal knowledge.

2.      I was born in April 1996 and am now 26 years old. I am a resident of the State of Alaska. In accordance with 28 U.S.C. §§ 1605A (a)(2)(A)(ii)(I) and 1605A(c)(1), at the time of the April 21, 2005 terrorist attack at issue ('**the Attack'**) I was a United States citizen.

3.      I am submitting this Affidavit in support of my request for the Court to enter a Default Judgment against Defendant Islamic Republic of Iran ('**Iran'**). More specifically, I am submitting this Affidavit to provide the Court with facts and evidence concerning the mental anguish, bereavement, grief, and loss of society and comfort (*i.e*., solatium damages) I suffered following the Attack. *See* Pls.' First Amend. Compl. at 173—174.

4.      I am Robert Sabado's son. At the time of the Attack, I was 9 years old. For the reasons detailed in this Affidavit, Robert Sabado's traumatic experience during the Attack, and his resulting injuries, has caused a significant personal impact on my life.

5.      Prior to signing this Affidavit, my attorneys asked me series of questions about

the Attack and how the injuries Robert Sabado sustained in the Attack has impacted my life.

Below are the questions and my answers:

**Q**. What was your relationship like with Robert growing up?

**A.** Growing up, my Dad and I were always very close. He taught me how to play baseball and we would always go to the local park to play catch. My Dad would take me out of school on my birthday to catch Dodgers games and we would always ride around Los Angeles together.

The photograph below fairly and accurately depicts my dad (on the right side of the photograph wearing a Hawaiian shirt) and me (being held in my dad's arms). The photo was taken in Cancun, Mexico when I was around 6 years old.



**Q.** What was your relationship with Robert like on April 21, 2005?

**A.** On the day of the Attack, I was very close with my Dad. I would speak with him often because he and I would talk whenever he called my mother. I looked forward to his calls, and my Dad would also send emails to my mother for me.

**Q.** Where were you when you found out about the Attack and what feelings did you experience at this time?

**A.** When I found out about the Attack, I was not old enough to understand the gravity of the situation. My Mom took me out of school mid-day to explain what was happening and why it happened.  I was confused and scared about what had happened to my Dad and if he would come home.

**Q.** Do certain dates or events trigger feelings of sadness, frustration, or anger relating to the Attack?

**A.** You learn a lot about all different types of warfare while serving the Army. I enlisted in the Army in 2018 and currently serve at Joint Base Elmendorf-Richardson in Alaska

While in the Army, we once had a class about explosives and Improvised Explosive Devices ('IEDs'). Learning about IED's was tough for me and I never told anyone about what my Dad did or what happened to him in Iraq. During that block of instruction, it was frustrating to see how bad guys implement these attacks and how IED attacks changed the military campaign in the Middle East knowing that my Dad was a victim of that type of attack.

**Q.** How has the Attack changed Robert? What do you miss the most about your relationship with Robert prior to the Attack?

**A.** When my Dad came back, we were still close but I remember him lashing out in anger at my Mom. Most of the time my mom would send me to go play with my friends when my Dad would have episodes or flashbacks of the event. I specifically remember my Mom not letting my Dad come to some of my baseball games for fear that the flashbacks would occur in public, which upset me that he did not come.

Also, after the Attack, my Dad did not physically move the same. I rarely saw my Dad run with me like he used to and for years he could not get as physical while teaching me sports like he initially did. I missed being active with my Dad, he could not grip a baseball and play catch with me for a couple years after the Attack. My parents always tell me stories about how I would get mad that he could not keep his promise and play catch with me. I was only 9years old and did not fully understand what was happening. For many years after the attack, my Dad battled with PTSD and would never actually talk about what happened.

**Q.** Please describe how Robert's post–Attack injuries currently impacts your life?

**A.** I know that some things do bug my father. I'm pretty sure he has shrapnel in his leg, which bothers him. When the weather changes, his hand does go numb. My father doesn't come out that much, and every now and again he will miss family events, which makes me sad.

**Q.** Do you have a favorite photograph of you and Robert together?

**A.** Yes, the photograph below. The photograph below fairly and accurately depicts my Dad (on

the left side of the photo) and me (on the right side of the photo wearing a Yankees hat) when I was 7 years old. The photo was taken at the old Yankee Stadium in New York City in the spring of 2003.

**Q**. Why is this photograph so special to you?

**A**. This photograph was taken during a family vacation to New York City. While the rest of the family went adventuring through the gigantic city, my Dad knew I only wanted one thing – to see a New York Yankees game. My Dad and I split from the family that day and caught a Yankees game together. Not only did we get to see some of the legends of the game play, like Derek Jeter, but we shared a moment together watching the sport we both loved that he passed down to me.



**"I DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE UNITED STATES OF AMERICA THAT THE FOREGOING IS TRUE AND CORRECT."**

Skyler Sabado

SIGNED under oath before me on April 6th, 2023 .

Notary Public – State of South Carolina

My Commission Expires
December 14, 2028

Although Skyler is a resident of Alaska, he is currently in South Carolina for an internship.

**SABADO 144**