**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARY B. HEATON, et al., | |
| Plaintiffs, | |
| v. | Civil Action No. 1:19-cv-03003-JMC |
| THE ISLAMIC REPUBLIC OF IRAN, | |
| Defendant. | |

**BELLWETHER PLAINTIFFS' PROPOSED FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

Pursuant to this Court's December 20, 2024 Minute Order, Bellwether Plaintiffs, by and through undersigned counsel, hereby submit the following proposed findings of fact and conclusions of law in support of their Motion for Default Judgment against Defendant the Islamic Republic of Iran ("Iran").

# TABLE OF CONTENTS

BACKGROUND ..................................................................................................... 1

FINDINGS OF FACT............................................................................................. 2

   I.   Evidence Supporting Findings of Fact............................................................ 2

   II.   Iran's Support for Terrorism ......................................................................... 6

   III.   Attacks Against Bellwether Plaintiffs .......................................................... 8

      A.   Explosively Formed Penetrator Attacks ................................................ 8

      B.   "Complex" Attack ................................................................................ 19

      C.   Militia Attacks Using Improvised Explosive Devices......................... 21

      D.   Admitted Responsibility ....................................................................... 27

CONCLUSIONS OF LAW ................................................................................. 28

   I.   Legal Standards .......................................................................................... 28

   II.   Subject-Matter Jurisdiction ....................................................................... 29

      A.   Iranian Officials Provided Material Support to Terrorist Groups In The Scope of Their Employment .............................................................. 31

      B.   Iran Provided Material Support For Extrajudicial Killings ................. 31

      C.   Iran's Provision Of Material Support Caused Plaintiffs' Injuries ....... 33

   III.   Personal Jurisdiction ................................................................................. 35

   IV.   Liability...................................................................................................... 37

   V.   Damages .................................................................................................... 39

      A.   KIA Family Member Damages............................................................ 40

      B.   Direct Injury Plaintiffs and Their Immediate Family Members .......... 49

      C.   Punitive Damages ................................................................................ 56

      D.   Post-Judgment Interest......................................................................... 57

**BACKGROUND**

Plaintiffs in this action are United States nationals who seek compensatory and punitive damages against Defendant the Islamic Republic of Iran for its role in approximately 420 separate acts of attempted or completed extrajudicial killing under the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605A. Plaintiffs allege that Iran provided material support and resources to multiple terrorist organizations in Iraq that perpetrated various attacks injuring them or their family members. Iran did not respond to the complaint.

On November 8, 2022, this Court ordered Plaintiffs to file a Motion for Default Judgment for a group of "bellwether" plaintiffs, to help the Court evaluate the adequacy of the Plaintiffs' evidence of Iran's provision of material support for the terrorist attacks that injured them and their resulting damages. *See* November 8, 2022 Minute Order. Accordingly, plaintiffs identified 46 "Bellwether Plaintiffs" who alleged they were injured in 20 distinct attacks. *See* February 9, 2023 Status Report Bellwether, ECF No. 48. Bellwether Plaintiffs moved for default judgment as to liability and damages. *See* Bellwether Plaintiffs' Motion for Default Judgment, ECF No. 51.

While Bellwether Plaintiffs' Motion for Default Judgment was pending, the Court of Appeals for the District of Columbia Circuit held in *Borochov v. Islamic Republic of Iran* that a foreign state provides material support for an extrajudicial killing only if the attack that it supported resulted in at least one victim's death. *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024). On request from Bellwether Plaintiffs, this Court agreed to hold in abeyance the Bellwether Plaintiffs' claims arising from nine attacks that did not involve victim deaths. *See* December 20, 2024 Minute Order.

Accordingly, currently at issue are plaintiffs' injuries arising from eleven terrorist attacks that occurred in Iraq between 2004 and 2010. *See* Plaintiffs' Bellwether Motion for Default Judgment Against Defendant Iran, ECF No. 51 at 21-24, 27, 29. As discussed in this Proposed

1

Findings and Fact and Conclusions of Law, Iran caused their injuries by providing material support—including funding, weapons, and tactical training—to the terrorist groups that committed the attacks.

## FINDINGS OF FACT

### I.     Evidence Supporting Findings of Fact

Because Iran did not respond, Bellwether Plaintiffs have moved for default judgment. To win default judgment against a foreign sovereign, Plaintiffs must "establish[]" their "claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  At the outset, Bellwether Plaintiffs must establish subject-matter jurisdiction and personal jurisdiction. *See Jerez v. Repub. of Cuba*, 775 F.3d 419, 422 (D.C. Cir. 2014). Plaintiffs may establish both types of jurisdiction by properly showing all elements of a § 1605A claim. Plaintiffs may do so by establishing that a signature weapon or method used in attacks was traceable to Iran or by showing that Iran provided material support to the terrorist group responsible for the attacks.

Courts have found numerous evidentiary sources "satisfactory."  28 U.S.C. § 1608(e). As an initial matter, a court can rely upon plaintiffs' "'uncontroverted factual allegations, which are supported by ... documentary and affidavit evidence.'" *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal quotation marks and citations omitted); *accord, e.g.*, *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005); *Saberi v. Islamic Republic of Iran*, 541 F. Supp. 3d 67, 77 (D.D.C. 2021); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012). In FSIA cases, expert testimony is often sufficient for plaintiffs to meet their burden because "firsthand evidence and eyewitness testimony is difficult or impossible to obtain from an absent and likely hostile sovereign." *Owens v. Repub. of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Repub. of Sudan*, 590 U.S. 418 (2020). Finally, a court may "'take judicial notice of related proceedings and records in cases before the same

court.'" *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010) (quoting *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 50-51 (D.D.C. 2009)).

Bellwether Plaintiffs provided three types of evidence here. *First*, they submitted "uncontroverted factual allegations" in the Amended Complaint, ECF No. 26, as "supported by" the extensive "documentary and affidavit evidence." *Rimkus*, 750 F. Supp. 2d at 171; *see also* Affidavits, CENTCOM reports, and other documentary evidence filed by Bellwether Plaintiffs, ECF No. 51-7–51-29.

*Second*, Bellwether Plaintiffs provided expert evidence. They presented reports from three experts, qualifies as an expert under Federal Rule 702:

- Michael Knights, Ph.D., has, since 2003, been a senior fellow at the Washington Institute—a D.C. think tank—in its Military and Security Program. Declaration of Michael Knights Regarding Militia Group Attacks at 2-3, ECF No. 51-4 ("Knights Militia Rep."). Dr. Knights studies militia and terrorist organizations operating in Iraq. *Id*. at 2-4. He has presented and published extensively on "Iran-backed militias in Iraq." *Id*. at 4. He has served as a consultant on Iran and the Middle East to several government agencies, including the Central Intelligence Agency, the United States Department of Defense, the State Department Bureau of Intelligence and Research, the National Security Agency, and the Defense Intelligence Agency. *Id*. at 3. In his work at the Washington Institute, Dr. Knights has received daily intelligence from Iraq regarding insurgent attacks and acts of terrorism, including the use of explosively formed penetrators (EFPs). Declaration of Michael Knights Regarding EFPs, ECF No. 51-3 ("Knights EFP Rep."). Dr. Knights qualifies as an expert on Iran's role in the use

of EFPs in Iraq, on terrorist and militia groups in Iraq, and on Iranian support for those groups.

- Ryan Thompson is a retired Army lieutenant colonel and a licensed engineer specializing in systems like those at issue here. Declaration of Ryan Thompson at 2, ECF No. 51-6 ("Thompson Report"). While in the Army, Thompson was in a company that patrolled a military supply route between the Iraq-Kuwait border and Baghdad in order to clear it of improvised explosive devices (IEDs), including EFPs. *Id.* at 2-3. Moreover, in both Iraq and Afghanistan, Thompson investigated IED incidents to educate U.S. and coalition forces about such weapons in all their local varieties. *Id.* at 3. In another FSIA case in this District, Mr. Thompson previously qualified as an expert on the topics presented here. *See Fissler v. Islamic Republic of Iran*, 2022 WL 4464873, at *2 (D.D.C. Sept. 26, 2022) ("The Court . . . qualifies Mr. Thompson as an expert on IEDs, including EFPs, used against U.S. and allied forces in the most recent wars in Iraq . . . ."). Accordingly, Mr. Thompson now qualifies as an expert on IEDs, including EFPs, used against U.S. forces in Iraq.

- Patrick Clawson, Ph.D., has served as Director of Research for the Washington Institute for more than 25 years. Declaration of Patrick Clawson, PhD at 3, ECF No. 51-5 ("Clawson Report"). Dr. Clawson studies Iranian sponsorship of terrorism. *Id*. at 2. He has been consulted by multiple government agencies and has testified before Congress on numerous occasions regarding Iranian support for militias and proxy groups. *Id*. at 2-4. Dr. Clawson has also been qualified as an expert on Iran and its material support for terrorist organizations many times in this District. *Id*. at 4-6; *see, e.g.*, *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 13 n.3 (D.D.C. 2009) ("In over 20 cases,

Dr. Clawson has provided this Court with reliable and credible testimony regarding the involvement of Iran [and its proxy groups] in sponsoring and organizing acts of terrorism carried out against citizens of the United States."). Dr. Clawson thus qualifies as an expert on Iran and its support for militias and terrorist groups in Iraq.

*Third*, Plaintiffs ask the Court to take judicial notice of prior decisions by courts in this District that have held Iran responsible under § 1605A on similar facts. *See* Bellwether Plaintiffs' Motion for Default Judgment, ECF No. 51-1 at 20. Federal Rule of Evidence 201(b) permits courts to take judicial notice of facts that are "not subject to reasonable dispute" and that are "either (1) generally known within the territorial jurisdiction ... or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also Rimkus*, 750 F. Supp. 2d 163 (relying exclusively on judicial notice of evidence presented in earlier FSIA litigation to reach independent findings of fact holding Iran liable under FSIA).

The findings of fact rely in part on the following evidence, of which the court takes judicial notice:

- Cpt. Donald Wade Barker's Expert Report in *Karcher*. *Karcher*, 1:16-cv-00232, ECF No. 84-4, PX-158.

- Cpt. Donald Wade Barker's Testimony in *Karcher*. *Karcher*, 1:16-cv-00232, ECF No. 70.

- Col. Kevin Lutz's Expert Report in *Karcher*. *Karcher*, 1:16-cv-00232, ECF No. 84-5.

- Col. Kevin Lutz's Testimony in *Karcher*. *Karcher*, 1:16-cv-00232, ECF No. 71.

- Col. Kevin Lutz's Expert Report in *Lee*. *Lee*, 19-cv-00830, ECF No. 53-2.

- Michael Pregent's Expert Report in *Roth*. *Roth v. Islamic Republic of Iran*, Case No. 1:19-cv-02179, ECF No. 91-2.

- Michael Pregent's Hearing Testimony in *Roth. Roth v. Islamic Republic of Iran*, Case No. 1:19-cv-02179, ECF No. 102.

- Michael Pregent's Expert Report in *Brown. Brown v. Islamic Republic of Iran*, 1:21-cv-1308, ECF No. 34-3.

## II.    Iran's Support for Terrorism

Courts in this District have repeatedly detailed Iran's extensive sponsorship of terrorist groups. *See, e.g.*, *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 73-77 (D.D.C. 2023); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 22 (D.D.C. 2019). This Court incorporates those facts by reference and recounts a few especially pertinent ones.

For decades, Iran and its leader, Ayatollah Khomeini, have seen the United States as an enemy and a "malign force in the world." Clawson Report, ECF No. 51-5 at 10. Rather than risk all-out war with the United States through conventional, direct military action, Iran has sought to drive the United States from the Middle East through its terrorist proxies. *Id.* at 11. Iran, often through the Islamic Revolutionary Guard Corps (IRGC), has provided material support to a wide array of groups willing to attack U.S. interests. *Id.*

For example, Iran largely controls Lebanese Hezbollah and has supported that terrorist organization since the 1990s. *Id.*; Pregent Report, *Roth*, Case No. 1:19-cv-02179, ECF No. 91-2 at 7. Lebanese Hezbollah has served as Iran's "premier proxy" and has been "bankrolled, armed, and trained" by Iran. *Id.*; *see also Lee v. Islamic Repub. of Iran*, 518 F. Supp. 3d 475, 482 (D.D.C. 2021). Experts have estimated that "Iran provides Hezbollah with as much as $700 million–$1 billion per year in the form of cash, training, intelligence, and weapons." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 60 (D.D.C. 2018). In concert with Hezbollah, Iran began providing material support to terrorist groups in Iraq. Pregent Report, *Roth*, Case No. 1:19-cv-02179, ECF

No. 91-2 at 7-9. Iranian leaders met with Hezbollah and al-Qaeda—a terrorist group founded by Osama bin Laden—in Iran to plan terrorist attacks. *Id.* Osama bin Laden began sending al-Qaeda terrorists to train at Hezbollah camps in Iran and Lebanon. *Id.* Specifically, in 1995, the IRGC Qods Force began teaching al-Qaeda operatives how to make better explosive devices and other weapons that terrorists would later use in Iraq. *Id.* at 9. Iran's Supreme Leader, Ayatollah Khomeini, approved of these Iranian Hezbollah terrorist training programs. *Id.* at 8. Iran, through it IRGC Qods forces, provided Abu Musab al-Zarqawi, eventual leader of al-Qaeda in Iraq (AQI), with funds, weapons, and safe passage to Iraq to harry U.S. troops. *Id.* at 9. Hezbollah persuaded al-Qaeda leaders to use suicide bombers against the United States, despite al-Qaeda's previous religious objections to the tactic. *Id.* at 8.

Iran has demonstrated a willingness to support terrorists regardless of their ideology or whether they are Sunni or Shia. Clawson Report, ECF No. 51-5 at 11-24. When the United States joined coalition forces in Iraq to depose Saddam Hussein, Iran freed many Sunni jihadists that it had been holding captive—and then sent them to Iraq to battle the U.S. military. Pregent Report, *Roth*, Case No. 1:19-cv-02179, ECF No. 91-2 at 9. By 2007, the IRGC and Quds Force provided between $750,000 and $3 million worth of assistance each month to its proxies, both Shia and Sunni. *See Lee*, 518 F. Supp. 3d at 483. Through Hezbollah and other proxies, Iran brought terrorists into the country for training. *See id.*; *see also Karcher*, 396 F. Supp. 3d at 23. Iran taught the proxy group terrorists how to build and deploy IEDs and how to conduct intelligence operations to target Americans. Pregent Report, *Roth*, Case No. 1:19-cv-02179, ECF No. 91-2 at 6-7, 17-21.

Iran's support for terrorist groups who attack Americans in Iraq has been effective—and so broad-based as to be almost indiscriminate. Further discussion of particular terrorist organizations as they relate to specific attacks follows below.

### III.    Attacks Against Bellwether Plaintiffs

Bellwether Plaintiffs' experts Dr. Knights and Dr. Clawson studied each attack to assess whether it could be traced to Iran's material support. *See* Knights EFP Report, ECF No. 51-3 at 21-22; Knights Militia Report, ECF No. 51-4 at 6-7; Clawson Report, ECF No. 51-5 at 26-27. Bellwether Plaintiffs' expert Lt. Col. Thompson looked specifically at roadside bomb attacks to determine if the method of attack was an EFP. *See* Thompson Report at 4. Each expert expressed his opinions to a "reasonable degree of certainty/probability." Knights EFP Rep. at 22; Knights Militia Rep. at 7; Thompson Report at 5; Clawson Report at 27. It is appropriate to take judicial notice of evidence from other similar cases.

### A.    Explosively Formed Penetrator Attacks

Of the 11 attacks that Bellwether Plaintiffs claim Iran materially supported, six involved a uniquely lethal weapon known as an explosively formed penetrator ("EFP"). The use of EFPs as signature weapons of Iranian-supported militia groups has been discussed at length in similar cases in this District. *See, e.g.*, *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 25-30 (D.D.C. 2019); *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152 (D.D.C. 2022). Plaintiffs have requested that the Court take judicial notice of expert evidence and other materials submitted in substantially similar litigation and have cited specifically to *Karcher* and *Roberts* on EFP attacks.

EFPs are explosive devices that are intentionally "designed to defeat armor." Barker Report, *Karcher* PX-158 at 5.[1] EFPs "appear[ed] on modern battlefields in the 1990s as a weapon

---

[1] This document has adopted a modified convention for citations to evidence submitted to the *Karcher I* court. All transcripts from the *Karcher I* trial are denominated with "Tr." and a number 1 through 5 indicating the volume in which the cited testimony appears. A transcript designated "Tr. 1," for example, appears in the first volume of the transcript from the *Karcher I* trial. Exhibits from the *Karcher I* trial are denoted by their title and "PX," followed by the exhibit number assigned to the exhibit during the *Karcher I* trial. *See Lee v. Islamic Republic of Iran*, 656 F. Supp. 3d 11 at n.2 (D.D.C. 2023) (also adopting this modified citation approach to *Karcher I* evidence).

deployed in Lebanon by Hezbollah." *Id.* at 6. EFPs became insurgents' weapon of choice in Iraq after the United States began to "up-armor" its military vehicles, particularly its HMMWVs (Humvees), in response to increased attacks from militia groups and terrorist cells. *Id.* at 12-13. Using EFPs, insurgents could target and destroy even heavily-armored U.S. military vehicles. *Id.* at 13-14.

The EFPs detonated "in Iraq were generally made with a precision manufactured concave copper disk liner and [high-energy] explosive ... packed behind the liner." *Id.* at 6 (footnote omitted). EFPs are designed to "pierce through several inches of military-grade armor like a fist through a wall." *Id.* at 7 (internal quotation marks omitted). The weapons create "a massive blast overpressure, capable of blowing the doors and turrets from vehicles close to the device," and "the heat and force of the penetrator [can] shatter [a] vehicle's armor and materials inward," propelling "razor-sharp shards of Teflon and steel ripping through the interior compartment." *Id.* The heat generated by EFPs is powerful enough to "ignite engine fuel and set vehicles ablaze." *Id.*

The sophistication of the devices in Iraq was beyond the capacity of individuals with only basic training in explosive construction. *Id.* at 16. "[W]ithout the active involvement, training, equipment and support of the IRGC," insurgents could not have constructed EFPs. *Id*. As Barker further explained, "EFPs are extremely complicated systems to build," so Iran and its proxies "would build [EFPs] complete, [and] bring them in as a complete total system, ready to go." Barker's Testimony, *Karcher*, 1:16-cv-00232, ECF No. 70, Tr. 3 at 44:13-16.

EFPs have been "almost exclusively operated by militant groups with close operational ties to the [Islamic Revolutionary Guard Corps ("IRGC"), a branch of the Iranian military] and Lebanese Hezbollah," "an organization formed by the IRGC." Knights EFP Report, ECF No. 51-3 at 11. Other than those two groups, "the EFP has been encountered only in the use of other armed

groups supported by the IRGC." *Id.* at 11-12. Dr. Knights further explained that EFPs were used frequently in Iraq as early as 2004—and that U.S. military officials found that "militant" Shia groups "received the weapons from Iran in order to aid their uprising against the U.S.-led coalition": Iran "was conducting a full-scale unconventional warfare campaign in Iraq to dominate the emerging Iraqi Government while keeping the U.S.-led coalition off balance by supplying" EFPs to these militia groups. *Id.* at 12-15. Dr. Knights' report cited American and British military records and findings, statements from Iranian dissidents, and other evidence to determine that "Iran-backed political and militia groups . . . helped smuggle the EFPs into Iraq from Iran" and that EFPs used in Iraq were "manufactured in three factories run by the IRGC Qods Force." *Id.* at 15-20.

Dr. Knights concludes that "the Iranian government, including the IRGC and its Qods Force, was the principal supplier of almost all, if not all, EFP warheads used in Iraq prior to U.S. military withdrawal in late 2011," and that as a result, "EFP attacks on U.S. persons in Iraq from 2004-2011 are examples of Iranian government material support to attempted extrajudicial killings and extrajudicial killings against U.S. persons." *Id.* at 22-23.

Iran (acting through agents like the IRGC and IRGC-QF) provided material support and resources to acts of extrajudicial killing by giving militia groups the money and EFPs they need to perpetrate Bellwether Attacks #1-6. And because Iran's support helped get these groups the resources they needed to attack U.S. forces, its material support was a proximate cause of the deaths and injuries that occurred in Attacks #1-6.

1.    <u>Attack #1 – May 14, 2006 – Baghdad, Iraq</u>

      a.    Mary B. Heaton (The Late Robert West's Mother)

      b.    Lisa R. Brooks (The Late Robert West's Sister)

The evidence related to this May 14, 2006 attack has previously been reviewed in *Karcher* and is cited here, although the Court makes its own findings of fact. *See Karcher v. Islamic Republic of Iran*, 2021 WL 133507, at *20-21 (D.D.C.) (January 14, 2021).

Sergeant First Class ("SFC") Robert West was serving as a member of the United States Army in Iraq in 2006. *See* Robert West Evidence, ECF No. 51-7 at 3. On May 14, 2006, SFC West was part of a Special Police Transition Team ("SPTT") from the 1st Battalion, 312th Regiment. *See Karcher*, 16-cv-232, Lutz Rep. ECF No. 84-5 at 67. That day, the SPTT was part of an Iraqi National Police convoy traveling north along Route Pluto in Baghdad, Iraq. *Id.* At approximately 6:10 p.m., an explosive device struck the up-armored M1114 HMMWV that was the lead vehicle in the convoy. *Id.* The blast propelled the vehicle off of the road and caused it to catch fire. *Id.* SFC West, who was driving that vehicle, was killed. *Id.* SFC West's casualty report confirms that he was killed in action in Baghdad, Iraq on May 14, 2006, as a result of hostile "blast injuries." *See* Robert West Evidence, ECF No. 51-7 at 10.

The explosive responsible for the May 14, 2006 attack that caused the death of SFC West was an EFP traceable to Iran and its proxies. The SIGACT report analyzing the attack identifies the explosive as "an EFP placed on the right shoulder of RTE Pluto." Lutz Rep. at 67. Route Pluto was the site of many "EFP attacks orchestrated by Shi'a proxy groups." *Id.* Post-blast investigation evidence further confirmed that the device was "a multi-array EFP," and photographic evidence shows that the EFP penetrated SFC West's armored HMMWV; photos likewise depict the comprehensive damage inflicted during the May 14, 2006 attack. *Id.* at 70-71. Copper residue was

visible on the vehicle's armor. *Id.* at 71. Lt. Col. Thompson further determined that the device used in the attack on SFC West was an EFP. Thompson Report, ECF No. 51-6 at 6. Col. Lutz likewise concluded "that the attack that killed SFC West was part of the EFP campaign orchestrated by the IRGC and Hezbollah, that was conducted by one of the IRGC's Special Group proxies." Lutz Rep. at 72. Moreover, as Dr. Knights also opined, "there is a reasonable connection between Iran's material support and . . . the May 14, 2006" attack that resulted in the death of SFC West. Knights Report, ECF No. 51-3 at 22. Therefore, Iran bears responsibility for the May 14, 2006 EFP attack in Baghdad, Iraq that killed SFC West.

       2.      <u>Attack #2 – January 5, 2010 – Balad, Iraq</u>

             a.  Victoria Croft (The Late David Croft's Mother)

             b.  Robin Messer (The Late David Croft's Sister)

             c.  Tyler Croft (The Late David Croft's Brother)

             d.  Melodie Hanson (The Late David Croft's Sister)

             e.  Andrea Whatley (The Late David Croft's Sister)

Sergeant[2] David Croft was serving as a member of the United States Army in Iraq in 2010. Croft Evidence, ECF No. 51-8 at 23. On January 5, 2010, Sgt. Croft was a member of B Troop, 1-7th Cavalry Regiment, 1st Brigade Combat Team, 1st Cavalry Division and was conducting an orientation patrol near Balad, Iraq. *Id*. at 24, 40. As the three-vehicle convoy of up-armored M1151 HMMWVs reached a choke point on "Route Ninja," the convoy was attacked by two explosive devices—a dual array copper EFP with 40 to 50 pounds of unknown bulk explosive and a smaller single array steel EFP. *Id*. at 25. Both EFPs hit the lead vehicle in the convoy, and the blast from the copper EFP pierced the armor, striking Sgt. Croft inside that HMMWV. *Id*.  Immediately after

---

[2] David Croft was promoted posthumously to sergeant. Croft Evidence, ECF No. 51-8 at 98.

the blasts, insurgents attacked the convoy with small arms fire. *Id.* Sgt. Croft was medevacked to Balad but died from the wounds he sustained in the attack. *Id*. at 25, 98, 99, 104.

The explosive responsible for the January 5, 2010 attack that caused the death of Sgt. Croft was an EFP traceable to Iran and its proxies. The contemporaneous post-blast investigation revealed that the EFPs were angled, directional weapons, and an Explosive Ordnance Disposal ("EOD") team recovered 21 copper fragments at the scene of the attack. *Id*. at 25; Thompson Report, ECF No. 51-6 at 7. The EOD team also found that the EFPs were remote detonated, "which was a technique routinely used by EFP emplacement cells." *Id*. at 7-8. Lt. Col. Thompson stated that, to a reasonable degree of probability, "[t]his was an Explosively Formed Projectile (EFP) attack." *Id*. at 8. As Dr. Knights explained, "there is a reasonable connection between Iran's material support and . . . the January 5, 2010" attack that resulted in the death of Sgt. Croft. Knights Report, ECF No. 51-3 at 22. Therefore, Iran bears responsibility for the January 5, 2010 EFP attack in Balad, Iraq that killed Sgt. Croft.

3. <u>Attack #3 – March 11, 2008 – Kishkishkia, Iraq</u>

a. Laurie West (The Late Laurent West's Mother[3])

b. Albert Dyk (Direct Victim)

Staff Sergeant ("SSG") Laurent West and SSG Albert Dyk were serving in the United States Army in Iraq in 2008. Laurent West Evidence, ECF No. 51-9 at 3; Dyk Evidence, ECF No. 51-10 at 3. On March 11, 2008, SSG West and SSG Dyk were members of the 3rd Squadron, 73rd Cavalry Regiment, 1st Brigade Combat Team, of the 82nd Airborne Division participating in a

---

[3] Laurie West (formerly Larry West) is the decedent's biological father. Mrs. West now identifies as female. Because "mother" is a gender-specific description, Plaintiffs have described Laurie West as Laurent's mother. However, at the time of Laurent's death, Laurie (then Larry) identified as male and as Laurent's father.

mission to gather intelligence about a weapons cache. Laurent West Evidence, ECF No. 51-9 at 17; Dyk Evidence, ECF No. 51-10 at 4. During the mission, their five-vehicle convoy of up-armored M1151 HMMWVs was attacked with a multi-array EFP near Kishkishkia, Iraq. *Id*. at 15; Thompson Report, ECF No. 51-6 at 9. The blast pierced the armor of the lead vehicle and struck SSG West, who was killed in action. SSG Dyk was in the second vehicle and saw his "good friend, Staff Sergeant Laurent West . . . cut in half by the EFP" shrapnel. Dyk Evidence, ECF No. 51-10 at 4.

The explosive responsible for the March 11, 2008 attack that caused the death of SSG West and injury to SSG Dyk was an EFP traceable to Iran and its proxies. The contemporaneous post-blast EOD team investigation confirmed that the explosive was a five-array EFP with multiple angled charges to maximize damage. Thompson Report, ECF No. 51-6 at 9. The blast pattern to SSG West's vehicle was also characteristic of an EFP. *Id*. Lt. Col. Thompson stated to a reasonable degree of probability, "This was an Explosively Formed Projectile (EFP) attack." *Id*. at 8. Dr. Knights stated, "there is a reasonable connection between Iran's material support and . . . the March 11, 2008" attack that resulted in the death of SSG West and injury to SSG Dyk. Knights Report, ECF No. 51-3 at 22. Therefore, Iran bears responsibility for the March 11, 2008 EFP attack in Kishkishkia, Iraq that killed SSG West and injured SSG Dyk.

4.    <u>Attack #4 – September 8, 2009 – Baghdad, Iraq</u>

a.  Jon Kone (Direct Victim)

The evidence related to this September 8, 2009 attack has previously been reviewed in *Lee* and is cited here, although the Court makes its own findings of fact. *See Lee v. Islamic Republic of Iran*, 656 F. Supp. 3d 11, 48-49 (D.D.C. January 30, 2023).

Sergeant Jon Kone was serving in the United States Air Force in Iraq in 2009. Kone Evidence, ECF No. 51-14 at 3. On September 8, 2009, Sgt. Kone was a member of Detachment 2, 732nd Expedition Squadron, 93rd Military Police Battalion participating in an Iraqi Police Station "meet and greet" from Camp Victory to the Al Rasheed district in southern Baghdad. *Id*. at 4. Around 10:00 a.m. on September 8, 2009, Sgt. Kone was in the third vehicle of a four-vehicle convoy—two up-armored M1151 HMMWVs and two MRAPs—traveling north on Route Jackson near FOB Falcon in southern Baghdad. *Lee*, 19-cv-00830, ECF No. 53-2, Lutz Report at 184. As the convoy was entering the traffic circle on "Route Jackson," the third vehicle was struck by an explosive "on the right side of the vehicle toward the rear of the truck commander's door." *Id.* at 184-85. The explosive, which "consist[ed] of a copper cone, steel case, and approximately 50-60 pounds of unknown bulk explosives, had been placed between a brick wall and the road on Route Jackson." *Id.* The blast penetrated the armor of the HMMWV, killing Lt. Joseph Helton and injuring Sgt. Kone. *Id.* at 184-85; Kone Evidence, ECF No. 51-14 at 8-16, 30-31. Sgt. Kone received a Purple Heart for injuries he sustained in the attack. *Id*. at 27.

The January 5, 2010 attack causing injury to Sgt. Kone and the death of Lt. Helton was an EFP traceable to Iran and its proxies. The AR 15-6 Report analyzing the attack states that the vehicle was "struck by an Explosively Formed Projectile (EFP)" and that "[v]isual evidence taken after the blast [shows] that the EFP was encased in concrete and hidden behind the curb. When detonated, the EFP penetrated it's [sic] casing, went through the curb, through the 1151 armor and into the cab of the vehicle." *Lee*, 19-cv-00830, ECF No. 53-2, Lutz Report at 185. Col. Lutz further noted that the SIGACT Report identified the explosive as an angled EFP with a copper cone. *Id.* at 186. The post-blast investigation determined that the device was an "EFP with a copper cone approximately 10 inches in diameter and a thin steel case" that was believed to be "command

15

detonated using either R[adio] C[ontrol] or command wire." *Id.* The IED Report notes that "it appears that the [third vehicle] was specifically targeted due to the angle of the EFP, [and because] the first two vehicles (MRAPs) passed the device, [while the] third vehicle (HMMWV) [was] struck," and the JTF Troy Report comes to the same conclusion. *Id.* at 186-87, 190. The CJTP Troy Report from the attack notes that this was "the third EFP attack within the [area] in the past 90 days" and opines that Former Special Groups (FSG), Iranian-backed militias, are responsible for the attack, "due to their previous activity within the area." *Id.* at 187. Col. Lutz explained that the specific type of explosive used in the attack was "a common component in HE explosives, including Iranian manufactured C-4." *Id.* at 193. Lt. Col. Thompson also stated that the distinctive blast pattern and armor piercing seen in the photographic evidence of the HMMWV further demonstrate this was an EFP attack. Thompson Report, ECF No. 51-6 at 19.

Moreover, Lutz concluded the September 8, 2009 attack "was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Lee*, 19-cv-00830, ECF No. 53-2, Lutz Report at 194. As Dr. Knights also determined, "there is a reasonable connection between Iran's material support and . . . the September 8, 2009" attack that resulted in injury to Sgt. Kone. Knights Report, ECF No. 51-3 at 22.

Therefore, Iran bears responsibility for the September 8, 2009 EFP attack in Baghdad, Iraq that injured Sgt. Kone and resulted in an unlawful killing.

    5.    <u>Attack #5 – April 21, 2005 – Ramadi, Iraq</u>

        a.  Lisa Hundley (The Late Curtis Hundley's Wife), Individually and as Personal Representative of the Estate of Curtis Lee Hundley

        b.  Robert Sabado (Surviving Military Contractor)

    c.  Michelle Sabado (Robert Sabado's Wife)

    d.  Skyler Sabado (Robert Sabado's Son)

    e.  Crystal Sabado (Robert Sabado's Daughter)

    f.  Tiffany Sabado (Robert Sabado's Daughter)

Curtis Hundley and Robert Sabado were U.S. citizens employed by Blackwater Security Consulting, LLC ("Blackwater") as security contractors in Iraq in 2005. Hundley Evidence, ECF No. 51-15 at 5, 12, 22; Sabado Evidence, ECF No. 51-16 at 3. On April 21, 2005, Hundley and Sabado were in the first vehicle of a three-vehicle convoy consisting of Blackwater armored Mamba vehicles on a mission to transport Blackwater personnel from Baghdad through Fallujah into Ramadi. *Id*. at 3. While on "Route Michigan" traveling from Fallujah to Ramadi, a directional explosive hit the right side of the lead Mamba vehicle. Boelens Affidavit, ECF No. 51-17 at 6, (photographic evidence) 9-10. "Multiple penetrating shrapnel injuries" from the blast killed Hundley—and Sabado sustained serious injuries that necessitated a medevac to Ramadi, Iraq and then to Landstuhl, Germany for treatment. Hundley Evidence, ECF No. 51-15 at 13; Sabado Evidence, ECF No. 51-16 at 6-8. In a series of attacks, eight Blackwater contractors were killed in Iraq on April 21, 2005. *Id*. at 7.

An EFP traceable to Iran and its proxies was the explosive responsible for the April 21, 2005 attack that caused the death of Hundley and injury to Sabado. The CENTCOM report confirms a directional blast from the roadside aimed at the lead vehicle, which is consistent with an EFP. Thompson Report, ECF No. 51-6 at 21. The penetration of the armor of that Mamba vehicle and Hundley's injuries seen on autopsy are characteristic of an EFP. *Id*. "The roadside emplacement techniques of the device are consistent with known enemy techniques, tactics, and procedures (TTPs) utilizing EFPs against coalition forces." *Id*. at 22. Lt. Col. Thompson stated

that, to a reasonable degree of probability, "[t]his was an Explosively Formed Projectile (EFP) attack." *Id*. As Dr. Knights stated, "there is a reasonable connection between Iran's material support and . . . the April 21, 2005" attack that resulted in the death of Hundley and injury to Sabado. Knights Report, ECF No. 51-3 at 22. So Iran bears responsibility for the April 21, 2005 EFP attack in Ramadi, Iraq that killed Hundley and injured Sabado.

6.    Attack #6 – January 18, 2007 – Baghdad, Iraq

     a. Bradley Salisbury (Surviving Soldier), Individually and as Next Friend of his Minor Daughter, M.S.

     b. Deidre Salisbury (Bradley Salisbury's Wife)

     c. Robin Bogacz (Bradley Salisbury's Mother)

     d. Amy Crandel (Bradley Salisbury's Sister)

The evidence related to this January 18, 2007 attack has previously been reviewed in *Karcher* and is cited here, although the Court makes its own findings of fact. *See Karcher v. Islamic Republic of Iran*, 2021 WL 133507, at *30-31 (D.D.C.) (January 14, 2021).

Sergeant Bradley Salisbury was serving in the United States Army in Iraq in 2007. Salisbury Evidence, ECF No 51-21 at 3.  On January 18, 2007, Sgt. Salisbury was a member of 1st Cavalry Division, Division Special Troop Battalion participating in a personal security detachment mission to escort a counterintelligence officer to a meeting in Dawr, Iraq. *Id*. at 4, 8. Sgt. Salisbury and Specialist Rechenmacher were in the fourth vehicle of a four-vehicle convoy of up-armored M1114 HMMWVs. *Id*. at 4-5; *see also Karcher*, 16-cv-232, Lutz Rep. ECF No. 84-5 at 158. While traveling on "Route Senator," an explosive device struck the passenger side of their HMMWV, decapitating and killing in action (KIA) SPC Rechenmacher and injuring Sgt. Salisbury. *Id*.; Salisbury Evidence, ECF No. 51-21 at 6.

An EFP traceable to Iran and its proxies was the explosive responsible for the January 18, 2007 attack causing the death of SPC Rechenmacher and injury to Sgt. Salisbury. The IED report from the attack identifies the "main charge configuration" from the blast as a command-wire initiated "EFP." *Karcher*, 16-cv-232, Lutz Rep. ECF 84-5 at 159. The SIGACT report from the attack also confirms the explosive device from the January 18, 2007 attack was an EFP. *See id.* Col. Lutz's expert report also states that the "event storyboards" from the attack indicate that the weapon used in the attack was an EFP placed on the right side of the road. *Id.* Col. Lutz opines in his expert report that "[a]n EFP was the weapon used to attack the M1114 HMMWV and that killed Spc. Rechenmacher." *Id*. Likewise, Lt. Col. Thompson notes that a directional blast originated at street level and was well camouflaged, which is consistent with the techniques, tactics, and procedures (TTPs) of militia EFP emplacement teams. Thompson Report, ECF No. 51-6 at 31. The geographic region and date of the attack is also consistent with the proliferation of EFP use by militia groups. *Id.* Lt. Col. Thompson stated that the penetration of the M1114 HMMWV, causing serious injury, is further evidence that the device was an EFP. *Id.* Lt. Col. Thompson opined that, to a reasonable degree of probability, "[t]his was an Explosively Formed Projectile (EFP) attack." *Id*. And as Dr. Knights determined, "there is a reasonable connection between Iran's material support and . . . the January 18, 2007" attack that resulted in injury to Sgt. Salisbury. Knights Report, ECF No. 51-3 at 22. Furthermore, Col. Lutz concluded, "[T]he attack that killed Spc. Rechenmacher was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Id.* at 161. Iran accordingly bears responsibility for the January 18, 2007 EFP attack in Baghdad, Iraq that killed SPC Rechenmacher and injured Sgt. Salisbury.

### B.    "Complex" Attack

One of the Bellwether Plaintiffs was injured in a complex attack. Complex attacks involve

multiple weapons systems (such as an IED and vehicle-borne improvised explosive device (VBIED)), often used in succession. *See Roth*, 651 F. Supp. 3d at 79-80; *Roth*, Hearing Transcript, 1:19-cv-02179, ECF No. 102 at 30-31, 66. Such attacks often also show evidence of advanced planning to inflict maximum casualties. *See Roth*, 651 F. Supp. 3d at 89-90; *Roth*, Case No. 1:19-cv-02179, ECF No. 102 at 76.

> 7.    Attack #7 – May 21, 2004 – Iskandariyah, Iraq

>> a.  Bellwether Plaintiff: Gretchen Miller (The Late Jeremy Horton's Mother)

Staff Sergeant Jeremy Horton was serving in the United States Army in Iraq in 2004. Horton Evidence ECF No. 51-25 at 3. On May 21, 2004, SSG Horton was a member of the B Company, 2nd Battalion, 6th Infantry, 1st Armored Division on a patrol near Iskandariyah, Iraq. *Id*. at 9. A roadside IED caused his convoy to stop. *Id*. at 13. Once SSG Horton exited his vehicle following the initial blast, he was attacked with a vehicle-borne improvised explosive device (VBIED) and was killed in action (KIA) by "penetrating shrapnel injuries to the head." *Id*. at 9. SSG Horton was posthumously awarded a Bronze Star and a Purple Heart. *Id*. at 11.

Dr. Knights identified the region where SSG Horton was killed as an area where Al-Qaeda in Iraq (AQI), Ansar al-Sunnah (AAS), the Islamic Army of Iraq (IAI), and Jaish al-Mahdi (JAM) all operated. Knights Militia Report, ECF 51-4 at 8. Based on the location and the surface-laid IED used in the first explosion, Dr. Knights offered to a reasonable degree of professional probability that the attack was carried out by one of those militia groups. *Id*. Michael Pregent explained in *Roth* that complex attacks employing multiple weapon types in a coordinated attack —here, an IED to disable the convoy and a subsequent VBIED to inflict additional damage on both the vehicles to those who exited them—are indicative of an Iran-backed militia attack. *Roth*, Hearing Transcript, 1:19-cv-02179, ECF No. 102 at 30-31, 66, 76.  Pregent further explained that advanced,

coordinated attacks in Iraq during this time could only be carried out by AQI, as other militia groups did not operate with the same level of sophistication. *Id*. at 74-76, 104-05. In *Brown*, Pregent also stated that a VBIED attack is a signature method used by AQI, one of the terrorist militias Dr. Knights identified. *See* Pregent Rep. *Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 35 (2023), 1:21-cv-1308, ECF No. 34-3 at ¶¶ 122, 132 (discussing VBIED attacks in the context of complex attacks). Moreover, Dr. Clawson stated, "it is my expert opinion that there is a reasonable connection between Iran's material support and the personal injuries and deaths suffered in the May 21, 2004 attack on Jeremy Horton." Clawson Report, ECF No. 51-5 at 26.

AQI carried out this May 21, 2004 attack involving an initial IED to stop the convoy followed by a VBIED to inflict further damage. Iran's material support was a "substantial factor" in the May 21, 2004 complex attack, and the consequences of its support were "reasonably foreseeable." *Roth*, 651 F. Supp. 3d at 90 (2023) (finding Iran responsible for complex attacks); *see also Owens*, 864 F.3d at 794. Plaintiffs have therefore shown proximate cause for these attacks. *Accord Est. of Doe v. Islamic Repub. of Iran*, 808 F. Supp. 2d 1, 8-9 (D.D.C. 2011) (reasoning that the complexity of the attack, including the weapon and planning involved, revealed Iran's involvement). Iran thus bears responsibility for the May 21, 2004 complex attack in Iskandariyah, Iraq that killed Staff Sergeant Jeremy Horton.

### C.    Militia Attacks Using Improvised Explosive Devices

The next three attacks involve IEDs. In *Roth*, expert Michael Pregent explained that IEDs are sophisticated weapons systems that an insurgent could not deploy on his own without training. *Roth*, Case No. 1:19-cv-02179, ECF No. 102 at 50-51, 151. To successfully fire an IED, Iran had to train terrorist militia groups on how to place and trigger them (either through command or passive detonation). *See id.* at 50, 151. According to Pregent, Iranian-backed training camps taught terrorists in Iraq how to operate IEDs, and Pregent discussed a militia group training manual for

IED construction and use. *Id*.; Training Manual, *Roth*, Case No. 1:19-cv-02179, ECF No. 97-2. To carry out an IED attack that injured American troops, terrorist militias had to gather intelligence on routes used by the U.S. military. *Roth*, Case No. 1:19-cv-02179, ECF No. 102 at 51. As Pregent explained, the region and date of the attack help determine that a militia—rather than an individual acting alone—carried out the attack. *See, e.g.*, *Roth*, Case No. 1:19-cv-02179, ECF No. 102 at 124-25.

Specific to these attacks, Bellwether Plaintiffs' expert Dr. Knights analyzed the region, date, and attack method employed for each of the IED attacks. Knights Militia Report, ECF No. 51-4 at 6-7. Dr. Knights confirmed that each attack was carried out by a terrorist militia group and then identified the responsible militia or militias that were operating in the area at the time. *Id*. at 8-18. Next, Bellwether Plaintiffs' expert Dr. Clawson outlined the ways in which Iran provided material support that enabled each attack by those terrorist militia groups. It is appropriate to take judicial notice of relevant evidence presented in other cases to reach its own findings of fact.

8.     Attack #8 – September 19, 2007 – Baghdad, Iraq

        a.  Bellwether Plaintiff: William Neff (The Late Christian Neff's Father)

        b.  Bellwether Plaintiff: Nancy Neff (The Late Christian Neff's Mother)

        c.  Bellwether Plaintiff: Shannon Neff (The Late Christian Neff's Sister)

Specialist[4] Christopher Neff was serving in the United States Army in Iraq in 2007. Neff Evidence, ECF No. 51-26 at 3. On September 19, 2007, SPC Neff was a member of Company C, 1st Battalion, 64th Armored Division on a counter-IED patrol mission in the Baghdad, Iraq. *Id*. at 11, 19. The convoy consisted of two M1A1 Abrams tanks. *Id*. at 19. SPC Neff's tank turned down

---

[4] Christopher Neff was posthumously promoted to Specialist. Neff Evidence, ECF No. 51-26 at 107.

a dirt path to follow fresh tire tracks in the Khadra neighborhood of Baghdad, Iraq and a large surface-laid IED detonated. *Id*. at 55, 59. The explosion disabled the tank and caused severe blast injuries to SPC Neff, who was killed in action (KIA). *Id*. at 71, 106, 107.

Dr. Knights geolocated the location of the September 19, 2007 attack as a region where Al-Qaeda in Iraq (AQI), Ansar al-Sunnah, and the Islamic Army of Iraq all operated. Knights Militia Report, ECF No. 51-4 at 10-11. Based on the location and the large surface-laid IED, Dr. Knights offered to a reasonable degree of professional probability that the attack was carried out by one of those militia groups. *Id*. He elaborated, "A planned attack with a large surface-laid (buried) improvised explosive device is consistent with and indicative of an organized militia group perpetrating the attack rather [than] an individual or informal group of local Iraqis." *Id*. at 11. These terrorist militias "were the only groups taking on heavily-armored US M1 tanks." *Id*.

Dr. Clawson's expert report discussed Iran's material support for AQI, AAS, and IAI. Clawson Report, ECF No. 51-5 at 18-22. Dr. Clawson explained Iran's extensive support for Al Qaeda, and specifically AQI, including providing funding, training, equipment, and munitions. Clawson Report, ECF No. 51-5 at 18-22. Iran sent money directly to Al Qaeda and provided "weapons and explosives" to AQI. *Id*. at 18, 20. Iranian material support for AQI resulted in arms of the Iranian government being designated by the Department of the Treasury as terrorist organizations because they provided "money and weapons to al Qa'ida in Iraq (AQI), a terrorist group designated under E.O. 13224, and negotiated prisoner releases of AQI operatives." *Id*. at 21. Dr. Clawson noted that Maj. Gen. William B. Caldwell IV said the weapons used by Sunni insurgents (which include AQI) to attack U.S. soldiers in Iraq, "were largely of Iranian manufacture." *Id*. at 17-18. Furthermore, Iran routinely provided safe harbor to AQI leader, Abu Musa'ab Al-Zarqawi, and allowed AQI and Al Qaeda to travel through and operate a base of

operations from Iran. *Id*. at 18-20.

Dr. Clawson explained that Ansar al-Sunnah was simply another name for the terrorist group Ansar al-Islam, as confirmed by the militia's leader, Abu Abdullah al-Shafi. *Id.* at 23. "Ansar al-Islam [and Ansar al-Sunnah] were working closely with Iran, and also al Qaeda, in its terrorist attacks against coalition forces." *Id*. Iran specifically trained the Ansar al-Sunnah/Ansar al-Islam group "on how to build and set up improvised explosive devices, known as IEDs." *Id*. (internal quotations omitted).

Likewise, Dr. Clawson noted Iran's broad-based support for all militia groups attacking U.S. forces, including IAI. *Id.* at 24. "Iran was funding any group that could keep Iraq chaotic." *Id.* As Dr. Clawson stated, "at least in 2004-2008 Iran provided material support to the following groups operating in Iraq: Al-Qaeda in Iraq/Islamic State in Iraq, Ansar al-Sunnah, Islamic Army of Iraq, Jaish alMahdi, and Asaib Ahl al-Haq." *Id*. at 25.

With respect to this attack, Dr. Clawson concluded: "it is my expert opinion that there is a reasonable connection between Iran's material support and the personal injuries and deaths suffered in the September 19, 2007 attack on Christian Neff." *Id*. at 25.

Iran provided material support to AQI, AAS, and IAI for attacks on U.S. troops. And Iran's material support was a "substantial factor" in the September 19, 2007 IED attack and the consequences of its support were "reasonably foreseeable." *Roth*, 651 F. Supp. 3d 65, 91 (2023); *accord Owens*, 864 F.3d at 794 (same); *Fissler v. Islamic Repub. of Iran*, 2022 WL 4464873, at *1, 3 (D.D.C. Sept. 26, 2022) (finding Iran liable for IED attacks in light of Iran's arms transfers, training programs, and signature tactic of burying IEDs in the ground); *Neiberger v. Islamic Repub. of Iran*, 2022 WL 17370239, at *4 (D.D.C. Sept. 8, 2022) (report and recommendation finding Iran liable for an IED attack in Sadr City), *adopted by* 2022 WL 17370160 (D.D.C. Sept. 30, 2022).

Iran bears responsibility for the September 19, 2007 IED attack in the Khadra neighborhood of Baghdad, Iraq that killed Specialist Christopher Neff.

9.    Attack #9 – June 20, 2007 – Baghdad, Iraq

a.    Bellwether Plaintiff: Gary Hubbell (The Late Darren Hubbell's Father)

Staff Sergeant Darren Hubbell was serving in the United States Army in Iraq in 2007. Hubbell Evidence, ECF No. 51-27 at 3. On June 20, 2007, SSG Hubbell was a member of Headquarters Company, 1st Battalion, 64th Armored Division, 2nd Brigade Command Team on a mission in south Baghdad, Iraq. *Id*. at 4, 9. SSG Hubbell and three other servicemembers were killed in action (KIA) by an IED blast. *Id*. at 11, 16. The IED was embedded in the doorframe of a house and triggered with a copper command wire. *Id*. at 16.

Dr. Knights determined that the June 20, 2007 attack occurred in the Al Jamaa area of Baghdad, Iraq where AQI, AAS, and the IAI all operated. Knights Militia Report, ECF No. 51-4 at 13.   Dr. Knights opined to a reasonable degree of professional probability that the attack, involving a house-borne IED with a copper command wire trigger, was carried out by one of the militia groups in the area, AQI, AAS, or IAI. *Id*. at 13-14. As he noted, "[t]his attack is characteristic of tactics used by Al-Qaeda in Iraq in this region during this time period." *Id*. at 13.

As discussed above, the evidence establishes Iran's material support for AQI, AAS, and IAI related to Attack #8, sustaining the factual finding that Iran provided material support to AQI, AAS, and IAI for attacks on U.S. troops. After detailing the material support Iran provided to AQI, AAS, and IAI, Dr. Clawson concluded, "it is my expert opinion that there is a reasonable connection between Iran's material support and the personal injuries and deaths suffered in the June 20, 2007 attack on Darren Hubbell." Clawson Report, ECF No. 51-5 at 26.

Iran's material support was a substantial factor in the June 20, 2007 IED attack and that

the consequences of its support were reasonably foreseeable. Iran bears responsibility for the June 20, 2007 IED attack in Baghdad, Iraq that killed SSG Hubbell.

10.    Attack #10 – March 22, 2008 – Husseiniyah, Iraq

a.    Bellwether Plaintiff: David Stelmat, Sr. (The Late David Stelmat, Jr.'s Father)

b.    Bellwether Plaintiff: Carisa Girdwood (The Late David Stelmat, Jr.'s Sister)

c.    Bellwether Plaintiff: Rebecca McGraw (The Late David Stelmat, Jr.'s Sister)

Sergeant David Stelmat was serving in the United States Army in Iraq in 2008. Stelmat Evidence, ECF No. 51-28 at 3.  On March 22, 2008, SGT Stelmat was a member of 1st Squad, 1st Platoon, 1132 Military Police Company on a combat patrol mission in near Husseiniyah, Iraq traveling to conduct training at the Boob al Sham Iraqi Police Station.  *Id*. at 37, 188. SGT Stelmat was an up-armored M114 HMMWV, the fourth vehicle in a four-vehicle convoy. *Id*. at 38. An IED buried seven inches under the road was command-wire triggered, engulfing SGT Stelmat's HMMWV in flames and killing him. *Id*. A post-blast investigation traces two command wires back to a nearby shack and a second location 200 meters north. *Id*. Three similar buried IEDs with command wires had been found in the area and attributed to AQI. *Id*. at 13. The IED storyboard states, "THIS ATTACK WAS MORE THAN LIKELY CONDUCTED BY AQI DUE TO THE FACT THAT THIS WAS A DEEP BURIED, COMMAND WIRE DETONATED IED WHICH IS A COMMON TTP OF AQI." *Id*.

Dr. Knights geolocated the attack to an area where AQI operated. Knights Militia Report, ECF 51-4 at 15. He stated, "AQI employed command-wire[,] surface-laid IEDs in rural areas against targets in the lightly armored class (such has the M1114 Uparmored Hummer struck on March 22, 2008)." *Id*.  Dr. Knights concluded, "it is very likely . . . that Stelmat was killed on

March 22, 2008 by the Iran-backed Al Qaida in Iraq (AQI)." *Id.*

Dr. Clawson stated, "[I]t is my expert opinion that there is a reasonable connection between Iran's material support and the personal injuries and deaths suffered in the March 22, 2008 attack on David Stelmat." Clawson Report, ECF No. 51-5 at 26.

The evidence establishing Iran's material support for AQI related to Attack #8 discussed *supra* is equally applicable here. Therefore, Iran's material support was a substantial factor in the March 22, 2008 IED attack and the consequences of its support were reasonably foreseeable. The Court further finds that Iran bears responsibility for the March 22, 2008 IED attack in Husseiniyah, Iraq that killed SGT Stelmat.

### D.    Admitted Responsibility

The final attack presented by Bellwether Plaintiffs involves an attack for which the Islamic State of Iraq claimed responsibility and posted corroborating evidence of its culpability online.

11.    <u>Attack #11 – February 7, 2007 – Karmah, Iraq</u>

      a.  Bellwether Plaintiff: Lisa Ruiz (The Late Manuel Ruiz's Mother), Individually and as Personal Representative of the Estate of Manuel Antonio Ruiz

      b.  Bellwether Plaintiff: Manuel Ruiz (The Late Manuel Ruiz's Father)

      c.  Bellwether Plaintiff: Joshua Ruiz (The Late Manuel Ruiz's Brother)

      d.  Bellwether Plaintiff: Jacobo Ruiz (The Late Manuel Ruiz's Brother)

Hospital Corpsman Manuel Ruiz was serving in the United States Navy in Iraq in 2007. Ruiz Evidence, ECF No. 51-24 at 3. On February 7, 2007, HM Ruiz was assigned to the Marine Medium Helicopter Squadron 364, Marine Aircraft Group 26, 2nd Marine Aircraft Wing on a CH-

46E Sea Knight helicopter. *Id*. at 15. The helicopter was "shot down by hostile fire" killing HM Ruiz and the six other servicemembers aboard. *Id*. at 15, 21-23.

Dr. Clawson stated that the Islamic State of Iraq publicly took responsibility for the February 7, 2007 attack. Clawson Report, ECF No. 51-5 at 25. Furthermore, the Islamic State of Iraq posted a more-than-two-minute video showing a shot fired from the ground connecting with the helicopter, which then burst into flames and fell from the sky. Ruiz Evidence, ECF 51-24 at 7. The Islamic State of Iraq is "an umbrella group of Iraqi insurgent groups that includes al-Qaeda in Iraq." *Id*. Dr. Clawson explained how Iran provided material support and resources to Al-Qaeda in Iraq, as well as to the Islamic State of Iraq in particular. *Id*. at 18-20. Dr. Clawson thus concluded to a reasonable degree of certainty—based on his experience, knowledge, and expertise, and the evidentiary record in this case, that "there is a reasonable connection between Iran's material support and the personal injuries and deaths suffered in the February 7, 2007 attack on Manuel Ruiz." *Id.* at 25.

The Islamic State of Iraq was responsible for the February 7, 2007 attack on HM Ruiz's helicopter. The attack involved an advanced weapon capable of downing a military helicopter and the Islamic State of Iraq publicly professed its responsibility. Likewise, Iran's material support was a substantial factor in the February 7, 2007 helicopter attack, and the consequences of its support were reasonably foreseeable. Iran bears responsibility for the February 7, 2007 attack in Karmah, Iraq that killed HM Ruiz.

## CONCLUSIONS OF LAW

### I.    Legal Standards

Under Federal Rule of Civil Procedure 55(b)(2), the Court may enter default judgment when a party applies for it. But the entry of a default judgment "is not automatic." *Mwani v. Bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Courts must establish their subject-matter over the case and

their personal jurisdiction over the defendant. *See id.* And under the FSIA, plaintiffs need to "establish[] [their] claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e). The statute does not specify what constitutes "evidence satisfactory to the court," and "the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'" *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014). District courts therefore "have the authority—indeed . . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'" *Id.* at 1047-48 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)). They must therefore assess default judgment motions "in light of both Congress's purpose" to compensate victims of terrorism "and the difficulty in obtaining 'firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign.'" *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)).

As discussed below, plaintiffs have established the Court's subject matter jurisdiction over their claims, the Court's personal jurisdiction over Iran, Iran's liability to the Plaintiffs, and their entitlement to damages.

## II.    Subject-Matter Jurisdiction

"The Foreign Sovereign Immunities Act ... affords the sole basis for obtaining jurisdiction over a foreign state in United States courts." *Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 13 (D.C. Cir. 2015). "While the FSIA establishes a general rule granting foreign sovereigns immunity from the jurisdiction of United States courts . . . that grant of immunity is subject to a number of exceptions." *Id.* at 13-14.

The exception relevant here the terrorism exception, 28 U.S.C. § 1605A. Section 1605A provides that "[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case not otherwise covered by this chapter in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency," and thus extends subject matter jurisdiction over such cases.

Before invoking the terrorism exception, a plaintiff must make two threshold showings. *First*, the claimant or victim must be a U.S. national, a member of the U.S. armed forces, or a U.S. government employee or contractor when the act of terrorism occurred. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii). Plaintiffs here meet this requirement, as all are U.S. citizens. *See* Amended Complaint, ECF No. 26 at ¶ 2.5; Bellwether Plaintiffs' Evidence, ECF No. 51-7, 51-10, 51-14, 51-16, 51-21, 51-24, 51-28. *Second*, the State Department must have designated the foreign government as a state sponsor of terrorism at the time of the attack and when Plaintiffs filed their lawsuit. *See* 28 U.S.C. § 1605A(a)(2)(A)(ii). Plaintiffs meet this requirement because the U.S. State Department has designated Iran as a State Sponsor of Terrorism since 1984. *See* Amended Complaint, ECF No. 26 at ¶ 2.4.

Next, Plaintiffs must show that their claims fit within the waiver of sovereign immunity in 28 U.S.C. § 1605A(a)(1). That waiver contains five requirements:

> [1] money damages are sought against a foreign state [2] for personal injury or death [3] that was caused by [4] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act if such act or provision of material support or resources is [5] engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency.

30

28 U.S.C. § 1605A(a)(1). The Amended Complaint establishes the first two requirements: Plaintiffs seek money damages for the injuries to themselves or their family members. *See* Amended Complaint, ECF 26 at ¶¶ 7.2-7.3. As discussed below (in reverse order), the latter three requirements are also met.

### A.    Iranian Officials Provided Material Support to Terrorist Groups In The Scope of Their Employment

Part II and Part III of the Findings of Fact discussed found that Iran assisted its proxy groups in the form of training, money, safe passage, and other forms of support. Bellwether Plaintiffs and their experts have sufficiently shown that Iran's leadership and the IRGC supported various terrorist groups, including Shia Special Groups, AQI, AAS, IAI, and ISI in many ways. *See id.* Bellwether Plaintiffs have further shown that Iran supplied EFPs to terrorist groups in order to carry out Attacks 1-6. *See* Part II and the discussion of EFP attacks in Section III.A. Bellwether Plaintiffs have thus provided ample evidence "satisfactory to the court," 28 U.S.C. § 1608(e), that Iran materially supported the terrorist groups and that this support came from an "agent of such foreign state while acting within the scope of his or her office, employment, or agency," *id.* § 1605A(a)(1).

### B.    Iran Provided Material Support For Extrajudicial Killings

Another requirement of the sovereign immunity waiver is that the nation provide material support for extrajudicial killings. *See* 28 U.S.C. § 1605A(a)(1). "Extrajudicial killing" has the same meaning as in Section 3 of the Torture Victim Protection Act (TVPA) of 1991. *See* 28 U.S.C. § 1605A(h)(7). The TVPA defines an extrajudicial killing as "a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples." 28 U.S.C. § 1350 note. "[T]his definition contains three elements: (1) a killing; (2) that is deliberated; and (3) is not

authorized by a previous judgment pronounced by a regularly constituted court." *Owens*, 864 F.3d at 770.

Here, each of the 11 attacks involves "a killing." In *Borochov v. Islamic Republic of Iran*, the D.C. Circuit held that a foreign state provides material support for an extrajudicial killing only if the attack that it supported resulted in at least one victim's death—and not if the foreign state provided material support with the intention that the terrorist organization commit an extrajudicial killing. 94 F.4th 1053, 1061 (D.C. Cir. 2024). Therefore, plaintiffs must show that the relevant terrorist organization "succeeded in committing an extrajudicial killing during the relevant attack." *Cabrera v. Islamic Republic of Iran*, 2024 WL 4345784, at *2 (D.D.C. Sept. 30, 2024).

Importantly, that requires only that each attack resulted in a death of an individual other than the terrorist insurgents. Section 1605A does not require that the Plaintiffs or their family members must have perished in the attack. "[B]y its plain text, the FSIA terrorism exception grants a court jurisdiction to hear a claim brought by a third-party claimant who is not the legal representative of a victim *physically injured* by a terrorist attack"—and, *a fortiori*, to hear a claim brought by the injured victim himself. *Owens*, 864 F.3d at 807 (emphasis added); *see also* 28 U.S.C. § 1605A(a)(1) (stripping immunity from claims for both "personal injur[ies]" and "death[s]"). Courts in this District have therefore repeatedly held that "[i]t is not necessary … for one of the *plaintiffs* to have died in the attack in order for the state-sponsor-of-terrorism exception to apply." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) (emphasis added); *see Hammons v. Islamic Republic of Iran*, 2023 WL 5933340, at *10 (D.D.C. July 24, 2023), *report and recommendation adopted*, 2023 WL 6211248 (D.D.C. Sept. 25, 2023) (the terrorism exception's "language is broad enough to encompass personal injuries suffered as a result of a terrorist bombing that killed unrelated third parties"). *Borochov* did not change that. *See* 94

F.4th at 1066 ("[D]istrict courts need only determine whether a foreign government's material support was a proximate cause of *a* completed killing.") (emphasis added).

Plaintiffs thoroughly explained that Iran provided material support to proxy groups in Iraq to cause killings. *See supra* Findings of Fact Sections II and III. For example, Iran trained AQI to use various weapons—including IEDs and EFPs. *See id.* These are all lethal explosives engineered to kill targets. Moreover, Iran supplied EFP to the proxy groups in Iraq that carried out those attacks. *See supra* Findings of Fact Section III.A. And Iran provided instruction on military tactics to help proxy groups deploy their weapons more effectively. *See supra* Findings of Fact Section II. Iran funneled money to these Iraqi militia with the express purpose of killing U.S. citizens. This support strengthened these groups and made them more deadly to Americans.

In short, Iran's proxies instigated these attacks with the intent to kill and with material support—including training and weapons—from Iran. None of the attacks resulting in death or injury to Bellwether Plaintiffs were sanctioned by applicable law. *See* 28 U.S.C. § 1350 note. Thus, Iran gave material support for the extrajudicial killings.

### C.    Iran's Provision Of Material Support Caused Plaintiffs' Injuries

Bellwether Plaintiffs must show that their injuries were "caused by" Iran's material support to terrorist groups. *Mark v. Islamic Repub. of Iran*, 626 F. Supp. 3d 16, 32 (D.D.C. 2022). But they need not establish a close nexus between Iran's support and the attacks that injured them, because financial support and material aid are fungible. *See Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1130 (D.C. Cir. 2004). The causation requirement "is established by showing 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Roth v. Syrian Arab Republic*, 2018 WL 4680270, at *8 (D.D.C. Sept. 28, 2018) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010)). Notably, the FSIA's causation requirement is a "relatively low" one that does not

require showing "but for" causation. *Id.* (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). It is enough that the defendant's actions were a substantial factor in the events that caused plaintiff's injury, and that the injury was a reasonably foreseeable consequence of the defendant's actions. *Karcher*, 396 F. Supp. 3d at 55.

*The EFP attacks*: For Attacks #1-6, the EFPs used in those attacks were created and deployed with Iran's material support. Moreover, for Attacks #1, #4, and #6, courts in this District have already found Iran responsible. *See Karcher v. Islamic Republic of Iran*, 2021 WL 133507, at *20-21, *30-31 (D.D.C.) (January 14, 2021); *Lee v. Islamic Republic of Iran*, 656 F. Supp. 3d 11, 48-49 (D.D.C. January 30, 2023). Iran caused Attacks #1-6 and thereby caused those plaintiffs' injuries.

*The complex attack*: Attack #7 was "complex" because it involved both a surface-laid IED and then the use of a VBIED after the convoy was waylaid. *Accord Roth*, 651 F. Supp. 3d at 89-90. Iran taught the tactics and supplied weapons to AQI for these complex attacks. *Id*. Iran also caused Attack #7 and thereby caused those plaintiffs' injuries.

*The IED attacks*: Attacks #8-10 involved IEDs. As Pregent explained in *Roth*, IEDs are sophisticated weapons that require training to make and use effectively. *See Roth*, 651 F. Supp. 3d at 90-91. Iranian-backed training camps operated to spread knowledge about making and emplacing explosives in the years before these attacks. *Id*. Iran likewise trained proxy groups on gathering surveillance and intelligence to place IED on routes where they could inflict damage on American troops. *See Roth*, 651 F. Supp. 3d at 90-91. Moreover, Dr. Knights confirmed that each of the IED attacks was perpetrated by militia groups, and Dr. Clawson determined that Iran provided support for all of them. Knights Militia Report, ECF No. 51-4; Clawson Report, ECF

No. 51-5. Iran's material support was a contributing cause for the IED attacks, so Iran caused those plaintiffs' injuries.

*Admitted responsibility attack*: Attack #11 involved a sophisticated weapon powerful enough to shoot down a military helicopter. The Islamic State of Iraq publicly claimed responsibility for the attack. And Dr. Clawson outlined the Iranian support of the Islamic State of Iraq that put a weapon of that ferocity in the hands of the terrorist group. Iran caused Attack #11 and thereby caused those plaintiffs' injuries.

Bellwether Plaintiffs have met their burden to show causation for each of the 11 attacks. Bellwether Plaintiffs have shown that Iran was a substantial factor in the attacks and that their injuries or deaths were a reasonably foreseeable consequence of Iran's actions. *Karcher*, 396 F. Supp. 3d at 55.

### III.    Personal Jurisdiction

A court must "satisfy itself that it has personal jurisdiction before entering [default] judgment against an absent defendant," but "[i]n the absence of an evidentiary hearing, although the plaintiffs retain the burden of proving personal jurisdiction, they can satisfy that burden with a prima facie showing." *Mwani*, 417 F.3d at 6-7 (cleaned up).   The FSIA extends personal jurisdiction over a foreign state exists whenever a court has subject-matter jurisdiction and a plaintiff has effected service as required in 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b).

Section 1608 "provides four methods of service in descending order of preference." *Barot v. Emb. of the Repub. of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). The first is "by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." 28 U.S.C. § 1608(a)(1). The second is "by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents." *Id.* § 1608(a)(2). Next, a plaintiff can

effect service "by sending a copy of the summons and complaint and a notice of suit . . . by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned." *Id.* § 1608(a)(3). And finally, if none of the first three methods works, a plaintiff can serve the documents through the Department of State. *See id.* § 1608(a)(4).

The first two methods for service were unavailable to Bellwether Plaintiffs. No special arrangement governs service of process between the United States and Iran, and "Iran is not party to an international convention on service of judicial documents." *Fritz*, 320 F. Supp. 3d at 88 (citation omitted).

Bellwether Plaintiffs therefore tried to serve under § 1608(a)(3) by requesting the Clerk of the Court to mail the summonses and Complaint to Iran by the Postal Service. *See* ECF No. 10-12. Iran did not appear or otherwise acknowledge receipt, so Bellwether Plaintiffs asked the Clerk of the Court to effect service through the State Department. *See* ECF No. 15-17. The State Department served Iran on November 4, 2020 through diplomatic channels. *See* Return of Service, ECF No. 19. This was sufficient. *Accord  Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 62 (D.D.C. 2021).

Thereafter, Bellwether Plaintiffs filed an Amended Complaint and repeated the process. Bellwether Plaintiffs requested that the Clerk of Court send out English and Farsi copies of the summons, complaint, and notice of suit on April 8, 2021, and arranged for service to Iranian Minister of Foreign Affairs Mohammad Javad Zarif by DHL, through a shipping intermediary, Condor Speditions, in Austria. ECF Nos. 28-29. The Clerk's Office sent out the materials the next day. ECF No. 30. On May 25, 2021, however, Bellwether Plaintiffs learned that Iran rejected service. ECF No. 31-1.

Because "service [could] not be made within 30 days under [§ 1608(a)](3)," Plaintiffs proceeded to serve Iran through the fourth method: diplomatic channels. 28 U.S.C. § 1608(a)(4). Bellwether Plaintiffs requested that the Clerk of Court effect service of the Amended Complaint through the State Department. ECF Nos. 32-33; *see also* ECF No. 31. The State Department served Iran through diplomatic channels on April 6, 2022. ECF No. 42.

Because there is subject-matter jurisdiction and Plaintiffs properly served Iran, there is also personal jurisdiction over the defendant.

## IV.    Liability

In addition to extending subject matter jurisdiction, the terrorism exception provides plaintiffs with a private right of action against state sponsors of terrorism. *See* 28 U.S.C. § 1605A(c). This cause of action holds foreign state sponsors of terrorism and their employees or agents liable for "personal injury or death" to U.S. nationals. *Id.* But, though it creates a right of action, the terrorism exception does not "provide the substantive basis for plaintiffs' claims." *Ewan v. Islamic Repub. of Iran*, 466 F. Supp. 3d 236, 245 (D.D.C. 2020). Plaintiffs need to "prove a theory of liability which justifies holding the defendants culpable for the injuries that the plaintiffs allege to have suffered." *Oveissi v. Islamic Repub. of Iran*, 879 F. Supp. 2d 44, 53-54 (D.D.C. 2012) (cleaned up).  That is "generally expressed 'through the lens of civil tort liability.'" *Id.* at 52 (quoting *Rimkus*, 750 F. Supp. 2d at 176).

The injured soldiers and contractors plead facts to support claims for assault and battery. *See* Amended Complaint, ECF No. 26. Courts in this District have applied assault and battery theories of liability to attacks like the ones here. Iran is liable for assault if, "when it committed extrajudicial killing or provided material support and resources therefor, (1) it acted 'intending to cause a harmful contact with . . . or an imminent apprehension of such a contact' by, those attacked and (2) those attacked were 'thereby put in such imminent apprehension.'" *Murphy v. Islamic*

*Repub. of Iran*, 740 F. Supp. 2d 51, 73 (D.D.C. 2010) (quoting Restatement (Second) of Torts § 21(1)). Iran intended to cause harmful contact and apprehension of that contact because "acts of terrorism are, by their very nature, intended to harm and to terrify by instilling fear of further harm." *Valore v. Islamic Repub. of Iran*, 700 F. Supp. 2d 52, 76 (D.D.C. 2010). The injured Bellwether Plaintiffs have submitted substantial evidence about the harm Iran caused them and the fear they experienced during these attacks. So, Iran is liable for assault.

Iran is liable for battery if "when it committed extrajudicial killing or provided material support and resources therefor, it acted 'intending to cause a harmful or offensive contact with . . . or an imminent apprehension of such a contact' by those attacked and (2) 'a harmful contact with' those attacked 'directly or indirectly result[ed].'" *Murphy*, 740 F. Supp. 2d at 74 (quoting Restatement (Second) of Torts § 13). "Harmful contact is that which results in 'any physical impairment of the condition of another's body, or physical pain or illness.'" *Id.* (quoting Restatement (Second) of Torts § 15). As has been explained, Iran intended to cause harmful or offensive contact. And all injured Bellwether Plaintiffs stated in their declarations that they experienced harmful contact during the attacks. Thus, Iran is liable for battery.

Bellwether Family Member Plaintiffs each bring a claim for solatium and intentional infliction of emotional distress. *See* Amended Complaint, ECF No. 26 at ¶ 6.3-6.6. Solatium is "the mental anguish, bereavement and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent's society and comfort." *Est. of Hirshfeld v. Islamic Repub. of Iran*, 330 F. Supp. 3d 107, 140 (D.D.C. 2018) (cleaned up). Under FSIA, solatium claims are indistinguishable from claims of intentional infliction of emotional distress. *See Valore*, 700 F. Supp. 2d at 85. Courts

have applied the Restatement (Second) of Torts to these claims. *See, e.g.*, *Abedini v. Islamic Repub. of Iran*, 422 F. Supp. 3d 118, 133 (D.D.C. 2019); *Est. of Hirshfeld*, 330 F. Supp. 3d at 140.

The Restatement sets out four requirements for an intentional infliction of emotional distress claim: Iran must have (1) engaged in extreme and outrageous conduct, (2) which was directed at persons other than plaintiffs, (3) which intentionally or recklessly caused severe emotional distress, (4) to plaintiffs' immediate family members who were present when such conduct occurred. *See* Restatement (Second) of Torts § 46. The family members satisfy the necessary requirements. They meet the first and third requirements because "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress." *Est. of Hirshfeld*, 330 F. Supp. 3d at 141-42 (cleaned up). They meet the second requirement because the conduct was directed at the soldiers and contractors, not the family members. And they meet the fourth requirement because they are immediate family to those injured. Courts typically waive the requirement that immediate family members be present at the time of the attack when the attackers were terrorists. *See, e.g.*, *Est. of Hirshfeld*, 330 F. Supp. 3d at 141. The family members have thus established Iran's liability under the federal private right of action for their solatium claims.

## V.    Damages

To obtain damages in this FSIA suit, Plaintiffs must show "that the consequences of [Iran's] acts were reasonably certain to occur" and they must "prove the amount of damages by a reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136. Bellwether Plaintiffs' physical injuries and emotional suffering were a foreseeable consequence of Iran's actions. *See supra* Findings of Fact Section III. What is left is to determine whether each Plaintiff's claim for damages is supported by a "reasonable estimate." *Abedini*, 422 F. Supp. 3d at 136.  Assessing damages for victims of terrorism "is an imperfect science," but "courts strive to maintain consistency of awards between

39

plaintiffs in comparable situations." *Mark*, 626 F. Supp. 3d at 35 (cleaned up).

### A.    KIA Family Member Damages

Courts in this District have adopted standard damage amounts for solatium claims, which are then adjusted upward or downward based on the particular circumstances of each case. "As a starting point, the family of a deceased victim typically receives damages in the amount of $8 million for a spouse, $5 million for a child or parent, and $2.5 million for a sibling." *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 53-54 (D.D.C. 2020); *see also* **Schooley v. Islamic Republic of Iran**, 2019 WL 2717888, at *74 (D.D.C. June 27, 2019) (same). "[A]n upward adjustment may be appropriate in cases with aggravating circumstances, indicated by such things as '[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence' or '[m]edical treatment for depression and related affective disorders.'" *Barry*, 437 F. Supp. 3d at 54 (citations omitted). In the case of aggravating circumstances, an upward adjustment of 25% to solatium damages is appropriate for family members of deceased U.S. contractors. *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 118 (D.D.C. 2015) (awarding a 25% upward adjust despite unrelated issues contributing to the family members' emotional harm and dysfunction); *see also Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (approving an upward departure of 25% from the baseline for solatium damages); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (same).

The compensatory damages of each of the KIA family member Bellwether Plaintiffs are addressed by family:

1. <u>Late Army Master Sergeant Robert West</u> – Robert West, a United States Army Master Sergeant, was killed by an EFP on May 14, 2006 while deployed to Baghdad, Iraq. Amended Complaint, ECF No. 26 at 42-43; Robert West Evidence ECF No. 51-7 at 10.

a. Mary B. Heaton (The Late Robert West's Mother)

The mother of Robert West, Plaintiff Mary B. Heaton, learned of her son's death by telephone call while she was at work. *Id.* at 5. He was killed on Mother's Day. *Id.* at 4. Lt. Col. Robert Thompson, the last person with her son while he was alive, informed her that her son had severe blast injuries and suffered as he burned alive. *Id.* Robert West's injuries were so disfiguring that "his funeral was a closed casket," so she was unable to see him one last time. *Id.* She felt horrible pain at his funeral. *Id.* at 6. Over the years since his death, the feeling of sadness leads her to isolate herself beginning around his birthday on March 6 and continues through the anniversary of his death on May 14. *Id.* at 7. These feelings return "during the Thanksgiving and Christmas holidays." *Id.* She described the profound sense of permanent loss as "if a part of me is missing—17 years later it is still missing." *Id.* She required antidepressants and attended counseling to address her depression and profound sense of permanent loss of her son. *Id.* Presently, she continues to experience depression and feels no sense of closure. *Id.* In light of these facts, Mary B. Heaton is awarded six million, two hundred and fifty thousand dollars ($6,250,000.00) in solatium damages because she is the mother of the deceased victim who experienced aggravating circumstances.

b. Lisa R. Brooks (The Late Robert West's Sister)

The sister of Robert West, Plaintiff Lisa R. Brooks, was only one year older than him. ECF No. 51-7 at 18. They had a very close bond as a result of their father dying when they were both very young. *Id.* Throughout their "entire childhood" they "were inseparable." *Id.* When she learned of her brother's death, Lisa Brooks stated that she was "numb, in complete and total shock." *Id.* at 19. She experienced gut-wrenching feelings of sadness and loss due to his death. *Id.* In light of these facts, the Lisa R. Brooks is awarded two million, five hundred thousand dollars ($2,500,000.00) in solatium damages.

2. Late Army Specialist David Andrew Croft, Jr. – David Andrew Croft, Jr., a United States Army Specialist, was killed by an EFP on January 5, 2010 in Balad, Iraq. ECF No. 26 at 80-81; Croft Evidence ECF No. 51-8 at 98.

a. Victoria Croft (The Late David Croft's Mother)

The mother of David Croft, Jr., Plaintiff Victoria Croft, learned of her son's death when her doorbell woke her at 6:00 a.m. on January 5, 2010, and the Army Chaplain gave her the tragic news. *Id.* at 12. She walked "around in circles screaming." *Id.* They had a closed casket at David's funeral due to the severity of his injuries. *Id.* at 13. At the funeral she was "numb," "in a daze," and her "mind was not there." *Id.* As other people got up and spoke at his funeral, she "just sat and cried." *Id.* She thinks about her son every day and has "constant awareness" that he is dead. *Id.* at 14. Ms. Croft feels that "a part of [her] died the night that David died." *Id.* at 16.

"[T]here is always something missing." *Id*. Ms. Croft's constant sense of loss is heightened at Christmas because it was her son's favorite holiday. *Id.* at 13-14. In light of these facts, Victoria Croft is awarded six million, two hundred and fifty thousand dollars ($6,250,000.00) in solatium damages because she experienced aggravating circumstances as the mother of the deceased victim.

b.  Robin Messer (The Late David Croft's Sister)

The sister of David Croft, Jr., Plaintiff Robin Messer, was two-and-a-half years older than he was. ECF No. 51-8 at 122. She was very close with her younger brother, and they had just spoken on the phone the day before he was killed. *Id*. When she found out that her brother had been killed, she "went through all the emotions—sad, angry, in denial." *Id*. Although she was engaged at the time that he died, his death affected the relationship, and she and fiancé "broke up months later." *Id*. at 122, 123. Since David died on January 5 and his birthday is on January 8, that time of year is particularly challenging for Ms. Messer. *Id.* at 123. "Life after David has been hard." *Id*. She has dealt with "depression and required medications." *Id*. In light of these facts, Robin Messer is awarded three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium damages because she experienced aggravating circumstances as the sister of the deceased victim.

c.  Tyler Croft (The Late David Croft's Brother)

The brother of David Croft, Jr., Plaintiff Tyler Croft, was only 14 years old when his brother died. Despite being 8 years apart, they were very close. ECF No. 51-8 at 117. Tyler Croft "looked up to him and wanted to be like him." *Id*. David was his "role model." *Id*. On the day that he learned his older brother was killed, he was first in a state of disbelief, then "total shock" as he cried. *Id*. The death of his brother "took away the only male role model that [he] had in [his] life." *Id.* at 118. This experience at such a young age has caused him to have "anxiety of losing people," which has affected his personal relationships. *Id*. In light of these facts, Tyler Croft is awarded three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium damages because he experienced aggravating circumstances as the brother of the deceased victim.

d.  Melodie Hanson (The Late David Croft's Sister)

The sister of David Croft, Jr., Plaintiff Melodie Hanson, was eight years older than he was. ECF No. 51-8 at 133. As the eldest sibling, she "often helped care for David when he was young." *Id*. She spoke with David a few weeks before his death about naming her third child and first boy after him. *Id*. When she heard her brother had been killed by terrorists, she felt like "life drained out of [her]." *Id*. "It was a devastating blow to [the] entire family," as he was the patriarch after their father passed away. *Id*. "The stress of his death had caused [her] blood pressure to become highly elevated," and she was "put on bed rest during the rest of [her] pregnancy." *Id*. She felt "angry, and an immense feeling of loss and anguish." *Id*. In light of

these facts, Melodie Hanson is awarded three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium damages because she experienced aggravating circumstances as the sister of the deceased victim.

e. <u>Andrea Whatley (The Late David Croft's Sister)</u>

The sister of David Croft, Jr., Plaintiff Andrea Whatley, was six years older than he was. ECF No. 51-8 at 128. Despite the age difference, they were still close. *Id.* She was shocked by the news that her brother had been killed. *Id.* During his funeral procession, she remembers "crying and just being so mad and sad." *Id.* "It feels like there is always a huge piece missing since David died." *Id.* at 129. "The anniversary of David's death and his birthday are very hard times" every year. *Id.* In light of these facts, Andrea Whatley is awarded three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium damages because she experienced aggravating circumstances as the sister of the deceased victim.

3. <u>Late Army Staff Sergeant Laurent J. West</u> – Army Staff Sergeant Laurent J. West, was killed by an EFP on March 11, 2008 while deployed to Kishkishkia, Iraq. Amended Complaint, ECF No. 26 at 77; Laurent J. West Evidence ECF No. 51-9 at 17.

a. <u>Laurie West (The Late Laurent West's Mother)</u>

The mother of Laurent J. West, Plaintiff Laurie West, learned of her son's death when the Army officers drove up her driveway before dawn to give her the news. *Id.* at 6. The moment she caught a glimpse of their uniforms, her "whole life imploded," she "couldn't catch [her] breath, [she] was frozen in place." *Id.* She "felt tremendous anger and hate during Laurent's funeral." *Id.* "There are so many emotional triggers, sometimes on a daily basis or multiple times a day, that remind [her] of Laurent's death." *Id.* at 8. Years later, she feels "anger and hurt for losing [her] baby son." *Id.* In light of these facts, Laurie West is awarded six million, two hundred and fifty thousand dollars ($6,250,000.00) in solatium damages because she experienced aggravating circumstances as the mother of the deceased victim.

4. <u>Late Curtis Lee Hundley</u> – Curtis Lee Hundley, a U.S. Military Contractor with Blackwater Security Consulting, was killed by an EFP on April 21, 2005 while deployed to Ramadi, Iraq. Amended Complaint, ECF No. 26 at 51-52; Hundley Evidence ECF No. 51-15 at 13-15.

a. <u>Lisa Hundley (The Late Curtis Hundley's Wife), as Personal Representative of the Estate of Curtis Lee Hundley</u>

Curtis Hundley suffered before his death. Paul Fondren was "sitting next to Sparky [Curtis Hundley] on the bench seat" in the lead Mumba armored vehicle at the time the IED struck the Mumba. ECF No. 51-17 at 12. He recalled "Sparky saying he was hit and then [he] saw Sparky actually hit the floor of the Mamba." *Id.* He saw "Sparky moving on the floor and [he] saw him open his eyes." *Id.* "[Curtis Hundley]

reached toward his abdomen area to show his teammates in the Mamba . . . where he was hit." *Id*. He was carried away by teammates "approximately 3-4 minutes after the IED hit the Mamba." *Id*. According to the autopsy report, Curtis Hundley suffered the following physical injuries that lead to his death: Multiple penetrating ballistic injuries to his right forehead, right side of his face, right thigh, left thigh, as well as multiple lacerations to the right side of his face, right buttock, left middle finger, and right forearm, and lastly abrasions to his nasal bridge, mid lower back, and right forearm. ECF No. 51-15 at 13-15. "The penetrating injury of the right thigh resulted in near transection of the femoral artery with subsequent hemorrhage." *Id*. In light of these facts, Lisa Hundley is awarded one million dollars ($1,000,000.00) in survival damages as the Personal Representative of the Estate of Curtis Lee Hundley.

b. <u>Lisa Hundley (The Late Curtis Hundley's Wife), Individually</u>

The spouse of Curtis Hundley, Plaintiff Lisa Hundley, learned of his death when five men appeared on her front porch to give her the life-altering news. ECF 51-15 at 7. After Curtis's family was notified, she called his parents on the phone, and they just cried. *Id*. "There were no words, just gut-wrenching sobs." *Id*. "After Curtis' funeral, [she] was angry and . . . confused." *Id*. She "felt sick all the time." *Id*. After his death, "[t]here were weeks on end [she] did not leave the house." *Id*. She has an especially hard time every year on the anniversary of his death and his birthday—she does not leave her house. *Id.* at 8. Her life has been forever changed by his death. *Id*. In light of these facts, Lisa Hundley is awarded ten million dollars ($10,000,000.00) in solatium damages to Lisa Hundley because she experienced aggravating circumstances as the spouse of the deceased victim.

5. <u>Late Army Staff Sergeant Jeremy Horton</u> – Army Staff Sergeant Jeremy Horton was killed in a complex attack on May 21, 2004 while deployed to Iskandariyah, Iraq. Amended Complaint, ECF No. 26 at 48; Horton Evidence ECF 51-25 at 9.

a. <u>Gretchen Miller (The Late Jeremy Horton's Mother)</u>

The mother of Jeremy Horton, Plaintiff Gretchen Miller, learned of her son's death through a phone call from her daughter-in-law. *Id.* at 4. She was in "immediate pain," shock, and disbelief. *Id*. She has "feelings of sadness everyday about the loss of [her] son." *Id.* "Mother's Day is an extremely sad day." *Id*. She "blamed [herself] for Jeremy's death," because she feels that as his mother, she "could have talked him out of joining the Army." *Id.* at 6. "It took [her] at least 10 years to realize that [she] need[ed] to talk to a mental health professional about Jeremy's death," but she ultimately received counseling about her sense of permanent loss. *Id*. In light of these facts, Gretchen Miller is awarded five million dollars ($5,000,000.00) in solatium damages because she is the mother of the deceased victim.

6. <u>Late Army Specialist Christian M. Neff</u> – Army Specialist Christian M. Neff was killed by an IED on September 19, 2007 while deployed to Baghdad, Iraq. Amended

Complaint, ECF No. 26 at 75; Neff Evidence ECF No. 51-26 at 106-107.

a. <u>William Neff (The Late Christian Neff's Father)</u>

The father of Christian M. Neff, Plaintiff William Neff, is a soybean farmer: his wife called him in from the field to receive the news of his son's death from two soldiers who were waiting in his living room. ECF No. 51-26 at 5. He was in "denial and disbelief"; he experienced "anger and then tears," as he processed this tragic news. *Id*. He "was devastated, and it felt like a part of [him] had died." *Id*. "Due to lack of sleep and from not eating, [his] doctor prescribed a tranquilizer." *Id.* at 6. "The void of not having him around is a constant reminder [for William] of what happened," to his son. *Id.* at 7. He still has "feelings of sadness, confusion, devastation, and disbelief that the IED struck him down . . . and took him." *Id*. He threw himself into his work and the harvest on the farm as a coping mechanism and therapy to deal with his loss. *Id*. In light of these facts, William Neff is awarded six million, two hundred and fifty thousand dollars ($6,250,000.00) in solatium damages because he is the father of the deceased victim who experienced aggravating circumstances.

b. <u>Nancy Neff (The Late Christian Neff's Mother)</u>

The mother of Christian M. Neff, Plaintiff Nancy Neff, was home alone when the two soldiers came to the house to tell Christian's parents that their son had been killed; however, they would not provide any information until she called her husband in from the field. *Id.* at 109. Her "worst nightmare had come true." *Id*. Her "whole world seemed to end." *Id*. She expressed how "no parent should have to bury their child." *Id*. Even after so many years have passed since the attack, she will "sometimes go in [her] room and have a crying spell" because of the great loss that she feels from losing her son. *Id.* at 110. In light of these facts, Nancy Neff is awarded six million, two hundred and fifty thousand dollars ($6,250,000.00) in solatium damages because she is the mother of the deceased victim who experienced aggravating circumstances.

c. <u>Shannon Neff (The Late Christian Neff's Sister)</u>

The sister of Christian M. Neff, Plaintiff Shannon Neff, was very close to her older brother. *Id.* at 114. They grew up in their rural region of Ohio and would play together frequently because no other children lived nearby. *Id.* at 114. On the day that her brother died, Shannon had just gotten home from school when her mother told her. *Id.* at 115. She described feeling "shock" and "denial" and well as being "grief stricken and suicidal." *Id*. "Losing [her brother] was the most traumatic experience of [her] life." *Id*. His funeral has had a huge impact on her life. "[T]he flag folding and the 21-gun salute at Chris's funeral haunts [her] to this day." *Id* at 116. Losing her brother at such a young age caused her problems with "mental illness and substance abuse." *Id*. She has "had drug and alcohol abuse problems since losing him." *Id*. She went to "many mental health programs and was even

hospitalized for [her] mental illness and drug abuse." *Id.* She "continue[s] to go to the therapy twice monthly to continue working through [her] trauma." *Id.* In light of these facts, the Shannon Neff is awarded three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium damages because she experienced aggravating circumstances as the sister of the deceased victim.

7. <u>Late Army Staff Sergeant Darren Hubbell</u> – Army Staff Sergeant Darren Hubbell was killed by an IED on June 20, 2007 while deployed to Baghdad, Iraq. Amended Complaint, ECF No. 26 at 71-72; Hubbell Evidence, ECF No. 51-27 at 9.

   a. <u>Gary Hubbell (The Late Darren Hubbell's Father)</u>

   The father of Darren Hubbell, Plaintiff Gary Hubbell, learned of his son's death early in the morning when uniformed men came to his front door to deliver the tragic news. Id. at 5. He was "in total shock and felt like a zombie." *Id.* "There is a hole in [his] heart that will never be filled." ECF No. 51-27 at 6. "There is really no end to the grief of [his] son's death." *Id.* He has never been able to move on from his death because the moment that he thinks he has, he goes "right back to where [he] started." *Id.* "Darren was [his] hero." *Id.* at 7. In light of these facts, Gary Hubbell is awarded five million dollars ($5,000,000.00) in solatium damages because he is the father of the deceased victim.

8. <u>Late Army Specialist David Stelmat, Jr.</u> – Army Specialist David Stelmat, Jr. was killed by an IED on March 22, 2008 while deployed to Baghdad, Iraq. Amended Complaint, ECF No. 26 at 77-78; Stelmat Evidence ECF No. 51-28 at 198.

   a. <u>David Stelmat, Sr. (The Late David Stelmat, Jr.'s Father)</u>

   The father of David Stelmat, Jr., Plaintiff David Stelmat, Sr., learned of his son's death on Easter morning. ECF No. 51-28 at 7. He "felt angst, anger, devastation and many emotions that words cannot describe," upon getting the terrible news. *Id*. Those same feelings "continue to this day." *Id*. His emotions are triggered at just about every special event throughout the year, including David's birthday, weddings, funerals, holidays, and "seeing American Soldiers defending our country and giving the ultimate sacrifice are very triggering," as he is reminded of his own son. *Id.* at 10. In light of these facts, the David Stelmat, Sr. is awarded six million, two hundred and fifty thousand dollars ($6,250,000.00) in solatium damages because he experienced aggravating circumstances as the father of the deceased victim.

   b. <u>Carisa Girdwood (The Late David Stelmat, Jr.'s Sister)</u>

   The sister of David Stelmat, Jr., Plaintiff Carisa Girdwood, was very close with her younger brother growing up. ECF No. 51-28 at 201-202. They had a difficult childhood after their parents divorced; the three siblings shared a bedroom, and they heavily relied upon one another for love, support, and friendship. *Id*. She stated

that, "March 22nd absolutely triggers sadness consistently since his passing." *Id.* at 203. She "feel(s) frustration and anger when [she] hear[s] of other soldiers passing this way." *Id.* She "absolutely cannot watch any type of war movie" because of the memories of the death of her brother. *Id.* She often cried "spontaneously after DJ died." *Id.* In light of these facts, Carisa Girdwood is awarded awards three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium because she experienced aggravating circumstances as the sister of the deceased victim.

c. <u>Rebecca McGraw (The Late David Stelmat, Jr.'s Sister)</u>

The sister of David Stelmat, Jr., Plaintiff Rebecca McGraw, was the oldest of the three siblings; she was four years older than David and was "very protective of [her] younger siblings." ECF No. 51-28 at 207. She "loved being his big sister." *Id.* Her "heart broke," she "fell to the floor," she felt like she "couldn't breathe," and she was "in denial" when her mom told her the news over the phone that her little brother had been killed. *Id.* She had to break this horrible news to her younger sister and to their father, and it weighed very heavily upon her. *Id.* Memorial Day weekend is always hard for her because her birthday is May 29 and his is May 27. *Id.* at 208. Now they share that weekend to "honor all those who have served and died in our military." *Id.*  His death put a "strain on [her] relationship with [her] mom and dad" because they "were so devastated by his death." *Id.* Initially, his death left her "unable to cope and [she] was very depressed." *Id.* She was unable "to focus at work and was always crying." *Id.* This led to her seeking treatment with her primary care physician, "who diagnosed [her] with depression and prescribed medication." *Id.* In light of these facts, Rebecca McGraw is awarded three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium damages to Rebecca McGraw because she experienced aggravating circumstances as the sister of the deceased victim.

9. <u>Late Navy Hospital Corpsman 3rd Class Manuel Antonio Ruiz</u> – Navy Hospital Corpsman 3rd Class Manual Antonio Ruiz was killed when his helicopter was shot down by an al-Qaeda linked terrorist group on February 7, 2007 while deployed in Baghdad, Iraq. Amended Complaint, ECF No. 26 at 66-67; Ruiz Evidence ECF No. 51-24 at 16.

a. <u>Lisa Ruiz (The Late Manuel Ruiz's Stepmother)</u>

The stepmother of Manuel Antonio Ruiz, Plaintiff Lisa Ruiz, learned of her son's death when military personnel interrupted a party she was hosting at her home to deliver the news. ECF No. 51-24 at 5. She went into a "daze," felt "bewildered," and described the experience as "surreal," and "like a nightmare was happening in real life." *Id.* She had served in the Navy when Manuel was a child, which significantly influenced his decision to enlist. *Id.* at 4. They were very close and their shared Navy experienced deepened their special bond. *Id.* at 4. She is "always particularly sad on … the anniversary of Manuel's death, Memorial Day, and Manuel's birthday." *Id.* at 5. Although there is not a day that goes by that she does

not miss him, those days are especially hard for her. *Id*. In light of these facts, Lisa Ruiz is awarded five million dollars ($5,000,000.00) in solatium damages to Lisa Ruiz is the stepmother of the deceased victim.[5]

b.  <u>Manuel Ruiz, Sr. (The Late Manuel Ruiz's Father)</u>

The father of Manuel Antonio Ruiz, Plaintiff Manuel Ruiz, Sr. "fell to the floor in tears" when the two military officers informed him that that his son had been killed. ECF No. 51-24 at 29. He felt "anger" toward all the unnecessary deaths in Iraq like his son's. *Id*. He is sad every year on his son's birthday, the anniversary of his death, Memorial Day, and Christmas. *Id*. In light of these facts, the Manuel Ruiz, Sr. is awarded five million dollars ($5,000,000.00) in solatium damages because he is the father of the deceased victim.

c.  <u>Joshua Ruiz (The Late Manuel Ruiz's Brother)</u>

The brother of Manuel Antonio Ruiz, Plaintiff Joshua Ruiz, was five years younger than Manuel, who was his hero and a great role model. ECF No. 51-24 at 38. They often went to the movies together growing up, and they shared a love for drawing. *Id*. Joshua joined the Air Force in 2016 and is triggered with a flood of emotions every time he "hear[s] the guns firing the 21-gun salute and 'TAPS'." *Id*. at 39. "These sounds bring forth a rush of sadness and memories that reduce [him] to tears." *Id*. He also became "serious and introverted" after Manuel's death. *Id*. In light of these facts, Joshua Ruiz is awarded three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium because he experienced aggravating circumstances as the brother of the deceased victim.[6]

d.  <u>Jacobo Ruiz (The Late Manuel Ruiz's Brother)</u>

The brother of Manuel Antonio Ruiz, Plaintiff Jacobo Ruiz, was the youngest of the three boys, and his big brother was "everything to [him]." ECF No. 51-24 at 32. He was his hero, too. *Id*. at 33. He remembers that his "parents were gone a lot so [Manuel] raised me." *Id*. "Manuel was [his] best friend." *Id*. The day that he learned

---

[5] "[M]embers of the victim's household who are viewed as the functional equivalents of immediate family members" qualify for solatium damages. *Fritz v. Islamic Republic of Iran*, 324 F. Supp. 3d 54, 63 (D.D.C. 2018) (citing *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003)). Non-adoptive stepparents are treated as biological parents and half-siblings are treated equal to other siblings so long as they "lived in the same household" and were treated "like . . . biological" parents and siblings. *Estate of Heiser v. Islamic Republic of Iran*, 659 F. Supp. 2d 20, 29 (D.D.C. 2009); *see also Valore*, 700 F. Supp. 2d at 79. Although Lisa Ruiz never adopted Manuel Ruiz, Jr. and is not his biological mother, she married his biological father, lived in the same household since 1986, and raised Manuel Ruiz, Jr. since he was six months old. ECF No. 51-24 at 3. She is accordingly entitled to equal damages as would be awarded to parents. *See Heiser*, 659 F. Supp. 2d at 29.

[6] Joshua Ruiz was raised with Manuel Ruiz, Jr. in the same household and they treated each other as brothers. ECF 51-24 at 32-33, 38. He is accordingly entitled to equal damages as would be awarded to siblings. *See Heiser*, 659 F. Supp. 2d at 29.

that his big brother had died was just two days after his birthday and he described it as "the worst day of [his] life." *Id*. "It broke everything inside [him]." *Id*. He has never fully recovered from the death of his brother. *Id*. He "was lost" and is "still" lost due to his death. *Id*. "The pain of Manuel's death strained some of the relationships" in their home, and Joshua, his other brother, "does not even talk to [him] anymore." *Id*. He hates talking about Manuel's death and "his absence is so gut-wrenching." *Id*. at 34. In light of these facts, the Jacobo Ruiz is awarded three million, one hundred and twenty-five thousand dollars ($3,125,000.00) in solatium damages because he experienced aggravating circumstances as the brother of the deceased victim who experienced aggravating circumstances.[7]

**B.    Direct Injury Plaintiffs and Their Immediate Family Members**

For direct victims who were members of the military, courts in this District rely in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each servicemember plaintiff." *Schooley*, 2019 WL 2717888, at *74. That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id*. (internal quotation marks omitted). As *Schooley* explained, "[t]he VA disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *accord Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) (holding that, in calculating damages, "the Court must take pains to ensure that individuals with similar injuries receive similar awards"); *see also Ackley v. Islamic Republic of Iran*, 2022 WL 3354720, at *51 (D.D.C. August 12, 2022) (using Schooley's "basic rubric" of VA disability ratings to calculate damages amounts); *Christie v. Islamic Republic of Iran*, 2020 WL 3606273, at *23 (D.D.C. July 2, 2020) (same); *Aceto v. Islamic Republic of Iran*, 2020 WL 619925, at *18 (D.D.C. Feb. 7,

---

[7] Jacobo Ruiz was raised with Manuel Ruiz, Jr. in the same household and they treated each other as brothers. ECF 51-24 at 32-33, 38. He is accordingly entitled to equal damages as would be awarded to siblings. *See Heiser*, 659 F. Supp. 2d at 29.

2020) (same); *Taitt v.  Islamic Republic of Iran*, 2023 WL 2536518, at *10 (same); *Gunn v. Islamic Republic of Iran*, 2024 WL 3566173, at *12 (D.D.C. July 29, 2024) (same).

"Servicemember plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and servicemember plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000." *Gration v. Islamic Republic of Iran*, 2023 WL 5221955, at *30 (D.D.C. Aug. 15, 2023) (citing *Ackley*, 2022 WL 3354720, at *51) (using this approach); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same). Consistent with the approach employed in *Schooley* and its progeny to award damages, this analysis uses VA ratings for injured servicemembers.

In the absence of a VA rating, courts typically award $5 million for pain and suffering from substantial injuries. *See, e.g.*, *Cohen v. Islamic Repub. of Iran*, 268 F. Supp. 3d 19, 24 (D.D.C. 2017). Substantial injuries include compound fractures, severe flesh wounds, and lasting and severe psychological pain. *See, e.g.*, *Valore*, 700 F. Supp. 2d at 84. Courts vary above or below this amount depending on the extent of the injuries. For example, victims who endured severe physical or psychological pain, such as multiple surgeries, losing limbs, vision, or hearing may receive between $7.5–12 million in damages. *See Mark*, 626 F. Supp. 3d at 35.

As for the family members of injured servicemembers or contractors, the standard amount of solatium damages depends on the nature of the relationship between the victim and the relative, and the severity of pain the relative suffers. *See Mark*, 626 F. Supp. 3d at 35. For the family of an injured victim, courts generally award $4 million to a spouse, $2.5 million to a child or parent, and $1.25 million to a sibling. *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 54 (D.D.C. 2020). Of course, none of those numbers is "set in stone." *Selig*, 573 F. Supp. 3d at 65. Thus, the Court

may award greater amounts in cases with "aggravating circumstances" or lower amounts "where the relationship between the claimant and the [injured family member] is more attenuated." *Id.*

Bellwether Plaintiffs thoroughly detail their injuries and submit medical reports to further support their claims. *See* ECF Nos. Bellwether Plaintiffs' Evidence, ECF 51-7 – 51-10, 51-14 – 51-16, 51-21, 51-24 – 51-28. Based on all this evidence, the Court applies *Schooley*'s rubric with a few alterations to the servicemember and contractor Plaintiffs. This analysis addresses family-by-family the compensatory damages of the directly injured Bellwether Plaintiffs and   the compensatory damages of their immediate family members.

10. <u>Army Specialist Albert Dyk</u> – Army Specialist Albert Dyk was injured in the same attack listed above, where Army Staff Sergeant Laurent J. West was killed by an EFP on March 11, 2008 in Kishkishkia, Iraq. Amended Complaint, ECF No. 26 at 115; Dyk Evidence ECF No. 51-10 at 19-20.

Army Specialist Dyk was in the second Humvee of a four-vehicle convoy when the vehicle in front of him was struck by an EFP: Army Staff Sergeant Laurent J. West was cut in half by the blast and instantly killed. *Id.* at 4. Dyk was good friends with West and saw his body be removed from the vehicle. *Id.* He reports that ever since the attack, he has "hallucinations [of] Laurent's dead body and smell[s] blood even through nothing is there." *Id.* He has a VA rating for "100% Posttraumatic Stress Disorder (PTSD)" that is connected to the March 11, 2008 attack. *Id.* at 8. He was a ten-year Army Veteran and was medically discharged for PTSD. *Id.* at 30. In 2019, he reported symptoms of anxiety, anger, crying spells, guilt, numbness, and fleeting suicidal thoughts. *Id.* at 34. In light of these facts, Albert Dyk is awarded four million, seven hundred and fifty thousand dollars ($4,750,000.00) in pain and suffering damages.

11. <u>Robert Scott Sabado</u> – Robert Scott Sabado, of Blackwater Security Consulting, was injured in the same attack listed above where fellow Blackwater Security Curtis Lee Hundley was killed by an IED on April 21, 2005 in Ramadi, Iraq. Amended Complaint, ECF No. 26 at 173-174; Sabado Evidence ECF No. 51-16 at 23.

   a. <u>Robert Sabado (Surviving Military Contractor)</u>

   Robert Sabado was the team leader of the Mamba Unit on the day of the attack. ECF No. 51-16 at 4. He was also the lead gunner in the first Mamba vehicle. *Id.* He felt "guilty" for [Curtis "Sparky" Hundley] talking him into going on this mission with them when he was supposed to "fly home later that afternoon." *Id.* at 6. He asked himself, "Would Sparky forgive me?" *Id.* He was transported from Iraq to the Army Hospital in Landstuhl, Germany. *Id.* at 8. He

had to undergo "5 surgeries in 6 days" to save his life. *Id*. His medical records list his injuries as "[r]ight upper-extremity, partial right ulnar nerve, bilateral lower extremity shrapnel wounds, Right Buttock, bilateral groin wounds, distal penile injury, and abdominal injuries. *Id.* at 23-24. He was declared to have a "Left Ear - 30% impairment" by Dr. Robert Siegel. *Id.* at 57. He suffers from "nightmares" and "really bad survivor['s] guilt," for Hundley dying the day that he was supposed to fly home and Sabado living through it. *Id.* at 95. He was diagnosed with "PTSD" by an Independent Medical Evaluation in Psychiatry by Dr. Jerome Franklin, MD on March 23, 2016. *Id.* at 77-122 (specifically 113 and 119). Sabado had suicidal ideations, separated from his wife, and was living out of his car for a time. *Id.* at 106. In light of these facts, an upward adjustment to the standard injury award is warranted based on Mr. Sabado's multiple surgeries and lasting deficits. Robert Sabado is awarded seven million dollars ($7,000,000.00) in pain and suffering damages.

b. Michelle Sabado (Robert Sabado's Wife)

The wife of Robert Sabado, Plaintiff Michelle Sabado, had a "huge meltdown" upon hearing the news that her husband's "convoy had been hit and [that] Bob was injured." ECF No. 51-16 at 127. During a phone call with her husband while he was at the Army Hospital in Landstuhl, Germany, he said that he thought she would come and get him, and those words "broke [her] heart." *Id*. She "left the next day for Germany" to bring him home to a California hospital for further treatment. *Id*. Once she got her husband back home, she had to deal with his frequent "screaming nightmares and horrible PTSD attacks that he does not remember." *Id.* at 128. He "would experience mood swings, suicidal episodes, and irrational outbursts." *Id*. "He was scary and unstable, even violent at times. *Id*. Because of its impact on Sabado's mental health, the attack also harmed his relationship with his wife. They "almost got divorced" and had to "rebuild [their] relationship from the ground up." *Id*.  Their lives have never been the same since, as he can no longer work, and she had to return to working full time. *Id*. "The attack turned [their] whole life upside down": they lost their home, declared bankruptcy, and had to move from California—away from family—to South Carolina because it was too expensive for them to stay in California. *Id*. In light of these facts, the Lisa Sabado is awarded four million dollars ($4,000,000.00) in solatium damages because she experienced aggravating circumstances as the spouse of the surviving victim.

c. Skyler Sabado (Robert Sabado's Son)

The son of Robert Sabado, Plaintiff Skyler Sabado, states that growing up, he and his father "were always very close." ECF No. 51-16 at 142. His father taught him how to play baseball. *Id.* After the attack, when his dad was battling with PTSD, his mom would not let his dad go to some of Skyler's baseball games "for fear that the flashbacks would occur in public, which upset [Skyler] that he did not come." *Id.* at 143. Skyler is sad that his "father doesn't come out

that much . . . and . . . will miss family events," because of his PTSD and the physical limitations caused by his injuries. *Id.* In light of these facts, Skylar Sabado is awarded two million, five hundred thousand dollars ($2,500,000.00) in solatium damages to Skyler Sabado because he experienced aggravating circumstances as the son of the surviving victim, Robert Sabado.

d.  <u>Crystal Sabado (Robert Sabado's Daughter)</u>

The daughter of Robert Sabado, Plaintiff Crystal Sabado, states that her "growing up, [her] relationship with [her] Dad was amazing." ECF No. 51-16 at 138. Her parents divorced when she was only three years old, and Tiffany and Crystal were with their dad "all of the time." *Id.* He taught her how to read and play baseball. *Id.* She remembers how it was "really hard for [her] to see" her father so badly hurt and hooked up to the "wound vac machine." *Id.* at 139. She "cried the whole ride home" after seeing him in the hospital in Santa Barbara, CA. *Id.* Her mom's birthday is the same day as the attack, so she is reminded of the attack every year that they celebrate her mom's birthday. *Id.* She has been heavily impacted by her father's survivor's guilt because she hears him say "it should have been him and that's the saddest part." *Id.* She misses "how carefree and happy go lucky" her dad used to be before the attack. *Id.* The attack "took a part of the dad [she] once knew away," and he has never been the same since. *Id.* In light of these facts, Crystal Sabado is awarded two million, five hundred thousand dollars ($2,500,000.00) in solatium damages because she experienced aggravating circumstances.  as the daughter of the surviving victim, Robert Sabado.

e.  <u>Tiffany Sabado (Robert Sabado's Daughter)</u>

The daughter of Robert Sabado, Plaintiff Tiffany Sabado, states that her "relationship with [her] father growing up was great, [they] were very close." ECF No. 51-16 at 133. She loved doing all sorts of Southern California activities with him and she "always felt close to [her] father and could talk to him about anything." *Id.* He was "fun to be around and was easy to talk to." *Id.* When she found out about the attack, she "saw flashes of images and noise bursts . . . and fear came out of nowhere." *Id.* A few weeks after the attack, she experienced "unpleasant physical symptoms similar to those of a heart attack," and she couldn't sleep. *Id.* She has been triggered emotionally by "acts of terrorism," especially on the anniversary of her dad's attack, and she re-lives "all the memories and feelings that happened" around the time she learned of the attack. *Id.* at 134. Since the attack, her father is no longer the "happy person that was easy to talk to and fun to be around." *Id.* She "miss[es] that person." *Id.* Because her father now suffers from PTSD, his "behavior is erratic and is unpredictable," he "is not the same person and [she] is somewhat hesitant to be around him now." *Id.* She "is definitely apprehensive when [she does] interact with him." *Id.* In light of these facts, the Court Tiffany Sabado is awarded two million, five hundred thousand dollars ($2,500,000.00) in solatium damages

because she is the daughter of the surviving victim, Robert Sabado.

12. <u>Army Sergeant Bradley Salisbury</u> – Army Sergeant Bradley Salisbury was injured when an EFP hit the right side of his vehicle, killing his gunner, Spc. William J. Rechenmacher on January 18, 2007 in Baghdad, Iraq. Amended Complaint, ECF No. 26 at 85-86; Bradley Salisbury Evidence ECF No. 51-21 at 17.

a. <u>Bradley Salisbury (Surviving Soldier), Individually</u>

Sgt. Bradley Salisbury was traveling in the fourth truck of a convoy passing under an overpass when an EFP fired into the right side of his vehicle, knocking him unconscious for a few minutes." ECF No. 51-21 at 4-5. When he regained consciousness, he "felt a searing pain in [his] right leg, and throat, and found it difficult to breathe." *Id*. When he went to check on his gunner, Spc. Rechenmacher, he discovered that "the EFP slug had cut off his head and cauterized the wound." *Id*. Salisbury's wounds consisted of a bruised femur bone, shrapnel wounds in his right leg, a burned esophagus, and burn wounds to his face. *Id*. at 19. He was rated by the VA at 100% disability. *Id*. at 37. The 100% VA Rating is broken down to include 50% for PTSD, 30% for Migraine, and 10% for Tinnitus, along with a TBI documented to be service-related without a separate rating—all associated with this attack. *Id*. at 39-56. In light of these facts, Bradley Salisbury is awarded s six million, five hundred thousand dollars ($6,500,000.00) in pain and suffering damages.

b. <u>Deidre Salisbury (Bradley Salisbury's Wife)</u>

The spouse of Sgt. Bradley Salisbury, Plaintiff Deidre Salisbury, states that prior to the attack, her husband was "carefree" and enjoyed outings, like taking her and their daughter to Disneyland. ECF No. 51-21 at 71. She "misses [her] husband" who used to do those things with her. *Id*. Now on "certain holidays and dates he gets extremely upset and cries." *Id*. at 71. She now has "to drive him because he is afraid to" drive. *Id*. His "PTSD has taken an extreme toll on [their] family." *Id*. She has "seen him have full-blown anxiety attacks just being in the car where he couldn't breathe[,] meaning that "[they] can't go on long road trips and visit [their] family out of state." *Id*. Despite having a college degree, she is "unable to work because [she has] to provide care for Brad." *Id*. at 72. She feels that she "lost her husband the day of the attack and had no idea the struggles [they] would face after." *Id*. In light of these facts, Deirdre Salisbury is awarded four million dollars ($4,000,000.00) in solatium damages because she is the spouse of the surviving victim, Bradley Salisbury.

c. <u>Robin Bogacz (Bradley Salisbury's Mother)</u>

The mother of Bradley Salisbury, Plaintiff Robin Bogacz, stated that she had a good relationship with her son during his childhood and that they "did everything together, . . . camping, . . . go[ing] to the park, . . . and watch[ing] baseball games."

ECF No. 51-21 at 76. She was so "scared" for her son when she learned that he was hurt in the attack—and she "felt useless" because at that moment there was nothing that she could do to help her son. *Id*. She was so "scared and nervous" when she heard the news at work that she "had to go home." *Id*. She misses most how, before the attack, her son was "such a loving person," "always laughing and . . . hav[ing] a great time." *Id*. Now he is "very anti-social," "he doesn't like crowds," and he "has a very short fuse … when it comes to his temper." *Id*. She doesn't get to see him "very much" anymore since she "lives in Michigan and Brad lives in Texas," and Brad "has a hard time driving." *Id*. As she explains, "he is not like the son [she] knew before the military and the attack," and she misses him very much. *Id*. In light of these facts, Robin Bogacz is awarded two million, five hundred thousand dollars ($2,500,000.00) in solatium damages because she is the mother of the surviving victim, Bradley Salisbury.

d. <u>Amy Crandel (Bradley Salisbury's Sister)</u>

Plaintiff Amy Crandel is Bradley Salibsury's older sister by ten years. ECF No. 51-21 at 80. She "loved holding Brad and playing with him" as a child. *Id*. When he got older and joined the military, they "became very close," and he "was [her] best friend." *Id*. When she her brother was injured in the attack, she was "very distraught and couldn't believe it." *Id*. Now, when the overseas troops appear in the news, "panic overcomes" her. *Id*. She has observed how her brother now "dislikes people and is very angry at the world," and she misses "him being happy and outgoing," the way he was before the attack. *Id*. It makes her "so sad to see how bad he hurts." *Id*. The fact that she can't help him "makes [her] so angry." *Id*. In light of these facts, the Court awards one million, two hundred and fifty thousand dollars ($2,500,000.00) in solatium damages to Amy Crandel because she is the sister of the surviving victim, Bradley Salisbury.

13. <u>Air Force Sergeant Jon Kone</u> – Sergeant Jon Kone was injured when an EFP hit the front passenger door of the Humvee, instantly killing U.S. Air Force Lt. Joseph Helton, on September 8, 2009 in Baghdad, Iraq. Amended Complaint, ECF No. 26 at 142; Kone Evidence ECF No. 51-14 at 18-20.

Jon Kone was driving the second Humvee of a two-vehicle convoy when the EFP attack occurred. ECF No. 51-14. at 7. "He was unconscious for what he believes to be only a matter of seconds and was able to proceed to drive the vehicle 'off the x' before stopping." *Id*. at 30. He suffered a shoulder wound that required five stitches. *Id*. at 11. He "suffers from significant and excessive guilt as he believes that he did not do enough" to save his vehicle commander's life. *Id* at 31. "He additionally suffers from survivor's guilt." *Id*. He was awarded both the Purple Heart and the Army Commendation Medal with "Valor" Device for his injuries his courage. *Id*. at 27-28. He was medically discharged from the U.S. Air Force because he was no longer fit for continued service. *Id*. at 34-36. His VA rating is at 70%. *Id*. at 42. The VA rating analysis notes that he has a non-ratable, service-related TBI, as well as a 50% for PTSD and 30% for thoracic and lumbar pain with numbness and tingling. *Id*. In light of these

facts, Jon Kone is awarded s six million dollars ($6,000,000.00) in pain and suffering damages.

### C.    Punitive Damages

Plaintiffs also seek punitive damages. *See* Amended Complaint, ECF No. 26 at ¶¶ 6.7-6.10. Such damages help "punish outrageous behavior and deter [it] in the future." *Selig*, 573 F. Supp. 3d at 75. Four factors guide awarding punitive damages. *See id.* These are: (1) the character of the defendant's acts, (2) the nature and extent of harm to the plaintiffs that the defendant caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendant. *See id.* These factors support an award of punitive damages. Iran's terroristic acts were intended to—and did— cause severe pain and suffering to Plaintiffs. Moreover, "[t]here is need for deterrence because, time and again, courts in this District have been confronted with families shattered by Iran-backed terrorists." *See id.*

One of the "primary methods of calculating punitive damages in FSIA cases" in "[t]his District" "involves multiplying the total compensatory damages award by a factor of between one and five." *Ben-Yishai v. Syrian Arab Republic*, 2022 WL 17250344, at *15 (D.D.C. Nov. 28, 2022). This method is "especially appropriate when the defendants 'did not directly carry out the attack, but funded [a proxy actor].'" *Id.* (citation omitted) (alteration in original). Because Iran "intentionally supported . . . proxy actor[s] who specifically sought to wreak violence," *id.*, this Court will follow "the usual practice" in such cases and adopt "a multiplier of three," *Roth*, 2018 WL 4680270, at *17; *accord, e.g.*, *Taitt*, 2023 WL 2536518, at *23; *Ben-Yishai*, 2022 WL 17250344, at *15; *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 126-27 (D.D.C. 2015). The damages awarded therefore include punitive damages equal to three times the proposed compensatory damages amount.

### D.    Post-Judgment Interest

Finally, post-judgment interest is awarded in line with the federal post-judgment interest statute, which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment." 28 U.S.C. § 1961(a); *see Flanagan*, 87 F. Supp. 3d at 127 n.39.

Respectfully submitted,

Dated: February 28, 2025

/s/      *Matthew D. McGill*
Matthew D. McGill (D.C. Bar No. 481430)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9522
mmcgill@gibsondunn.com

/s/      *Craig W. Carlson*
Craig W. Carlson (D.C. Bar No. TX0182)
THE CARLSON LAW FIRM, P.C.
100 East Central Expressway
Killeen, TX 76541
Telephone: (254) 526-5688
Facsimile: (254) 526-8204
ccarlson@carlsonattorneys.com

*/s/ Jeremy C. Shafer*
Jeremy C. Shafer
(DC Bar No. 1006578)
VETERAN LEGAL GROUP
700 12th Street NW, Suite 700
Washington, D.C. 20005
Telephone: (888) 215-7834
jshafer@bannerlegal.com

*Attorneys for Plaintiffs*