# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

MARY B. HEATON, et al.,

               Plaintiffs,

     v.

THE ISLAMIC REPUBLIC OF IRAN,

               Defendant.

Civil Action No. 1:19-cv-03003-JMC

## ROUND 2 PLAINTIFFS' MOTION FOR
## DEFAULT JUDGMENT AGAINST IRAN

Pursuant to Federal Rule of Civil Procedure 55(b) and 28 U.S.C. § 1608(e), Plaintiffs, by and through undersigned counsel, hereby move for default judgment for the Round 2 Plaintiffs against Defendant the Islamic Republic of Iran ("Iran"). Pursuant to LCvR 7, the grounds for this motion are set forth in the accompanying Statement of Points and Authorities.

Dated: May 8, 2025

/s/     *Matthew D. McGill*

Matthew D. McGill (D.C. Bar No. 481430)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9522
mmcgill@gibsondunn.com

/s/     *Craig W. Carlson*
Craig W. Carlson (D.C. Bar No. TX0182)
THE CARLSON LAW FIRM, P.C.
100 East Central Expressway
Killeen, TX 76541
Telephone: (254) 526-5688
Facsimile: (254) 526-8204
ccarlson@carlsonattorneys.com

_s/ Jeremy C. Shafer_
Jeremy C. Shafer
(DC Bar No. 1006578)
VETERAN LEGAL GROUP
700 12th Street NW, Suite 700
Washington, D.C. 20005
Telephone: (888) 215-7834
jshafer@bannerlegal.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

MARY B. HEATON, et al.,

               Plaintiffs,

     v.

THE ISLAMIC REPUBLIC OF IRAN,

               Defendant.

Civil Action No. 1:19-cv-03003-JMC

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF**
**ROUND 2 PLAINTIFFS' MOTION FOR**
**<u>DEFAULT JUDGMENT AGAINST IRAN</u>**

# TABLE OF CONTENTS

Page(s)

I.  Procedural Background ................................................................................. 1

II.  Legal Standard for Default Judgment Under the FSIA .................................. 4

III.  Service of Process and Personal Jurisdiction .............................................. 5

IV.  Subject Matter Jurisdiction ......................................................................... 6

    A.  Elements One, Two, and Three are met because this case seeks money damages against Iran for personal injury or death. .......................................... 8

    B.  Elements Four and Five are met because Iran provided material support for acts of extrajudicial killings, which caused the injuries and deaths of the Round 2 Plaintiffs and their family members. .............................................................. 8

    C.  Elements Six and Seven are met because Iran is a designated state sponsor of terrorism and the Round 2 Plaintiffs are all U.S. Citizens. ............................ 29

V.  Liability and Damages ............................................................................... 30

    A.  Iran Is Liable To Plaintiffs For Causing Their Personal Injuries. ................ 30

    B.  Plaintiffs Are Entitled To Compensatory Damages. .................................... 31

    C.  Plaintiffs Are Entitled To Punitive Damages. ............................................. 42

    D.  Plaintiffs Are Entitled To Post-Judgment Interest. ..................................... 43

VI.  Conclusion ................................................................................................. 43

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aceto v. Islamic Republic of Iran,*
   2020 WL 619925 (D.D.C. Feb. 7, 2020) ...............................................................33

*Ackley v. Islamic Republic of Iran,*
   2022 WL 3354720 (D.D.C. August 12, 2022) ......................................................33

*Baker v. Socialist People's Libyan Arab Jamahiriya,*
   775 F. Supp. 2d 48 (D.D.C. 2011) ......................................................................32

*Barry v. Islamic Republic of Iran,*
   437 F. Supp. 3d 15 (D.D.C. 2020) .................................................................31, 32

*Ben-Yishai v. Syrian Arab Republic,*
   2022 WL 17250344 (D.D.C. Nov. 28, 2022) ................................................31, 42

*Borochov v. Islamic Republic of Iran,*
   94 F.4th 1053 (D.C. Cir. 2024) ....................................................................3, 8, 9

*Brown v. Islamic Republic of Iran,*
   2023 WL 4824740 (D.D.C. July 27, 2023) ..........................................................13

*Brown v. Islamic Republic of Iran,*
   687 F.Supp. 3d. 21 (D.D.C. July 27, 2023) ........................................................28

*Bundy v. Jackson,*
   641 F.2d 934 (D.C. Cir. 1981) ............................................................................4

*Cabrera v. Islamic Republic of Iran,*
   2024 WL 4345784 (D.D.C. Sept. 30, 2024) .........................................................8

*Christie v. Islamic Republic of Iran,*
   No. 19-cv-1289, 2020 WL 3606273 (D.D.C. July 2, 2020) ..................................33

*Cohen v. Islamic Republic of Iran,*
   238 F. Supp. 3d 71 (D.D.C. 2017) .......................................................................9

*DiBenedetto v. Islamic Republic of Iran,*
   2020 WL 820877 (D.D.C. Feb. 19, 2020) ............................................................1

*Driscoll v. Islamic Republic of Iran,*
   2023 WL 4892710 (D.D.C. June 27, 2023) ...................................................17, 18

*Driscoll v. Islamic Republic of Iran,*
   2023 WL 5932974 (D.D.C. July 13, 2023) .........................................................17

*Fissler v. Islamic Republic of Iran,*
   2022 WL 4464873 (D.D.C. Sept. 26, 2022) .......................................................12

*Flanagan v. Islamic Republic of Iran*,
   87 F. Supp. 3d 93 (D.D.C. 2015) .............................................................32, 42, 43

*Flatow v. Islamic Republic of Iran*,
   999 F. Supp. 1 (D.D.C. 1998) .............................................................................31

*Fritz v. Islamic Republic Of Iran*
   320 F. Supp. 3d 48 (D.D.C. 2018) .....................................................................4, 6

*Gration v. Islamic Republic of Iran*,
   2023 WL 5221955 (D.D.C. Aug. 15, 2023) ..........................................................33

*Gunn v. Islamic Republic of Iran*,
   2024 WL 3566173 (D.D.C. July 29, 2024)............................................................33

*Hammons v. Islamic Republic of Iran*,
   2023 WL 5933340 (D.D.C. July 24, 2023), *report and recommendation*
   *adopted*, 2023 WL 6211248 (D.D.C. Sept. 25, 2023) .............................................9

*Han Kim v. Democratic People's Republic of Korea*,
   774 F.3d 1044 (D.C. Cir. 2014) .............................................................................4

*Harrison v. Sudan*,
   882 F. Supp. 2d 23 (D.D.C. 2012) ..........................................................................7

*Karcher v. Islamic Republic of Iran*,
   396 F. Supp. 3d 12 (D.D.C. 2019) ....................................................................7, 10

*Karcher v. Islamic Republic of Iran*,
   2021 WL 133507 (D.D.C. January 14, 2021)...............................4, 13, 14, 15, 16, 17, 21, 22

*Kilburn v. Socialist People's Libyan Arab Jamahiriya*,
   376 F.3d 1123 (D.C. Cir. 2004) ...........................................................................10

*Lee v. Islamic Republic of Iran*,
   656 F. Supp. 3d 11 (D.D.C. 2023) ...................................................................23, 24

*Maalouf v. Islamic Republic of Iran*,
   923 F.3d 1095 (D.C. Cir. 2019) .............................................................................8

*Mwani v. bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) ...................................................................................5

*Neiberger v. Islamic Republic of Iran*,
   2022 WL 17370239 (D.D.C. September 8, 2022) ..................................................28

*Opati v. Republic of Sudan*,
   140 S. Ct. 1601 (2020).................................................................................4, 5, 9

*Oveissi v. Islamic Republic of Iran*,
   768 F. Supp. 2d 16 (D.D.C. 2011) ........................................................................31

*Oveissi v. Islamic Republic of Iran*,
   879 F. Supp. 2d 44 (D.D.C. 2012) ........................................................................11

*Owens v. Republic of Sudan,*
  864 F.3d 751, 785 (D.C. Cir. 2017) ..................................................................4

*Peterson v. Islamic Republic of Iran,*
  515 F. Supp. 2d 25 (D.D.C. 2007) ..................................................................33

*Reed v. Islamic Republic of Iran,*
  845 F. Supp. 2d 204 (D.D.C. 2012) ..................................................................5

*Rimkus v. Islamic Republic of Iran,*
  750 F. Supp. 2d 163 (D.D.C. 2010) ......................................................5, 11, 12

*Roberts v. Islamic Republic of Iran,*
  581 F. Supp. 3d 152 (D.D.C. 2022) ................................................................10

*Roth v. Syrian Arab Republic,*
  2018 WL 4680270 (D.D.C. Sept. 28, 2018) ...............................................10, 42

*Saberi v. Islamic Republic of Iran,*
  541 F. Supp. 3d 67 (D.D.C. 2021) ....................................................................5

*Schooley v. Islamic Republic of Iran,*
  2019 WL 2717888 (D.D.C. June 27, 2019) ...........................................31, 32, 33

*Spencer v. Islamic Republic of Iran,*
  71 F. Supp. 3d 23 (D.D.C. 2014) ...............................................................30, 31

*Stearns v. Islamic Republic of Iran,*
  633 F. Supp. 3d 284 (D.D.C. 2022) ..............................................4, 11, 18, 19, 21

*Taitt v. Islamic Republic of Iran,*
  2023 WL 2536518 (D.D.C. Mar. 16, 2023)......................................7, 29, 31, 33, 42

*Valore v. Islamic Republic of Iran,*
  700 F. Supp. 2d 52 (D.D.C. 2010) ...............................................................10, 11, 32

**Statutes**

18 U.S.C. § 2339A(b)(1)...................................................................................9

28 U.S.C. § 1330(a) .....................................................................................6, 29

28 U.S.C. § 1330(b) ......................................................................................5, 6

28 U.S.C. § 1605A(a) ...................................................................................7, 8, 9

28 U.S.C. § 1605A(b) ......................................................................................7

28 U.S.C. § 1605A(c) ...................................................................................1, 30

28 U.S.C. § 1605A(h) ...................................................................................9, 29

28 U.S.C. § 1608(a) ......................................................................................5, 6

28 U.S.C. § 1608(e) ................................................................................................4

28 U.S.C. § 1961(a) ...............................................................................................43

**Rules**

Fed. R. Evid. 201 ...............................................................................................11, 12

Fed. R. Evid. 702 ...................................................................................................12

**Regulations**

U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979-Iran, 49 Fed. Reg. 2836 (Jan. 3, 1984)  29

Pursuant to Federal Rule of Civil Procedure 55(b) and 28 U.S.C. § 1608(e), Plaintiffs, by and through undersigned counsel, hereby submit this Statement of Points and Authorities in Support of their Motion for Default Judgment Against Iran, and state as follows:

## I.    Procedural Background

Plaintiffs in this action are United States nationals who seek compensatory and punitive damages against Defendant the Islamic Republic of Iran for its role in approximately 420 separate acts of attempted or completed extrajudicial killing under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.  Plaintiffs allege that Iran provided material support and resources to multiple terrorist organizations in Iraq that used those resources to perpetrate various attacks injuring them or their family members.

As alleged in detail in the Amended Complaint, ECF No. 26, Plaintiffs include immediate family members of United States Armed Forces members and U.S. Government contractors who were tragically killed in action during Operation Iraqi Freedom, *id.* at 42-82, and individuals who include former U.S. Armed Forces members and U.S. Government contractors who were stationed in Iraq from approximately 2003 through 2011 and who suffered personal injuries following attempted extrajudicial killings, along with certain members of their immediate families, *id.* at 82-367.

This case arises under the FSIA.  Plaintiffs have sued Iran under Section 1605A(c) of the FSIA for Iran's provision of material support for the terrorist attacks that caused them harm.  As authorized by Section 1605A, Plaintiffs have brought claims for pain and suffering, solatium, intentional infliction of emotional distress, and punitive damages.  *See* 28 U.S.C. § 1605A(c)(4) (authorizing right to solatium, pain and suffering, and punitive damages); *see also DiBenedetto v. Islamic Republic of Iran*, 2020 WL 820877, at *1 (D.D.C. Feb. 19, 2020) ("Survivors may recover damages for their pain and suffering, estates of the deceased may recover economic losses

stemming from wrongful death to the victims of terrorism, family members may recover solatium for their emotional injury, and all plaintiffs may recover punitive damages."). Plaintiffs also seek post-judgment interest pursuant to 28 U.S.C. § 1961(a).

Plaintiffs initiated this suit in October 2019. ECF No. 1. Plaintiffs served their Complaint on Iran, first by trying to send it via DHL to the head of Iran's ministry of foreign affairs in June 2020, ECF Nos. 10-12, and then, when that failed, by dispatching it through diplomatic channels with the help of the U.S. Department of State, ECF Nos. 15-17. Service was effected on November 4, 2020. ECF No. 19. Because Iran did not timely respond to the Complaint or otherwise appear in the case, the Clerk of Court entered default against Iran on January 15, 2021. ECF No. 25.

Shortly after that, however, Plaintiffs filed the Amended Complaint, which remains the operative complaint in this action. ECF No. 26. The Amended Complaint largely maintained the same legal theories but added additional plaintiffs who, like the original group, experienced harm as a result of Iran's material support for terrorist attacks on U.S. Armed Forces and U.S. government contractors stationed in Iraq. *See* ECF No. 24, at 2.

Plaintiffs then proceeded to serve Iran with the Amended Complaint. Plaintiffs sent, through the Clerk's Office, the Amended Complaint, summons, and notice of suit by DHL to the head of Iran's foreign affairs ministry in April 2021. ECF Nos. 28-30. Iran rejected two attempts to serve the documents, ECF No. 31-1, and so Plaintiffs in June 2021 proceeded to serve through diplomatic channels with the help of the State Department, ECF Nos. 32-34. Iran was successfully served on April 6, 2022. ECF No. 42; *see also* Minute Order (Aug. 19, 2022).

Although required by 28 U.S.C. § 1608(d) to respond to the Amended Complaint within 60 days of service, Iran has not to date filed any responsive pleading or otherwise appeared in this case. The time for Iran to answer or otherwise plead, respond to, or defend this action has not been

extended.  On Plaintiffs' request, ECF No. 43, the Clerk of Court entered default under Federal Rule of Civil Procedure 55(a) against Iran on August 26, 2022.  ECF No. 44.

On November 8, 2022, this Court ordered Plaintiffs to file a Motion for Default Judgment for a group of "bellwether" Plaintiffs, to help the Court evaluate the adequacy of the Plaintiffs' evidence of Iran's provision of material support for the terrorist attacks that injured them and their resulting damages.  *See* November 8, 2022 Minute Order.  Accordingly, Plaintiffs identified 46 "Bellwether Plaintiffs" who alleged they were injured in 20 distinct attacks.  *See* February 9, 2023 Status Report Bellwether, ECF No. 48.  Bellwether Plaintiffs moved for default judgment as to liability and damages.  *See* Bellwether Plaintiffs' Motion for Default Judgment, ECF No. 51.

While Bellwether Plaintiffs' Motion for Default Judgment was pending, the Court of Appeals for the District of Columbia Circuit held in *Borochov v. Islamic Republic of Iran* that a foreign state provides material support for an extrajudicial killing only if the attack that it supported resulted in at least one victim's death.  94 F.4th 1053, 1060-61 (D.C. Cir. 2024).  On request from Bellwether Plaintiffs, this Court agreed to hold in abeyance the Bellwether Plaintiffs' claims arising from nine attacks that did not involve any victim's death.  *See* December 20, 2024 Minute Order.  The Bellwether Plaintiffs' Motion for Default Judgment related to the remaining 11 terrorist attacks is pending before Magistrate Judge Sharbaugh.  *See* Bellwether Plaintiffs' Motion for Default Judgment, ECF No. 51, at 21-24, 27, 29; October 29, 2024 Minute Order.

By the March 4, 2025 Minute Order, the Court ordered Plaintiffs to file a Motion for Default Judgment on behalf of 16 additional plaintiffs injured in seven attacks that resulted in fatalities ("Round 2 Plaintiffs").  *See* March 4, 2025 Minute Order; *see also* February 28, 2025 Motion for Leave to File Second Motion for Default Judgment (identifying Round 2 plaintiffs),

ECF No. 59.  Courts in this district have already received evidence and found Iran responsible for six of those seven attacks.[1]  Those Round 2 Plaintiffs now bring this Motion for Default Judgment.

## II.    Legal Standard for Default Judgment Under the FSIA

To secure a default judgment against Iran, the Round 2 Plaintiffs must "establish [their] claim or right to relief by evidence satisfactory to the court."  28 U.S.C. § 1608(e).  "[W]hen [a] defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide, requiring only that it be 'satisfactory to the court.'"  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014).  District courts therefore "have the authority— indeed . . . the obligation—to 'adjust [evidentiary requirements] to . . . differing situations.'"  *Id.* at 1047-48 (quoting *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981)).  They must therefore assess default judgment motions "in light of both Congress's purpose" to compensate victims of terrorism "and the difficulty in obtaining 'firsthand evidence and eyewitness testimony . . . from an absent and likely hostile sovereign.'"  *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 57 (D.D.C. 2018) (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)).

In practice, "courts in FSIA cases may look to numerous evidentiary sources to satisfy their statutory obligation" under § 1608(e), including a "plaintiff's uncontroverted factual allegations . . . supported by . . . documentary and affidavit evidence"; "traditional documentary

---

[1] With respect to the seventh attack, Plaintiffs believed that Larry Clark was injured in one of the two May 6, 2007 attacks near Baghdad, Iraq, adjudicated in both *Karcher* and *Stearns*.  *Stearns v. The Islamic Republic of Iran*, 633 F. Supp. 3d 284, 311-12 (D.D.C. 2022); *Karcher v. Islamic Republic of Iran*, Case No. 16-cv-232, 2021 WL 133507, at *40-41 (D.D.C.) (January 14, 2021).  Plaintiffs have subsequently determined that, in fact, Larry Clark sustained his injuries in a different May 6, 2007 complex attack just north of Baghdad in al-Qaeda in Iraq's ("AQI") self-proclaimed capital - Baqubah, Iraq.  Because the Court ordered the plaintiffs identified in the February 28 minute order—which includes Larry Clark—to move for default judgment by May 8, Plaintiffs have included Larry Clark in Round 2.  *See* March 4, 2025 Minute Order.

and testimonial evidence"; and "evidence in the form of affidavits." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (internal quotation marks and citations omitted) (collecting cases); *accord, e.g.*, *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005); *Saberi v. Islamic Republic of Iran*, 541 F. Supp. 3d 67, 77 (D.D.C. 2021); *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 212 (D.D.C. 2012). Courts also may "take judicial notice of related proceedings and records in cases before the same court." *Rimkus*, 750 F. Supp. 2d at 171 (citation omitted). And "cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to the FSIA . . . based solely upon expert testimony." *Owens*, 864 F.3d at 788.

### III.    Service of Process and Personal Jurisdiction

A court must "satisfy itself that it has personal jurisdiction before entering [default] judgment against an absent defendant." *Mwani*, 417 F.3d at 6-7 (cleaned up). The FSIA extends personal jurisdiction over a foreign state whenever a court has subject-matter jurisdiction and a plaintiff has effected service as required in 28 U.S.C. § 1608. *See* 28 U.S.C. § 1330(b). Because Plaintiffs served Iran in compliance with the FSIA's service requirements, and because this Court has subject matter jurisdiction, *see infra*, this Court has personal jurisdiction over Iran.

A foreign sovereign can be served through one of four methods listed in 28 U.S.C. § 1608(a). Each method is permissible only if service cannot be made under the method listed before it. *See id.* Here, service could not be made under the first method—service "in accordance with any special arrangement for service" between the plaintiff and the foreign state, 28 U.S.C. § 1608(a)(1)—because Plaintiffs have no special arrangement with Iran. Nor could service be made under the second method—service "in accordance with an applicable international convention on service of judicial documents," *id.* § 1608(a)(2)—because "Iran is not party to an

5

international convention on service of judicial documents." *Fritz*, 320 F. Supp. 3d at 88 (citation omitted).

Round 2 Plaintiffs therefore tried to serve the Amended Complaint on Iran under Section 1608(a)(3) by requesting that the Clerk of Court send out English and Farsi copies of the summons, complaint, and notice of suit on April 8, 2021, and arranged for service to Iranian Minister of Foreign Affairs Mohammad Javad Zarif by DHL, through a shipping intermediary, Condor Speditions, in Austria.  ECF Nos. 28-29.  The Clerk's Office sent out the materials the next day. ECF No. 30.  On May 25, 2021, however, Round 2 Plaintiffs learned that Iran rejected service. ECF No. 31-1.

Because "service [could] not be made within 30 days under [§ 1608(a)](3)," Plaintiffs proceeded to serve the Amended Complaint on Iran through the fourth method: diplomatic channels.  28 U.S.C. § 1608(a)(4).  Round 2 Plaintiffs requested that the Clerk of Court effect service of the Amended Complaint through the State Department.  ECF Nos. 32-33; *see also* ECF No. 31.  The State Department served Iran through diplomatic channels on May 6, 2022. ECF No. 42.  That service, in combination with Iran's lack of immunity from this suit, *see* Part IV, *infra*, means that this Court has personal jurisdiction over Iran.  28 U.S.C. § 1330(b).

## IV.    Subject Matter Jurisdiction

This Court has subject matter jurisdiction over the Round 2 Plaintiffs' claims under Section 1605A of the FSIA because Iran, as a foreign state sponsor of terrorism that provided material support for the extrajudicial killings that harmed the Round 2 Plaintiffs, is not entitled to sovereign immunity from this action.  The FSIA vests in federal district courts jurisdiction "as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity . . . under sections 1605–1607 of this title."  28 U.S.C. § 1330(a).

6

As relevant here, the FSIA's terrorism exception, Section 1605A, strips foreign states of immunity "in any case . . . in which money damages are sought against a foreign state for personal injury or death that was caused by an act of . . . extrajudicial killing" or by "the provision of material support or resources for such an act" by the foreign state's officials, employees, or agents. 28 U.S.C. § 1605A(a)(1).  A court may hear such a case if, as relevant here, (i) "the foreign state was designated as a state sponsor of terrorism at the time the [relevant] act . . . occurred . . . and . . . remains so designated when the claim is filed under this section"; and (ii) the plaintiff was, at the time the relevant act occurred, a national of the United States, a member of the armed forces, or an employee of the U.S. government or a government contractor acting within the scope of his employment.  *Id.* § 1605A(a)(2)(A).[2]  As it pertains to this case, the jurisdictional inquiry breaks down into seven elements: There must be (1) "money damages . . . sought" (2) "against a foreign state" (3) for personal injury or death (4) that was "caused by" (5) "the provision of material support or resources for" "an act of . . . extrajudicial killing" by the foreign state's employees, officials, or agents, *id.* § 1605A(a)(1), (6) the foreign state was designated as a state sponsor of terrorism at the time of the attack through to the present, and (7) the plaintiff is a U.S. national, member of the armed forces, or U.S. government employee or contractor acting within the scope of his employment.[3]  *See Harrison v. Sudan*, 882 F. Supp. 2d 23, 29 (D.D.C. 2012) (listing these elements).

---

[2] Section 1605A(a) also requires that a plaintiff provide the foreign state a "reasonable opportunity to arbitrate the claim," but that only applies in a case "in which the act occurred in the foreign state" being sued.  28 U.S.C. § 1605A(a)(2)(A)(iii).  The Round 2 Plaintiffs seek to hold Iran responsible for its support of terrorist attacks that occurred in Iraq, so that requirement does not apply here.  *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 54 (D.D.C. 2019) ("[T]he killings at issue did not take place in Iran and accordingly Plaintiffs had no obligation to afford Iran an opportunity to arbitrate.").

[3] Although Section 1605A contains a limitations period, 28 U.S.C. § 1605A(b), it "is 'not jurisdictional' and the Court lack[s] authority or discretion to *sua sponte* raise the terrorism exception's statute of limitations' on behalf of an entirely absent defendant."  *Taitt v. Islamic Republic of Iran*, 2023 WL 2536518,
*(Cont'd on next page)*

A. **Elements One, Two, and Three are met because this case seeks money damages against Iran for personal injury or death.**

The Round 2 Plaintiffs' compliance with the first three elements is straightforward.  The Round 2 Plaintiffs are (1) seeking money damages (2) against Iran (3) based on personal injuries they or their family members experienced or based on the death of their family members.  **Exhibits 1-2**; *see* ECF No. 26 at 371-72.  The first three elements are therefore met.

B. **Elements Four and Five are met because Iran provided material support for acts of extrajudicial killings, which caused the injuries and deaths of the Round 2 Plaintiffs and their family members.**

The fourth element, causation, and the fifth element, "the provision of material support or resources for" "an act of . . . extrajudicial killing" by the foreign state's employees, officials, or agents, are also met.  28 U.S.C. § 1605A(a)(1).

1. **Legal Standard**

Under Section 1605A, "plaintiffs must show that their personal injuries or death were 'caused by,' … the provision of material support or resources for" an act of extrajudicial killing. *Cabrera v. Islamic Republic of Iran*, 2024 WL 4345784, at *2 (D.D.C. Sept. 30, 2024).  In *Borochov v. Islamic Republic of Iran*, the D.C. Circuit held that a foreign state provides material support for an extrajudicial killing only if the attack that it supported resulted in at least one victim's death—and not if the foreign state provided material support with the intention that the terrorist organization commit an extrajudicial killing but there was no death.  94 F.4th 1053 (D.C. Cir. 2024).  Therefore, plaintiffs must show that the relevant terrorist organization "succeeded in committing an extrajudicial killing during the relevant attack."  *Cabrera*, 2024 WL 4345784, at *2.

---

at *5 (D.D.C. Mar. 16, 2023) (quoting *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108, 1114-15 (D.C. Cir. 2019)).

Importantly, that requires only that each attack resulted in a death of an individual other than the terrorist insurgents. Section 1605A does not require that the Plaintiffs or their family members must have perished in the attack. Courts in this district have repeatedly held that "[i]t is not necessary … for one of the *plaintiffs* to have died in the attack in order for the state-sponsor-of-terrorism exception to apply." *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 81 (D.D.C. 2017) (emphasis added); *see also Owens*, 864 F.3d at 807; 28 U.S.C. § 1605A(a)(1) (explaining that because the terrorism exception strips immunity from claims for both "personal injur[ies]" and "death[s]," claims may be brought by injured victims); *Hammons v. Islamic Republic of Iran*, 2023 WL 5933340, at *10 (D.D.C. July 24, 2023), *report and recommendation adopted*, 2023 WL 6211248 (D.D.C. Sept. 25, 2023) (the terrorism exception's "language is broad enough to encompass personal injuries suffered as a result of a terrorist bombing that killed unrelated third parties"). *Borochov* did not change that. *See Borochov*, 94 F.4th at 1066 ("[D]istrict courts need only determine whether a foreign government's material support was a proximate cause of *a* completed killing.") (emphasis added).

The FSIA defines "material support or resources" by reference to 18 U.S.C. § 2339A, *see* 28 U.S.C. § 1605A(h)(3), which defines the term broadly to mean "any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials," 18 U.S.C. § 2339A(b)(1).

In addition, Iran's provision of material support or resources for the acts of extrajudicial killing[4] that impacted the Round 2 Plaintiffs must be "the 'proximate cause' of [their] personal injuries or death." *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 57-59 (D.D.C. 2019) (citation omitted). The causation requirement "is established by showing 'some reasonable connection between the act or omission of the defendant and the damages which the plaintiff has suffered.'" *Roth v. Syrian Arab Republic*, 2018 WL 4680270, at *8 (D.D.C. Sept. 28, 2018) (quoting *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 66 (D.D.C. 2010)). Notably, the FSIA's causation requirement is a "relatively low" one that does not require showing "but for" causation. *Id.* (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). It is enough that the defendant's actions were a substantial factor in the events that caused plaintiff's injury, and that the injury was a reasonably foreseeable consequence of the defendant's actions. *Karcher*, 396 F. Supp. 3d at 55.

So, in sum, elements four and five of subject matter jurisdiction under Section 1605A are met if plaintiffs can show that they were proximately injured by Iran's provision of material support for a terrorist attack that killed at least one victim.

### 2.     Evidentiary Approach

Plaintiffs have ample evidence that their injuries were caused by Iran's provision of material support for completed extrajudicial killings. Indeed, for six of the seven attacks, courts in this district have already adjudged that Iran's provision of material support caused the attacks. This Court should not find differently.

---

[4] The Round 2 Attacks are clearly "extrajudicial" killings; there is no evidence that these attacks, carried out by rogue militia groups and terrorist organizations, "were authorized by a judgment pronounced by a court of law." *Roberts v. Islamic Republic of Iran*, 581 F. Supp. 3d 152, 170 (D.D.C. 2022).

i.    **Uncontroverted allegations, documentary evidence, and affidavits**

The Round 2 Plaintiffs have provided ample evidence to satisfy their evidentiary obligations under the FSIA.  Much of that comes in the form of the "uncontroverted factual allegations" in the Amended Complaint, ECF No. 26, as "supported by" the extensive "documentary and affidavit evidence," *Rimkus*, 750 F. Supp. 2d at 171, that the Round 2 Plaintiffs have organized by family.  S*ee* **Exhibits 3-9**.

ii.    **Judicial notice**

The Round 2 Plaintiffs also respectfully request that the Court take judicial notice of expert evidence and other materials submitted in substantially similar litigation.  Fed. R. Evid. 201. Courts in this district have articulated the appropriate role of judicial notice in FSIA cases: "The proper approach is one that permits courts in subsequent related cases to rely upon the evidence presented in earlier litigation … without necessitating the formality of having the evidence reproduced." *Oveissi v. Islamic Republic of Iran*, 879 F. Supp. 2d 44, 49 (D.D.C. 2012).  "Because of the multiplicity of FSIA-related litigation, courts in this District have frequently taken judicial notice of earlier, related proceedings."  *Id.*  The "FSIA does not require this Court to relitigate issues that have already been settled in previous decisions.  Instead, the Court may review the evidence considered in an opinion that is judicially noticed without necessitating representment of such evidence."  *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 60 (D.D.C. 2010).  *See, e.g.*, *Stearns v. The Islamic Republic of Iran*, 633 F. Supp. 3d 284, 341-43 (D.D.C. 2022) ("*Stearns*") (taking judicial notice of *Fritz v. Islamic Repub. Of Iran*, 320 F. Supp. 3d 48, 86-87 (D.D.C. 2018); *Karcher v. Islamic Repub. of Iran*, 396 F. Supp. 3d 12 (D.D.C. 2019) ("*Karcher I*"); *Karcher v. Islamic Repub. of Iran*, No. 16-cv-232 (CKK); 2021 WL 133507 (D.D.C. Jan. 14, 2021) ("*Karcher II*"); and *Lee v. Islamic Repub. of Iran*, 518 F. Supp. 3d 475 (D.D.C. 2021)); *see*

*also Fissler v. Islamic Republic of Iran*, 2022 WL 4464873, at *2 (D.D.C. Sept. 26, 2022) ("incorporating *Karcher*'s factual findings here").

In six of the seven attacks at issue, courts in this district have already found Iran responsible for the specific attacks during which the Round 2 Plaintiffs were injured. *See Rimkus*, 750 F. Supp. at 171-74 (relying exclusively on uncontroverted allegations, affidavits, and judicial notice of evidence presented in earlier FSIA litigation to reach independent findings of fact holding Iran liable under FSIA).

For the seventh, the May 6, 2007 Baqubah, Iraq Attack, many of the issues presented have been repeatedly and consistently decided in this District based on extensive evidence presented in prior cases, including: (1) Iran's material support for al-Qaeda in Iraq; and (2) Iran's provision of that material support to al-Qaeda in Iraq for the purpose of bringing about extrajudicial killings. *See* Fed. R. Evid. 201.

### iii.   Expert evidence

In addition, with respect to Attack #7, the May 6, 2007 Baqubah, Iraq Attack, the Round 2 Plaintiffs respectfully request that the Court qualify Michael Pregent as an expert on Iran and its sponsorship of terrorist organizations, Iran's role in Iraq and on its support for terrorist and militia groups in Iraq, on the terrorist and militia groups operating and in control of geographic areas in Iraq at the times relevant to this case, as well as attribution of specific terrorist attacks to the militia groups that perpetrated them, and specifically on al-Qaeda, al-Qaeda in Iraq, and its control of Baqubah, including as of May 6, 2007.

Mr. Pregent's qualifications in his areas of expertise, his methodology for his analysis, and his analysis of the facts as laid out in the evidentiary record provided by the Round 2 Plaintiffs are set forth in his declaration and accompanying CV. *See* **Exhibit 10**; *see also* Fed. R. Evid. 702 (permitting expert testimony by an individual "qualified as an expert by knowledge, skill,

experience, training, or education" if the expert's "specialized knowledge will help the trier of act to understand the evidence or to determine a fact in issue," their testimony is based on sufficient facts or data and is the product of reliable principles and methods, and the expert has reliably applied those principles and methods to the facts of the case). In similar cases, courts in this District have already recognized Mr. Pregent as an expert on Iran's connection to other terrorist acts perpetrated by militia groups. *See, e.g.*, *Karcher v. Islamic Republic of Iran*, 2021 WL 133507, at *4 (D.D.C. Jan. 14, 2021) ("The Court found that Mr. Pregent was qualified to testify regarding 'intelligence matters, including attribution of terror attacks and also evidence collection and analysis in the intelligence field.'"); *Brown v. Islamic Republic of Iran*, 2023 WL 4824740, at *1 (D.D.C. July 27, 2023) ("[T]he Court recognized Pregent as an expert in military intelligence within Iraq and Afghanistan and terrorism under Federal Rule of Evidence 702. Pregent has submitted reports and testified in several other FSIA cases in this district involving Iran and provided declarations in two others related to Yemen.").

### 3.    Iran's Material Support and Causation

For each of the seven Round 2 Attacks, Iran provided material support and resources—by financing and training the terrorist groups and militias that carried out the attacks and by equipping them with weapons used in such attacks. That provision of material support or resources enabled the execution of each attack, leading to the result Iran intended: extrajudicial killings that caused serious injuries and/or death to the Round 2 Plaintiffs or their family members.

The *Heaton* Plaintiffs have made extensive arguments about Iran's sponsorship of terrorist groups through their previous briefing, which Round 2 Plaintiffs incorporate by reference as if set forth fully herein, including:

- Bellwether Plaintiffs' Motion for Default Judgment, ECF. No. 51 and accompanying Exhibits.

13

- Bellwether Plaintiffs' Proposed Findings of Fact and Conclusions of Law, ECF No. 58.

### i. Attack #1 – December 10, 2006 – Sadr City, Iraq

Corporal Matthew Ashmead was serving as a member of the United States Army in Iraq in 2006. **Exhibit 3 at 2-7, 14, 15.** On December 10, 2006, Cpl. Ashmead was the Senior Medic for C Company, 3rd Battalion, 509th Airborne Infantry Regiment. *Id.* **at 3.** He was part of a five-vehicle convoy of up-armored HMMWVs conducting a mounted patrol in Baghdad near Sadr City. *Id.* The lead vehicle in the convoy was struck by an explosively formed penetrator ("EFP") that penetrated the HMMWV's armor. *Id.* Cpl. Ashmead provided emergent, hands-on field treatment to the wounded and treated a tension pneumothorax and shrapnel wounds caused by copper and human bone fragments from the bodies of their fellow soldiers. *Id.* **at 3-4.** Cpl. Ashmead was awarded a Combat Medical Badge for the live-saving medical care he rendered during the attack. Sgt. Brennan Gibson, Spc. Philip "Cody" Ford, and PFC Shawn Murphy were all killed in action during the same December 10, 2006 EFP attack. *Id.* **at 4-5.** Cpl. Ashmead sustained a traumatic brain injury and developed severe post-traumatic stress with major depressive disorder and alcohol use disorder as a result of the December 10, 2006 EFP attack. *Id.* **at 6-7, 19.**

In *Karcher*, the Court received evidence about this attack and found, "[U]pon review of the record evidence regarding the December 10, 2006 attack, along with the broader evidence of Iran's use of EFPs in Iraq, the Court finds that Iran and its proxies bear responsibility for the EFP attack that killed Sgt. Gibson and Spc. Ford." *Karcher v. Islamic Republic of Iran*, No. 16-cv-232, 2021 WL 133507, at *28 (D.D.C. Jan. 14, 2021). Round 2 Plaintiffs respectfully request that this Court take judicial notice of the *Karcher* decision and the underlying evidence upon which that court relied, including: (1) the general evidence of Iran's support for terrorist attacks; and (2) the specific evidence of Iran's responsibility for this attack, including the Dec. 11, 2019 Consolidated

Expert Rep. of Col. (Ret.) Kevin Lutz, *Karcher v. Islamic Repub. of Iran*, No. 16-cv-232, ECF No. 109-1.

Consistent with the *Karcher* opinion and Judge Kollar-Kotelly's bases for that finding that Iran and its proxies bear responsibility for the December 10, 2006 EFP attack, Round 2 Plaintiffs submit that:

> As an initial matter, the Army AR 15-6 Investigation report indicates that Sgt. Gibson and Spc. Ford's vehicle was struck by an EFP. *See* Lutz Rep. at 132. Specifically, Col. Lutz opines that the AR 15-6 report references "EFP," "RHINO," and "-lined EFP," terms which "are consistent with a determination that the HMMWV was struck by an EFP." *Id.* Moreover, the SIGACT report from the attack indicates that Sgt. Gibson and Spc. Ford's up-armored HMMWV was struck by an EFP on the driver's side of the vehicle. *Id.* And similarly, Col. Lutz notes in his expert report that the IED report from the December 10, 2006 attack identifies the "main charge configuration" from the blast as "EFP." *Id.* at 133. Finally, the record contains compelling photographic evidence depicting the catastrophic damage inflicted to Sgt. Gibson and Spc. Ford's up-armored HMMWV by the blast, including at least four penetration points through the vehicle's reinforced armor. *See id.* at 133—34 (photographic evidence). In his expert report, Col. Lutz opines that "the weapon that destroyed the soldiers' up-armored M1114 HMMWV was a large, single EFP which completely defeated the vehicle's armor and killed three of the soldiers in the crew cabin, including Sgt. Gibson and Spc. Ford." *Id.* at 136. Col. Lutz further concludes that "the attack that killed Sgt. Gibson and Spc. Ford was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Id.* at 135-36.

*Karcher*, 2021 WL 133507, at *28.

The uncontroverted evidence establishes that Iran is responsible for the December 10, 2006 EFP attack near Sadr City that injured Cpl. Ashmead and caused the deaths of Sgt. Brennan Gibson, Spc. Philip "Cody" Ford, and PFC Shawn Murphy, making this attack an extrajudicial killing.

### ii.     Attack #2 – May 3, 2007 – Baghdad, Iraq

Private First Class Jerome Potter was serving as a member of the United States Army in Iraq in 2007. **Exhibit 4 at 2, 3, 11, 12, 14-17.** On May 3, 2007, PFC. Potter was killed in action

in Baghdad, Iraq as a result of blast injuries he sustained during a hostile action. **Ex. 4 at 17.** In

*Karcher*, the court received evidence about this attack and specifically found, "Iran and its proxies

bear responsibility for the EFP attack that killed PFC Potter." *Karcher*, 2021 WL 133507, at *38.

Round 2 Plaintiffs ask this Court to take judicial notice of the *Karcher* findings and the underlying

evidence upon which those findings were based, including: (1) the general evidence of Iran's

support for terrorist attacks; and (2) the specific evidence of Iran's responsibility for this attack ,

including the Dec. 11, 2019 Consolidated Expert Rep. of Col. (Ret.) Kevin Lutz, *Karcher v.*

*Islamic Repub. of Iran*, No. 16-cv-232, ECF No. 109-1.

        Consistent with the *Karcher* opinion, Round 2 Plaintiffs submit that:

> "On May 3, 2007, PFC Potter was participating in a mission in eastern Baghdad to
> prevent indirect fire attacks on the International Zone." Lutz Rep. at 223. During
> the mission, PFC Potter was driving an M2A3 Bradley on Old Crow Road,
> approaching Route Oilers. *See id.* At approximately 6:10 PM local time, however,
> an explosive struck PFC Potter's M2A3 Bradley "on its right side, underneath the
> turret," setting the vehicle on fire and causing it to crash into a civilian
> vehicle nearby. *Id.* Despite rescue attempts from soldiers at the site of the attack,
> PFC Potter died in the fire. *See id.* at 224. PFC Potter's casualty report confirms
> that he was killed in action in Baghdad on May 3, 2007, as a result of hostile "blast
> injuries." Pls.' Section 1605A(c) Index, Ex. 38 (Potter Casualty Rep.) at 1.

*Karcher*, 2021 WL 133507, at *38.

        The *Karcher* court found that "the explosive responsible for the May 3, 2007 attack in

Baghdad causing the death of PFC Potter was an EFP traceable to Iran and its proxies." *Id.* Judge

Kollar-Kotelly articulated her bases for that finding as follows:

> First, the SIGACT report from the May 3, 2007 attack states that
> "the weapon used to destroy PFC Potter's Bradley was an EFP [located] at the
> corner of Old Crow [Road] and [Route] Oilers." Lutz Rep. at 225. Moreover, Col.
> Lutz's explains that the Army AR15-6 investigation report from the attack shows
> "PFC Potter was killed as the result of the EFP striking his Bradley." *Id.* at 224.
> That report also notes that PFC Potter's vehicle carried "reactive armor to defend
> it from EFPs." *Id.* And in his expert report, Col. Lutz opines that it would take a
> "well-designed and professionally manufactured EFP that employed both precision
> milled copper liners and high explosives" to "cause the damage sustained to the

M2A3 Bradley Fighting Vehicle." *Id.* at 226.  Accordingly, Col. Lutz opines that the May 3, 2007 "attack that killed PFC Potter was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Id.*

*Karcher*, 2021 WL 133507, at *38

The uncontroverted evidence establishes that Iran is responsible for the May 3, 2007 EFP attack in Baghdad, Iraq that caused the death of PFC Jerome Potter, making this attack an extrajudicial killing.

### iii.    Attack #3 – August 4, 2007 – Hawr Rajab, Iraq

Corporal Jaron Holliday was serving as a member of the United States Army in Iraq in 2007.  **Exhibit 5 at 2, 3, 71, 72, 82.**  On August 4, 2007, Cpl. Holliday was killed in action in Hawr Rajab, Iraq as a result of blast injuries he sustained during a hostile action.  *Id.*  Also killed in action during the attack were Sergeant Dustin Wakeman and Corporal Jason Lafleur.  *Id.* **at 3, 71-74, 76.**  In *Driscoll*, the court received evidence and specifically found that the August 4, 2007 attack "was a deliberated, extrajudicial killing traceable to Iran and its proxies." *Driscoll v. Islamic Republic of Iran*, 2023 WL 4892710, at *8 (D.D.C. June 27, 2023) (Report and Recommendation); *Driscoll v. Islamic Republic of Iran*, 2023 WL 5932974 (D.D.C. July 13, 2023) (Order adopting Report and Recommendation).  Round 2 Plaintiffs ask this Court to take judicial notice of the *Driscoll* findings and the underlying evidence upon which those findings were based, including: (1) the general evidence of Iran's support for terrorist attacks; and (2) the specific evidence of Iran's responsibility for this attack, including (a) the Second Amended Declaration/Report of Michael Pregent in Supp. Pls.' Default J. as to Liability Pursuant to FRCP 55(b)(2) ("Pregent Report") 13, *Driscoll v. Islamic Republic of Iran*, Case No. 20-cv-622, ECF No. 26, and (b) PX-369 Dustin Wakeman SIGACT Report 1, *Driscoll v. Islamic Republic of Iran*, Case No. 20-cv-622, ECF No. 39-1.

Consistent with the *Driscoll* opinion, Round 2 Plaintiffs submit that:

> On August 4, 2007, an IED detonated under a military vehicle killing Sergeant
> Dustin Wakeman and two other passengers.  *See* Proposed Findings ¶ 533; Ex. 369
> at 1.  According to the SIGACT Report, "the vehicle was completely destroyed" by
> the IED explosion.  Ex. 1, PX-369 Dustin Wakeman SIGACT Report 1, ECF No.
> 39-1.  Pregent concluded that the attack "was committed by al-Qaeda or an al-
> Qaeda affiliate with material support and resources from the Islamic Republic of
> Iran, its IRGC-QF, and Lebanese Hezbollah."  Pregent Report at 30.  The hidden
> nature and sheer power of the IED device indicate that this attack was a deliberate,
> extrajudicial killing traceable to Iran and its proxies.  *See* Pls.' 2d Suppl. Br. at 12;
> *Schwartz*, 2020 WL 7042842, at *12.

*Driscoll*, 2023 WL 4892710, at *8.

The uncontroverted evidence establishes that Iran is responsible for the August 4, 2007

IED attack in Hawr Rajab, Iraq that caused the death of Corporal Jaron Holliday along with

Sergeant Dustin Wakeman and Corporal Jason Lafleur, making this attack an extrajudicial killing.

### iv.  Attack #4 – April 6, 2008 – Baghdad, Iraq

Lieutenant Colonel Dale Fair was serving as a member of the United States Army in Iraq

in 2008.  **Exhibit 6 at 2-6, 18-21.**  On April 6, 2008, shortly after 3:00 p.m. local time, Lt. Col.

Fair was walking to the Coalition Army Advisory Training Team (CAATT)

headquarters at Phoenix Base in Baghdad, Iraq, when it was bombarded by rocket fire from an

Iranian-backed militia group in the vicinity of Sadr City, Iraq.  ***Id*. at 3-4.**  Major Stuart Wolfer

and Colonel Stephen Scott were both killed in the April 6, 2008 rocket attack.  ***Id*. at 4, 13-16.**  Lt.

Col. Fair was injured during the April 6, 2008 terrorist attack and was awarded a Purple Heart.  ***Id*.

at 5-6, 18-19.**

In *Stearns*, the court received evidence about this attack and specifically found "Iran

responsible for the [ ] April 6, 2008 Attack by supporting proxy forces who conducted the attack."

*Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 343 (D.D.C. 2022).  Round 2 Plaintiffs

ask this Court to take judicial notice of the *Stearns* findings and the underlying evidence upon

which those findings were based, including: (1) the general evidence of Iran's support for terrorist attacks; and (2) the specific evidence of Iran's responsibility for this attack, including the Expert Report of Russell L. McIntyre for the April 6, 2008 Rocket Attacks, *Stearns v. Islamic Republic of Iran*, 1:17-cv-131, ECF No. 35-4.

Consistent with the *Stearns* opinion and Judge Lamberth's bases for the finding that Iran and its proxies bear responsibility for the April 6, 2008 rocket attack, Round 2 Plaintiffs submit that:

> The AR 15-6 Investigation report, reviewed by McIntyre, noted that, "EOD determined the IDF consisted of one Iranian made 107mm rocket." *Id.* at 10. The SIGACT Report the lists the "Modes of Attack" as "Rocket," and specifically a 107mm Iranian rocket. *Id.* at 10. The JTF Troy Report observed that the "[b]last seat, rocket motor, and fragmentation are consistent with one 107mm Iranian rocket dated 2006" and concludes that "P[oint] O[f] I[mpact] was impacted by one Iranian 107mm H[igh] E[xplosive] Rocket." *Id.* The "event storyboard" concludes that the attack consisted of "3x 107 mm Iranian rockets on the I[nternational] Z[one]." *Id.* at 11. Additionally, the "event storyboard" notes that "[t]his is the 4th IDF attack against the international zone since the beginning of April.... Special Group Criminal (SGC) elements within the Sadr City security district continue to attack C[oalition] F[orces] fixed points in response to the perception that an incursion further into Sadr City is imminent." *Id.* After reviewing the available evidence of the attack, McIntyre concludes, in his expert opinion, "it is highly probable that the April 6, 2008 attack on Phoenix Base that killed ... [Maj.] Wolfer was consistent with the types of attacks orchestrated by the IRGC and Hezbollah against U.S. and Coalition Forces operating in Iraq and was committed at the general direction of the IRGC by one of its Special Groups proxies using weapons provided by the IRGC and training provided by the IRGC and Hezbollah." *Id.* at 13.
>
> The representations of plaintiffs' expert and the Court's own review of the materials submitted underscore the lethality, sophistication, and unique physical characteristics of the attack, which are consistent with Iran's facilitation of other attacks involving rockets. Additionally, the attack occurred in an area with a pattern of previous attacks facilitated by Iran-supported proxy groups.

*Stearns*, 633 F. Supp. 3d at 342-43.

The uncontroverted evidence establishes that Iran is responsible for the April 6, 2008 rocket attack in Baghdad, Iraq that injured Lt. Col. Dale Fair and caused the deaths of Major Stuart Wolfer and Colonel Stephen Scott, making this attack an extrajudicial killing.

### v. Attack #5 – April 6, 2008 – Tikrit, Iraq

Specialist Zachary C. Martinez was serving as a member of the United States Army in Iraq in 2008. **Exhibit 7 at 2-9, 21, 22, 24.** On September 8, 2009, Spc. Martinez was part of a four-vehicle convoy of Mine Resistant Ambush Protected vehicles ("MRAPs") traveling in Tikrit, Iraq with the 1st Squad, Second Platoon, 545th Military Police Company when they were attacked with an EFP. *Id.* **at 4-5.** The shockwave from the blast propelled Spc. Martinez forward and shook his whole body. *Id.* Spc. Martinez helped pull Staff Sergeant Shannon Smith out of his destroyed MRAP and recalls, "there was a huge hole is his head and his brain was pouring out on the sand and my boots." *Id.* Likewise, Spc. Martinez assisted in recovering Specialist Zackary Myers's body, which he described as, "blown in half" with his "internal organs" "spilling into the dirt" and "blood everywhere." *Id.* **at 4.** As they tried to pick up Spc. Myers, Spc. Martinez's head slipped into Spc. Myers' rib cage. *Id.* **at 5.** Spc. Martinez then picked up Spc. Myers severed leg and put it with his fallen fellow soldier's body. *Id.* Specialist Thomas Lyons was struggling to breathe following his injuries when Spc. Martinez first saw him, but Spc. Lyons later succumbed to his extensive injuries. *Id.* Spc. Martinez received a Combat Action Badge for his service while actively engaged by the enemy on September 8, 2009. *Id.* **at 8, 21-22.** Specialist Thomas Lyons, Specialist Zachary Myers, and Staff Sergeant Shannon Smith were all killed in action during the September 8, 2009 terrorist attack. *Id.* **at 4-5, 10-13.** Spc. Martinez developed severe PTSD as a result of the EFP attack, which has rendered him unemployable as determined by the Department of Veteran's Affairs. *Id.* **at 5-8, 26-27.**

In *Karcher*, the court received evidence about this attack and specifically found, "Iran and its proxies bear responsibility for the EFP attack that killed Staff Sgt. Smith and Spc. Myers." *Karcher*, 2021 WL 133507 at *61.  Also in *Stearns*, the court received evidence and specifically found "Iran responsible for the September 8, 2009 EFP Attack by supporting proxy forces who conducted the attack."  *Stearns*, 633 F. Supp. 3d at 322.  Round 2 Plaintiffs ask this Court to take judicial notice of the *Karcher* and *Stearns* findings and the underlying evidence upon which those findings were based, including: (1) the general evidence of Iran's support for terrorist attacks; and (2) the specific evidence of Iran's responsibility for this attack, including the Dec. 11, 2019 Consolidated Expert Rep. of Col. (Ret.) Kevin Lutz, *Karcher v. Islamic Repub. of Iran*, No. 16-cv-232, ECF No. 109-1.

Consistent with the *Karcher* opinion,[5] Round 2 Plaintiffs submit that:

> On September 8, 2009, Staff Sgt. Smith and Spc. Myers were traveling east on Salah Ad Din Street with a four-vehicle patrol from the 545th Military Police Company, 607th Military Police Battalion, 8th Military Police Brigade.  *See* Lutz Rep. at 469. Within the patrol, Staff Sgt. Smith and Spc. Myers were riding in the last vehicle of the convoy, which was a Mine Resistant Ambush Protected vehicle ("MRAP").  *See id.*  At approximately 8:00 AM local time, however, an explosive struck Staff Sgt. Smith and Spc. Myers's vehicle from the left side of the road.  *See id.*  The blast blew off the vehicle's doors and the vehicle's turret, leading to the deaths of both Staff Sgt. Smith and Spc. Myers.  *See id.* at 469-70.  To that end, Staff Sgt. Smith's casualty report confirms that he was killed during hostile action in Iraq on September 8, 2009, and, Spc. Myers casualty report similarly confirms that he was killed in action on September 8, 2009 in Iraq, as the result of hostile "blast injuries."  Pls.' Section 1605A(c) Index, Ex. 70 (Smith & Myers Casualty Rep.) at 1–2.

*Karcher*, 2021 WL 133507, at *61.

---

[5] The *Stearns* opinion references *Karcher* and makes essentially the same findings.  *Stearns v. The Islamic Republic of Iran*, 633 F. Supp. 3d 284, 321-322 (D.D.C. 2022).

The *Karcher* court found that "the explosive responsible for the September 8, 2009 attack causing the deaths of Staff Sgt. Smith and Spc. Myers was an EFP traceable to Iran and its proxies." *Id*. Judge Kollar-Kotelly articulated her bases for that finding as follows:

> As an initial matter, the IED report from the attack indicates that the munitions type from the blast was a "Shaped Charge/EFP." Lutz Rep. at 470. Moreover, the SIGACT report from the attack confirms that command wire was recovered from the blast site. *See id.*; disc. *supra* at 20 (noting that EFPs in the Iraqi theatre are commonly initiated through command wire). The record also contains compelling photographic evidence showing the significant damage inflicted to Staff Sgt. Smith and Spc. Myers's MRAP from the blast, including the total destruction of the vehicle's turret. *See* Lutz Rep. at 472-73. Finally, Col. Lutz opines in his expert report that the September 8, 2009 attack "involved an EFP," and further concludes that the attack "was part of the EFP campaign orchestrated by the IRGC and Hezbollah that was conducted by one of the IRGC's Hezbollah-trained Special Group proxies." *Id.* at 474.

*Karcher*, 2021 WL 133507, at *61.

The uncontroverted evidence establishes that Iran is responsible for the September 8, 2009 EFP attack in Tikrit, Iraq that injured Spc. Martinez and caused the deaths of Spc. Thomas Lyons, Spc. Zachary Myers, and Staff Sgt. Shannon Smith, making this attack an extrajudicial killing.

### vi. Attack #6 – June 6, 2011 – Baghdad, Iraq

Master Sergeant David C. Rogers, III was serving as a member of the United States Army in Iraq in 2011. **Exhibit 8 at 2-11, 22-26.** On June 6, 2011 at approximately 5:29 AM, Master Sgt. Rogers was asleep in his housing unit at Joint Security Station Loyalty in Baghdad, Iraq when it was hit with Improvised Rocket Assisted Munitions (IRAMs). ***Id.* at 4.** The first explosion awoke Master Sgt. Rogers who rolled onto the floor and covered himself with his armored vest. ***Id.*** During the bombardment, one IRAM, which fortunately failed to detonate, crashed through the wall of Master Sgt. Rogers' housing unit (a metal trailer) and landed on his bed sending glass and metal debris flying in all directions in his room. ***Id.*** Master Sgt. Rogers was wounded and awarded a Purple Heart. ***Id.* at 22-23.** Hezbollah took credit for the attack and posted a video on

its website touting the IRAM attack as a success. *Id.* at 6-7. Specialist Emilio Campo, Specialist Robert Hartwick, Private First Class Michael Cook, Private First Class Michael Olivieri, Private First Class Christopher Fishbeck, and Specialist Marco Cintron were all killed in action during the IRAM attack. *Id.* at 5, 12-17.

In *Lee*, the court received evidence about this attack and specifically found, "Iran, acting through its proxies, was responsible for the June 6, 2011 IRAM attack on U.S. forces." *Lee v. Islamic Republic of Iran*, 656 F. Supp. 3d 11, 51 (D.D.C. 2023). Round 2 Plaintiffs ask this Court to take judicial notice of the *Lee* findings and the underlying evidence upon which those findings were based, including: (1) the general evidence of Iran's support for terrorist attacks; and (2) the specific evidence of Iran's responsibility for this attack, including Pls.' Second Proposed Findings, Ex. B, Colonel (Ret.) Kevin Lutz Report, *Lee v. Islamic Republic of Iran*, 19-cv-00830, ECF No. 53-2.

Consistent with the *Lee* opinion, Round 2 Plaintiffs submit that:

Around 5:35 a.m. on June 6, 2011, seven explosives were launched from a cargo truck that was used as a mobile launch platform against JSS Loyalty in eastern Baghdad. Lutz Report at 197. Two of the explosives failed to detonate, two impacted near the launcher outside JSS Loyalty, and the remaining three detonated near housing units in JSS Loyalty causing a fire that destroyed 30 of the units and damaged 28 units. *Id.* The two recovered devices had explosive weights of 52.3 and 75.2 pounds. *Id.* The attack killed six U.S. servicemembers, including PFC Fishbeck. *Id.* PFC Fishbeck's Casualty Report confirms he was killed on June 6, 2011, in Baghdad "as a direct result of [indirect fire]." Ex. A at 99.
…

The SIGACT Report lists the "Event Category" as "Indirect Fire" and the "Modes of Attack" as "IRAM." Lutz Report at 197. The report further states that the IRAMs "measured 240 mm in diameter," that "7X impacts were confirmed, 2 of which did not detonate," and that the attack's point of origin "was 150 meters" from a Federal Police checkpoint. *Id.* The report adds that this attack "matches similar TTPS to the (16) IRAM attacks assessed to be conducted by KH between 2007 and 2010," and concludes that "[d]ue to the nature of this attack, this event was coordinated by a [KH] Element, likely based out of Sadr City." *Id.* at 198–99. The SIGACT Report further states that this was the first IRAM attack on COL Loyalty

since April 28, 2008, and that the last IRAM attack in USD-C's area of operation was January 3, 2011. *Id.* at 199. Importantly, "KH claimed and posted videos of both [of] the ... attacks." *Id.* The SIGACT Report predicts that "KH[ ] inten[ded] to increase IDF attacks within Baghdad, with specific threats to utilize al-Ashtar rockets (240mm) within the V[ictory] B[ase] C[omplex], I[nternational] Z[one] and Mal'ab al Shaab areas." *Id.*

The CEXC Triage Report lists items recovered from the scene, which include "[f]ull IRAM 1 weight 191.2 lbs, explosive weight 52.3 lbs." and "[f]ull IRAM 2 weight 196.6 lbs (w/ expended rocket motor), explosive weight 75.2 lbs," *Id.* The JTF Troy Report notes that EOD discovered "1x fired 107mm rocket motor, verified by visual recon, as well as an 8' × 8' blast seat ... 1x 240mm [IRAM] ... 1ea expended 107mm rocket motor with a bolted-on base plate, and found a 12'×6'×3' blast seat ... fragmentation consistent with 1ea expended 107mm rocket motor ... [and] one IRAM and one fuze" at the scene. *Id.* at 199–200.

Lutz concluded that it was "highly probable" that the attack involved the use of IRAMs "propelled by 107mm and 240mm rockets that were supplied by the IRGC," and that KH, an IRGC proxy group, was likely responsible. *Id.* at 196. According to Lutz, the "U.S. government has publicly confirmed the IRGC's provision of 240mm rockets to Shi'a Special Groups (particularly KH) in Iraq." *Id.* at 198. For example, in July 2007, then-Brigadier General Kevin J. Bergner briefed the media regarding the U.S. intelligence community's assessment that Shi'a Special Groups were being trained by Hezbollah instructors in a course that "teaches the use of indirect fire weapons including 60mm and 120mm mortars, and 107mm, 122mm and 240mm rockets." *Id.* Lutz opined that because of this support, it is "unsurprising" that "the SIGACT Report for the June 6, 2011 attack contains an intelligence assessment that the attack was likely committed by KH." *Id.*

Lutz agreed with the Department of Defense's Joint Improvised Explosive Device Defeat Organization's ("JIEDDO") assessment that "IRAMs—at least from 2007-2011—were a signature weapon 'used by Iranian-backed militias that operate with the aid of Iran's Islamic Revolutionary Guards Group.'" *Id.* at 196. Lutz explained that following the attack, KH posted a video "showing multiple IRAMs being fired at FOB Loyalty followed by several explosions. The video contains a subtitle providing the date and location of the attack and KH's logo." *Id.* at 204.

*Lee*, 656 F. Supp. 3d at 50-51.

The uncontroverted evidence establishes that Iran is responsible for the June 6, 2011 IRAM attack in Baghdad, Iraq that injured Master Sgt. Rogers and caused the deaths of Specialist Emilio Campo, Specialist Robert Hartwick, Private First Class Michael Cook, Private First Class Michael

Olivieri, Private First Class Christopher Fishbeck, and Specialist Marco Cintron, making this attack an extrajudicial killing.

### vii. Attack #7 – May 6, 2007 – Baqubah, Iraq

Specialist Larry Clark was serving as a member of the United States Army in Iraq in 2007. **Exhibit 9 at 2-18, 27-28.** On May 6, 2007, Spc. Clark was the driver of a M1126 Stryker infantry carrier vehicle in the 5th Battalion, 20th Infantry Regiment, 3rd Brigade, 2nd Infantry Division. *Id.* **at 3.** The M1126 Stryker is a heavily armored personnel transport vehicle. *Id.* Spc. Clark was driving the lead armored M1126 Stryker in a four-vehicle convoy tasked with IED interdiction. *Id.* **at 4.** Specifically, the convoy was investigating a backhoe digging a hole with a squad of armed guards. *Id.* As the convoy moved forward, Spc. Clark and the team in his Stryker noticed that, in the week since they had last been in the area, concrete barriers had been moved to block the road. *Id.* Pursuant to orders, Spc. Clark drove around the barriers to the right. *Id.* Those barriers re-routed Spc. Clark's M1126 Stryker over a massive, deep-buried improvised explosive device (DBIED) that was command detonated as they crossed over it. *Id.* **at 4-8.** The huge explosion devastated and flipped the 19-ton Stryker. *Id.* **at 5.** The blast knocked Spc. Clark unconscious and he awoke to the sound of gunfire. *Id.* **at 5-8.** The terrorist group followed the DBIED blast with a coordinated small arms attack while Spc. Clark's Stryker was disabled and the rest of the convoy sought to treat the wounded and recover the bodies of the fallen soldiers. *Id.* **at 5-8.** Spc. Clark's hand was broken in multiple places and was trapped in the wreckage of the M1126 as other soldiers in the convoy struggled to free him. *Id.* **at 8-11.** Spc. Clark was flown to Ramstein, Germany where he received treatment and ultimately underwent two hand surgeries to repair open fractures to his dominant right hand. *Id.* **at 11.**

Corporal Matthew Alexander, Corporal Anthony Bradshaw, Sergeant Joel Lewis, Staff Sergeant Jason Harkins, Corporal Michael Pursel, Staff Sergeant Vincenzo Romeo, and

photographer Dmitry Chebotayev were all killed in action in the May 6, 2007 coordinated IED

and gunfire attack, making this attack an extrajudicial killing. *Id.* **at 13.** They were all in Spc.

Clark's M1126 – he was the only survivor from that vehicle. *Id.* **at 6, 8.**

Al-Qaeda in Iraq ("AQI") and its affiliates were responsible for the May 6, 2007 complex

attack in Baqubah, Iraq. **Exhibit 10 at 45.** Plaintiffs' expert Mr. Pregent determined:

> U.S. Army Specialist Larry Clark was injured in a complex IED attack on 6 May 2007 in Baqubah, Diyala Province Iraq. This complex attack involved a command-detonated deep buried IED (DBIED) estimated to be 2000-3000 lbs of explosive material and supporting fires (small-arms fire). The attack resulted in 6 U.S. Casualties – KIAs. Corporal Matthew Alexander, Corporal Anthony Bradshaw, Sergeant Joel Lewis, Staff Sergeant Jason Harkins, Staff Sergeant Vincenzo Romeo, and Corporal Michael Pursel were killed in this attack
> . . .
>
> This is a signature explosives tactic used by al-Qaeda and its affiliates. The IED is a complex attack that requires expert explosives training, intelligence on the patterns of U.S. patrols and operations, rehearsals, and lethal aid. Post-blast coordinated attack with small-arms fire is likewise one of the hallmarks we see in AQI complex attacks. Through mapping and documentation, research confirmed that AQI was the dominant group in the area in 2007.

*Id.* Mr. Pregent further explained the AQI's control of the area at the time:

> In late 2006, al-Qaeda in Iraq forces began a quiet troop build-up in Baqubah, naming it the capital of their "Islamic State of Iraq." "By the end of 2006, al Qaeda – not the government of Iraq – controlled the city of Baqubah and much of Diyala Province." Shortly after this attack, Coalition Forces began Operation Arrowhead Ripper on 19 June, 2007. "The primary aim of Arrowhead Ripper was to clear al-Qaeda from Baqubah, and secure the city."
> . . .
>
> The attack on Spc. Larry Clark occurred during the longer period known at the Battle of Baqubah II from March 2007 through the conclusion of Operation Arrowhead Ripper on August 19, 2007. During this period, Coalition Forces were engaged by an estimated 2500-3000 al-Qaeda insurgents in numerous attacks, including this 6 May, 2007 complex attack.

**Id. at 45-46 (footnotes omitted).**

The uncontroverted evidence establishes that this complex attack involving a large IED blast

followed by attack with small arms fire was perpetrated by AQI.

Iran is liable for the May 6, 2007 attack because Iran provided material support to the AQI for the purposes of causing extrajudicial killings and thereby caused that attack.  Mr. Pregent's expert report explains Iran's broad and longstanding support for the AQI, including providing funding, training, equipment, and munitions.  *Id.* **at 22-28, 33-35, 42-44.**  Iran furnished al-Qaeda and AQI with explosives, and training on how to carry out complex attacks like the May 6, 2007 attack in this case.  *Id.*  More specifically, "The IRGC-QF provided easily accessible lethal aid to al-Qaeda and its affiliates and sustained their operations by pushing Foreign Fighters through established IRGC-QF Syrian facilitation routes into Iraq.  The IRGC-QF and Lebanese Hezbollah made Lethal Aid available to AQI in Diyala Province to target American and Coalition Forces." *Id.* **at 46.**

Mr. Pregent also explained that Iran's material support of the AQI and its affiliates was reasonably connected to and was a cause of the May 6, 2007 attack:

> I attribute this attack to FTO al-Qaeda in Iraq (AQI) and its affiliates that benefited from IRGC-QF lethal aid and Foreign Fighter (FF) facilitation through IRGC-QF, Lebanese Hezbollah, and Syrian intelligence support networks.
> . . .
> As explained previously, IRGC-QF is an arm of Defendant Iran through which Iran provides material support to numerous terrorist organizations, including al-Qaeda, AQI, and their affiliates.  Therefore, I further attribute this 6 May, 2007 attack on Spc. Larry Clark resulting in the extrajudicial killing of Corporal Matthew Alexander, Corporal Anthony Bradshaw, Sergeant Joel Lewis, Staff Sergeant Jason Harkins, Staff Sergeant Vincenzo Romeo, and Corporal Michael Pursel to Defendant Iran and its material support of FTO al-Qaeda in Iraq (AQI) and its affiliates.

*Id.*  This uncontroverted expert evidence is independently sufficient to carry Round 2 Plaintiffs' low burden of proof to establish the connection between Iran's material support to the AQI and the May 6, 2007 attack.  Nevertheless, Plaintiffs also request that the Court take judicial notice of additional evidence.

This Court should take judicial notice of the extensive evidence establishing Iran's material support of AQI for the purpose of bringing about extrajudicial killings. In a number of cases previously decided in this District, the court has considered evidence and repeatedly determined that Iran provided support in the form of financing, training, explosives, and other arms to AQI for the purpose of killing U.S. citizens in Iraq. *See, e.g.*, *Roth v. Islamic Repub. of Iran*, 651 F. Supp. 3d 65, 73-77 (D.D.C. January 17, 2023) (finding that Iran provided material support to AQI related to AQI's attacks on U.S. servicemembers in Iraq from 2004 through 2006, among other dates); *Neiberger v. Islamic Republic of Iran*, 2022 WL 17370239, at \*7-8 (D.D.C. September 8, 2022) (finding that Iran provided material support to AQI related to AQI's attacks on U.S. servicemembers in Iraq); *Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d. 21, 32-33, 39-40 (D.D.C. July 27, 2023) (finding that Iran provided material support for AQI attacks in Iraq from 2004 through 2006, among other dates). Specifically, Plaintiffs request that this Court take judicial notice of the following evidence previously submitted to courts in this District, which shows Iran's material support of the AQI to cause extrajudicial killings:

- Michael Pregent's Expert Report in *Roth*. *See Roth v. Islamic Republic of Iran*, Case No. 1:19-cv-02179, ECF No. 91-2;
- Michael Pregent's Hearing Testimony in *Roth*. *See Roth v. Islamic Republic of Iran*, Case No. 1:19-cv-02179, ECF No. 102;
- Michael Pregent's First Amended Exp. Witness Report in *Brown*. *See Brown v. Islamic Republic of Iran*, Case No. 1:21-cv-1308, ECF No. 34-3;
- Daveed Gartenstein-Ross's Expert Report in *Neiberger*. *See Neiberger v. Islamic Republic of Iran*, Case No. 16-cv-2193, ECF No. 73-6.

Round 2 Plaintiffs' evidence presented in this case, along with the Court's judicial notice of evidence previously submitted in similar cases in this District, establishes Iran's material support for AQI to cause extrajudicial killings and specifically the May 6, 2007 attack in Baqubah, Iraq that wounded Larry Clark.

**C.      Elements Six and Seven are met because Iran is a designated state sponsor of terrorism and the Round 2 Plaintiffs are all U.S. Citizens.**

As with the first three elements, the Plaintiffs' compliance with elements six and seven is straightforward.  The sixth element is met because "[t]he United States designated Iran a state sponsor of terrorism in 1984, and the designation remains in place today." *Taitt v. Islamic Republic of Iran*, 2023 WL 2536518, at *3 (D.D.C. Mar. 16, 2023); *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited January 28, 2025); U.S. Dep't of State, Determination Pursuant to Section 6(i) of the Export Administration Act of 1979—Iran, 49 Fed. Reg. 2836 (Jan. 3, 1984).

The seventh element—proper plaintiffs—is satisfied because Round 2 Plaintiffs were nationals of the United States and/or members of the armed forces at the time of the relevant attack. As attested in the affidavits of the Round 2 Plaintiffs, all Round 2 Plaintiffs were and are U.S. citizens.  *See* 28 U.S.C. § 1605A(h)(5) (defining "national of the United States" by reference to 8 U.S.C. § 1101(a)(22), which includes "a citizen of the United States"); **Exhibit 3 at 2; Exhibit 4 at 2; Exhibit 5 at 2, 19, 28, 32, 38, 43, 53, 60, 65; Exhibit 6 at 2, 8; Exhibit 7 at 2; Exhibit 8 at 2; Exhibit 9 at 2.**  In addition, Round 2 Plaintiffs Matthew Ashmead, Dale Fair, Zachary Martinez, David Rogers, and Larry Clark, were members of the U.S. military at the time of the relevant attacks, **Exhibit 3 at 2; Exhibit 6 at 2; Exhibit 7 at 2; Exhibit 8 at 2; Exhibit 9 at 2.**

In sum, the Round 2 Plaintiffs have established that Iran is not entitled to sovereign immunity from their claims and that this Court therefore has jurisdiction over the claims under 28 U.S.C. §§ 1330(a) and 1605A(a).

V.    **Liability and Damages**

With this Court's personal and subject matter jurisdiction established, all that is left is for the Court to determine Iran's liability and Plaintiffs' entitlement to compensatory and punitive damages.

A.    **Iran Is Liable To Plaintiffs For Causing Their Personal Injuries.**

In addition to creating an exception to immunity giving rise to subject matter jurisdiction, Section 1605A also creates a private right of action against foreign state sponsors of terrorism like Iran. Such a defendant "shall be liable to" a national of the United States, a member of the armed forces, a government contractor, or their legal representative "for personal injury or death caused by acts described in subsection (a)(1) of that foreign state, or of an official, employee, or agent of that foreign state, for which the courts of the United States may maintain jurisdiction under this section for money damages." 28 U.S.C. § 1605A(c). The foreign state is subject to the vicarious liability for the acts of its officials, employees, or agents. *Id.* Plaintiffs who prevail may recover "economic damages, solatium, pain and suffering, and punitive damages." *Id.*

As explained above and as specified for each Round 2 Plaintiff in **Exhibit 1**, the Round 2 Plaintiffs—U.S. nationals and, in some cases, service members—seek relief for personal injuries that were caused by Iran's provision of material support for the terrorist attacks at issue (acting through its agents like the IRGC and its Qods Force), as per Section 1605A(a)(1). For the plaintiffs directly injured by Iran's provision of material support for terrorist attacks—wounded U.S. servicemembers—Iran is liable for those physical personal injuries. And for the Plaintiffs who are family members of U.S. servicemembers killed or injured in those attacks, Iran is liable to the family member Plaintiffs for their solatium claims. Such claims "are functionally identical to claims for intentional infliction of emotional distress." *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014). Solatium claims compensate plaintiffs for "mental anguish,

bereavement and grief" caused by the death or injury of a loved one; courts presume that spouses and children of victims of terrorism suffer compensable mental anguish, and siblings with "close emotional relationships" are typically entitled to relief as well. *Id.* (citing *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 25 (D.D.C. 2011), and *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 30 (D.D.C. 1998)). The mental anguish, grief, and bereavement that these Plaintiffs suffered as a result of the deaths of their immediate family members is laid out in **Exhibit 1**, which cross-references affidavits and other evidence corroborating their entitlement to relief on a solatium theory.[6]

Based on Iran's directly injuring certain plaintiffs and its indirectly injuring others, Iran is liable under Section 1605A(c). This Court should therefore enter judgment in the Round 2 Plaintiffs' favor.

### B.    Plaintiffs Are Entitled To Compensatory Damages.

Courts in this district have adopted standard damage amounts of solatium claims, which are then adjusted upwards or downwards based on the particular circumstances of each case. "As a starting point, the family of a deceased victim typically receives damages in the amount of $8 million for a spouse, $5 million for a child or parent, and $2.5 million for a sibling." *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 53-54 (D.D.C. 2020); *see also* ***Schooley v. Islamic Republic of Iran***, No. 17-cv-376, 2019 WL 2717888, at *74 (D.D.C. June 27, 2019) (same). "[A]n

---

[6] Proceeding on an IIED theory yields the same result. On an FSIA claim, "a defendant is liable for IIED if its 'extreme and outrageous conduct intentionally or recklessly causes severe emotional distress' to a plaintiff," whether or not the plaintiff was present at the time of the incident. *Taitt*, 2023 WL 2536518, at *8 (citations omitted). Here, Iran intentionally provided material support to proxy groups, intending that they engage in terroristic acts, which are "sufficiently extreme and outrageous." *Ben-Yishai v. Syrian Arab Republic*, 2022 WL 17250344, at *11 (D.D.C. Nov. 28, 2022). "The intent requirement is . . . met because 'acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress.'" *Taitt*, 2023 WL 2536518, at *8 (quoting *Belkin*, 667 F. Supp. 2d at 22). And the Round 2 Plaintiffs' severe emotional distress is laid out in **Exhibit 1** and the underlying evidentiary exhibits it cross-references.

upward adjustment may be appropriate in cases with aggravating circumstances, indicated by such things as '[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence' or '[m]edical treatment for depression and related affective disorders.'" *Barry*, 437 F. Supp. 3d at 54 (citations omitted). In the case of aggravating circumstances, an upward adjustment of 25% to solatium damages is appropriate for family members of deceased U.S. contractors. *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 118 (D.D.C. 2015) (awarding a 25% upward adjust despite unrelated issues contributing to the family members' emotional harm and dysfunction); *see also Baker v. Socialist People's Libyan Arab Jamahiriya*, 775 F. Supp. 2d 48, 83 (D.D.C. 2011) (approving an upward departure of 25% from the baseline for solatium damages); *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 86 (D.D.C. 2010) (same). The family member Plaintiffs in Round 2 all discussed profound feelings of permanent loss and recounted the changes in the life because their family member was killed and Round 2 Plaintiffs request 25% upward adjustments for certain of the family members. Their evidence is summarized by family below and in **Exhibit 1**.

For direct victims who were members of the military, Courts in this District have looked to VA disability ratings to help guide the damages awarded. Round 2 Plaintiffs have included evidence of VA disability ratings for the servicemembers who were directly injured during the Round 2 Attacks in order to facilitate equitable and efficient awards of damages. In *Schooley*, this Court relied in part on an "objective metric"—the VA disability rating—to "determin[e] the relative degree of injury suffered by each servicemember plaintiff." *Schooley v. Islamic Republic of Iran*, 2019 WL 2717888, at *74 (D.D.C. June 27, 2019). That rating is the "agency's official determination regarding the extent of disabling injury sustained by service members in connection with military service." *Id.* (internal quotation marks omitted). As *Schooley* explained, "[t]he VA

disability rating, which includes both mental and physical injuries in a single number, facilitates an approach to awarding damages that is generally agnostic to the mental or physical nature of the injury and further provides" an effective way of comparing injuries to ensure that similar injuries yield similar awards. *Id.*; *accord Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) (holding that, in calculating damages, "the Court must take pains to ensure that individuals with similar injuries receive similar awards"); *see also Ackley v. Islamic Republic of Iran*, 2022 WL 3354720, at *51 (D.D.C. August 12, 2022) (using Schooley's "basic rubric" of VA disability ratings to calculate damages amounts); *Christie v. Islamic Republic of Iran*, No. 19-cv-1289, 2020 WL 3606273, at *23 (D.D.C. July 2, 2020) (same); *Aceto v. Islamic Republic of Iran*, 2020 WL 619925, at *18 (D.D.C. Feb. 7, 2020) (same); *Taitt*, 2023 WL 2536518, at *10 (same); *Gunn v. Islamic Republic of Iran*, 2024 WL 3566173, at *12 (D.D.C. July 29, 2024).

"Servicemember plaintiffs rated by the VA up to 30% disabled receive a baseline award of $5,000,000; plaintiffs rated 40–60% disabled by the VA will receive an upward departure, for a total award of $6,000,000; and servicemember plaintiffs rated 70–100% disabled by the VA will receive a further upward departure, for a total of $7,000,000." *Gration v. Islamic Republic of Iran*, 2023 WL 5221955, at *30 (D.D.C. Aug. 15, 2023) (citing *Ackley*, 2022 WL 3354720, at *51 (using this approach); *Christie*, 2020 WL 3606273, at *23 (same); *Aceto*, 2020 WL 619925, at *18 (same)). Plaintiffs request that this Court utilize the VA rating consistent with the approach employed in *Schooley* and its progeny to award damages.

Round 2 Plaintiffs state the following in support of their damages claims as further explained in **Exhibits 1 and 2**.

1. Corporal Matthew Ashmead: As a result of the December 10, 2006 Attack, Plaintiff Cpl. Ashmead sustained the following injuries: post-traumatic stress disorder ("PTSD"), major

depressive disorder, alcohol use disorder, residual of traumatic brain injury ("TBI") and tinnitus.  *See* ECF No. 26 – Amended Complaint at 194-195; **Exhibit 3 at 3-7, 17, 19-21, 24, 51, 55.**  He received the following VA Ratings for his injuries: 100% PTSD with major depressive disorder and alcohol use disorder, residual of TBI; and 10% tinnitus.  *Id.* **at 17, 19.**  Cpl. Ashmead has received ongoing, extensive mental healthcare related to his PTSD, depression, anxiety, and the constellation of other related conditions.  *Id.* **at 6.**  He needs 16 different daily medications to control his symptoms.  *Id.*  He has required inpatient mental health, inpatient holds, and intensive outpatient psychological treatment.  *Id.*  His doctors have attempted electroconvulsive treatment ("ECT") to treat his depression and PTSD.  *Id.*  He has night terrors, battles insomnia, struggles with suicidal ideations, and "tried to kill [himself] twice."  *Id.* **at 6, 21, 39, 51-52, 55.**  In light of these facts, Plaintiffs hereby request that the Court award $7,000,000 in compensatory damages to Matthew Ashmead.  **Exhibit 1 at 1.**

2.  <u>Late Private First-Class Jerome Potter</u>: Jerome Potter, Private First Class in the U.S. Army was killed on May 3, 2007 in an Iran-sponsored IED attack in Baghdad, Iraq.  See ECF No. 26 – Amended Complaint at 70; **Exhibit 4 at 2, 18, 22-23, 71, 78, and 82.**

    i.  <u>Brad Lee Jones</u>: The father of the late Jerome Potter, Plaintiff Brad Lee Jones, was in shock and broke down crying when he learned of his son's death.  *Id.* **at 6.**  Prior to the death of his son, Mr. Jones was gainfully employed as a welder and forklift driver.  *Id.*  But within a short time after his son's death, Mr. Jones lost his job due to his emotion and inattention at work.  *Id.*  He has not been able to work since, and he has been homeless, living in his Ford van since the summer of 2011.  *Id.*  Mr. Jones constantly battles with depression, sadness, and horrible recurring nightmares

about being unable to save his son while be burns to death.  ***Id.***  In light of these facts, Plaintiffs hereby request that the Court award $6,250,000 in compensatory damages to Brad Lee Jones, based on aggravating circumstances.  **Exhibit 1 at 1-2.**

3.  <u>Late Corporal Jaron Holliday</u>: Jaron Holliday, Cpl. in the U.S. Army was killed on August 4, 2007 in an Iran-sponsored IED attack in Hawr Rajab, Iraq.  See ECF No. 26 – Amended Complaint at 73-74; **Exhibit 5 at 2, 6-7, ad 19-23.**

   i.  <u>Kelly Holliday</u>: The mother of the Late Jaron Holliday, Plaintiff Kelly Holliday, learned of her son's death when two men from the U.S. Army came to her door to inform them that her son had been killed in Iraq.  ***Id.* at 7.**  The moment that she walked into her family room and saw the two officers, she "immediately fell to [her] knees and screamed."  ***Id.* at 8.**  "[N]othing will ever compare to the hurt, loss, and emptiness [she] feel[s] when [she] think[s] about the death of [her] son CPL Jaron D. Holliday.  When he was killed, it left a huge hole in [her] life, [her] heart, and [her] family."  ***Id.***  To this day, she still cries when she hears his favorite song come on the radio because it reminds her of him so much.  ***Id.* at 10.**  "There is not a day that goes by that [she doesn't] think about him."  ***Id.***  "For over seventeen years [she has] been deprived his smile, his laugh, [and] his jokes."  ***Id.***  She misses the way that he lit up a room when he entered and how he always knew how to cheer her up when she was sad.  ***Id.* at 11.**  She "will never get to experience that on this side of life again."  ***Id.***  In light of these facts, Plaintiffs hereby request that the Court award $6,250,000 in compensatory damages to Kelly Holliday, based on aggravating circumstances.  **Exhibit 1 at 2.**

ii.   <u>John Holliday, Jr</u>: The father of the Late Jaron Holliday, John Holliday, Jr., learned of his son's death from U.S. Army officers. **Exhibit 5 at 24.** "The harde[st] part was … tell[ing] [his] wife," that Jaron had been killed. ***Id.*** When he brought her into the room with the officers she immediately said, "I want you all to go away," and she began to cry and hold on to Mr. Holliday. ***Id.*** "It was one of the most difficult things that [he has had] to do, and [he] felt the pain of that moment." ***Id.*** "The anniversary of [Jaron's] death … brings [him] a great deal of sorrow and hurt" every year. ***Id.* at 25.** "The thing that [he misses] miss the most about Jaron is his joyful smile, positive attitude, and love he had for his family and others." ***Id.*** In light of these facts, Plaintiffs hereby request that the Court award $5,000,000 in compensatory damages to John Holliday, Jr. **Exhibit 1 at 2.**

iii.  <u>John Holliday, III</u>: The brother of the Late Jaron Holliday, John Holliday, III, was 13 years old when his brother died. **Exhibit 5 at 29.** He "felt confused, angry, and hurt." ***Id.* at 29-30.** He "miss[es] having someone [he can] go to for advice," and he does not "feel like [he has] that anymore." ***Id.* at 30.** In light of these facts, Plaintiffs hereby request that the Court award $2,500,000 in compensatory damages to John Holliday, III. **Exhibit 1 at 2.**

iv.   <u>Joshua Holliday</u>: The brother of the Late Jaron Holliday, Joshua Holliday, "felt a rush of just about every emotion … when [he] heard the news that [Jaron] had been killed." **Exhibit 5 at 34.** Joshua Holliday is now a teacher, and he thinks about his brother "every single day when [he] recite[s] the pledge of allegiance with [his] students." ***Id.*** They never had the opportunity to interact and be there for each as adults because Jaron was taken from the family. ***Id.* at 35.** In light of these facts,

36

Plaintiffs hereby request that the Court award $2,500,000 in compensatory damages to Joshua Holliday. **Exhibit 1 at 2.**

    v.    <u>Jeremiah Holliday</u>: The brother of the Late Jaron Holliday, Jeremiah Holliday, said that after receiving the news of Jaron's death was the "first time that [he] felt [ ] real depression and anxiety in [his] life." **Exhibit 5 at 40.** He cried for years about the loss of his brother. *Id.* He stated that "emotions come flooding back around [Jaron's] birthday, Memorial Day, and [his own] birthday" because the last time that he saw Jaron. *Id.* In light of these facts, Plaintiffs hereby request that the Court award $2,500,000 in compensatory damages to Jeremiah Holliday. **Exhibit 1 at 2.**

    vi.    <u>Jada Holliday</u>: The sister of the Late Jaron Holliday, Jada Holliday, learned of her brother's death when she was only seven years old. **Exhibit 5 at 46.** She answered the door when the Army representative came to give the family the devastating news. *Id.* She "can still hear the screams that [her] mom let out that day." *Id.* **at 47.** When her father brought them all downstairs and told them that Jaron was dead, she was crushed. *Id.* "[T]he anniversary of Jaron's death is always a hard day for [her]." *Id.* **at 48.** She feels "so much sadness and anger" about his death and the way that it forever changed their family. *Id.* Since Jaron's death, she misses "having someone in my family who understands [her]." *Id.* **at 49.** "[N]o one in [her] family really made the effort to know [her] the way [Jaron] did." *Id.* In light of these facts, Plaintiffs hereby request that the Court award $3,125,000 in compensatory damages to Jada Holliday, based on aggravating circumstances. **Exhibit 1 at 2.**

vii. <u>Josiah Holliday</u>: The brother of the Late Jaron Holliday, Josiah Holliday, was so young that he didn't know how to process the emotions when his brother was killed. **Exhibit 5 at 55-56.** He said, "It's never been the same since" Jaron's death. ***Id.* at 56.** "When [Jaron] died, [they] lost a huge part of [their] family." ***Id.*** In light of these facts, Plaintiffs hereby request that the Court award $2,500,000 in compensatory damages to Josiah Holliday. **Exhibit 1 at 2.**

viii. <u>Justus Holliday</u>: The brother of the Late Jaron Holliday, Justus Holliday, learned of his brother's death when he was only four years old as his father woke him up from a nap and told all of the children that Jaron had been killed in Iraq. **Exhibit 5 at 62.** Justus Holliday is "angry because [he] didn't get know [Jaron] like [his] older siblings did." ***Id.*** He feels like he missed out on the opportunity to get to know and grow up with Jaron. ***Id.*** In light of these facts, Plaintiffs hereby request that the Court award $2,500,000 in compensatory damages to Justus Holliday. **Exhibit 1 at 2.**

ix. <u>Jamin Holliday</u>: The brother of the Late Jaron Holliday, Jamin Holliday, feels like he has missed out on his relationship with Jaron these last 17 years because he has "grown so much since then." **Exhibit 5 at 67.** He wishes Jaron "could see [him], and [they] could have talked about relationships and the difficulties in college." ***Id.*** In light of these facts, Plaintiffs hereby request that the Court award $2,500,000 in compensatory damages to Jamin Holliday. **Exhibit 1 at 3.**

4. <u>Lieutenant Colonel Dale Fair</u>: As a result of the April 6, 2008 Attack, Plaintiff Lt. Col. Fair sustained the following injuries: PTSD, TBI, bilateral hearing loss, and tinnitus. *See* ECF No. 26 – Amended Complaint at 99-100; **Exhibit 6 at 5-6, 17, 22-27, 29-31, 33, 37-39.**

He received the following VA ratings, exceeding 100%, for his injuries: 50% PTSD; 70% TBI with mild neurocognitive disorder; 30% peripheral vestibular disorder (post-status TBI); 30% migraine headaches; 10% radiculopathy, left lower extremity: femoral nerve; 10% bilateral hearing loss; and 10% tinnitus. *Id.* **at 22-27.** Lt. Col. Fair required one year of outpatient rehabilitation at Walter Reed Medical Center, as well as extensive treatment for his battery of health problems associated with the attack. *Id.* **at 5.** He also requires "weekly immunoglobulin replacement therapy and take a host of medications to treat [his] ailments." *Id.* His mental health conditions and the complications he has experienced following the terrorist attack have been life changing and remarkably debilitating. *Id.* In light of these facts, Plaintiffs hereby request that the Court award $7,000,000 in compensatory damages to Dale Fair. **Exhibit 1 at 3.**

   i.   <u>Dana Fair</u>: The daughter of Lt. Col. Dale Fair, Plaintiff Dana Fair, states that during her childhood, although her father worked hard and his work in the military took him away from home a lot, she "always loved the time we got together," as a family. **Exhibit 6 at 9.** She recalls that her father worked hard so that kids could be involved in extracurricular activities and so that they could go on family vacations. *Id.* When he was in Iraq, she would speak "on the phone with him daily." *Id.* She recalls that after the attack her father "struggle[ed] mentally," "didn't sleep," and "appeared more on edge or withdrawn," after he returned home. *Id.* She has not been able to do the same types of physical activities with her dad because his injuries have prevented him from being more physically active. *Id.* She said that they can't do those physical activities or go on the trips together because of his physical and psychological injuries. *Id.* In light of these facts, Plaintiffs hereby

request that the Court award $2,500,000 in compensatory damages to Dana Fair. **Exhibit 1 at 4.**

5.  <u>Specialist Zachary Christopher Martinez</u>: As a result of the September 8, 2009 Attack, Plaintiff Spc. Martinez sustained a TBI, developed PTSD, and has tinnitus.  See ECF No. 26 – Amended Complaint at 133-134; **Exhibit 7 at 5-8, 25-29, 35-36, 70-74.**  He received the following VA ratings that total 80% but the VA has assessed Spc. Martinez as unemployable due to these injuries: 70% for PTSD, 10% for tinnitus.  *Id*. **at 23, 25-27, 28.** The impact of the attack on his marriage resulted in a divorce in 2012.  *Id.* **at 6.**  In 2015, the medications that he was prescribed for his PTSD, anxiety, and depression were "causing [him] to hallucinate."  *Id.*  The hallucinating "got worse" and he was "seeing battle buddies in [his] back yard, reliving the day of the attack over and over, and [he] experienced suicidal thoughts."  *Id.*  He eventually got treatment and was even able to get his bachelor's degree in Diesel Science.  *Id.* **at 7.**  However, due to panic attack in public places, he has "been unable to maintain steady, gainful employment."  *Id.*  He estimates that he has "cycled through probably 30 or more jobs over the past 10 years."  *Id.*  He "struggle[s] with maintaining relationships because of [his] anxiety and it's very hard to relate to people in the civilian world."  *Id.*  In light of these facts, Plaintiffs hereby request that the Court award $7,000,000 in compensatory damages to Zachary Christopher Martinez.  **Exhibit 1 at 4.**

6.  <u>Master Sergeant David C. Rogers, III</u>: As a result of the June 6, 2011 Attack, Plaintiff Master Sgt. Rogers sustained the following injuries: PTSD, adjustment disorder, lumbar spine injuries, shrapnel lacerations on both legs, glass in the bottom of his left foot, and tinnitus.  See ECF No. 26 – Amended Complaint at 205-206; **Exhibit 8 at 7-8, 10, 26, 28-**

**31, 38-39, 41-43, 65.**  The VA determined that he is 100% disabled, giving him the following ratings: 70% disability for PTSD, adjustment disorder, and related issues, 10% for tinnitus, 10% for lumbar spine injuries, 10% for left lower extremity injuries, and 10% for right lower extremity injuries, as a result of the attack.  ***Id.* at 8, 10, 26-31.**  As a part of his PTSD he suffers from "survivors guilt," "intrusive thoughts," "chronic avoidance," "loss of feelings," and has required ongoing treatment over the years for my injuries.  ***Id.* at 8-10.**  Master Sgt. Rogers does not believe he could find other employment due to his many deficits related to his injuries from the attack.  ***Id.***  In light of these facts, Plaintiffs hereby request that the Court award $7,000,000 in compensatory damages to David C. Rogers, III.  **Exhibit 1 at 5.**

7.  <u>Specialist Larry Clark</u>: As a result of the May 6, 2007 Attack, Plaintiff Spc. Clark sustained the following injuries: multiple fractures to his dominant right hand necessitating two surgeries with significant residual scarring, shrapnel lacerations to the face, severe PTSD, right wrist injury, and tinnitus.  See ECF No. 26 – Amended Complaint at 107; **Exhibit 9 at 17-18, 29-32, 34, 52-53.**  He received the following VA ratings, totaling 80%, for his injuries: 70% for PTSD, 10% for his right wrist injury, and 10% for tinnitus.  ***Id.* at 18, 29-32.**  His right hand was broken in three places, with two open fractures that required two surgeries, and left two permanent scars that measure 2" and 3/4" respectively.  ***Id.* at 17, 50, 52-53, 55, 58, 59.**  The relationship that Sp. Clark was in at the time of the attack ended shortly after his return and "she told [him] that [he] was a completely different person; the old [Larry] never came home."  ***Id.* at 17.**  He has been unable to have "any meaningful, gainful employment since [he] left the Army in 2010."  ***Id.***  He has suffered from terrible insomnia for "at least a decade, [because] when [he] closed [his] eyes, [he] would have

flashbacks to May 6 – the explosion, the gunfire, being trapped under the Stryker, calling to [his] brothers and not getting a response." *Id.* He suffers from "paranoia and anxiety, and for "years, [he] carried a gun everywhere [he] went." *Id.* "As the sole survivor from [his] Stryker, [he has] significant survivor guilt and battle[s] severe depression." *Id.* "The repercussions of the attack have been debilitating." *Id.* In light of these facts, Plaintiffs hereby request that the Court award $7,000,000 in compensatory damages to Larry Clark.

**Exhibit 1 at 5-6.**

The Court should award Round 2 Plaintiffs the amounts set forth above and in **Exhibit 2.**

**C.        Plaintiffs Are Entitled To Punitive Damages.**

Moreover, "because all Plaintiffs here properly bring their claims under the federal private right of action established by section 1605A(c) . . . they are eligible to seek punitive damages." *Taitt*, 2023 WL 2536518, at *23. One of the "primary methods of calculating punitive damages in FSIA cases" in "[t]his District" "involves multiplying the total compensatory damages award by a factor of between one and five." *Ben-Yishai v. Syrian Arab Republic*, 2022 WL 17250344, at *15 (D.D.C. Nov. 28, 2022). This method is "especially appropriate when the defendants 'did not directly carry out the attack, but funded [a proxy actor].'" *Id*. (citation omitted) (alteration in original). Because Iran "intentionally supported . . . proxy actor[s] who specifically sought to wreak violence," *id.*, this Court should follow "the usual practice" in such cases and adopt "a multiplier of three," *Roth*, 2018 WL 4680270, at *17; *accord, e.g.*, *Taitt*, 2023 WL 2536518, at *23; *Ben-Yishai*, 2022 WL 17250344, at *15; *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93, 126-127 (D.D.C. 2015). The proposed damages in **Exhibit 2** therefore include punitive damages equal to three times the proposed compensatory damages amount.

This Court should award damages in the amount set forth in the chart appended as **Exhibit 2** and the Proposed Order.

### D.    Plaintiffs Are Entitled To Post-Judgment Interest.

Finally, this Court should award post-judgment interest in line with the federal post-judgment interest statute, which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a); *see Flanagan*, 87 F. Supp. 3d at 127 n.39.

## VI.    Conclusion

The Round 2 Plaintiffs respectfully request that the Court enter judgment in their favor against Iran and that it award them damages in the amounts set out in the **Proposed Order**.

Respectfully submitted,

Dated: May 8, 2025

/s/    *Matthew D. McGill*
Matthew D. McGill (D.C. Bar No. 481430)
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, D.C. 20036
Telephone: (202) 955-8500
Facsimile: (202) 530-9522
mmcgill@gibsondunn.com

/s/    *Craig W. Carlson*
Craig W. Carlson (D.C. Bar No. TX0182)
THE CARLSON LAW FIRM, P.C.
100 East Central Expressway
Killeen, TX 76541
Telephone: (254) 526-5688
Facsimile: (254) 526-8204
ccarlson@carlsonattorneys.com

s/ Jeremy C. Shafer
Jeremy C. Shafer
(DC Bar No. 1006578)
VETERAN LEGAL GROUP
700 12th Street NW, Suite 700
Washington, D.C. 20005
Telephone: (888) 215-7834
jshafer@bannerlegal.com

*Attorneys for Plaintiffs*