**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MARY B. HEATON, *et al.*,<br>Plaintiffs,<br>v.<br>THE ISLAMIC REPUBLIC OF IRAN<br>Defendant. | Case No. 19-cv-3003-JMC-MJS |

## REPORT AND RECOMMENDATION

This is a case brought by several hundred plaintiffs—including U.S. servicemembers, military contractors, and the family members of both—based on a series of deadly attacks during the Iraq War. Invoking the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), Plaintiffs pursue recovery from the Islamic Republic of Iran for the injuries they sustained from the attacks. After Iran failed to appear to defend against this action, two groups of bellwether plaintiffs—forty-nine in total—now move for default judgment against Iran. Following its careful review of Plaintiffs' submissions and their evidentiary support, this Court finds that most, but not all, of the Group 1 Plaintiffs properly established Iran's liability and thus a basis to recover damages against Iran in this default posture, and that all the Group 2 Plaintiffs have done the same. In turn, for those Plaintiffs who demonstrated an entitlement to recovery under the FSIA, the Court makes recommendations on damages, sometimes diverging from Plaintiffs' requested awards. Accordingly, and for the reasons that follow, the undersigned **RECOMMENDS** that the Court **GRANT IN PART** and **DENY IN PART** the Group 1 Plaintiffs' motion (ECF No. 51) and **RECOMMENDS** that the Court **GRANT IN PART** the Group 2 Plaintiffs' motion (ECF No. 62).

* * *

In considering these motions, the Court begins with the relevant background and evidence. Next, the Court turns to its recommended findings of fact. As this Court sees it, Iran can be connected to these attacks either by showing that an Iranian-backed proxy group was responsible for the attack, or by showing that a distinctive Iranian weapon was used—typically, an explosively formed penetrator or "EFP." After examining the details of these groups and weapons, the Court walks through an overview of each attack at issue. Then, with relevant findings of fact in hand, the Court turns to the legal analysis, considering personal and subject-matter jurisdiction, liability, and ultimately damages. As explained, the Court ultimately finds that for each EFP attack, Plaintiffs have shown a sufficient connection with Iran to support a finding of liability and damages. And for the proxy group attacks, Plaintiffs have shown a sufficient connection to Iran for all but one group: the Islamic Army of Iraq or the "IAI." Where the IAI is alleged to be responsible for a particular attack, the Court is not, given the evidence before it, able to conclude that the FSIA's terrorism exception supplies a defensible basis to assign liability against Iran for that attack.

## BACKGROUND

### I. Procedural Background

Plaintiffs filed this action in October 2019 and later filed an amended complaint in 2021, adding new plaintiffs and additional allegations. (*See* ECF No. 26 ("Am. Compl.").) By May 2022, Plaintiffs completed service on Iran. (ECF No. 42.) Iran failed to appear in response, so the Clerk entered default against Iran in August 2022. (ECF Nos. 42–44.) Following an order from Judge Jia Cobb (*see* Min. Order, Oct. 5, 2022), Plaintiffs proposed a schedule for default judgment motions (*see* ECF Nos. 45, 46). To that end, Plaintiffs identified a group of bellwether plaintiffs whose

claims implicated twenty representative attacks (the "Group 1 Plaintiffs"). (*See* ECF No. 48.) The Group 1 Plaintiffs then moved for default judgment against Iran. (ECF No. 51 ("Mot. I.").)

In July 2024, Plaintiffs filed a notice of supplemental authority, directing the Court's attention to *Borochov v. Islamic Republic of Iran*, 94 F.4th 1053 (D.C. Cir. 2024). (*See* ECF No. 54.) In *Borochov*, the D.C. Circuit held that a foreign state provides material support for an extrajudicial killing within the meaning of the FSIA's terrorism exception only if the attack that it supported resulted in at least one victim's death. *See* 94 F.4th at 1060–61. Of the twenty representative attacks, Plaintiffs reported that eleven resulted in deaths and nine resulted only in injuries. (*See* ECF No. 54 at 2–5.)[1] In turn, Plaintiffs asked the Court to hold any ruling in abeyance pending further appellate proceedings in *Borochov*, which the undersigned granted. (ECF No. 57 at 1–2; Min. Order, Dec. 20, 2024.) In June 2025, the Supreme Court denied certiorari in *Borochov*, *see* 145 S. Ct. 2847 (2025), leaving the D.C. Circuit's holding undisturbed. Consequently, Plaintiffs then filed a notice of voluntary dismissal for all the *Borochov*-impacted plaintiffs—those associated with the nine attacks resulting in injury only. (*See* ECF Nos. 64, 65.) That left eleven attacks in the original motion, and for these attacks, Plaintiffs have since filed proposed findings of fact and conclusions of law. (ECF No. 58 ("FFCL").)

Meanwhile, in February 2025, Plaintiffs sought leave to file another motion for default judgment as to a second group of bellwether plaintiffs (the "Group 2 Plaintiffs"). (*See* ECF No. 59.) After the Court granted leave, Plaintiffs moved for default judgment as to the Group 2 Plaintiffs, seeking recovery for injuries associated with seven additional attacks. (*See* ECF No. 62 ("Mot. II."); *id.* at 12.)[2]

---

[1] Page citations are to those assigned by the Court's electronic filing system.

[2] In seeking leave, Plaintiffs originally indicated that the Group 2 Plaintiffs would include claims stemming from seven different attacks, but they ultimately only filed for default judgment as to six attacks.

To resolve these motions—which collectively implicate eighteen total attacks and forty-nine Plaintiffs[3]—this Report and Recommendation now follows.

## II. Evidence Supporting Findings of Fact

To secure a default judgment against a foreign sovereign, Plaintiffs must establish their "claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e).

As the D.C. Circuit has explained, this is a relatively "lenient standard" that can be satisfied with a lesser "quantum and quality of evidence ... than that normally required." *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017) (citations and quotation marks omitted), *rev'd on other grounds sub nom. Opati v. Republic of Sudan*, 590 U.S. 418 (2020). Broadly speaking, the standard is met "when the plaintiff shows her claim has some factual basis ... even if she might not have prevailed in a contested proceeding." *Id.* (citation and quotation omitted). In that sense, courts retain considerable latitude as to the evidence considered. *See id.* at 785–86 ("Section 1608(e) does not require a court to step into the shoes of the defaulting party and pursue every possible evidentiary challenge; only where the court relies upon evidence that is both clearly inadmissible and essential to the outcome has it abused its discretion."); *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) ("[W]hen [a] defendant State fails to appear and the plaintiff seeks a default judgment, the FSIA leaves it to the court to determine precisely how much and what kinds of evidence the plaintiff must provide[.]").

In practice, "courts in FSIA cases may look to numerous evidentiary sources" in applying Section 1608(e), including a "plaintiff's uncontroverted factual allegations" supported by "documentary and affidavit evidence"; "traditional documentary and testimonial evidence"; and

[3] Plaintiff Lisa Hundley is counted twice because she is proceeding both individually and as personal representative of the estate of her late husband. (*See* (ECF No. 58 at 18 ("FFCL").)

"evidence in the form of affidavits." *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citations and quotation marks omitted). In addition, "cases in this Circuit and in others have repeatedly sustained jurisdiction or liability or both under the terrorism exception to FSIA based on "expert testimony." *Owens*, 864 F.3d at 788. And courts may also properly "take judicial notice of related proceedings and records in cases before the same court." *Rimkus*, 750 F. Supp. 2d at 171 (citation modified). Here, Plaintiffs ask the Court to consider three general forms of evidence: factual allegations supported by sworn declarations, several expert reports, and other judicially noticeable facts and evidence. The Court broadly discusses each in turn.

**A. Plaintiffs' Uncontroverted Factual Allegations**

Plaintiffs posit that their Amended Complaint consists of "uncontroverted factual allegations," which are "supported by" both "documentary and affidavit evidence." (Mot. I. at 18–19; Mot. II. at 19.) As noted, in the default FSIA context, "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits." *See Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015). Plaintiffs' allegations generally satisfy this test because they are supported by affidavits and documentary evidence. (*See* ECF Nos. 51-7 to 51-29; 62-3 to 62-9.) While some of the source documents contain hearsay, the Court can generally still rely on that evidence under the hearsay exception applicable to statements made for purposes of medical diagnosis or the exception applicable to public records. *See* Fed. R. Evid. 803(4), (8), (9); *Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 16 (D.D.C. 2019). Accordingly, the Court generally considers Plaintiffs' uncontroverted facts and evidence, noting any issues with specific evidence in the context of the Court's substantive discussion throughout the rest of this ruling.

**B. Plaintiffs' Proffered Expert Testimony**

Plaintiffs additionally ask that the Court consider and qualify as experts Dr. Michael Knights, Dr. Patrick Clawson, Lieutenant Colonel Ryan Thompson, and Michael Pregent. (Mot. I. at 19; Mot. II. at 20–21.) For the reasons discussed below, pursuant to Fed. R. Evid. 702, the Court finds each to be qualified on the subject they are proffered to address.

*Dr. Michael Knights* is Plaintiffs' proposed expert on Iran's connection to EFPs and on Iran's "support for terrorist and militia groups in Iraq." (Mot. I. at 19; *see* ECF No. 51-3 ("Knights EFP Decl.").); ECF No. 51-4 ("Knights Militia Decl.").) Dr. Knights holds a Ph.D. in strategic studies and serves as a senior fellow at the Washington Institute for Near East Policy. (Knights Militia Decl. ¶¶ 4, 13.) Dr. Knights has presented and published extensively on "Iran-backed militias in Iraq," has served as a consultant "on Iran and the Middle East for several U.S. government agencies," and has researched security issues related to Iraq for over twenty years. (*Id*. ¶ 6, 10.) Considering his experience, knowledge, and the materials he explains having relied upon to come to his conclusions, the Court concludes that Dr. Knights is qualified as an expert on Iran's connection to both the use of EFPs in Iraq and on militia groups operating in Iraq.

*Dr. Patrick Clawson* serves as Plaintiffs' proposed expert "on Iran and its sponsorship of terrorist organizations." (Mot. I. at 19; *see* ECF No. 51-5 ("Clawson Decl.").) For over twenty-five years, Dr. Clawson has served as the Director of Research for the Washington Institute. (Clawson Decl. ¶ 6.) He has served as a consultant for several government agencies and has testified before Congress on numerous occasions regarding Iranian support for militias and proxy groups. (*Id*. at 2–4, 9.) Dr. Clawson has also been qualified as an expert on Iran and its material support for proxy organizations many times in this District (*see id*. ¶¶ 7–8 (listing cases)). *See, e.g.*, *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 13 n.3 (D.D.C. 2009). Based on the

record before it, this Court likewise deems Dr. Clawson qualified to serve as an expert as to the connections between the insurgent groups in Iraq and Iran's sponsorship of those organizations.

*Ryan Thompson* is presented as Plaintiffs' expert for "improvised explosive devices ('IEDs') and EFPs." (Mot. I. at 19.) Thompson is a Lieutenant Colonel in the U.S. Army Reserve and an engineer specializing in explosive systems like those at issue here. (ECF No. 51-6 ("Thompson Decl.") ¶¶ 2–3.) During a prior deployment to Iraq, Thompson commanded a Special Weapons Exploitation Team and investigated hundreds of IED and EFP incidents. (*Id.* ¶ 5.) In another FSIA case in this District, Mr. Thompson previously qualified as an expert on the same topics presented here. *See Fissler v. Islamic Republic of Iran*, 2026 WL 1162455, at *2 (D.D.C. Apr. 29, 2026). Based on Thompson's declaration and associated materials, this Court similarly finds him qualified as an expert on the use of IEDs and EFPs in Iraq.

*Michael Pregent* is put forward by the Group 2 Plaintiffs as an expert on Iran's support of terrorist organizations. (Mot. II. at 20.) Pregent is a "former intelligence officer," a senior fellow at the Hudson Institute, and his opinions have been published by leading news organizations in print and on television. (ECF No. 62-10 ("Pregent Decl.") ¶¶ 4–5.) Pregent served five tours in Iraq and worked as a subject matter expert for coalition forces on various terrorist groups in Iraq. (*Id.* ¶¶ 5–7.) In at least a dozen cases in this District, Pregent has provided his expert opinion on "Iran's material support of terrorist activities" (*id.* ¶ 16). *See, e.g.*, *Roth v. Islamic Republic of Iran*, 651 F. Supp. 3d 65, 72–73 (D.D.C. 2023) (*Roth II*). On review of Pregent's declaration and the other relevant materials in this case, this Court follows suit and qualifies him as an expert on Iran's material support for various groups in Iraq.

### C. Plaintiffs' Requests for Judicial Notice

In addition to evidence submitted in this case, Plaintiffs also ask the Court to "take judicial notice of expert evidence and other materials submitted in substantially similar litigation." (Mot. I. at 20; Mot. II. at 19.) Plaintiffs also request that the Court take judicial notice of a collection of cases from this District because—for the Group 2 Plaintiffs specifically—many of those prior decisions found Iran responsible for the attacks at issue. (*See* Mot. II. at 20–21.) More, Plaintiffs ask the Court to take judicial notice of expert reports submitted in other similar cases. (*See id.* at 19–20; Mot. I. at 20.) In the default FSIA context, courts "in subsequent related cases" may "rely upon the evidence presented in earlier litigation—without necessitating the formality of having that evidence reproduced—to reach their own, independent findings of fact in the cases before them." *Rimkus*, 750 F. Supp. 2d at 172. The Court will examine the cases and evidence that Plaintiffs identify, while still independently making its own findings of fact. *See id.*; *see also Roth II*, 651 F. Supp. 3d at 73.

## FINDINGS OF FACT

With a general understanding of Plaintiffs' sources of evidence in mind, the Court turns to its recommended findings of fact. In the discussion that follows, the Court first looks at Iran's general ties to attacks in Iraq, either through its support of proxy groups or through its provision of EFPs. Then, the Court specifically considers each of the eighteen attacks at issue.

### I. Iran's Support of Proxy Groups

Since 1984, the United States has designated Iran as a "State Sponsor of Terrorism." *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran, 49 Fed. Reg. 2836-02 (Jan. 23, 1984); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ [https://perma.cc/9RRQ-2QT5] (last visited

Sept. 15, 2026). Judges in this District have extensively chronicled Iran's role in the Iraq War, *see, e.g.*, *Roth II*, 651 F. Supp. 3d at 73–77; *Karcher*, 396 F. Supp. 3d at 22–30, so the Court here focuses only on those connections that are relevant to the attacks at issue.

One principal area of Iran's involvement in the war was its support of proxy groups in Iraq. Plaintiffs' expert, Dr. Clawson, describes how Iran worked "to reduce U.S. influence in the world and, in particular, to force the United States to leave the Middle East." (Clawson Decl. ¶ 19.) In pursuit of that goal, Iran often relied on "proxy groups rather than carrying out attacks directly itself," and it worked with groups from a range of religious and ideological positions, so long as they all "share[d] a common anti-American agenda." (*Id.* ¶¶ 22–24.) To facilitate support for these groups, Iran used its Islamic Revolutionary Guard Corps ("IRGC"), the Qods Force ("IRCG-QF"), and the Ministry of Information and Security ("MOIS"). (*Id.* ¶¶ 26–27, 32, 39, 47; Pregent Decl. ¶¶ 32–36.) Through these organizations, Iran was able to support proxy groups in Iraq by providing travel, funding, training, safe-haven, and weapons. (Clawson Decl. ¶¶ 34, 35, 39, 48, 51, 52.) And during the Iraq War, Iran also leveraged Hezbollah, "an Iranian-funded and IRGC-trained Lebanese terrorist organization," to "help organize and arm Shia groups"[4] fighting against coalition forces. (Pregent Decl. ¶¶ 49, 53.) Of the various proxy groups that Iran is alleged to have supported in Iraq, Plaintiffs home in on five groups: Al-Qaeda in Iraq ("AQI"), later known as the Islamic State of Iraq ("ISI"), Ansar al-Islam ("AAI"), later known as Ansar al-Sunnah ("AAS"), the Islamic Army of Iraq ("IAI"), Jaish al-Mahdi ("JAM"), and Kataib Hezbollah ("KH").

[4] As another judge previously described, "Islam has two major branches: Shia and Sunni Islam …. Though Iran is mostly Shia and the intelligence community historically thought its goal was to spread[] the Shia revolution, … the Quds force helped Sunni groups so long as they acted against the United States." *Roth II*, 651 F. Supp. 3d at 74 n.2 (citations and quotation marks omitted).

### A. Al-Qaeda in Iraq and the Islamic State of Iraq

Al-Qaeda in Iraq was an arm of the "global Al-Qaeda organization," and it benefitted from Iran's support. (Clawson Decl. ¶ 41.) Dr. Clawson characterizes Iran's support of AQI as "sustained and major," coming from "top Iranian leadership." (*Id.* ¶ 46.) In particular, he describes how Iran's MOIS sent "money and weapons" to AQI and negotiated for the release "of AQI operatives." (*Id.* ¶ 47 (citation omitted).) AQI also used Iranian territory as a base and connection between Iraq and Al-Qaeda leadership in Pakistan. (*Id.* ¶ 48.) Through the IRGC, Iran also funded and armed AQI to specifically "target Americans in Iraq and Afghanistan." (Pregent Decl. ¶ 82.)

The relationship between AQI and Iran was sometimes fraught due to religious differences and Iran's prolific support of other organizations in Iraq. (Clawson Decl. ¶¶ 46, 49.) At times, Iran simultaneously supported AQI and Shia militias fighting against it. (*Id.* ¶ 49.) But according to the evidence, Iran kept up its support of AQI because it remained focused on driving coalition forces out of Iraq, regardless of which group ultimately prevailed in that task. (*Id.*; Pregent Decl. ¶ 48.) And because of Iran's support (among other factors), many Iraqis criticized AQI's "foreign components" and "radical" beliefs; so, in an effort to essentially rebrand itself, AQI later merged with a few other groups to become the Islamic State of Iraq. (Clawson Decl. ¶ 43.) As Dr. Clawson describes it, ISI was merely "a continuation of AQI" that received ongoing and material support from Iran. (*Id.* ¶ 43–44.) In fact, ISI was often still referred to as AQI, and it continued to receive weapons and explosives from Iran. (*Id.* ¶¶ 44–45.)

Based on this evidence, Plaintiffs have satisfactorily shown that Iran provided material support to AQI (and later ISI) to attack U.S. forces during the relevant period. (*See id.* ¶ 55.)

### B. Ansar al-Islam and Ansar al-Sunnah

Ansar al-Islam, also known as Ansar al-Sunnah, was a Sunni militia with Al-Qaeda affiliations. (Clawson Decl. ¶¶ 50–51.) In 2003, AAS announced their "dedicat[ion] to fighting U.S. and allied forces" in Iraq, and it is reasonably well documented that Iran supported this group to that end. (*Id.* ¶¶ 50–51.) Iran provided safe-haven and training to AAS fighters—teaching them "how to build and set up [IEDs]," preparing them for sniper attacks, and facilitating movement between Iran and Iraq. (*Id.* (citation omitted).) Other AAS members were prepped in Iran "for various attack scenarios including suicide bombings, assassinations, and general subversion against U.S. forces in Iraq." (*Id.*)

Based on this evidence, Plaintiffs have satisfactorily shown that Iran provided material support to AAI (and later AAS) between 2004 and 2008. (*See id.* ¶ 55.)

### C. Islamic Army of Iraq

According to Dr. Clawson, relevant background about the Islamic Army of Iraq "is more limited." (Clawson Decl. ¶ 52.) Based on the information available, he explains that IAI "was less motivated" by religion, functioning more as a "nationalist" organization. (*Id.*) And far from being a constant enemy to coalition forces, "in about 2008–2009, IAI worked in a limited way with the forces the U.S. government supported," and later in 2014, "some of its fighters" even worked directly "with U.S. forces." (*Id.* ¶ 53.) On review of the limited evidence, Dr. Clawson concludes that Iran materially supported IAI. (*Id.* ¶ 55.) But to reach that conclusion, Dr. Clawson relies in large part on a statement from Colonel Rick Welch, who simply opines that "Iran was funding any group that could keep Iraq chaotic." (*Id.* ¶ 52.) Dr. Clawson does not point to any other specific evidence or concrete connections between IAI and Iran. To the contrary, Dr. Clawson

acknowledges "there are few accounts of Iranian support for Sunni militants" like those in IAI, and he provides no specific accounts of Iranian support for IAI. (*Id.* ¶ 52.)

The Court is unpersuaded that this evidence establishes the necessary connection between Iran and IAI. While Colonel Welch's statement may be correct, it does little to show that Iran provided material support to IAI specifically. Instead, it just bears on the notion that Iran's support was prolific throughout Iraq—a fairly general premise that much of Plaintiffs' other evidence likewise demonstrates. And aside from Colonel Welch's statement, Dr. Clawson's opinion does not point to much else. Without any other evidence to support his conclusion, Dr. Clawson's attempt to tie Iran's support to IAI is not something the Court can credit on the present record. *See, e.g.*, *Sibley v. Islamic Republic of Iran*, 2025 WL 1928036, at *7 (D.D.C. July 14, 2025) ("[A]n expert's unsubstantiated *ipse dixit* is not 'satisfactory' evidence.").

**D. Jaish al-Mahdi ("JAM")**

Jaish al-Mahdi is an Iraqi Shia militia and one of the main Shia insurgent groups that Iran utilized as a proxy. (Clawson Decl. ¶ 27.) Through IRCG-QF and Hezbollah, Iran trained and armed JAM "to augment their ability to inflict damage against U.S. troops." (*See id.* ¶¶ 27, 31–34 (citation omitted).) As Plaintiffs' expert Pregent describes, JAM's leader was "eager to accept financial support and weapons from the IRGC and training from Hezbollah," but he still tried to appear independent from "Iranian influence." (Pregent Decl. ¶ 65.) Iran insisted that it did not provide weapons to JAM, claiming that any Iranian-made weapons must have been residuals from the Iran-Iraq war in the eighties. (Clawson Decl. ¶¶ 34–35.) Iran's denial, however, was soon rebutted when coalition forces began recovering weapons from JAM—many of which were made in Iran after 2003. (*Id.*) Beyond weapons, Iran also offered "basic military training" to many JAM fighters and more advanced training to select JAM leaders. (*Id.* ¶ 34 (citation omitted).)

On this record, Plaintiffs have sufficiently shown that during the relevant period, Iran provided material support to JAM to drive coalition forces out of Iraq. (*See id.* ¶ 55.)

**E. Kataib Hezbollah ("KH")**

Finally, Kataib Hezbollah was "Iran's premiere special operations unit in Iraq." (Pregent Decl. ¶ 66.) Through the IRGC-QF, Iran "manned, equipped, trained, and funded Kataib Hezbollah." (*Id.*) Specifically, IRGC-QF trained KH fighters on "[s]urveillance tactics, [s]niper and kidnapping operations, room clearing, complex ambush tactics," and various explosive attacks. (*Id.* ¶ 68.) During the Iraq War, the group's "signature weapon" was an improvised rocket assisted mortar ("IRAM"). (*Id.* ¶¶ 69, 73.) The weapon worked by using a dump truck, or other large truck, as "a crude launching platform for shrapnel-filled barrel sized explosives," which KH would launch over U.S. compounds to devastating effect. (*Id.* ¶ 69.)

Here, too, Plaintiffs have satisfactorily shown that Iran provided material support to KH to harm U.S. troops in Iraq during the period relevant to their claims.

**II. Iran's Provision of EFPs**

Along with proxy-group support, one of Iran's most notorious contributions to the war in Iraq was the EFP—a weapon designed to penetrate armored vehicles. (Knights EFP Decl. ¶¶ 19, 22.) By initiating an explosion behind "a concave copper plate," an EFP creates "a molten [copper] slug." (*Id.* ¶ 19 (citation omitted).) The molten slug can penetrate a vehicle's armor, after which it "shatters into deadly fragments" and causes a "wide spray of semi-molten metal," which can maim and kill a vehicle's occupants. (*Id.* ¶ 22.) Unlike many other IEDs, EFPs require "complex metallurgy" and other complicated design elements, making it difficult for "non-state actor[s]" to manufacture these weapons. (*Id.* ¶¶ 23, 49.) EFPs made their first recorded appearance in Iraq around August 2004. (*Id.* ¶ 30.) They were devastatingly effective at piercing coalition forces'

armored vehicles, and between November 2005 and December 2011, more than 1,500 EFPs were detonated in Iraq, "killing at least 196 U.S. troops" and injuring many more. (*Id.* at ¶¶ 22, 29.)

Iran supplied almost all the EFPs used during the Iraq War, and those ties are well documented. (*Id.* ¶¶ 34, 38–39, 41.) Evidence of Iran's EFP-related involvement started to mount around 2005, when U.S. special forces "intercepted EFPs entering Iraq from Iran, over the marshes connecting the two countries." (*Id.* ¶ 34; *see also id.* ¶¶ 38–43 (discussing smuggling routes).) As information about Iran's involvement grew, coalition forces were sometimes able to use clues left by an EFP's manufacture (such as a unique chemical signature) to identify the exact mill or designer in Iran who was responsible for making the weapon. (*Id.* ¶¶ 24, 25, 32.) Further, EFPs "never proliferated into the hands of Sunni militants, indicating" Iran's distinct control over these weapons, which it only supplied to Shia groups.[5] (*Id.* ¶ 43.) And Iran did not just supply these weapons; IRGC-QF also sponsored training on how to deploy EFPs. (*Id.* ¶ 33.) Based on this evidence, U.S. military officials concluded that Iran was responsible for the provision of EFPs in Iraq (*id.* ¶ 41), and United Kingdom military officials made similar findings (*id.* ¶ 45).

In recent years, several other judges in this District have found Iran responsible for the provision of EFPs. *See, e.g.*, *Lee v. Islamic Republic of Iran*, 518 F. Supp. 3d 475, 484–85 (D.D.C. 2021); *Karcher*, 396 F. Supp. 3d at 30; *Roth II*, 651 F. Supp. 3d at 89. In keeping with those rulings, and based on the additional evidence here (*see* Knights EFP Decl. ¶ 51 ("[T]o a reasonable degree of certainty … the Iranian government, including the IRGC and its Qods Force, was the principal supplier of almost all, if not all, EFP warheads used in Iraq prior to U.S. military withdrawal in late 2011.")), this Court has no trouble reaching the same conclusion.

[5] Though, as noted above, Iran did still provide support to some Sunni groups, just not in the form of EFPs.

## III. Attacks Against the Group 1 Plaintiffs

Having traced Iran's connections to various proxy groups and to EFPs, the Court now turns to the specific attacks at issue in this case. The Court will first address the eleven Group 1 attacks, broken out based on whether an EFP was involved or not. (*See* Mot. I. at 20, 26.)[6]

### A. EFP Attacks

There are six Group 1 attacks where Plaintiffs have offered evidence of EFP usage.

#### 1. Attack 1 – May 14, 2006 – Baghdad, Iraq

Because this attack was squarely addressed in *Karcher*, the Court relies on evidence from that case while making its own findings of fact. *See Karcher v. Islamic Republic of Iran*, 2021 WL 133507, at *20–21 (D.D.C. Jan. 14, 2021). On May 14, 2006, Army Sergeant First Class ("SFC") Robert West was driving the lead vehicle as part of a convey heading along Route Pluto in Baghdad, Iraq. (ECF No. 51-7 at 10; *Karcher*, 16-cv-232, Lutz Rep., ECF No. 109-1 at 71.) At approximately 6:10 PM local time, an explosion ignited West's up-armored M1114 HMMWV, causing the vehicle to careen and flip. (*Karcher*, 16-cv-232, Lutz Rep., ECF No. 109-1 at 71.) SFC West and the front-seat passenger, Chief Warrant Officer John Engeman, were both killed in the incident. (*See* ECF No. 51-7 at 10.) Later investigation revealed evidence "consistent with a multiple EFP array," including copper residue left on one of the penetrated doors. (*See Karcher*, 16-cv-232, Lutz Rep. ECF No. 109-1 at 72, 75.) Plaintiffs' expert, Thompson, also concluded that the explosive used was an EFP. (Thompson Decl. ¶ 11.a & accompanying report.)

[6] Given the myriad Plaintiffs and attacks at issue, the Court's summary of each attack is relatively brief. But this should not be construed as an effort to minimize the lasting effects of these attacks on the lives of these Plaintiffs. The supporting declarations paint a more fulsome picture of Plaintiffs' pain and grief stemming from the attacks. So, even though the Court's legal summary will not—and frankly, cannot—fully encapsulate the associated details, these declarations were fully considered in the Court's analysis.

2. Attack 2 – January 5, 2010 – Balad, Iraq

On January 5, 2010, Army Sergeant David Croft was conducting a patrol near Balad, Iraq. His convoy of up-armored M1151 HMMWVs was on Route Ninja when it hit a choke point. (ECF No. 51-8 at 23–25.) After some reconnaissance, the convoy opted to proceed and was soon attacked by two EFPs that pierced the lead vehicle with Sgt. Croft inside. (ECF No. 51-8 at 23–25, 40; Thompson Decl. ¶ 11.b & accompanying report.) The blast severely wounded Sgt. Croft, and the convoy was then attacked with small arms fire. (ECF No. 51-8 at 25.) Sgt. Croft was medevacked to Balad, but he ultimately succumbed to the blast wounds and died. (*Id*. at 25, 27, 98, 99, 104.)

3. Attack 3 – March 11, 2008 – Kishkishkia, Iraq

In March 2008, Army Staff Sergeant ("SSG") Laurent West and Army SSG Albert Dyk went to meet a local leader in Kishkishkia, Iraq about a potential weapons cache. (ECF No. 51-9 at 17; ECF No. 51-10 at 4.) On their return trip, their convoy of up-armored M1151 HMMWVs was attacked with a multi-array EFP. (ECF No. 51-9 at 15; Thompson Decl. ¶ 11.c & accompanying report.) The blast struck SSG West in the lead vehicle and killed him. (ECF No. 51-10 at 4.) SSG Dyk was in the second vehicle; he watched as the first one exploded, and he later had to wash the carnage from the attack out of that vehicle. (*Id.*)

4. Attack 4 – September 8, 2009 – Baghdad, Iraq

The evidence related to this attack has been reviewed in *Lee v. Islamic Republic of Iran*, 656 F. Supp. 3d 11, 48–49 (D.D.C. Jan. 30, 2023). On September 8, 2009, Air Force Sergeant Jon Kone participated in a "meet and greet" at an Iraqi Police Station in southern Baghdad. (ECF No. 51-14 at 3–4.) His convoy was travelling through a traffic circle when his up-armored M1151 HMMWV was struck by an EFP (*see* Thompson Decl. ¶ 11.g & accompanying report) that "had been placed between a brick wall and the road" (*Lee*, 19-cv-830, Lutz Rep., ECF No. 53-2 at 187–

88). The blast penetrated the armor of the HMMWV, killing the vehicle commander and injuring Sgt. Kone. (*Id.*; *see also* ECF No. 51-14 at 8–16, 30–31.)

5. Attack 5 – April 21, 2005 – Ramadi, Iraq

Curtis Hundley and Robert Sabado both worked for Blackwater Security Consulting, LLC ("Blackwater"). (ECF No. 51-15 at 6; ECF No. 51-16 at 3.) On April 21, 2005, they were part of a convoy of armored Mamba vehicles traveling from Baghdad to Ramadi when their vehicle was hit by an EFP. (Thompson Decl. ¶ 11.h & accompanying report; ECF No. 51-16 at 4; ECF No. 51-17 at 6, 9–10.) Shrapnel from the blast killed Hundley, and Sabado sustained serious injuries and was medevacked to Landstuhl, Germany. (ECF No. 51-15 at 13; ECF No. 51-16 at 6–8.)

6. Attack 6 – January 18, 2007 – Baghdad, Iraq

This attack was previously addressed by the *Karcher* court, and the Court here looks to that same evidence. *See*, 2021 WL 133507, at *30–31. On January 18, 2007, Army Sergeant Bradley Salisbury was escorting a counterintelligence operator to a meeting in Dawr, Iraq. (ECF No. 51-21 at 4, 8.) Sgt. Salisbury and Specialist ("SPC") William Rechenmacher were in the last vehicle of their convoy of up-armored M1114 HMMWVs when they were struck by an EFP. (*Id.* at 4–6; Thompson Decl. ¶ 11.l & accompanying report.) A molten slug pierced the passenger door, decapitating SPC Rechenmacher and injuring Sgt. Salisbury. (ECF No. 51-21 at 4–6.) The area of the attack was the site of many EFP attacks at the time (*id.*), and the expert in *Karcher* also found that this was an EFP attack (*see Karcher,* 16-cv-232, Lutz Report, ECF 109-1 at 162).

**B. Proxy Group Attacks**

For these next five attacks, Plaintiffs' expert, Dr. Knights, proffered evidence that attempts to link responsibility to various proxy groups. The Court discusses each in turn.

7. Attack 7 – May 21, 2004 – Baghdad, Iraq

On May 21, 2004, Army SSG Jeremy Horton was on patrol near Iskandariyah, Iraq, when he was attacked by an IED that caused "[p]enetrating shrapnel injuries to" his head, killing him. (ECF No. 51-25 at 9, 10; Knights Militia Decl. ¶ 17.a & accompanying report.) Based on the location and other details from the attack, Dr. Knights concluded that this IED attack was carried out by one of the following insurgent groups: AQI, AAS, IAI, or JAM. (*See* Knights Militia Decl. ¶ 17.a & accompanying report.)[7] In recognition of his service, SSG Horton was posthumously awarded a Bronze Star and a Purple Heart. (ECF No. 51-25 at 11.)

8. Attack 8 – September 19, 2007 – Baghdad, Iraq

On September 19, 2007, Army SPC[8] Christopher Neff was in one of two M1A1 Abrams tanks on a counter-IED mission. (ECF No. 51-26 at 11, 19.) SPC Neff's tank was following some tire tracks in the Khadra neighborhood of Baghdad, Iraq when a large surface-laid IED detonated. (*Id*. at 55, 59.) The explosion disabled the tank and severely injured Neff, who later died in route to the hospital. (*Id*. at 17, 71, 106–07.) Dr. Knights concludes that AQI, AAS, or IAI was

[7] Plaintiffs submit that this attack was carried out with a vehicle-borne improvised explosive device ("VBIED") (*see* FFCL at 22), but their only support for that theory seems to be a hearsay statement from an Army chaplain to Horton's mother (*see* ECF No. 51-25 at 4). Ultimately, the Court cannot credit that inadmissible evidence and so cannot conclude that a VBIED was used. *See* Fed. R. Evid. 802; *Flanagan v. Islamic Republic of Iran*, 190 F. Supp. 3d 138, 178 n. 26 (D.D.C. 2016) ("[A] court considering a motion for default judgment under section 1608(e) must draw its findings of fact and conclusions of law from admissible testimony in accordance with the Federal Rules of Evidence[.]") (citation and quotation marks omitted). Plaintiffs suggest that the use of a VBIED indicates that only AQI can be connected to this attack. (*See* FFCL at 20–21.) They point to testimony from Michael Pregent in other cases, explaining that VBIEDs are a part of complex attack methods used by AQI. (*See Roth*, 19-cv-2179, Tr., ECF No. 102 at 30–31, 66, 76; *Brown v. Islamic Republic of Iran*, 21-cv-1308, ECF No. 34-3 ¶¶ 122, 132.) This Court is not persuaded. For one thing, Pregent's opinions in those cases were focused on his specific reviews of other specific attacks, not necessarily VBIED usage writ large. For another, and more strikingly, Plaintiffs' theory conflicts with their expert here, Dr. Knights—who specifically reviewed this attack and this location and believed that there were multiple groups that could be responsible, not just AQI. (*See* Knights Militia Decl. ¶ 17.a & accompanying report.) The Court looks to Dr. Knights' specific assessment of this specific attack over Plaintiffs' alternative connect-the-dots approach from other sources opining about other attacks.

[8] Christopher Neff was posthumously promoted to Specialist. (ECF No. 51-26 at 107.)

responsible for the attack, in part, because these "were the only groups" in the area "taking on heavily-armored" U.S. tanks. (Knights Militia Decl. ¶ 17.b & accompanying report.)

9. Attack 9 – June 20, 2007 – Baghdad, Iraq

On June 20, 2007, while in the Al Jamma area of Baghdad, SSG Darren Hubbell and three other servicemembers were killed by an IED lodged in a doorframe. (Knights Militia Decl. ¶ 17.c & accompanying report.) Because this was an area where AQI, AAS, and the IAI all operated, and considering other facts, Dr. Knights concludes that one of these groups was responsible. (*See id.*)

10. Attack 10 – March 22, 2008 – Husseiniyah, Iraq

Army Sergeant David Stelmat was part of a patrol mission near Husseiniyah, Iraq on March 22, 2008. (ECF No. 51-28 at 37, 188.) While driving along an eastern route, Stelmat's up-armored M114 HMMWV went over an IED that was buried under the road. (*Id.* at 37–38.) The IED was triggered by a command-wire, and the explosion "engulfed the vehicle in flames." (*Id.* at 38.) As other servicemembers tried to help those trapped in the vehicle, it exploded, killing its occupants, including Sgt. Stelmat. (*Id.*) A military investigation concluded that the attack "was more than likely conducted by AQI due to the fact that this was a deep buried, command wire detonated IED which is a common [practice] of AQI." (*Id.* at 13 (capitalization altered).) Dr. Knights concurs with the investigation's conclusion. (Knights Militia Decl. ¶ 17.d & accompanying report ("AQI employed command-wire surface-laid IEDs in rural areas against targets").)

11. Attack 11 – February 7, 2007 – Karmah, Iraq

On February 7, 2007, Navy Hospital Corpsman Manuel Ruiz was in a CH-46E Sea Knight helicopter over Karmah, Iraq. (ECF No. 51-24 at 15.) The helicopter was "shot down by hostile fire," killing Corpsman Ruiz and the six other servicemembers onboard. (*Id.* at 15, 21–23.) ISI publicly took responsibility for this attack (*see* Clawson Decl. ¶ 56) and even posted a video of the

attack after the fact (*see* ECF 51-24 at 7, 9–14). Dr. Clawson concludes that ISI was responsible for that attack. (*See* Clawson Decl. ¶ 56.)

## IV. Attacks Against the Group 2 Plaintiffs

The Court turns next to the seven Group 2 attacks, considering first those attacks where an EFP (or some other weapon of clear Iranian origin) was involved and then considering the remaining attacks that Plaintiffs attribute to various insurgent proxy groups.[9]

### A. EFP and Other Iranian Weapon Attacks

Four of the Group 2 attacks can be traced to Iran by the type of weapon used—generally EFPs and, for one attack, a distinctive Iranian rocket. The Court discusses each in turn.

12. Attack 12 – December 10, 2006 – Sadr City, Iraq

This attack was previously addressed in *Karcher*, 2021 WL 133507, at *28, so this Court relies on the same evidence in making its findings. On December 10, 2006, Army Corporal Matthew Ashmead was on a patrol in Sadr City, Iraq, near Baghdad. (ECF No. 62-3 at 3.) During that patrol, an EFP slug penetrated Ashmead's up-armored M114 HMMWV. (*See Karcher*, 16-cv-232, Lutz Rep. ECF No. 109-1 at 135–36, 140.) As it entered the vehicle, molten copper sliced through servicemembers bodies, killing three and severely wounding two. (*Id.*) Corporal Ashmead watched the brutal attack unfold, and he helped save the lives of two injured soldiers by administering medical care, earning a Combat Medical Badge. (ECF No. 62-3 at 3–4.)

13. Attack 13 – May 3, 2007 – Baghdad, Iraq

The *Karcher* court likewise addressed this attack. 2021 WL 133507, at *38. On May 3, 2007, Army SPC[10] Jerome Potter was driving an M2A3 Bradley vehicle in Baghdad, Iraq (ECF

[9] To remain sequential, the Court's numbering in this section diverges from that used in Plaintiffs' motion.

[10] Potter was posthumously promoted from Private First Class to Specialist. (ECF No. 62-4 at 17.)

No. 62-4 at 17) when the side of the vehicle was struck by an EFP explosion (*see Karcher*, 16-cv-232, Lutz Rep., ECF No. 109-1 at 227, 230). The vehicle caught fire and crashed into a nearby civilian car. (*Id.*) Then, combatants shot at SPC Bradley from rooftops. (*Id.*) Most of the passengers were able to escape, but despite their efforts to put out the fire, they could not remove SOC Potter from the driver's seat, and he died in the burning vehicle. (*Id.* at 227–28.)

14. <u>Attack 14 – April 6, 2008 – Baghdad, Iraq</u>

This attack was previously reviewed in *Stearns v. Islamic Republic of Iran*, 633 F. Supp. 3d 284, 343 (D.D.C. 2022). On April 6, 2008, Army Lieutenant Colonel ("LTC") Dale Fair was at Phoenix Base in Baghdad, Iraq, when it was attacked by rocket and mortar fire. (ECF No. 62-6 at 3.) LTC Fair was thrown to the ground by the blast and knocked unconscious. (*Id.* at 5.) Two other soldiers, Major Stuard Wolfer and Col. Stephen Scott were killed in the attack. (*Id.* at 4, 13.) The expert in *Stearns* reviewed the various post-attack investigations and evidence, determining that the attack was directed by the IRGC with IRGC weapons, including "a 107mm Iranian rocket." (*See Stearns*, 17-cv-131, McIntyre Rep., ECF No. 35-4 at 12.)

15. <u>Attack 15 – September 8, 2009 – Tikrit, Iraq</u>

This attack was previously reviewed in both *Karcher*, 2021 WL 133507 at *61 and *Stearns*, 633 F. Supp. 3d at 321–22. Army SPC Zachary C. Martinez was on a "normal" pick-up and drop-off mission on September 8, 2009. (ECF No. 62-7 at 4.) He was traveling through Tikrit, Iraq in a convoy of four mine resistant ambush protected vehicles when the vehicle behind him was pierced by an explosion. (*Id.* at 4.) SPC Martinez ran to assist and was confronted with the gory aftermath: SPC Zachary T. Myers, who was already dead on the scene, and two other servicemembers who Martinez tried to help, but who ultimately died from their severe blast-related injuries. (*Id.* at 4–5,

12.) The expert in *Karcher* described a variety of evidence supporting the conclusion that this was an EFP attack. (16-cv-232, Lutz Rep., ECF No. 109-1 at 478.)

**B. Proxy Group Attacks**

The Group 2 Plaintiffs separately focus on three additional attacks they contend can be connected to Iran through the responsible proxy group.

16. Attack 16 – August 4, 2007 – Hawr Rajab, Iraq

This attack was addressed in *Driscoll v. Islamic Republic of Iran*, 2023 WL 4892710, at *8 (D.D.C. June 27, 2023), *report and recommendation adopted*, 2023 WL 5932974 (D.D.C. July 13, 2023). On August 4, 2007, Army Corporal Jaron Holliday was on a recovery mission when his vehicle was hit by an IED blast. (*See Driscoll*, 20-cv-0622, SIGACT Rep., ECF No. 39-1 at 1.) The explosion destroyed Cpl. Holliday's vehicle, killing him and two other servicemembers. (*See* ECF No. 62-5 at 82.) The available information on this attack is comparatively sparse, but in *Driscoll*, Pregent reviewed this attack and found that it was carried out by AQI or its affiliates. (*Driscoll*, 20-cv-0622, Pregent Rep., ECF No. 26 at 30.)

17. Attack 17 – June 6, 2011 – Baghdad, Iraq

This attack was reviewed in *Lee*, 656 F. Supp. 3d at 49–51. Army Master Sergeant ("MSG") David C. Rogers was in his housing unit in the early morning hours of June 6, 2011, when he heard large explosions from around the base. (ECF No. 62-8 at 4.) MSG Rogers grabbed his armored vest, pulled it over himself, and a few moments later, an unexploded IRAM broke through the door of his housing unit. (*Id.* at 4–5 (picture of an IRAM and a crumpled wall).) Shrapnel and debris injured MSG Rogers' legs, and six other servicemembers died from the attack. (*Id.*) KH subsequently took credit for the attack and even posted a video of it. (*Id.* at 6–7.) Based on

substantial evidence, the expert in *Lee* concluded that this was an attack carried out by KH with support from IRGC. (*See* 19-cv-830, Lutz Rep., ECF No. 53-2 at 199.)

18. Attack 18 – May 6, 2007 – Baqubah, Iraq

On May 6, 2007, Army SPC Larry Clark was driving an M1126 Stryker infantry vehicle. (ECF No. 62-9 at 3.) He was on a mission to "engage an enemy IED emplacement team near Baqubah, Iraq," which was "the self-proclaimed capital" for AQI, and later, ISI. (*Id.*) As Clark was navigating around a concrete barrier, another infantryman in the Stryker commented, "this is a suicide mission"—and "[m]oments later," a deep-buried IED detonated under the vehicle, flipping it over. (*Id.* at 4.) SPC Clark "lost consciousness and woke to gunfire." (*Id.* 4–5.) The blast killed six servicemembers, along with a photographer who was embedded within the group. (*Id.* at 6, 19.) SPC Clark had to be worked out from under the Stryker and then medevacked to Germany via Balad. (*Id.* at 11.) Plaintiffs' expert, Pregent, determined that this attack was perpetrated by AQI based on the type of attack, the location, and other evidence. (*See* Pregent Rep. ¶¶ 167–73.)

## LEGAL STANDARDS

Foreign states are generally immune from suit in federal court, but the FSIA creates a few exceptions. "These exceptions are the 'sole bas[es] for obtaining jurisdiction over a foreign state in federal court' in a civil case." *Borochov*, 94 F.4th at 1060 (quoting *Permanent Mission of India to the United Nations v. City of New York*, 551 U.S. 193, 197 (2007)). Relevant here, the FSIA's "terrorism exception" provides jurisdiction and "a cause of action for U.S. citizens, members of the U.S. armed forces, and U.S. government employees who have been injured by foreign states' acts or sponsorship of terrorism." *Id.* at 1057 (citing 28 U.S.C. § 1605A(a)(1), (c)). And because such defendants rarely participate in any legal defense of their actions in court, suits against these

foreign states often end up in a default judgment posture, *see Boothe v. Islamic Republic of Iran*, 2026 WL 809887, at *1 (D.D.C. Mar. 24, 2026), as here.

After the Clerk enters default against a foreign sovereign, it is up to plaintiffs to move for a default judgment. *See* Fed. R. Civ. P. 55(b)(2). Once they have done so, the entry of a default judgment "is not automatic." *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005). Rather, in the FSIA context, plaintiffs must affirmatively demonstrate that the Court has personal jurisdiction over the foreign sovereign and subject matter jurisdiction over their claims. *See id.*; 28 U.S.C. § 1330(a)–(b). FSIA plaintiffs must then establish their claims "by evidence satisfactory to the court." *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1046 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1068(e)). "Precisely what that standard entails—that is, how much and what kind of evidence the default provision requires—is unclear." *Id*. The "FSIA leaves it to the court to determine precisely how much and what kinds of evidence" will be "satisfactory to the court," but claims under the FSIA's terrorism exception should be considered in light of the statute's purpose: preventing state sponsors of terror "from escaping liability." *Id.* at 1047–48.

## ANALYSIS

In assessing the two default judgment motions here, the Court begins with jurisdiction, then turns to liability, and finally considers damages.

### I. Personal Jurisdiction

"In cases involving default judgment under the FSIA, personal jurisdiction exists if effective service of process has been made." *Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 209 (D.D.C. 2012) (citing 28 U.S.C. 1330(b); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 89 (D.C. Cir. 2002)). Through Section 1608(a), Congress prescribed "four methods of service" listed "in descending order of preference." *Barot v. Embassy of the*

*Republic of Zambia*, 785 F.3d 26, 27 (D.C. Cir. 2015). Under that framework, FSIA plaintiffs "must attempt service by the first method (or determine that it is unavailable) before proceeding to the second method, and so on." *Angellino v. Royal Family Al–Saud*, 688 F.3d 771, 773 (D.C. Cir. 2012) (citation and quotation marks omitted). Here, Plaintiffs demonstrated that they were unable to effectuate service under the first three methods. (*See* Mot. I. at 11; ECF Nos. 28–29.) So, they resorted to option four: "sending two copies of the summons and complaint and a notice of suit" (in both English and the country's official language) to the Secretary of State, who can then effectuate service by sending a "copy of the papers through diplomatic channels." 28 U.S.C. § 1608(a)(4). The record establishes that Plaintiffs adhered to the requirements of subsection (a)(4) (*see* ECF Nos. 33, 34), and the Secretary of State then used diplomatic channels to deliver the relevant papers to the Iranian Ministry of Foreign Affairs (*see* ECF No. 42 (explaining the documents were sent via the Foreign Interests Section of the Embassy of Switzerland in Tehran).). Accordingly, because Plaintiffs effected service in accordance with the FSIA, the Court properly exercises personal jurisdiction over Iran. *See* 28 U.S.C. § 1330(b).

## II. Subject-Matter Jurisdiction

To establish subject-matter jurisdiction, Plaintiffs invoke the FSIA's terrorism exception. *See* 28 U.S.C. § 1605A. As the D.C. Circuit recently summarized, the exception applies to create jurisdiction for claims against a foreign state when: (1) "the foreign state was designated as a state sponsor of terrorism[,]" (2) "at the time of 'a personal injury or death[,]" (3) "that was caused by an … extrajudicial killing … or the provision of material support or resources for such an act," (4)

"and the claimant is 'a national of the United States.'" *Vickers ex rel. K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 991 (D.C. Cir. 2025) (quoting 28 U.S.C. § 1605A(a), (c)).[11]

Most of these statutory elements are easily satisfied. Iran has been designated a state sponsor of terrorism for decades, including at the time of the attacks. *See* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979–Iran, 49 Fed. Reg. 2836-02 (Jan. 19, 1984); U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ [https://perma.cc/7VCX-Z89W] (last visited Sept. 15, 2026). And the Plaintiffs across these two motions are all U.S. citizens who seek recourse stemming from personal injury or death. The key question that remains is whether Plaintiffs have shown their injuries were "caused by" Iran's material support for the various attacks. *See* 28 U.S.C. § 1605A(a)(1). And on that remaining element, most but not all the Plaintiffs' claims succeed.

"The D.C. Circuit has adopted a proximate cause standard for the FSIA terrorism exception." *Lee*, 656 F. Supp. 3d at 54 (citing *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1128 (D.C. Cir. 2004)). In this context, that means Plaintiffs must show "some reasonable connection between the act ... of the defendant and the damage which the plaintiff has suffered." *Id.* (quoting *Owens v. Republic of Sudan*, 864 F.3d 751, 794 (D.C. Cir. 2017)). The inquiry focuses on two components: "First, the defendant's actions must be a 'substantial factor' in the sequence of events that led to the plaintiff's injury. Second, the plaintiff's injury must have been 'reasonably foreseeable or anticipated as a natural consequence' of the

[11] "[I]n a case in which the act occurred in the foreign state against which the claim has been brought," there is an additional statutory requirement that "the claimant has afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with the accepted international rules of arbitration." *See Karcher v. Islamic Republic of Iran*, 396 F. Supp. 3d 12, 53–54 (D.D.C. 2019) (citing 28 U.S.C. § 1605A(a)(2)). But as Plaintiffs note (Mot. I. at 13 n.2), none of the attacks at issue occurred in Iran, so this requirement is inapplicable here.

defendant's conduct." *Owens*, 864 F.3d at 794 (quoting *Rothstein v. UBS*, 708 F.3d 82, 91 (2d Cir. 2013)). And "when a plaintiff bases his terrorism-exception claim on material support," as here, the "support need not 'go directly for the specific act' in order to have proximately caused it." *Sibley*, 2025 WL 1928036, at *10 (quoting *Kilburn*, 376 F.3d at 1130). Courts have instead "found proximate cause when a state's material support increased the *capacity* of a terrorist group to perpetrate attacks." *Id.* (emphasis added) (collecting cases). In other words, Plaintiffs here must show some reasonable connection reflecting Iran's material support for the attacks at issue, but the requisite connection need not be a one-to-one link.

Plaintiffs attempt to establish proximate cause in one of two ways: either by identifying an attack as an EFP attack or by identifying the proxy groups responsible for an attack and then arguing that the responsible proxy group(s) receives Iranian support.

Where Plaintiffs point to an EFP-involved attack, the Court agrees with Dr. Knights' conclusion that "the Iranian government … was the principal supplier of almost all … EFP warheads used in Iraq." (Knights EFP Decl. ¶ 51.) Further, as explained above, Plaintiffs' evidence demonstrates what other judges in this District have already found: the use of "an EFP *all but* necessitates the inference that Iran was responsible." *See Karcher*, 396 F. Supp. 3d at 30. And any lingering doubt about Iran's responsibility for these specific attacks is dispelled by the supporting expert testimony that Plaintiffs marshal. For the Group 1 attacks, Plaintiffs rely on expert reviews of each EFP attack that reasonably show a link between Iran and the EFP used in each instance. (*See* Knights EFP Decl. ¶ 53; Thompson Decl. ¶ 11 & accompanying reports.) For the Group 2 attacks, Plaintiffs direct the Court to expert evidence adduced in other cases, which likewise shows a reasonable connection between Iran and the EFP attacks at issue. These findings appropriately establish that Iran's material support was a substantial factor in the underlying

events. From there, Plaintiffs' injuries from the EFP attacks—whether the direct injuries to the victims, or the ensuing grief that engulfed their loved ones—are a reasonably foreseeable consequence of Iran's provision of these gruesome weapons. *See Lee*, 656 F. Supp. 3d at 54 ("It is clear from Iran's … provision of evolving and ever-more lethal weaponry to insurgents in Iraq that Iran reasonably anticipated—and indeed, intended—that its support would lead to the death and serious injury of U.S. soldiers."). In sum, the Court has no trouble concluding that Iran provided the EFP(s) for the attacks presented in these motions.[12] *See also Roth*, 651 F. Supp. 3d at 90 (finding proximate cause for EFP attacks).

Similarly, for Attack 14, Plaintiffs introduced evidence to show that an Iranian-made weapon—specifically, an Iranian 107mm rocket—was used to carry out the attack. This fact, alongside other expert evidence of IRGC support, satisfactorily shows Iran's material support. (*See id.*) Indeed, this Court is not the first to find that Iran bears responsibility for this specific attack. *See Stearns*, 633 F. Supp. 3d at 342–43.

Turning to the proxy-group attacks, Plaintiffs and their experts first discuss the type of attack and the area where it occurred to try to pin down the group (or groups) that could be responsible. Then, Plaintiffs and their experts attempt to show that these groups received material support from Iran. As other judges in this District have recognized, under this approach, Plaintiffs must show that (1) "Iran … 'generally provided material support or resources to the terrorist organization[s] which contributed to [their] ability to carry out the terrorist act' at issue"; and (2) "the 'particular terrorist group[s]' did indeed 'commit[] the terrorist act.'" *Flores v. Islamic Republic of Iran*, 2025 WL 2719429, at *3 (D.D.C. Sept. 24, 2025) (quoting *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 67 (D.D.C. 2008)). As explained, for most of the proxy group attacks,

[12] Attacks 1, 2, 3, 4, 5, 6, 12, 13, and 15.

Plaintiffs meet both these elements. But for the few Group 1 attacks where Plaintiffs attribute potential responsibility to IAI (among other groups), they come up short.

For most of the proxy group attacks, Plaintiffs have shown prolific Iranian support for the implicated organizations, and they have also satisfactorily shown how those organizations were behind the deadly attacks. Specifically, for Attacks 10, 16, and 18, Plaintiffs' experts used each attack's timing, location, tactics, and technology to show that only AQI could be responsible. Dr. Knights concluded that Attack 10 was likely carried out by AQI based on the time and place of the attack alongside the attackers' use of a deep-buried command wire to detonate an IED. (Knights Militia Decl. ¶ 17.d & accompanying report.) And for Attacks 16 and 18, Pregent followed that same approach to show that AQI was responsible. (*See Driscoll*, 20-cv-622, Pregent Rep., ECF No. 26 at 30; (Pregent Rep. at 45–46).) The Court found that Iran provided material support to AQI (and later ISI) during the relevant period for these attacks. And that support—*i.e.*, weapons and funding—makes Plaintiffs' resulting injuries reasonably foreseeable. So, Plaintiffs' evidence neatly stacks up to show Iran's material support was reasonably connected to these attacks.

The same is true for Attacks 11 and 17, in connection with which Plaintiffs show that an Iranian-backed group claimed credit for the attacks. Though not always conclusive on its own—terrorist groups sometimes lie about the acts they commit—the fact that an insurgent group took credit for an attack is strong support for an expert's ensuing conclusion that the group is responsible. *See, e.g.*, *Estate of Fishbeck v. Islamic Republic of Iran*, 2024 WL 5375596, at *6 (D.D.C. Dec. 9, 2024); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 344 (D.D.C. 2020). For Attack 11, ISI posted a two-minute video showing footage of the attack and took credit. Dr. Clawson relied on this and other evidence to conclude that ISI was responsible. (*See* Clawson Decl. ¶ 56.) Similarly, for Attack 17, KH posted footage of and took credit for the attack, helping

the expert in *Lee* to conclude that this was an attack by KH with weapons supplied from IRGC. (*See* 19-cv-830, Lutz Rep., ECF No. 53-2 at 199.) Because the Court already found that both ISI and KH received material support from Iran to attack U.S. troops, Plaintiffs' evidence shows that Iran's material support was a proximate cause of these attacks.

That leaves Attacks 7, 8, and 9. There, Plaintiffs and their expert point to a small list of groups, arguing generally that one of those groups was responsible for each attack. Specifically, Dr. Knights attributes responsibility to one of several insurgent proxy groups: AQI or AAS or IAI or (for Attack 7 only) JAM. (Knights Militia Decl. ¶¶ 11.a, 11.b, 11.c & accompanying reports.) There is nothing inherently wrong with that analytical approach as a general matter. *See Roth*, 651 F. Supp. 3d at 81–82, 91 (finding proximate cause where expert tied both "AAH and KH" to attacks). But it only works if Plaintiffs can show that all of the potentially implicated groups received material support from Iran. *See Flores*, 2025 WL 2719429, at *3. And although Plaintiffs have sufficiently shown Iran's material support for three of the groups identified—AQI, AAS, and JAM—they have not made a satisfactory showing as to IAI (*see id.* § I.C).

As the Court explained, it cannot credit Dr. Clawson's conclusion that Iran supported IAI because it hinges on a broad and generalized view, drawn from "numerous commentaries," that Iran's support was "broadly distributed" during that period, with "Iran was funding *any group* that could keep Iraq chaotic." (Clawson Decl. ¶ 52 (emphasis added).) Dr. Clawson posits, in essence, that because Iran's support was so widespread during that timeframe, one can essentially assume that any group operating in the region was supported by Iran. That logic requires too great a leap. Without better evidence showing that Iran provided material support to IAI during the period

relevant to these attacks, the Court cannot find that Iran was a proximate cause of the attacks for which, by Plaintiffs' own expert's telling, IAI may have been responsible.[13]

In summary, Plaintiffs have demonstrated causation as to Attacks 1 through 6 and Attacks 10 through 18, which means the Court properly exercises subject-matter jurisdiction over Plaintiffs' claims against Iran stemming from those attacks. The Court turns next to liability.

## III. Liability

Through 28 U.S.C. § 1605A(c), the FSIA provides "a cause of action for the same conduct that gives rise to subject-matter jurisdiction under the terrorism exception to sovereign immunity." *Lee*, 656 F. Supp. 3d at 56 (quoting *Karcher*, 2021 WL 133507, at *67). In other words, "[t]here is almost total 'overlap between the elements of [§ 1605A(c)'s] cause of action and the terrorism exception to foreign sovereign immunity,'" such that when a U.S. citizen or other qualifying individual "offers proof sufficient to establish a waiver of foreign sovereign immunity under" the FSIA's terrorism exception, they have "also established entitlement to relief as a matter of federal law." *Fritz v. Islamic Republic of Iran*, 320 F. Supp. 3d 48, 86–87 (D.D.C. 2018) (quoting *Foley v. Syrian Arab Republic*, 249 F. Supp. 3d 186, 205 (D.D.C. 2017).[14] So, for the same reasons the

[13] To show otherwise, Plaintiffs would need to either provide more concrete and specific evidence establishing Iran's material support of IAI during the relevant period, or they would need to reasonably foreclose the possibility that IAI was among the groups responsible for these incidents (the latter of which would seem a tall order given Dr. Knights' existing opinions). As the record stands, though, Plaintiffs come up short in showing that Iran's material support was a proximate cause for Attacks 7, 8, and 9.

[14] Some cases in this District have held that Section 1605A(c)'s "private cause of action" does "not provide [a] substantive basis for plaintiffs' claims." *See, e.g.*, *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 62 (D.D.C. 2021) (citation and quotation marks omitted). Rather, in addition to the Section 1605A(c) elements, these cases required FSIA plaintiffs "to prove a theory of liability," generally under tort-law principles, to "justif[y] holding the defendants culpable." *Id.* (citation and quotation marks omitted). Under that framework, Plaintiffs argue that Iran is liable for assault, battery, and IIED. (FFCL at 39–41.) But the D.C. Circuit recently clarified that courts need *not* "search outside the statute" for liability because to establish the elements of Section 1605A(c) is to "establish[] … liability" under the FSIA's terrorism exception. *Vickers ex rel. K.E.F.V. v. Islamic Republic of Iran*, 135 F.4th 988, 991 & n.4 (D.C. Cir. 2025)

Court has subject-matter jurisdiction, those Plaintiffs bringing claims related to Attacks 1–6 and 10–18 have established liability against Iran, opening a path to recovery of damages.

## IV. Damages

Plaintiffs in FSIA actions may seek "economic damages, solatium, pain and suffering, and punitive damages." 28 U.S.C. § 1605A(c). Here, Plaintiffs seek compensatory damages in the form of solatium and pain and suffering, and they seek punitive damages and prejudgment interest. (*See* Mot. I. at 31–34; Mot. II. at 38.) "To obtain damages for a[n] FSIA claim, a plaintiff must prove that the consequences of the defendants' acts were reasonably certain to occur, and he must prove the amount of damages by a reasonable estimate." *Selig v. Islamic Republic of Iran*, 573 F. Supp. 3d 40, 63–64 (D.D.C. 2021) (quoting *Abedini v. Government of Islamic Republic of Iran*, 422 F. Supp. 3d 118, 136 (D.D.C. 2019)). As discussed above, Plaintiffs have established that the personal injuries and deaths were a reasonably foreseeable consequence of Iran's conduct. The Court must assess whether each Plaintiff's claim for damages is sufficiently supported by a reasonable estimate. To do so, the Court begins by discussing the broader compensatory damage standards for solatium and pain and suffering, before making recommended damages awards for each Plaintiff entitled to recovery. Finally, the Court examines punitive damages and prejudgment interest.

### A. Compensatory Damages Standards

"No amount of money can compensate a victim and his family for suffering after a terrorist attack." *Mark v. Islamic Republic of Iran*, 626 F. Supp. 3d 16, 35 (D.D.C. 2022). Assessing damages in FSIA cases "is an imperfect science," where "courts strive to maintain consistency of awards between plaintiffs in comparable situations." *Id.* (citation modified). To that end, courts in this jurisdiction often look to the benchmarks in *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006), which "serve as a useful reference point" for compensatory

damages. *See Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 351 (D.C. Cir. 2018). These baselines are helpful, but "not binding precedent," so courts "invariably must exercise discretion in determining damages awards under the FSIA" based on the individual facts. *Id.* at 351, 361. Because Plaintiffs seek either solatium or pain and suffering damages, the Court starts with the relevant standards for these types of damages, alongside the typical *Heiser* benchmarks for each.

1. Solatium Damages

Many of the bellwether plaintiffs are immediate family members seeking solatium damages connected to the personal injuries or deaths of those victimized in the attacks. "To calculate solatium, a court considers two factors": (1) "the 'injury to the feelings' of a family member caused by the circumstances of the decedent's death" and (2) "the loss of the 'decedent's comfort and society.'" *Vickers*, 135 F.4th at 992 (quoting *Fraenkel*, 892 F.3d at 356). In general, the relationship between the victim and the family member who seeks relief determines the baseline amount of the award. *See Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 29–31 (D.D.C. 1998); *Fraenkel*, 892 F.3d at 356–57. For family-member claimants of a deceased victim, the *Heiser* baseline is: $8 million for spouses, $5 million for parents and children, and $2.5 million for siblings. *See Heiser*, 466 F. Supp. 2d at 269; *Oveissi v. Islamic Republic of Iran*, 768 F. Supp. 2d 16, 26 (D.D.C. 2011). "These amounts are [typically] halved for the family of an injured victim, with courts generally awarding $4 million to a spouse, $2.5 million to a child or parent, and $1.25 million to a sibling." *Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63, 92 (D.D.C. 2023). But again, "these figures 'are not set in stone and the Court may award greater amounts in cases with aggravating circumstances' or lower amounts 'where the relationship between the claimant and the decedent is more attenuated.'" *Mark*, 626 F. Supp. 3d at 35–36 (quoting *Selig*, 573 F. Supp. 3d at 65).

As to aggravating circumstances, courts typically consider facts that fall into "one of three categories: evidence establishing an especially close relationship between the plaintiff and decedent, in comparison to the normal interactions to be expected given the familial relationship; medical proof of severe pain, grief or suffering on behalf of the claimant; and circumstances surrounding the terrorist attack which made the suffering particularly more acute or agonizing." *Oveissi*, 768 F. Supp. 2d at 26–27. "For example, an upward deviation may be appropriate if the relative of a victim suffers unusually severe mental anguish leading to 'suicidal thoughts and attempts,'" *Heching v. Syrian Arab Republic*, 2025 WL 2959909, at *4 (D.D.C. Oct. 20, 2025) (quoting *Cabrera v. Islamic Republic of Iran*, 2022 WL 2817730, at *50 (D.D.C. July 19, 2022)), whereas other "medical conditions [that do] not involve hospitalization" are often adequately compensated by the "baseline" award, *Fishbeck*, 2025 WL 2410090, at *10. Additionally, as Plaintiffs note (Mot. II. at 40), some judges in this District find aggravating circumstances where testimony "describes a general feeling of permanent loss or change caused by decedent's absence." *See, e.g.*, *Barry v. Islamic Republic of Iran*, 437 F. Supp. 3d 15, 54 (D.D.C. 2020) (quoting *Valore*, 700 F. Supp. 2d at 85–86). As to this factor, the undersigned respectfully gives it little weight because a sense of permanent loss seems to be, unfortunately, a near-uniform result of having a family member killed in a terrorist attack, which is precisely what the baseline awards are meant to compensate. Overall, "deviations are generally not warranted absent evidence of 'unusual' circumstances." *Heching*, 2025 WL 2959909, at *4 (quoting *Roth*, 78 F. Supp. 3d at 405).

The Court pauses here to address a case that features prominently in Plaintiffs' proposed damages spreadsheets (ECF Nos. 51-2, 62-2): *Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015). Plaintiffs point frequently to *Flanagan* in seeking upward departures from the *Heiser* baselines. In *Flanagan*, the grieving family-member plaintiffs were all diagnosed with

and met the necessary criteria for "persistent complex bereavement-related disorder," and the court received specific expert evidence about the specific symptoms that accompanied that medical diagnosis as to each plaintiff—for instance, the victim's mother suffered from "a chronic, heightened state of mourning" that persistently led to "trouble getting through her day and carrying out normal life routines." 87 F. Supp. 3d at 109–113, 118. That specific diagnosis and the accompanying expert evidence animated the court's upward departure analysis. *See id.* at 118. Here, while some Plaintiffs may analogize to *Flanagan* on some level—due to diagnoses and symptoms associated with depression, anxiety, or similar medical issues—Plaintiffs have generally not adduced expert medical evidence of the sort described in *Flanagan*. Nor have they made much of an argument to truly analogize to *Flanagan*. (*See generally* ECF Nos. 51-2, 62-2 (providing short, footnote citations to explain upward departures).) So, where Plaintiffs rely on *Flanagan*, the Court notes as much, but it is generally unpersuaded by the comparison. *See also Fishbeck*, 2024 WL 4119382, at *6 ("[A]nxiety, depression, and PTSD '[w]hile serious ... are less severe than those [conditions] found to warrant a significant damages enhancement on their own.'") (quoting *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 86 (D.D.C. 2017)).

2. <u>Pain and Suffering Damages</u>

Other bellwether plaintiffs are direct victims of an attack, and they seek pain and suffering damages to compensate for their emotional distress and physical injuries. For pain and suffering, courts in this district generally begin with the assumption that "persons suffering substantial injuries in terrorist attacks" should receive at least $5 million in damages. *Barry*, 410 F. Supp. 3d at 53; *see Mark*, 626 F. Supp. 3d at 35; *Heiser*, 466 F. Supp. 2d at 269. As for departures from that assumptive baseline, *Schooley v. Islamic Republic of Iran* provides a framework to use VA disability ratings as an "objective metric" to compare the injuries of many servicemembers and to

take into account "both mental and physical injuries in a single number." *See* 2019 WL 2717888, at *74 (D.D.C. June 27, 2019); *Brown v. Islamic Republic of Iran*, 687 F. Supp. 3d 21, 45 (D.D.C. 2023) (using the *Schooley* framework); *Bein v. Islamic Republic of Iran*, 2026 WL 809794, at *15 (D.D.C. Mar. 24, 2026) (similar), *report and recommendation adopted sub nom. Deuley v. Islamic Republic of Iran*, 2026 WL 1212253 (D.D.C. May 4, 2026). *Schooley* generally "instructs that servicemembers rated up to 30% disabled receive the standard *Heiser* award of $5 million each; those rated between 40–60% disabled receive an upward departure to $6 million each; and those rated 70–100% disabled receive a further upward departure to $7 million each." *See Brown*, 687 F. Supp. 3d at 46 (citing *Schooley*, 2019 WL 2717888, at *75).[15] To the extent that certain Plaintiffs (such as government contractors) do not have VA disability ratings to guide the necessary analysis, courts typically look to "the extent of the injuries" to determine if any departures are warranted. *Id.* at 45, 47 (awarding baseline damages to two plaintiffs without VA ratings and departing upward to $7 million for one with "extensive injuries"). Downward departures are often proper where "the estates of victims who quickly succumb to their injuries" seek compensation for that window of pain and suffering. *Selig*, 573 F. Supp. 3d at 64 ("[A] $1 million pain-and-suffering award is typically given to the estates of victims who quickly succumb to their injuries[.]").

* * *

With these damage standards in mind, the Court proceeds to its specific damages recommendations, using Plaintiffs' proposed damage findings to guide the analysis. (*See* FFCL at 42–58; ECF No. 51-2; Mot. II. at 41–50; ECF No. 62-2.) Given the number of Plaintiffs, the Court's descriptions of the impacts of grief will be abridged, but the evidence provided by Plaintiffs—both in their individual declarations and otherwise—paints a vivid picture of immense

---

[15] Where Plaintiffs seek damages lower than this framework, the Court credits their damage assessment.

and lasting grief in the wake of these attacks. The Court's legal analysis does not capture the full emotional scale, but it fully considered the record submitted in making its recommendations.

**B. Compensatory Damages Recommendations**

1. Attack 1 – May 14, 2006 – Baghdad, Iraq

*Mary B. Heaton (Robert West's mother and a U.S. citizen)*. Ms. Heaton learned of her son's death over the phone while she was at work. (ECF No. 51-7 at 5.) Robert was killed on Mother's Day, and his funeral required a closed casket due to the breadth of his injuries. (*Id*. at 4.) In facing the loss of her son, Ms. Heaton describes, among other things how, "a part of [her] is missing—17 years later it is still missing." (*Id*. at 7.) She has attended counseling and taken antidepressants, but she still lacks a sense of closure. (*Id.*) Against those and the other proffered facts, the Court recommends a baseline award of $5,000,000. Although Ms. Heaton invokes *Flanagan* in asking for a 25% upward departure (FFCL at 43), her symptoms of depression (which the Court does not minimize) are not enough to warrant a departure here. *See Fishbeck*, 2024 WL 4119382, at *6.

*Lisa R. Brooks (Robert West's sister and a U.S. citizen)*. Ms. Brooks was one year older than Robert. (ECF No. 51-7 at 18.) They were very close when they were younger, especially after their father passed away while they were kids. (*Id*.) As adults, they "had a tenuous relationship," and the two got into a fight three years before West's death; they had not been talking around the time of his deployment. (*Id.*) Upon learning of her brother's death, Ms. Brooks was "in complete and total shock," and she felt immense sadness. (*Id.* at 18-19.) Considering Ms. Brooks sense of "sadness, loss, guilt, and regret" (*id.* at 19) and the related proffered facts, the Court recommends a baseline damage award at the amount requested: $2,500,000.[16]

[16] The Court considered a downward departure given the estranged and tenuous nature of their relationship, *see Estate of Hirshfeld v. Islamic Republic of Iran*, 330 F. Supp. 3d 107, 147 (D.D.C. 2018) ("Downward

2. Attack 2 – January 5, 2010 – Balad, Iraq

*Victoria Croft (David Croft's mother and a U.S. citizen)*. An Army Chaplain informed Ms. Croft that her son David was dead. (ECF No. 51-8 at 12.) David's funeral likewise required a closed casket because of the severity of his injuries. (*Id.*) According to Ms. Croft, she thinks about her son constantly, and she feels as though "a part of [her] died the night that David died." (*Id*. at 14, 16.) David's birthday and the Christmas holiday are particularly difficult for her. (*Id.* at 14–15.) Ms. Croft seeks a 25% upward departure based on *Flanagan*. (ECF No. 51-2 at 2.) While Ms. Croft has certainly suffered deep and lasting grief (*see* FFCL at 43–44), the record does not contain evidence showing that she received any heightened diagnosis or treatment to justify an upward departure. The Court thus recommends a baseline damages award of $5,000,000.

*Robin Messer (David Croft's sister and a U.S. citizen)*. Ms. Messer was close with her brother, and they talked over the phone the day before David was killed. (ECF No. 51-8 at 122.) David's death significantly impacted Ms. Messer's relationship with her fiancé, and the two broke up a few months later. (*Id*. at 122, 123.) She has dealt with "depression and required medications" in the wake of his death. (*Id*. at 123.) Pointing to *Flanagan*, Ms. Messer seeks an upward departure of 25%. (ECF No. 51-2 at 2.) But again, though Ms. Messer has shown some medical manifestations of grief, the Court is still left without the sort of medical evidence presented in *Flanagan* to justify a heightened award, so the Court recommends a baseline award of $2,500,000.

*Tyler Croft (David Croft's brother and a U.S. citizen)*. Tyler Croft was fourteen years old when his brother died, and David's death marked the loss of a "role model" in Tyler's life. (ECF No. 51-8 at 117.) Tyler now has "anxiety over losing people," which impacts many of his personal

departures may be justified where the evidence suggests an attenuated relationship between the victim and [their] family members."), but ultimately concluded that a reduction was not warranted.

relationships. (*Id*. at 118.) Under *Flanagan* (ECF No. 51-2 at 3), he seeks an upward departure of 25%, but the record does not contain sufficient evidence of unusually aggravating circumstances to justify a heightened award. The Court recommends baseline damages of $2,500,000.

*Melodie Hanson (David Croft's half-sister and a U.S. citizen)*.[17] Ms. Hanson was eight years older than David, and she "often helped care for David when he was young." (ECF No. 51-8 at 133.) She was pregnant at the time of his death and had recently spoken to David about the possibility of naming her son after him. (*Id*.) When she heard her brother had been killed, she felt like "life drained out of [her]," and she was "put on bed rest during the rest of [her] pregnancy." (*Id*.) Later, she "struggled for years with "depression and alcoholism," but has now "been in recovery for 5 years." (*Id.* at 134.) While she likewise seeks a 25% upward departure based on *Flanagan* (*see* ECF No. 51-2 at 3), the Court again does not believe the record supports that departure and instead recommends a baseline award of $2,500,000.

*Andrea Croft*[18] *(David Croft's Half-Sister and a U.S. citizen)*. Ms. Croft was six years older than David, and she feels that "there is always a huge piece missing since [he] died." (*Id*. at 129.) Ms. Croft described the devastation of losing David and how much she misses their "long talks" in the early morning and his "'Million-Dollar' smile." (*Id.*) Ms. Croft cites to *Flanagan* to seek a 25% upward departure. (ECF No. 51-2 at 3.) But again, the Court sees insufficient evidence to support it. The Court recommends a baseline damages award of $2,500,000.

3. Attack 3 – March 11, 2008 – Kishkishkia, Iraq

*Laurie West (Laurent West's mother and U.S. citizen)*. As soon as Ms. West saw Army officials coming up her driveway, her "whole life imploded," and she "was frozen in place." (ECF

---

[17] That Melodie Hanson and Andrea Croft are half-siblings does not impact their ability to recover solatium damages. *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 49–52 (D.D.C. 2007).

[18] Andrea Croft appears elsewhere by her prior last name, Whatley. (ECF No. 51-8 at 127 n.1.)

No. 51-9 at 7.) During Laurent's funeral, she "felt tremendous anger and hate." (*Id*. at 8.) Having served in the Army herself, she questioned why she let him follow in her footsteps, and she faces near daily reminders of his death. (*Id.* at 7–8.) Pointing to *Flanagan*, Ms. West seeks a 25% upward departure (ECF No. 52-2 at 3) but without analogous evidence of particularly unusual facts, the Court see no basis for a departure and recommends instead a baseline award of $5,000,000.

*Albert Dyk (direct victim and U.S. citizen)*. Albert Dyk has a VA rating for "100% Posttraumatic Stress Disorder (PTSD)" stemming from the attack. (ECF No. 51-10 at 6–7.) He suffers from occasional "hallucinations" of Laurent West's "dead body and smell[s] blood even though nothing is there." (*Id.* at 4.) He struggles, in particular, when driving and while socializing with strangers. (*Id.* at 5–6.) In 2019, Albert reported symptoms of "anxiety, anger, crying spells, guilt, numbness, and fleeting suicidal thoughts." (*Id.* at 34.) He seeks an award of $4,750,000. (*See* ECF No. 51-2 at 3.) The Court recommends awarding these damages as requested.

4. Attack 4 – September 8, 2009 – Baghdad, Iraq

*Jon Kone (direct victim and U.S. citizen)*. Jon Kone suffered a shoulder wound requiring five stitches, and he continues to "suffer[] from survivor's guilt." (ECF No. 51-14 at 10, 31.) He was medically discharged from the U.S. Air Force. (*Id.* at 34–36.) His VA rating is at 70%, including a non-ratable, service-related traumatic brain injury ("TBI"), PTSD, and back pain with numbness and tingling. (*Id*. at 42.) While he "can still do many physical activities," he is limited based on whether "[his] back is cooperative or not." (*Id.* at 16.) He seeks damages in the amount of $6,000,000 (ECF No. 51-2 at 4), which the Court recommends awarding.

5. Attack 5 – April 21, 2005 – Ramadi, Iraq

*Lisa Hundley as personal representative of Curtis Lee Hundley's estate*. Curtis Hundley suffered devastating physical injuries from the blast. The people who recovered Hundley's body

estimate that he succumbed to his injuries about "3–5 minutes" after the explosion. (ECF No. 51-17 at 12.) Per the autopsy report, Curtis Hundley suffered the following injuries: "Multiple penetrating shrapnel injuries" to his forehead and face, lacerations along his side and arms, along with other abrasions, including an injury to his femoral artery, causing him to bleed to death. (ECF No. 51-15 at 13–15.) Because his suffering was brief (though agonizing), a downward departure is apt. *Selig*, 573 F. Supp. 3d at 64 (recommending $1 million dollar award to victims who "quickly succumb to their injuries"). Ms. Hundley asks for $1,000,000 as personal representative of her late husband's estate (*see* ECF No. 51-2 at 5), and the Court recommends granting that award.

*Lisa Hundley (Curtis Hundley's wife and U.S. citizen)*. After learning about Curtis's death, the first few days for Ms. Hundley were just "a blur." (ECF No. 51-15 at 7.) Amid her grief in the early days after his death, she was pestered by media, and "[t]here were weeks on end [when she] did not leave the house." (*Id*. at 7–8.) She tried to make it through a night-school program but was unable to finish due to overwhelming feelings of grief. (*Id.* at 8.) She describes how much she misses simple moments with him such as sharing some coffee and "telling jokes." (*Id*. at 10.) Pointing to *Flanagan*, she seeks an upward departure of 25%, but because the record does not include any medical diagnosis or expert evidence comparable to what was presented in *Flanagan* (*see* FFCL at 46), the Court recommends a baseline damages award of $8,000,000.

*Robert Sabado (direct victim and U.S. citizen)*. Robert Sabado led the Mamba Unit when it was attacked. (ECF No. 51-16 at 4.) Hundley was supposed to have flown home earlier that afternoon, but he talked Sabado into letting him join the mission, which has caused serious feelings of survivor's guilt for Sabado. (*Id.* at 6.) More, Sabado himself suffered severe injuries in the attack. He had to be taken to the Army Hospital in Landstuhl, Germany, where he underwent "5 surgeries in 6 days." (*Id.* at 8.) The attack left him with an impairment in his left ear and PTSD.

(*Id.* at 47, 51, 113–19.) Sabado has also struggled with suicidal ideations and serious problems in his marriage in the wake of the attack. (*Id.* at 12–14.) While not 100% well, he was able to redeploy to Iraq with Blackwater "within 2 months after [his] injuries." (*Id.* at 11.) Sabado seeks an award of $7,000,000. Given the evidence reflecting Sabado's suicidal ideations and other severe physical injuries, the Court agrees that an upward departure is warranted. But that finding is tempered somewhat by the fact that he was able to redeploy in reasonably short order. So, the Court recommends a damages award of $6,000,000, at a more modest upward departure than requested.

*Michelle Sabado (Robert Sabado's wife and U.S. citizen)*. After the attack, Ms. Sabado dealt with Robert's frequent "screaming nightmares and horrible PTSD attacks that he does not remember." (ECF No. 51-16 at 128.) He "would experience mood swings, suicidal episodes, and irrational outbursts." (*Id*.) "He was scary and unstable, even violent at times." (*Id*.) The couple separated for over a year and had to "rebuild [their] relationship from the ground up." (*Id.* at 129.) Because he no longer works, Ms. Sabado had to return to full-time work. (*Id.*) Even still, they ended up declaring bankruptcy and moving away from family—from California to South Carolina—to live in a less expensive area. (*Id*.) Ms. Sabado seeks a baseline award of $4,000,000 in damages. (ECF No. 51-2 at 5.) The Court recommends awarding damages in that amount.

*Skyler Sabado (Robert Sabado's son and U.S. citizen)*. Skyler was nine years old when his dad was injured. (ECF No. 51-16 at 141.) Skyler watched as his PTSD-stricken dad "lash[ed] out in anger at [his] Mom." (*Id.* at 143.) And because of Skyler's young age at the time, he often did not understand why things had changed so much after the attack. (*Id.*) He seeks baseline damages of $2,500,000 (ECF No. 51-2 at 5), and the Court recommends awarding that amount.

*Crystal Sabado (Robert Sabado's daughter and U.S. citizen).* Crystal was twenty-one years old at the time of the attack. (ECF No. 51-16 at 137.) She "was just happy" he was alive, but when

he returned, he "was not the same at all." (*Id.* at 139.) The attack "took a part of the Dad [that she] once knew," and he has never been the same since. (*Id.*) She seeks $2,500,000 in damages (ECF No. 51-2 at 6), and the Court recommends awarding that amount.

*Tiffany Sabado (Robert Sabado's daughter and U.S. citizen)*. Tiffany was twenty years old at the time of the attack. (ECF No. 51-16 at 132.) Since the attack, her father is "erratic" and "unpredictable," and she is "definitely apprehensive when [she] interact[s] with him." (*Id.* at 134.) He is no longer the "happy person that was easy to talk to and fun to be around"—she "miss[es] that person." (*Id.*) Like Robert's other children, Tiffany seeks an award of $2,500,000 (ECF No. 51-2 at 6), and the Court recommends awarding damages in that amount.

6. <u>Attack 6 – January 18, 2007 – Baghdad, Iraq</u>

*Bradley Salisbury (direct victim).*[19] Bradley describes how, during the attack, melted copper went "sprawling throughout" the vehicle, causing a bruised femur bone, shrapnel wounds in his leg, a burned esophagus, and burns on his face. (ECF No. 51-21 at 5, 19.) After the attack, he was rated by the VA at 100% disability, accounting for PTSD, migraines, tinnitus, and a TBI. (*Id.* at 37, 39–56.) Before the attack, Bradley traveled frequently, but nowadays, he reportedly only feels comfortable at three places: his home, his barber, and his grocery store. (*Id.* at 6.) He seeks damages valued at $6,500,000. (ECF No. 51-2 at 6.) Given his high VA rating and various injuries, the Courts recommends awarding damages in that amount.

*Deidre Salisbury (Bradley Salisbury's wife and U.S. citizen)*. Ms. Salisbury "miss[es] [her] husband" who used to be "carefree," unlike the person who now, on "certain holidays and dates … gets extremely upset and cries." (ECF No. 51-21 at 71.) She has "to drive [him] because he is

[19] Originally, Bradley Salisbury was separately serving as M.S.'s Next Friend and seeking damages on her behalf. But the two are now estranged, so he is no longer serving in that capacity (ECF No. 51-21 at 3), and Plaintiffs do not seek damages for M.S. in their proposed findings of fact (*see* FFCL at 56–57).

afraid to" drive himself, and Bradley's "PTSD has taken an extreme toll on [their] family." (*Id.*) She has "seen him have full-blown anxiety attacks just being in the car where he couldn't breathe[,]" meaning that "[they] can't go on long road trips and visit [their] family out of state." (*Id.*) Despite having a college degree, Ms. Salisbury is "unable to work because [she has] to provide care for Brad." (*Id.* at 72.) She feels that she "lost [her] husband the day of the [a]ttack and had no idea the struggles [they] would face after." (*Id.*) She seeks damages in the amount of $4,000,000. (ECF No. 51-2 at 7.) The Court recommends an award in the requested amount.

*Robin Bogacz (Bradley Salisbury's mother and U.S. citizen)*. Ms. Bogacz was so "scared" for her son when she learned that he was hurt in the attack, and she "felt useless" because, at that moment, there was nothing that she could do to help her son. (ECF No. 51-21 at 76.) Before the attack, her son was such a "loving person," who was "always laughing and . . . hav[ing] a great time"; now he is "very anti-social," and she doesn't get to see him "very much" because they live states away and he "has a hard time driving" due to his PTSD. (*Id.*) She requests $2,500,000 at the baseline level (*see* ECF No. 51-2 at 7), and the Court recommends granting that award.

*Amy Crandall (Bradley Salisbury's sister and U.S. citizen)*. Ms. Crandall is ten years older than Bradley. (ECF No. 51-21 at 80.) After he joined the military, they "became very close," and he "was [her] best friend." (*Id.*) Since the attack, her brother "is very angry at the world," and she misses "him being happy and outgoing." (*Id.*) She is "so sad to see how bad he hurts." (*Id.*) She seeks a damages award of $1,250,000 (ECF No. 51-2 at 7), and the Court recommends granting it.

7. Attack 7 – May 21, 2004 – Iskandariyah, Iraq

*Gretchen Miller (Jeremy Horton's mother and U.S. Citizen)*. The Court does not presently recommend any damages award for Ms. Miller because, for the reasons explained above, Plaintiffs have not established the requisite jurisdiction or liability as to her claim.

8. Attack 8 – September 19, 2007 – Baghdad, Iraq

*William Neff (Christian Neff's father and U.S. citizen)*; *Nancy Neff (Christian Neff's mother and U.S. citizen)*; and *Shannon Neff (Christian Neff's sister and U.S. citizen)*. The Court similarly does not recommend any damages for the Neffs, at least not at this juncture, because Plaintiffs have not established the requisite jurisdiction or liability as to their claims.

9. Attack 9 – June 20, 2007 – Baghdad, Iraq

*Gary Hubbell (Darren Hubbell's father and U.S. citizen)*. The Court likewise does not recommend any damages for Mr. Hubbell, at least in the present posture, because Plaintiffs have not established the requisite jurisdiction or liability as to his claim.

10. Attack 10 – March 22, 2008 – Husseiniyah, Iraq

*David Stelmat, Sr. (David Stelmat, Jr.'s father and U.S. citizen)*. Mr. Stelmat learned of his son's death on Easter morning. (ECF No. 51-28 at 7.) Mr. Stelmat was himself a marine, and though he is "not a man of many words," he "miss[es] David's humor, his smile and laughter, everything about him." (*Id.* at 10.) Mr. Stelmat seeks a 25% departure, and Plaintiffs again cite to *Flanagan* in support. (ECF No. 51-2 at 9). But as has been true for many of Plaintiffs' departure requests, the record does not contain sufficient evidence to support one for Mr. Stelmat. Accordingly, the Court recommends granting a baseline award of $5,000,000.

*Carisa Girdwood (David Stelmat, Jr.'s sister and U.S. citizen)*. Growing up, the three Stelmat siblings all shared a room and were very close. (ECF No. 51-28 at 201–02.) After the attack, and in the early days of her grief, Ms. Girdwood would often "cry spontaneously," and later, she came to feel "that time doesn't heal," but instead "brings about perspective." (*Id.* at 203.) With her new perspective, she "empathize[s]" with others who have experienced grief because she continues to feel "a deep sense of loss." (*Id.* at 203–04.) Ms. Girdwood seeks a 25% departure and

points to *Flanagan* (ECF No. 51-2 at 10), but, once again, the Court does not see appropriate support in the record for such modification (*see* FFCL at 48–49). The Court accordingly recommends a damages award at the baseline level of $2,500,000.

*Rebecca McGraw (David Stelmat, Jr.'s sister and U.S. citizen)*. Ms. McGraw is the oldest of the three siblings, and she broke the news of David's death to her sister and father. (ECF No. 51-28 at 207.) His death put a "strain on [her] relationship with [her] mom and dad," and they "started avoiding" talking about him altogether. (*Id.* at 208.) She leaned on her sister to cope, but still struggled to focus at work. (*Id.*) Eventually, Ms. McGraw sought treatment with her physician, "who diagnosed [her] with depression and prescribed medication." (*Id.*) Similarly pointing to *Flanagan* (ECF No. 51-2 at 10), she asks for a 25% upward departure. But as the Court has explained, depression and its related symptoms—while legitimate and difficult—are not themselves enough to warrant a heightened award. *See Fishbeck*, 2024 WL 4119382, at *6. The Court recommends a baseline damages award for Ms. McGraw in the amount of $2,500,000.

11. Attack 11 – February 7, 2007 – Karmah, Iraq

*Lisa Ruiz (Manuel Ruiz's stepmother and U.S. citizen)*.[20] Ms. Ruiz served in the Navy while Manuel was growing up, which ultimately influenced Manuel's own decision to enlist. (ECF No. 51-24 at 4.) Before he went to Iraq, Ms. Ruiz begged Manuel not to go, but he was determined to serve. (*Id.* at 5–6.) She misses her "son every single day that goes by," longing for "his wonderful sense of humor" and the way "[h]e always brough a smile to [her] face." (*Id.* at 5.) She is very proud of all the lives he saved as a medic. (*Id.*) Ms. Ruiz seeks a baseline award of $5,000,000, and the Court recommends granting a damages award in her favor at that requested amount.

[20] Ms. Ruiz no longer seeks damages on behalf of Ruiz's estate. (*See* ECF No. 51-24 at 7.)

*Manuel Ruiz, Sr. (Manuel Ruiz's father and U.S. citizen)*. On hearing of his son's death, Mr. Ruiz "fell to the floor in tears" and felt "anger towards all the unnecessary deaths" in Iraq. (ECF No. 51-24 at 29.) He misses the way Manuel "could brighten anyone's day," and he is "always looking for signs" that Manuel "is still watching over [them]." (*Id*. at 30.) Mr. Ruiz seeks a $5,000,000 award, and the Court recommends granting that request.

*Joshua Ruiz (Manuel Ruiz's half-brother and U.S. citizen)*. Joshua was five years younger than Manuel and viewed him as his "hero." (ECF No. 51-24 at 38.) Joshua joined the Air Force in 2016 because "part of [him] wanted to honor [Manuel] in that way." (*Id.* at 39.) He struggles to "keep up with family or friends" amid his grief, and it is "difficult to get through any day without thinking about Manuel." (*Id.*) Based on *Flanagan*, Joshua seeks a 25% upward departure (ECF No. 51-2 at 8), but the Court does not see evidence in record to support that modification (*see* FFCL at 50). So, the Court recommends instead a baseline award of $2,500,000.

*Jacobo Ruiz (Manuel Ruiz's half-brother and U.S. citizen)*. Jacobo was the youngest of the three boys, and his big brother was "everything to [him]." (ECF No. 51-24 at 32–33.) Learning of Manuel's death "broke everything inside [him]" and he is still "lost" without his brother. (*Id.* at 33.) The grief has strained their family relationships, and the two surviving brothers do "not even talk … anymore." (*Id*. at 34.) Nonetheless, Jacobo "strive[s] to be like" Manuel: "a great person with a beautiful heart inside." (*Id.*) Jacob also cites to *Flanagan* in arguing for an upward departure, but once again, the record does not include the necessary support to grant that request (*see* FFCL at 50–51). The Court therefore recommends baseline damages of $2,500,000.

12. Attack 12 – December 10, 2006 – Sadr City, Iraq

*Matthew Ashmead (direct victim and U.S. citizen)*. Matthew Ashmead has a 100% disability rating from the VA, including PTSD "with major depressive disorder[,] alcohol use

disorder," and residual "traumatic brain injury." (ECF No. 62-3 at 6, 17–19.) He has "received ongoing, extensive mental healthcare related to [his] PTSD, depression, anxiety, and the constellation of other related conditions." (*Id.* at 6.) According to the record, he takes sixteen different medications a day, has gone through a variety of therapies, and struggles with "night terrors" and "insomnia." (*Id.*) He has also struggled with "suicidal ideations" and "tried to kill [him]self twice." (*Id.*) He requests a $7,000,000 damages award. (*See* ECF No. 62-2 at 1.) Given his VA rating and severe mental health struggles after the attack, the Court agrees with the request and recommends an award of damages in that amount.

13. Attack 13 – May 3, 2007 – Baghdad, Iraq

*Brad Lee Jones (Jerome Potter's father and U.S. citizen)*. When Mr. Jones heard of his son's death, he "was in shock." (ECF No. 62-4 at 6.) Mr. Jones previously worked as a welder and forklift driver, but in his grief, he could no longer focus and was let go from his job—he has not "been able to work since." (*Id.*) Mr. Jones has been homeless since 2011 and lives out of a van, where most of his mementos of Jerome have been stolen. (*Id.*) Mr. Jones has a "horrible recurring nightmare" where he's "trying to pull Jerome out of the flames," and "Jerome is screaming, 'Dad! DAD!!! DAAAAAAAD!!!!!'" (*Id.* at 7.) He requests an upward departure and seeks damages in the amount of $6,250,000. (*See* ECF No. 62-2 at 2.) Based on the evidence presented—including that Mr. Jones has been unhoused for over a decade due to the impacts of the attack—the Court agrees with an upward departure and recommends damages of $6,250,000, as requested.

14. Attack 14 – April 6, 2008 – Baghdad, Iraq

*Dale Fair (direct victim and U.S. citizen)*. Dale Fair was diagnosed with a TBI and PTSD from the attack, and he has a 100% disability rating from the VA. (ECF No. 62-6 at 5, 22–28.) He "require[s] weekly immunoglobulin replacement therapy and take[s] a host of medications to treat

[his] ailments." (*Id.* at 5.) He struggled to function at his job at the same level as he used to, and he "experienced a complete lifestyle change." (*Id.* at 6.) Based on his VA disability rating, the Court agrees with the requested upward departure and recommends granting damages in the amount of $7,000,000, as Plaintiffs seek. (*See* ECF No. 62-2 at 3.)

*Dana Fair (Dale Fair's daughter and U.S. citizen)*. Dana Fair has described how her father became more "withdrawn" and less "emotionally available" after the attack. (ECF No. 62-6 at 9.) The two can no longer take trips together because of his pain, and "[he] just isn't the same man he was before the attack." (*Id.*) She seeks damages at the baseline level of $2,500,000 (ECF No. 62-2 at 4), and the Court recommends granting an award in that amount.

15. Attack 15 – September 8, 2009 – Tikrit, Iraq

*Zachary C. Martinez (direct victim and U.S. citizen)*. Zachary Martinez received a Combat Action Badge for his actions in the wake of the attack. (ECF No. 62-7 at 8, 21–22.) He suffered PTSD, and the VA determined that he is unable to secure gainful employment due to his service-connected disabilities. (*Id.* at 5, 26, 85.) Upon returning from Iraq, his marriage and his relationship with his kids fell apart. (*Id.* at 6.) He takes various medications and receives therapy, but it has not been particularly helpful; one adverse drug reaction gave him hallucinations of the attack and caused him to have suicidal thoughts. (*Id.*) The VA has determined a 70% disability for him "for PTSD," alongside other conditions. (*Id.* at 8.) He seeks damages in the amount of $7,000,000 (*see* ECF No. 62-2 at 4), which the Court recommends granting as requested.

16. Attack 16 – August 4, 2007 – Hawr Rajab, Iraq

*Kelly Holliday (Jaron Holliday's mother and U.S. citizen)*. Ms. Holliday was battling breast cancer when she heard news of Jaron's death. (ECF No. 62-5 at 7–8.) In her words, "[n]othing will ever compare to the hurt, loss, and emptiness" that she feels when thinking about his death, and

she thinks about him every day. (*Id.* at 8) She misses "his huge personality and brilliant smile," which she "will never get to experience … on this side of life again." (*Id.* at 11.) Citing *Flanagan* and other cases, Ms. Holliday seeks a 25% upward departure. (*See* ECF No. 62-2 at 2.) But beyond that general reference, Plaintiffs do not otherwise explain or pinpoint what potentially unusual or especially aggravating circumstances would warrant a heightened award. As explained several times over, the Court simply does see sufficient support in the record for that request, so it recommends a baseline damages award instead in the amount of $5,000,000.

*John Holliday, Jr. (Jaron Holliday's father and U.S. citizen)*. John Holliday started dating Kelly when Jaron was four years old, and he "officially adopted" Jaron as his own. (ECF No. 62-5 at 20.) Since the attack, the anniversary of Jaron's death brings "a great deal of sorrow" and misses how Jaron "was always willing to give to others while he was still here." (*Id.* at 25.) He seeks $5,000,000 (*see* ECF No. 62-2 at 2), which the Court recommends granting.

*John Holliday, III (Jaron Holliday's brother and U.S. citizen)*. John was thirteen when Jaron was killed. (ECF No. 62-5 at 29.) When Jaron passed, John became the oldest brother, but he "never wanted to be the oldest" and misses having someone who he "could go to for advice." (*Id.* at 30.) He seeks $2,500,000 (*see* ECF No. 62-2 at 3), which the Court recommends granting.

*Joshua Holliday (Jaron Holliday's brother and U.S. citizen)*. Joshua was eleven at the time of the attack. (ECF No. 62-5 at 33.) He deeply misses Jaron, and as a teacher, he "think[s] about [his] brother every single day when [he] recite[s] the pledge of allegiance" at school. (*Id.* at 34.) He seeks $2,500,000 (*see* ECF No. 62-2 at 3), which the Court recommends granting.

*Jeremiah Holliday (Jaron Holliday's brother and U.S. citizen)*. Jeremiah was nine years old when Jaron died. (ECF No. 62-5 at 40.) He has "cried for years because of his passing" and

has "never" gotten over his brother's death. (*Id.*) He likewise seeks an award of $2,500,000 in damages (*see* ECF No. 62-2 at 3), which the Court recommends granting as requested.

*Jada Holliday (Jaron Holliday's sister and U.S. citizen)*. Jada was seven years old at the time of Jaron's death. (ECF No. 62-5 at 45.) She answered the door when soldiers came to bring the fateful news. (*Id.* at 46.) She "feel[s] so much sadness and anger" in the wake of his death, and she misses having someone in the family who understood her the way Jaron did. (*Id.* at 48–49.) Jada seeks a 25% upward departure (*See* ECF No. 62-2 at 3), but, on balance, the evidence is not sufficient to distinguish Jada's grief—awful in its own right, no doubt—from that of her other siblings. (*See generally* Mot. II. at 45.) Her relationship with Jaron may have been slightly different as his only sister (*see* ECF No. 62-5 at 45 ("Being the only girl in a house with seven boys was a very tough job!"), but this is not enough on its own to justify an upward departure. *Cf. Cabrera v. Islamic Republic of Iran*, 2024 WL 4183196, at *2 (D.D.C. 2024) ("While a plaintiff may have suffered a unique harm as a twin sibling, the Court did not grant an enhancement" where there was not a showing of "unique pain[.]"). The Court recommends baseline damages of $2,500,000.

*Josiah Holliday (Jaron Holliday's brother and U.S. citizen)*. Only six years old at the time of the attack, Josiah does not remember much about his brother, but he recalls how "whenever he was home from the army, he brought our family together." (ECF No. 62-5 at 55–56.) He struggled with depression, and he misses the happy family they were before Jaron's passing. (*Id.* at 57–58.) He seeks an award of $2,500,000 (*see* ECF No. 62-2 at 3), which the Court recommends granting.

*Justus Holliday (Jaron Holliday's brother and U.S. citizen)*. As one of the youngest Holliday siblings, Justus "can barely remember anything about Jaron." (ECF No. 62-5 at 61.) He is "angry because [he] didn't get to know [Jaron] like [his] older siblings did." (*Id.* at 62.) That said, his young age at the time of the attack is no bar to damages. *See Vickers*, 135 F.4th at 992

(allowing a child born two months after death of her father to recover solatium damages). He seeks $2,500,000 as an award (*see* ECF No. 62-2 at 3), which the Court recommends granting.

*Jamin Holliday (Jaron Holliday's brother and U.S. citizen)*. Jamin was only two when Jaron was killed. (*Id.* at 67.) He is sad that he missed out on connecting more with Jaron, but he knows that Jaron loved him very much. (ECF No. 62-5 at 66.) He is "envious" of his siblings who have strong memories of Jaron. (*Id.* at 68.) Jamin requests a damages award valued at $2,500,000 (ECF No. 62-2 at 3), which the Court recommends granting as requested.

17. Attack 17 – June 6, 2011 – Baghdad, Iraq

*David C. Rogers, III (direct victim and U.S. citizen)*. Stemming in part from injuries sustained in the attack, the VA gave David Rogers a 100% disability rating, including for PTSD and back and leg injuries. (ECF No. 62-8 at 8, 26, 29–32.) He takes numerous medications to help with his psychological problems, suffers from survivor's guilt (*e.g.*, "I should have died that day"), has regular intrusive thoughts about the aftermath of the attack, and often feels numb. (*Id.* at 8–9.) While he manages to work part-time as a college ROTC liaison, it is only because they understand his "deep-rooted issues" and are very flexible. (*Id.* at 9.) He seeks a damages award in the amount of $7,000,000 (ECF No. 62-2 at 4), which the Court recommends awarding.

18. Attack 18 – May 6, 2007 – Baqubah, Iraq

*Larry Clark (direct victim and U.S. citizen)*. Larry Clark suffers from hand injuries and PTSD from the attack. (ECF No. 62-9 at 17.) His relationship ended because his partner felt he was "a completely different person" afterward. (*Id.*) "For at least a decade," he would have flashbacks to the attack if he closed his eyes. (*Id.*) And as the Stryker's "sole survivor," he has "significant survivor guilt" and "severe depression"; he receives "[o]ngoing mental health counseling" and benefits from community and family support. (*Id.*) He has not had "meaningful,

gainful employment" since leaving the army. (*Id.*) His VA disability rating is 80%, including for PTSD, tinnitus, and a wrist injury. (*Id.* at 18.) He requests a damages award in the amount of $7,000,000 (ECF No. 62-2 at 4), which the Court recommends granting.

* * *

**C. Punitive Damages**

Plaintiffs additionally seek punitive damages (*see* Mot. I. at 33; Mot. II. at 50), which the FSIA's terrorism exception authorizes. 28 U.S.C. § 1605A(c); *see also Opati*, 590 U.S. at 427. "Punitive damages are not meant to compensate the victim, but [are] instead meant to award the victim an amount of money that will punish outrageous behavior and deter such outrageous conduct in the future." *Bodoff v. Islamic Republic of Iran*, 907 F. Supp. 2d 93, 105 (D.D.C. 2012) (quoting *Oveissi v. Islamic Republic of Iran* (*Oveissi II*), 879 F. Supp. 2d 44, 56 (D.D.C. 2012)). Typically, courts in this District look to four factors relevant in deciding the appropriate level of punitive damages in a given case: "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants." *Taitt*, 664 F. Supp. 3d at 113 (citation and quotation marks omitted). "When a defendant provides material support to terrorist organizations, courts find these factors satisfied" without much more, generally based on a "multiplier approach." *Bein*, 2026 WL 809794, at *16 (citation modified)). Here, Plaintiffs ask for a multiplier of three times compensatory damages. (*See* Mot. I. at 33; Mot. II. at 50.) Plenty of other cases in this District have found that to be an appropriate multiplier on similar facts. *See Roth v. Syrian Arab Republic*, 2018 WL 4680270, at *17 (D.D.C. Sept. 28, 2018); *Selig*, 573 F. Supp. 3d at 77; *Valore*, 700 F. Supp. 2d at 57, 89–90; *Karcher v. Islamic Republic of Iran*, 2025 WL 561261, at *4 (D.D.C. Feb.

20, 2025). This Court will follow suit, recommending an award of punitive damages valued at a three-to-one ratio of the compensatory damages awarded.

**C. Post-Judgment Interest**

Finally, Plaintiffs seek post-judgment interest. (Mot. I. at 34; Mot. II. at 51.) The federal post-judgment interest statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a). The statute provides that interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield[.]" *Id.* And that "[i]nterest shall be computed daily to the date of payment ... and shall be compounded annually." *Id.* § 1961(b). Courts typically view application of this statute as "mandatory, not discretionary." *Wang v. Islamic Republic of Iran*, 2025 WL 785736, at *17 (D.D.C. Mar. 12, 2025) (quoting *Winternitz v. Syrian Arab Republic*, 2022 WL 971328, at *12 (D.D.C. Mar. 31, 2022)); *Selig*, 573 F. Supp. 3d at 78. The Court follows that approach here and recommends an award of post-judgment interest at the statutory rate.

**RECOMMENDATION AND CONCLUSION**

The undersigned **RECOMMENDS** that the Court **GRANT IN PART** and **DENY IN PART** the Group 1 Plaintiffs' motion (ECF No. 51), denying without prejudice the Plaintiffs' claims that relate to Attacks 7, 8 and 9. The undersigned additionally **RECOMMENDS** that the Court **GRANT IN PART** the Group 2 Plaintiffs' motion (ECF No. 62). The Court should award: (1) compensatory damages at the amounts described above—and repeated for convenience in the appendix to this decision; (2) punitive damages against Iran at three times the value of the compensatory award(s); and (3) post-judgment interest consistent with 28 U.S.C. § 1961.

Dated: September 15, 2026

Matthew J. Sharbaugh
Digitally signed by Matthew J. Sharbaugh
Date: 2026.09.15 17:28:29 -04'00'

MATTHEW J. SHARBAUGH
United States Magistrate Judge

* * *

The Court hereby advises that, under the provisions of Local Civil Rule 72.3(b), any party who objects to the Report and Recommendation must file a written objection with the Clerk of Court within 14 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the Report and Recommendation to which objection is made and the basis for such objections. The Court further advises that failure to file timely objections to the findings and recommendations set forth in this report may waive the right of appeal from an order of the District Court that adopts such findings and recommendation. *See Thomas v. Arn*, 474 U.S. 140, 144–45 (1985).

# APPENDIX

| | Plaintiff | Attack | Recommended Compensatory Award | Recommended Punitive Award | Total Recommended Award | Post-Judgment Interest |
|---|---|---|---|---|---|---|
| 1. | Mary Heaton | Attack 1 – May 14, 2006<br>Baghdad, Iraq | $5,000,000 | $15,000,000 | $20,000,000 | 28 U.S.C. § 1961(a) |
| 2. | Lisa Brooks | Attack 1 – May 14, 2006<br>Baghdad, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 3. | Victoria Croft | Attack 2 – January 5, 2010<br>Balad, Iraq | $5,000,000 | $15,000,000 | $20,000,000 | 28 U.S.C. § 1961(a) |
| 4. | Robin Messer | Attack 2 – January 5, 2010<br>Balad, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 5. | Tyler Croft | Attack 2 – January 5, 2010<br>Balad, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 6. | Melodie Hanson | Attack 2 – January 5, 2010<br>Balad, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 7. | Andrea Croft | Attack 2 – January 5, 2010<br>Balad, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 8. | Laurie West | Attack 3 – March 11, 2008<br>Kishkishkia, Iraq | $5,000,000 | $15,000,000 | $20,000,000 | 28 U.S.C. § 1961(a) |
| 9. | Albert Dyk | Attack 3 – March 11, 2008<br>Kishkishkia, Iraq | $4,750,000 | $14,250,000 | $19,000,000 | 28 U.S.C. § 1961(a) |
| 10. | Jon Kone | Attack 4 – September 8, 2009<br>Baghdad, Iraq | $6,000,000 | $18,000,000 | $24,000,000 | 28 U.S.C. § 1961(a) |

| | Plaintiff | Attack | Recommended Compensatory Award | Recommended Punitive Award | Total Recommended Award | Post-Judgment Interest |
|---|---|---|---|---|---|---|
| 11. | Lisa Hundley (*Representative of Estate of Curtis Lee Hundley)* | Attack 5 – April 21, 2005 Ramadi, Iraq | $1,000,000 | $3,000,000 | $4,000,000 | 28 U.S.C. § 1961(a) |
| 12. | Lisa Hundley | Attack 5 – April 21, 2005 Ramadi, Iraq | $8,000,000 | $24,000,000 | $32,000,000 | 28 U.S.C. § 1961(a) |
| 13. | Robert Sabado | Attack 5 – April 21, 2005 Ramadi, Iraq | $6,000,000 | $18,000,000 | $24,000,000 | 28 U.S.C. § 1961(a) |
| 14. | Michelle Sabado | Attack 5 – April 21, 2005 Ramadi, Iraq | $4,000,000 | $12,000,000 | $16,000,000 | 28 U.S.C. § 1961(a) |
| 15. | Skyler Sabado | Attack 5 – April 21, 2005 Ramadi, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 16. | Crystal Sabado | Attack 5 – April 21, 2005 Ramadi, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 17. | Tiffany Sabado | Attack 5 – April 21, 2005 Ramadi, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 18. | Bradley Salisbury | Attack 6 – January 18, 2007 Baghdad, Iraq | $6,500,000 | $19,500,000 | $26,000,000 | 28 U.S.C. § 1961(a) |
| 19. | Deidre Salisbury | Attack 6 – January 18, 2007 Baghdad, Iraq | $4,000,000 | $12,000,000 | $16,000,000 | 28 U.S.C. § 1961(a) |
| 20. | Robin Bogacz | Attack 6 – January 18, 2007 Baghdad, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 21. | Amy Crandall | Attack 6 – January 18, 2007 Baghdad, Iraq | $1,250,000 | $3,750,000 | $5,000,000 | 28 U.S.C. § 1961(a) |

| | Plaintiff | Attack | Recommended Compensatory Award | Recommended Punitive Award | Total Recommended Award | Post-Judgment Interest |
|---|---|---|---|---|---|---|
| 22. | Gretchen Miller | Attack 7 – May 21, 2004<br>Iskandariyah, Iraq | ~ | ~ | ~ | ~ |
| 23. | William Neff | Attack 8 – September 19, 2007<br>Baghdad, Iraq | ~ | ~ | ~ | ~ |
| 24. | Nancy Neff | Attack 8 – September 19, 2007<br>Baghdad, Iraq | ~ | ~ | ~ | ~ |
| 25. | Shannon Neff | Attack 8 – September 19, 2007<br>Baghdad, Iraq | ~ | ~ | ~ | ~ |
| 26. | Gary Hubbell | Attack 8 – September 19, 2007<br>Baghdad, Iraq | ~ | ~ | ~ | ~ |
| 27. | David Stelmat, Sr. | Attack 10 – March 22, 2008<br>Husseiniyah, Iraq | $5,000,000 | $15,000,000 | $20,000,000 | 28 U.S.C. § 1961(a) |
| 28. | Carisa Girdwood | Attack 10 – March 22, 2008<br>Husseiniyah, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 29. | Rebecca McGraw | Attack 10 – March 22, 2008<br>Husseiniyah, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 30. | Lisa Ruiz | Attack 10 – March 22, 2008<br>Husseiniyah, Iraq | $5,000,000 | $15,000,000 | $20,000,000 | 28 U.S.C. § 1961(a) |
| 31. | Manuel Ruiz, Sr. | Attack 11 – February 7, 2007<br>Karmah, Iraq | $5,000,000 | $15,000,000 | $20,000,000 | 28 U.S.C. § 1961(a) |
| 32. | Joshua Ruiz | Attack 11 – February 7, 2007<br>Karmah, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 33. | Jacobo Ruiz | Attack 11 – February 7, 2007<br>Karmah, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |

| | Plaintiff | Attack | Recommended Compensatory Award | Recommended Punitive Award | Total Recommended Award | Post-Judgment Interest |
|---|---|---|---|---|---|---|
| 34. | Matthew Ashmead | Attack 12 – December 10, 2006 Sadr City, Iraq | $7,000,000 | $21,000,000 | $28,000,000 | 28 U.S.C. § 1961(a) |
| 35. | Brad Lee Jones | Attack 13 – May 3, 2007 Baghdad, Iraq | $6,250,000 | $18,750,000 | $25,000,000 | 28 U.S.C. § 1961(a) |
| 36. | Dale Fair | Attack 14 – April 6, 2008 Baghdad, Iraq | $7,000,000 | $21,000,000 | $28,000,000 | 28 U.S.C. § 1961(a) |
| 37. | Dana Fair | Attack 14 – April 6, 2008 Baghdad, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 38. | Zachary C. Martinez | Attack 15 – September 8, 2009 Tikrit, Iraq | $7,000,000 | $21,000,000 | $28,000,000 | 28 U.S.C. § 1961(a) |
| 39. | Kelly Hollidy | Attack 16 – August 4, 2007 Hawr Rajab, Iraq | $5,000,000 | $15,000,000 | $20,000,000 | 28 U.S.C. § 1961(a) |
| 40. | John Holliday, Jr. | Attack 16 – August 4, 2007 Hawr Rajab, Iraq | $5,000,000 | $15,000,000 | $20,000,000 | 28 U.S.C. § 1961(a) |
| 41. | John Holliday, III | Attack 16 – August 4, 2007 Hawr Rajab, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 42. | Joshua Holliday | Attack 16 – August 4, 2007 Hawr Rajab, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 43. | Jeremiah Holliday | Attack 16 – August 4, 2007 Hawr Rajab, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 44. | Jada Holliday | Attack 16 – August 4, 2007 Hawr Rajab, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 45. | Josiah Holliday | Attack 16 – August 4, 2007 Hawr Rajab, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |

| | Plaintiff | Attack | Recommended Compensatory Award | Recommended Punitive Award | Total Recommended Award | Post-Judgment Interest |
|---|---|---|---|---|---|---|
| 46. | Justus Holliday | Attack 16 – August 4, 2007<br>Hawr Rajab, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 47. | Jamin Holliday | Attack 16 – August 4, 2007<br>Hawr Rajab, Iraq | $2,500,000 | $7,500,000 | $10,000,000 | 28 U.S.C. § 1961(a) |
| 48. | David C. Rogers, III | Attack 17 – June 6, 2011<br>Baghdad, Iraq | $7,000,000 | $21,000,000 | $28,000,000 | 28 U.S.C. § 1961(a) |
| 49. | Larry Clark | Attack 18 – May 6, 2007<br>Baqubah, Iraq | $7,000,000 | $21,000,000 | $28,000,000 | 28 U.S.C. § 1961(a) |